# EXHIBIT 2



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**AMENDED COMPLAINT $75**
**December 17, 2025 10:10**

Confirmation Nbr. 3705248

SANDRA WORTHING ALVES                    CV 25 129498

vs.

**Judge:** JOHN J. RUSSO

INTERNET TRUCKSTOP PAYMENTS LLC, ET AL

**Pages Filed:** 243

**CIVIL COVER SHEET – OHIO, CASE NO. CV-25-129498**

INDIGENT PRO SE, INSTRUCTIONS FOR SERVICE CERTIFIED MAIL/PUBLICATION

☒ Contract / Commercial

☒ Fraud / Misrepresentation

☒ Declaratory Judgment

☒ Injunctive Relief

☒ Antitrust (Sherman Act §§1–2)

☒ Civil RICO (Ohio R.C. 2923.31–2923.34; 18 U.S.C. §1962)

☒ Court of Common Pleas – COMMERCIAL DOCKET

Amount in Controversy:

☒ Exceeds $25,000

Jury Demand: Bifurcate, Bench sequencing

☒ Jury demanded on all triable issues

Related Case Information:

**x** No related cases pending

Special Docket Requests:

☒ Injunctive Relief (TRO / Preliminary Injunction anticipated)

☒ Complex Commercial Litigation

1

# IN THE COURT OF COMMON PLEAS

# CUYAHOGA COUNTY, OHIO

**Case No.: CV-25-129498**

**Plaintiff,**

**Judge:**

**HONORABLE JOHN J RUSSO**

<u>Sandra Worthing Alves</u>

**d/b/a All Directions Trucking
MC#1710778**

**25540 Byron Dr.**

**North Olmsted OH 44070**

_____

**v.**

FIRST AMENDED

COMPLAINT

SUPER COMPLAINT FOR
DAMAGES,

DECLARATORY RELIEF,

INJUNCTIVE RELIEF,

CIVIL RICO, FRAUD

ANTITRUST, WRONGFUL LIEN

2

Defendant 1.
**Internet Truckstop Payments, LLC**
c/o Registered Agent
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 2.
**Internet Truckstop Group, LLC**
c/o Registered Agent
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 3.
**Truckstop.com, LLC**
also known as Truckstop; Truckstop Load Board; The Internet Truckstop
c/o Registered Agent
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 4.
**Truckstop Factoring**
a trade name and operating division of Internet Truckstop Payments, LLC
c/o Internet Truckstop Payments, LLC
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 5.
**RMIS – Registry Monitoring Insurance Services, LLC**
c/o Registered Agent
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 6.
**Grizella, Inc.**
c/o RMIS, LLC
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 7.
**Risk Factors®**
c/o RMIS, LLC
222 North Plymouth Avenue
New Plymouth, Idaho 83655

3

Defendant 8.
**SaferWatch®**
c/o RMIS, LLC
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 9.
**Denim, Inc.**
c/o Registered Agent
1444 South Entertainment Avenue, Suite 110
Boise, Idaho 83709

Defendant 10.
**C.H. Robinson Worldwide, Inc.**
c/o Registered Agent
14701 Charlson Road
Eden Prairie, Minnesota 55347

Defendant 11.
**Magellan Transport Logistics, Inc.**
8505 Baycenter Road
Jacksonville, Florida 32256

Defendant 12.
**MacroPoint, Inc.**
c/o Registered Agent
3350 Riverwood Parkway, Suite 1900
Atlanta, Georgia 30339

Defendant 13.
**Total Quality Logistics, LLC (TQL)**
c/o Registered Agent
4289 Ivy Pointe Boulevard
Cincinnati, Ohio 45245

Defendant 14.
**DAT Freight & Analytics, LLC**
c/o Registered Agent
8405 SW Nimbus Avenue

4

Beaverton, Oregon 97008

Defendant 15.
**Highway App, Inc.**
c/o Registered Agent
440 North Wolfe Road
Sunnyvale, California 94085

Defendant 16.
**John Doe Brokers 1–29,061**
To be identified

Defendant 17.
**John Doe Factoring Partners 1–100**
To be identified

5

NOW COMES Plaintiff, Sandra Worthing Alves, d/b/a All Directions Trucking, by and through herself, and for her First Amended Complaint against Defendants, alleges as follows:

This is an action for declaratory relief, injunctive relief, monetary damages, and all other legal and equitable relief deemed just and proper by this Court, arising from a coordinated course of conduct by Defendants that interfered with Plaintiff's lawful trucking operations, payment rights, contractual relationships, and access to interstate commerce.

This action concerns the conduct of a coordinated group of corporate actors that collectively exercise substantial control over access to freight, carrier onboarding, compliance verification, payment routing, and receivables administration in the freight transportation market through their roles as onboarding authorities, data aggregators, verification platforms, payment processors, compliance portals, and load-access gatekeepers. Plaintiff alleges that these entities function together as an integrated enterprise—referred to herein as the Integrated Freight Data-Control Conglomerate Enterprise (the "Enterprise")—that operates primarily for the benefit of freight brokers, not motor carriers. Brokers are the Enterprise's principal customers, and the Enterprise's structural design, data flows, and enforcement mechanisms are alleged to advantage brokers while imposing disproportionate burdens on carriers.

6

To access freight, carriers are required to submit to repetitive, escalating, and intrusive onboarding and verification requirements, including the disclosure of sensitive personal and business information such as W-9s, Social Security numbers or EINs, operating authority documents, driver credentials, equipment registrations, insurance certificates, photographs, and, in many instances, ongoing location or device-based tracking. Plaintiff alleges that these requirements provide no corresponding operational benefit to carriers, do not materially prevent fraud, and do not enhance safety or freight security, but instead function as mechanisms for data extraction, surveillance, profiling, and control, the commercial value of which inures primarily to brokers and platform operators. Despite the extensive obligations imposed on carriers, Plaintiff alleges that the Enterprise provides no comparable verification or transparency requirements for brokers, notwithstanding brokers' central role in payment control, load representation, and exposure to risks such as double brokering, misrepresentation, and diversion.

Plaintiff is a federally authorized motor carrier operating under active FMCSA authority, MC #1710778. Plaintiff conducted business in reliance upon lawful broker–carrier transactions, prompt payment expectations, and the ordinary operation of interstate freight markets. Defendants, acting individually and in concert, implemented interrelated systems, policies, and practices that collectively controlled carrier access, payment flow, compliance approval, and risk designation in a manner that exceeded any legitimate contractual purpose and operated instead as a coordinated restraint on Plaintiff's business.

7

Defendants include freight payment processors, factoring entities, broker marketplaces, compliance and monitoring platforms, data and tracking providers, and broker participants who utilized shared platforms, shared data, shared enforcement mechanisms, and aligned contractual instruments. Through these integrated operations, Defendants exercised centralized influence over whether Plaintiff could book loads, remain approved, receive payment, or continue operating without interruption. Plaintiff alleges that these structural imbalances are intentional and coordinated, not incidental, and that the Enterprise's design and operation have materially contributed to widespread carrier exclusion, financial distress, and market exit during what industry participants and analysts have described as the "Great Freight Recession." Plaintiff alleges that more than 113,000 U.S. motor carriers have exited the industry since 2023, and that the Enterprise's conduct materially accelerated and compounded that contraction.

Plaintiff alleges that Defendants Internet Truckstop Group, LLC / Truckstop.com; Internet Truckstop Payments, LLC d/b/a Truckstop Factoring; Truckstop Payments LLC; LoadPay LLC; Grizella LLC (including Safer Watch and Post Everywhere); RMIS – Registry Monitoring Insurance Services; Denim Labs, Inc.; Highway App, Inc.; DAT Freight & Analytics (DAT Solutions, LLC); Total Quality Logistics, CH Robinson Worldwide, Megellan Transport Logistics, John Doe Brokers and John Doe Factoring Partners collectively comprise and operate the Enterprise. Plaintiff alleges that the Enterprise uses interlocking systems of compliance onboarding, identity and fraud verification, freight visibility, factoring leverage, receivables diversion, and public lien filings to exert coordinated control over small and mid-sized motor carriers, including Plaintiff. Plaintiff alleges that this case does not arise from an isolated

8

commercial disagreement, but from systemic and enterprise-level conduct that has distorted market access, suppressed competition, and contributed to the broader instability of the freight transportation sector. Plaintiff further alleges that, but for the Enterprise's coordinated control over carrier approval, payment flow, compliance enforcement, and access to freight, Plaintiff would have been able to operate her federally granted authority free from the interference, encumbrances, and exclusions described herein.

Plaintiff' seeks declaratory relief to determine the parties' respective rights and obligations, including whether Defendants' practices, agreements, notices, liens, data controls, and payment restrictions are lawful, enforceable, and consistent with governing law. Plaintiff further seeks injunctive relief to prevent ongoing and future harm, including continued interference with payment, carrier approval, data access, and the ability to engage freely in interstate commerce.

Plaintiff also seeks compensatory damages for financial losses, withheld or delayed payments, business interruption, and consequential damages caused by Defendants' conduct, as well as any additional damages available under law, including statutory, treble, or punitive damages where applicable. Plaintiff further seeks all other relief, whether legal or equitable, that this Court deems appropriate to fully remedy the harms alleged and to prevent recurrence.

9

This Court's intervention is necessary because Defendants coordinated conduct was not isolated, accidental, or incidental, but instead arose from interconnected business practices operating across multiple entities and platforms, the cumulative effect of which imposed substantial and ongoing harm on Plaintiff and similarly situated motor carriers. Absent judicial relief, Plaintiff lacks an adequate remedy at law to halt the continuing effects of Defendants' actions and to restore lawful market conditions.

**CIVIL — CASE SUMMARY**

(Complex Commercial / Civil RICO Action — No Waiver of Rights)

**Nature of the Action**

Civil RICO; Antitrust; Unfair Competition; Breach of Contract; Declaratory and Equitable Relief

---

**DEFENDANTS,**

**Internet Truckstop Payments Ect all,**

**Unidentified Freight brokers,**

**Unidentified Factoring Partners,**

Description:

All Defendants and unidentified freight brokers holding active FMCSA broker authority (approximately 29,061 known registrants), operating throughout the United States and utilizing the same load boards, surveillance platforms, compliance gatekeepers, and payment controls alleged herein. Identities to be substituted as discovery proceeds.

---

**11.**

11

**John Doe Factoring Partners 1–unknown**

Description:

Unidentified factoring companies, payment intermediaries, and financial partners that coordinate with broker and platform defendants to control carrier cash flow and enforce suppressed compensation.

---

**BRIEF STATEMENT OF THE CASE**

This action arises from a nationwide, coordinated scheme by freight brokers, logistics platforms, surveillance technology providers, and payment-control entities to suppress motor-carrier compensation across interstate freight markets.

Defendants formed and operated an association-in-fact enterprise that replaced open market negotiation with a private, technology-enforced regime. Through shared load boards, mandatory phone-based driver tracking, carrier gatekeeping systems, and post-performance payment controls, Defendants imposed non-negotiable freight rates, eliminated bargaining, and routinely reduced carrier pay after delivery.

Dominant brokers anchored artificially low rates and declared invasive tracking "industry standard." Platform and compliance defendants enforced exclusionary rules that barred non-compliant carriers from access to freight. Surveillance defendants supplied real-time phone tracking used not for shipment verification, but as leverage to justify rate reductions and short

12

payments unrelated to delivery performance. Payment and factoring defendants reinforced the scheme by restricting cash flow and preventing carriers from refusing suppressed rates.

As a result, carriers nationwide were forced to accept compensation below competitive levels, subjected to standardized post-delivery deductions, and deprived of meaningful negotiation. Entire regions were treated as permanent low-pay "backhauls," causing market-wide rate suppression across state lines.

Plaintiff does not waive any right to a jury trial. Due to the complexity of the enterprise, Plaintiff anticipates the Court may bifurcate proceedings, with enterprise structure, liability, and equitable issues tried to the Court, and damages tried to a jury if necessary.

Plaintiff further seeks appointment of a Special Master to oversee discovery, data production, accounting, rate analysis, and platform practices due to the nationwide, multi-defendant scope of the case.

_____

**CASE CLASSIFICATION**

- Case Type: Complex Commercial / Business Litigation
- Primary Claims: Civil RICO; Antitrust; Unfair Competition, Breach of Contract
- Relief Sought:
    - Compensatory damages
    - Treble damages
    - Declaratory and equitable relief

13

- o   Punitive Damages

- o   Appointment of Special Master

- Jury Demand: Yes (bifurcate and no waiver)

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

**PROPOSED CONFIDENTIALITY AND NON-RETALIATION**

**FRAMEWORK**(Submitted for the Court's Consideration Only)

---

## I. NATURE OF THIS PROPOSAL

1. Plaintiff submits this document as a proposal, not as a stipulation, agreement, or order.

2. This Proposal is intended solely to assist the Court in managing:

   o   Confidential proprietary information;

   o   Public-facing judicial proceedings;

   o   Risks of retaliation or interference during litigation.

3. Nothing herein is binding unless and until adopted, modified, or rejected by the Court.

---

## II. NO WAIVER OF RIGHTS

4. No rights are waived by submission of this Proposal.

5. Specifically, nothing herein:

   o   Waives any claim, defense, or objection;

   o   Concedes confidentiality, privilege, relevance, or admissibility;

   o   Limits discovery rights.

   o   Restrict speech protected by law.

   o   Waives statutory, constitutional, or common-law rights of any party.

15

6. All parties reserve all rights.

---

## III. GUIDING PRINCIPLES FOR THE COURT'S CONSIDERATION

7. Plaintiff respectfully proposes that any confidentiality framework adopted by the Court should be guided by the following principles:

a. Open Courts — The case itself, pleadings, hearings, and rulings should remain public absent specific, narrowly tailored findings.

b. Narrow Confidentiality — Only legitimate proprietary or trade-secret information should be protected.

c. Anti-Retaliation — Participation in this litigation must not expose parties or witnesses to coercion, blacklisting, or exclusion.

d. Judicial Oversight — Confidentiality should not obstruct the Court's ability to observe, analyze, or remedy alleged misconduct.

---

## IV. PROPOSED SCOPE OF CONFIDENTIALITY (NARROW)

8. Plaintiff proposes that confidentiality, if ordered, be limited to non-public proprietary information, such as:

   o Trade secrets.

16

- o   Internal software architecture.

- o   Proprietary algorithms or security controls.

- o   Non-public financial identifiers.

9.  Plaintiff proposes that confidentiality does not extend to:

- o   The existence or substance of this case.

- o   Alleged conduct, practices, or policies described at a structural level.

- o   Public safety, regulatory compliance, or interstate commerce issues.

- o   The identities of parties or platforms involved.

10. Confidentiality should not be used to:

- Conceal alleged unlawful conduct.

- Avoid judicial scrutiny.

- Suppress matters of public concern.

---

## V. PUBLIC-FACING NATURE OF THE CASE

11. Plaintiff expressly proposes that:

- The docket remains public;

- Motions and rulings remain public except for narrowly redacted exhibits.

- No blanket sealing or gag restrictions are imposed.

12. Any sealing should be exceptional, narrow, and supported by specific findings.

17

## VI. SPECIAL MASTER / DATA MIRRORING CONSIDERATIONS

13. Plaintiff proposes that, if the Court appoints a Special Master or orders data mirroring:

- Confidentiality designations should not restrict neutral oversight.
- Mirrored data remains read-only and preserved with metadata.
- The Court retains full discretion over use and disclosure.

14. Plaintiff does not request access to proprietary systems beyond what the Court may permit.

## VII. NON-RETALIATION AND NON-INTERFERENCE (PROPOSED PRINCIPLE)

15. Plaintiff respectfully proposes that the Court consider safeguarding the litigation from retaliation, including:

- Blacklisting or reputation flagging (e.g., Carrier411 or similar systems);
- Denial of load access.
- Platform exclusion or downgrading.
- Payment interference.
- Online targeting or harassment.

16. Plaintiff submits that such conduct, if it occurs during litigation, would risk interference with the administration of justice, regardless of ultimate liability.

18

---

## VIII. PUBLIC SAFETY AND REGULATORY CONTEXT

17. Plaintiff further proposes that any confidentiality framework preserve the Court's ability to examine allegations involving:

- Dispatch practices affecting interstate commerce.
- Use of overseas dispatch services.
- Driver qualification, domicile, and English-language proficiency requirements.

18. These issues are raised as matters of public and regulatory concern, not as requests for premature findings.

---

## IX. CHALLENGES AND MODIFICATION

19. Plaintiff proposes that any confidentiality determinations remain subject to:

- Challenge by any party.
- Ongoing Court supervision.
- Modification as the case develops.

---

## X. RESPECT FOR JUDICIAL DISCRETION

20. Plaintiff submits this Proposal solely for the Court's consideration.

19

21. Plaintiff recognizes that:

- Adoption is discretionary.

- Scope, duration, and enforcement rest entirely with the Court.

- The Court may reject, revise, or ignore this Proposal in whole or in part.

---

## XI. CONCLUSION

22. Plaintiff respectfully submits that a narrow, non-retaliatory, public-facing approach to confidentiality best serves:

- Judicial economy.

- Due process.

- Public confidence in the courts.

- Fair participation by all parties.

---

## PLAINTIFF'S  COVER NOTE REGARDING PROPOSED CONFIDENTIALITY AND NON-RETALIATION FRAMEWORK

Plaintiff respectfully submits the accompanying Proposed Confidentiality and Non-Retaliation Framework solely for the Court's consideration.

This document is not offered as a proposed order, stipulation, or binding agreement. Plaintiff does not ask the Court to adopt it as written, nor to make any findings or rulings at this stage.

20

Rather, the Proposal is intended to:

1. Assist the Court in understanding the procedural concerns raised by the nature of the allegations.

2. Offer a narrow, non-prejudicial framework for balancing proprietary information with open-court principles; and

3. Highlight the risk of retaliation or interference inherent in platform-based markets during active litigation.

Plaintiff expressly reserves all rights and waives none by submitting this Proposal. The Proposal is submitted in the spirit of judicial efficiency and transparency, recognizing that any confidentiality, oversight, or protective measures remain entirely within the Court's discretion.

Plaintiff submits this material only as an aid to the Court, and stands ready to revise, narrow, or withdraw it as the Court directs.

---

**Respectfully submitted,**


**Plaintiff,**

**SANDRA WORTHING ALVES**

**d/b/a All Directions Trucking**
**MC#1710778**

**25540 Byron Dr.**

**North Olmsted OH 44070**

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

**Plaintiff's Supplemental Statement of Facts**

**Timeline of Events, Insurance Cancellation, Forced Migration, and Ongoing Coercion**

**A. Plaintiff and Regulatory Status**

1. Plaintiff is a federally regulated motor carrier operating as All Directions Trucking, the ability to lawfully operate in interstate commerce depends on uninterrupted insurance coverage, regulatory compliance, and timely payment for freight already hauled.

2. Plaintiff owns and operates commercial equipment consisting of a a high valued semi truck and trailer, both of which require continuous full coverage and cargo insurance coverage to lawfully operate and to protect against catastrophic loss.

3. Plaintiff successfully passed the FMCSA New Entrant Safety Audit and has accumulated approximately six months of positive safety and compliance scoring prior to the conduct described herein.

---

**B. Payment Withholding and Insurance Cancellation Timeline**

4. Prior to December 10, 2025, Internet Truckstop Payments LLC issued unexplained penny deposits and withheld payments of earned freight revenue owed to Plaintiff, without accounting or justification.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

5. As a direct result of Truckstop's withholding of earned funds, Plaintiff was unable to meet mandatory business obligations, including insurance premiums, fuel expenses, and federally required compliance costs.

6. Plaintiff's commercial insurance carrier issued a 30-day notice of cancellation for nonpayment of $1,600 in insurance premiums, with final cancellation scheduled for December 12, 2025.

7. As the cancellation date approached, Plaintiff was notified that insurance coverage would terminate within 24 hours, which would have rendered Plaintiff immediately uninsured, unable to book loads, and legally prohibited from operating in interstate commerce.

8. Loss of insurance would have resulted in:

   o Immediate inability to operate in interstate commerce

   o Immediate inability to book loads

   o Suspension of operating authority

   o Exposure of Plaintiff's truck and trailer to uninsured risk

   o Loss of six months of positive safety and compliance scoring

---

## C. Court Filing and Missed Work Due to Crisis

9. On December 10, 2025, Plaintiff filed the initial court complaint after exhausting internal remedies and while facing imminent insurance cancellation.

10. In the process of drafting pleadings, the Plaintiff was in the truck and stranded on the road, 1,200 miles away from home. While gathering evidence, and becoming qualified to

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

e-file with the Court, Plaintiff missed approximately one full week of driving and revenue-generating work, directly worsening Plaintiff's financial condition.

11. Plaintiff was forced to divert time and resources away from lawful interstate operations in order to seek judicial protection from imminent shutdown.

12. Due to the financial distress caused by Defendants' conduct, Plaintiff was required to declare indigency in order to access the court system, subjecting Plaintiff to humiliation, emotional distress, and loss of dignity.

---

### D. Emergency Payment and Its Limited Purpose

13. Plaintiff notified Truckstop's legal department on December 11,2025 by email about the newly filed lawsuit, after a demand letter had already been sent 10 days prior and included the complaint and that

- Insurance coverage would terminate within 24 hours
- Plaintiff would be unable to operate or book loads
- Plaintiff's operating authority would be effectively destroyed

14. Only after receiving notice of the December 12, 2025 insurance cancellation did Truckstop issue a payment of exactly $1,700. On December 11, 2025

15. The $1,700 payment was issued solely to prevent immediate cancellation of Plaintiff's insurance policy and was not payment of the substantially larger freight revenue amounts actually owed to Plaintiff.

24

16. That $1,700 payment was the sole reason Plaintiff's insurance remained active. Absent that payment, Plaintiff would have been uninsured, out of compliance, and forced to cease operations through no fault of Plaintiff.

---

## E. Public Safety Risk and Emotional Harm

17. The imminent loss of insurance placed Plaintiff in an untenable position where Plaintiff would have been forced to attempt to return home without insurance coverage in order to survive.

18. This scenario created a foreseeable and substantial risk to public safety, as it would have required an uninsured commercial vehicle to travel on public highways, exposing the public to harm in the event of any accident or mechanical failure.

19. Defendants' conduct therefore created not only business disruption, but a direct public safety risk, by forcing Plaintiff into crisis-level decisions under financial coercion.

20. Plaintiff suffered significant mental and emotional anguish, including fear of:

- Operating uninsured

- Losing operating authority

- Losing compliance history and safety scoring

- Losing substantial personal investment in equipment

- Retaliation for seeking judicial relief

---

## F. Forced Migration to Denim and Objection to Use of Company Name

21. After the December 10, 2025 court filing, Truckstop escalated its conduct by unilaterally announcing a forced migration of Plaintiff's factoring account to "Denim by Truckstop."

22. Plaintiff was informed that access to the existing Truckstop Factoring platform would be terminated on December 16, 2025 and that continued operation would require submission to Denim's system and Terms of Service, without negotiation or meaningful ability to decline. The email stated it would be done automatically, (with or without consent).

23. Denim's Terms of Service purport to allow use of Plaintiff's company name, All Directions Trucking, for advertising and promotional purposes.

24. Plaintiff fully objects to any use of Plaintiff's company name, brand, or identity for advertising or marketing purposes, and did not knowingly or voluntarily consent to such use and does not endorse Truckstop or Denim factoring.

25. Any purported acceptance of Denim's Terms of Service occurred, if at all, under economic duress, while Plaintiff was financially constrained, fuel-dependent, and facing imminent operational shutdown.

---

## G. Ongoing Harm and Captive Market Conditions

26. Defendants' conduct has held Plaintiff's business hostage by controlling access to earned funds, disrupting insurance coverage, preventing lawful interstate operation, and interfering with regulatory compliance.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

27. Plaintiff is uniquely situated among similarly affected carriers in possessing the ability to e-file pleadings and bring this conduct before the Court.

28. Many similarly situated carriers lack the practical ability to seek relief because they are continuously operating, fuel-dependent, financially constrained, and unable to withstand prolonged payment withholding.

29. Absent judicial intervention, Defendants' conduct is ongoing, continues to disrupt lawful interstate commerce, perpetuates a captive payment market, and causes irreparable harm to Plaintiff and similarly situated carriers.

**Plaintiff Re-Adopts Pending Motions and Jury Demand**

Plaintiff Sandra Worthing Alves hereby expressly incorporates, adopts, and re-adopts all motions previously filed in this action prior to the filing of the First Amended Complaint, to the extent such motions are not inconsistent with the allegations, claims, and relief requested in the First Amended Complaint. Plaintiff intends that all such motions remain pending and operative before this Court without waiver.

Nothing in the First Amended Complaint is intended to withdraw, moot, or abandon any previously filed motion unless expressly stated.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

**JURY DEMAND and BENCH TRIAL SEQUENCING**

Plaintiff hereby demands trial by jury on all claims and issues so triable as of right, and expressly reserves that demand; however, Plaintiff requests that this Court bifurcate proceedings as appropriate, and hear and determine in the first instance all equitable issues, including claims for declaratory relief, injunctive relief, equitable defenses, and any matters requiring court supervision or prospective relief, by the Court sitting in equity, prior to submission of any remaining legal claims for damages to a jury, in order to promote judicial economy, clarity of rights, and the orderly administration of Justice.

**JURISDICTION**

This Court has subject-matter jurisdiction over this action pursuant to R.C. 2305.01 and R.C. Chapter 2721, as this is a civil action seeking declaratory relief, injunctive relief, monetary damages, and other legal and equitable relief within the jurisdiction of the Court of Common Pleas. This Court further has jurisdiction to grant equitable relief necessary to determine the rights and obligations of the parties and to prevent ongoing or prospective harm.

This Court has personal jurisdiction over Defendants because they transact business in Ohio, purposefully avail themselves of the privilege of conducting activities within this state, and because the acts and omissions complained of caused injury to Plaintiff within Ohio. Defendants' contacts with Ohio are sufficient to satisfy the Ohio Long-Arm Statute, R.C. 2307.382, and the requirements of due process.

**VENUE**

Venue is proper in this Court pursuant to Ohio Civ.R. 3 and R.C. 2307.38–2307.40, because Plaintiff resides and conducts business in this county, substantial portions of the events and omissions giving rise to the claims occurred in this county, and one or more Defendants transact business, cause injury, or direct activities toward this county. The conduct alleged herein resulted in harm to Plaintiff within this county, and this forum forms a substantial relationship to the claims asserted

**FIRST AMENDED COMPLAINT**

**I. INTRODUCTION AND NATURE OF THE ACTION**

1. Plaintiff Sandra Worthing Alves ("Plaintiff"), d/b/a All Directions Trucking, MC#1710778 brings this civil action to address the coordinated, systemic exploitation of American motor carriers through an unregulated digital freight-control enterprise that operates outside federal oversight while exercising decisive control over who may operate, who may haul freight, and who gets paid.

2. This action is not a dispute between a carrier and a single broker or factoring company. It concerns a private, subscription-based digital freight-control regime composed of platforms that are neither carriers nor brokers, yet function as gatekeepers over all interstate commerce.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

3. Defendants are technology platforms, payment intermediaries, compliance vendors, and data aggregators who do not haul freight, do not broker freight, and bear no operational risk—yet collectively control access to freight, compliance approval, identity validation, payment routing, and reputational survival for carriers.

4. In this structure, brokers are the customers, carriers are the commodity, and data is the asset. Carriers are compelled to surrender identity documents, banking access, location data, ELD telemetry, and operational control as a condition of survival.

5. Plaintiff alleges that Defendants together operate an integrated enterprise that profits when carriers are destabilized, payments are delayed, authority is compromised, and desperation forces compliance.

6. During what industry analysts have termed the "Great Freight Recession," at least 113,000 U.S. motor carriers—large and small—exited the market since 2023, a contraction that Plaintiff alleges was materially caused and accelerated by Defendants' coordinated enterprise, such that but for the Enterprise's collective control over carrier approval, payment flow, compliance enforcement, and market access, a substantial portion of these carrier failures would not have occurred.

## II. PLAINTIFF'S BACKGROUND AND FIELD EXPERIENCE

7. Plaintiff is an American motor carrier, owner-operator, and logistics professional with over a decade of hands-on experience in the trucking industry, including pre-ELD operations, the ELD transition period, and the current surveillance-driven freight environment.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

8. Plaintiff conducted extensive field research beginning as early as 2015 while building what would later become All Directions Trucking MC #1710778 and also CEO of All Directions Trucking Agency and also All Directions Trucking and Dispatch Services and all of its related Agency concepts, working directly with multiple carriers across regulatory phases all across every region in the country's lower 48 states, by and for owner operators and all carriers and truck drivers.

9. Plaintiff has direct personal knowledge of how freight moved before ELDs, how ELDs were introduced, and how ELD data is now exploited by bad actors through backend manipulation.

*Electronic Logging Devices, mandated by Map21 in 2017. ELD's connect to the trucks computer ECM for recording data and hours of service for drivers)*

10. In 2022, Plaintiff intentionally worked for a carrier operating through Telegram-based dispatching groups to observe illegal practices firsthand, including falsification of hours-of-service, backend ELD editing, pressure to operate trucks for 20+ hours per day, and the use of non-domiciled drivers operating unlawfully as part of the field research. Plaintiff has recorded and screen grabbed proof of real time editing of ELD  driving hours and instant updating to appear to be in compliance with hours of service

### III. FMCSA AUTHORITY AND IMMEDIATE EXPLOITATION

11. The Federal Motor Carrier Safety Administration ("FMCSA") granted Plaintiff operating authority on May 30, 2025.

31

12. Within days of this federally granted authority, Plaintiff was subjected to predatory conduct that could only occur through coordinated platform access.

13. On June 4, 2025, without any executed factoring agreement, Defendants caused a UCC-1 financing statement to be filed in Ohio asserting a blanket lien over every and all of Plaintiff's assets, now and for the next five years. This is not Hyperbole.

## IV. DIGITAL ONBOARDING, FRAUD LABELING, AND IDENTITY HIJACKING

14. To access freight, Plaintiff was required to interact with digital onboarding platforms controlled by Defendants.

15. Plaintiff discovered that her newly issued authority had already been claimed inside Highway's system by an unknown, unauthorized dispatching entity.

## V. THE INTEGRATED FREIGHT DATA-CONTROL CONGLOMERATE ENTERPRISE ("THE ENTERPRISE")

16. Plaintiff alleges that Defendants collectively form and operate an integrated enterprise (the "Integrated Freight Data-Control Conglomerate Enterprise" or "Enterprise") that dominates essential functions of interstate trucking through interconnected subscription platforms, data pipelines, identity scoring, compliance gating, payment routing, and reputational enforcement mechanisms.

32

17. Plaintiff alleges the Enterprise operates as a closed-loop system that forces carriers into a "comply or disappear" reality, in which continued operation depends not solely upon compliance with FMCSA regulations, but upon submission to private platform conditions, private scoring systems, and private payment controls that have not a thing to do with the Federal Motor Carrier Safety Administrations requirements or the Department of Transportation's regulation or interstate commerce law. The Enterprise acts as a de-facto shadow government and claims authority over the US Government and gives itself a rise to a potential hostile take-over of the entire supply chain and freight movement if not stopped and dismantled.

18. Plaintiff alleges that within this Enterprise, brokers are the paying customers and beneficiaries of the systems, while carriers are treated as the data-producing commodity that is surveilled, graded, restricted, and financially controlled.

19. Plaintiff alleges that the Enterprise's functional structure can be described as: Identity and "Fraud" Signals → Compliance Gatekeeping → Freight Visibility → Payment Routing / Factoring Control → Reputation Enforcement → Economic Coercion.

20. Plaintiff alleges that the Enterprise's consolidated power is exercised without governmental mandate, without regulatory oversight, without due-process protections, and without transparency into algorithms, risk models, data retention practices, or dispute mechanisms.


## VI. DEFENDANT PLATFORM ROLES, FUNCTIONS, AND WHY THEY ARE NOT "INDEPENDENT TOOLS"

A. Truckstop Ecosystem: Freight Visibility, Financial Gatekeeping, and Leverage

21. Plaintiff alleges that Truckstop operates as a dominant load-board and freight-access platform that influences which carriers can see freight and which carriers are operationally viable in the marketplace.

22. Plaintiff alleges Truckstop's affiliated payment and factoring entities (including Truckstop Payments / Truckstop Factoring and related integrated systems) function as financial gatekeepers by asserting control over carrier receivables through liens, notices of assignment, and payment-routing demands.

23. Plaintiff alleges that, as applied to Plaintiff, this gatekeeping included an early UCC filing and the downstream effect of brokers treating Truckstop as the de facto required payee, leaving Plaintiff without meaningful ability to receive direct payment for completed freight.

24. Plaintiff alleges that these mechanisms create a coercive "hostage payment" structure: brokers are routed to pay a factoring intermediary; the intermediary controls timing, accounting, and release; and the carrier's survival needs (fuel, food, insurance, heat, safety) become leverage.

B. RMIS and Grizella/SaferWatch: Compliance Gating and Document Extraction

25. Plaintiff alleges RMIS (also owned by Truckstop) operates as a compliance gatekeeping portal used by many brokers as a prerequisite for tendering freight to carriers, and that RMIS demands extensive uploads of sensitive documentation as a condition of "approval."

26. Plaintiff alleges that these demanded uploads include, among other things, identity documents, CDL's, insurance certificates, EIN/Social Security documents, bank account and routing information, canceled checks, FMCSA operating authority documents, articles of incorporation, Secretary of State dba Filings, vehicle pictures and its registrations and related credential materials that they retain for future reuse or hoarding.

34

27. Plaintiff alleges Grizella/Safer Watch operates as a data aggregation and profile system whose outputs are used by brokers and platforms to influence acceptance decisions, and that such outputs are integrated into the broader verification and risk-signaling ecosystem.

28. Plaintiff alleges the combined effect is that a carrier may be economically blocked or delayed not because FMCSA revoked authority, but because a private onboarding portal or data profile flags, delays, or restricts the carrier based on opaque internal criteria.

C. Highway App: Identity "Verification," Authority Hijacking Risk, and Surveillance Pressure

29. Plaintiff alleges Highway markets itself as "fraud prevention" and identity verification yet operates as a private identity-control platform that materially influences whether carriers can onboard with participating brokers.

30. Plaintiff alleges that Highway permitted Plaintiff's newly issued authority to be "claimed" by an unauthorized third party and then remained slow to remove the fraudulent attachment, a 90 day delay, causing serious financial harm in the initial opening of operations for All Directions Trucking, reputational friction, and interference with onboarding and broker relationships.

31. Plaintiff alleges that Highway's system architecture, as experienced by Plaintiff, allows third parties to attach themselves to a carrier's authority and remain associated for extended periods while carriers suffer the consequences of suspicious status, "connection" signals, or onboarding blocks and there is no remedy but to call and email and find the right avenue to get the account decommissioned in order to establish the account for the new MC# with no fraudulent entities attached to begin hauling freight.

35

32. Plaintiff alleges that Highway and its broker users routinely pressure carriers to submit to continuous location monitoring and surveillance tools, including ELD API connections and phone-based tracking applications, even where such demands exceed what is required by law.

D. DAT Freight & Analytics: Freight Visibility and Normalization of Offshore / VOIP Channels

33. Plaintiff alleges DAT operates the most dominant freight matching and analytics platform controlling critical freight visibility for carriers across the United States. DAT is a load board.

34. Plaintiff alleges that, upon information and belief, DAT's marketplace structure and broker communications patterns have normalized the use of offshore and VOIP-based contact methods (including Google Voice numbers, Gmail accounts and encrypted messaging platforms WhatsApp and Telegram) as routine methods of broker-carrier engagement, thereby increasing anonymity, reducing traceability, and facilitating double-brokering and identity exploitation.

35. Plaintiff alleges that in practice this normalization benefits brokers and fraudulent actors by enabling contact points that are easier to mask, harder to authenticate, and more difficult for carriers to verify as domestic and legitimate.

E. Carrier411: Coercive Reputation Enforcement and Industry-Wide "Silence" Pressure

36. Plaintiff alleges Carrier411 operates a private, broker-driven and factoring company reputational reporting system used as a punitive enforcement arm against carriers, with permanent consequences and minimal due process protections if any. Carriers are unable to view the complaints or published defamation but will be arbitrarily blacklisted and put out of business with no due process.

37. Plaintiff alleges that Carrier411 functions effectively as a coercive deterrent: carriers operate under constant threat that any dispute, complaint, late delivery or breakdown or refusal to

36

comply with unfair demands may result in reputational damage that effectively blacklists the carrier from all segments of the market.

38. Plaintiff alleges the practical effect is a hostile environment where carriers feel compelled to "perform," remain silent, and say only favorable things about brokers and platforms to avoid economic retaliation—creating a market culture of coercion akin to an enforcement mechanism rather than a neutral review system.

39. Plaintiff alleges that this enforcement dynamic suppresses carrier speech, suppresses legitimate disputes, and reinforces the Enterprise's ability to impose nontransparent rules without accountability.

## VII. OFFSHORE DISPATCHING NETWORKS, DATA RETENTION, AND STRAW-MAN DOUBLE-BROKERING

40. Plaintiff alleges that offshore dispatching networks, including networks operating from Pakistan and other foreign jurisdictions, have proliferated within the U.S. freight ecosystem by exploiting platform weaknesses and verification gaps.

41. Plaintiff alleges that offshore dispatchers and offshore brokers target new and small carriers, aggressively obtain and retain carrier documents and credentials, and use those credentials to quote, book, and move freight through U.S. platforms while concealing the true controlling party.

42. Plaintiff alleges that she conducted and recorded phone interviews with offshore brokers and dispatchers to understand operational methods, and that these recorded interviews described practices including: managing 50 plus trucks per dispatcher; taking 5% Pay for loads; and retaining carrier data (including payment-routing information) as a reusable asset.

37

43. Plaintiff alleges that offshore groups publicly boast on social media about dispatching high volumes of trucks and earning revenue through percentage-based skimming per load, and that such boasts are consistent with an organized commercial model designed to scale control over U.S. freight lanes.

44. Plaintiff alleges that, upon information and belief, the widespread double-brokering and "straw-man" substitution crisis follows a recurring pattern: a load is booked or tendered under one identity or MC authority; a different carrier or driver physically hauls the freight; and the entity controlling the booking siphons payment while the hauling carrier is underpaid mostly not paid at all and doesn't find out his role until long after the freight is delivered to the wrong warehouse.

45. Plaintiff alleges that in many instances, the carrier that physically hauls the freight is not the same carrier identity presented to the broker, creating systemic mismatches that facilitate nonpayment, theft, re-routed full truckloads into the wrong hands and liability shifting.

46. Plaintiff alleges that these schemes are enabled by the Enterprise's design because the platforms control the onboarding credentials, the identity signals, the freight visibility, the payment routing pathways, and the reputational consequences that deter carriers from speaking out.

47. Plaintiff alleges that the Enterprise has created market conditions in which offshore actors can operate with minimal meaningful verification while domestic carriers are burdened with escalating compliance demands, repeated document submissions, and surveillance coercion.

## VIII. SURVEILLANCE COERCION: ELD API DEMANDS, PHONE TRACKING, AND SAFETY RISKS

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

48. Plaintiff alleges that a major coercive feature of the Enterprise is the demand for real-time surveillance, including ELD API integrations to the truck's onboard computer and also phone-based tracking, as a condition of hauling freight or maintaining broker relationships.

49. Plaintiff alleges that ELD systems connect to truck onboard computers and can transmit sensitive operational data including location streams, driving hours, engine diagnostics, and movement patterns, and private platform access to such data creates heightened privacy, safety, and security risks.

50. Plaintiff uses a Garmin ELD that does not connect to Wi-Fi, does not broadcast to anyone or integrate with Highway's ELD API architecture, and Plaintiff alleges that she was penalized, delayed and competitively disadvantaged on that basis despite using a lawful FMCSA-compliant ELD.

51. Plaintiff alleges that surveillance coercion is not designed to improve safety for carriers, but to increase broker convenience, expand data collection, and strengthen platform control through continuous monitoring, scoring, and compliance conditioning.

52. Plaintiff alleges that surveillance coercion creates foreseeable safety risks, including heightened stalking and targeting risks for female drivers, real-time visibility of valuable freight, and increased vulnerability to cyber intrusion, misuse of location data, and exploitation by fraudulent actors.

# IX. ELIGIBILITY AND ACCESS CONTROL: HOW THE ENTERPRISE "GOVERNS" WITHOUT AUTHORITY

39

53. Plaintiff alleges that Defendants interconnected systems effectively determine whether a carrier may access freight, whether a carrier may be onboarded, whether a carrier is deemed "verified," whether a carrier is permitted to receive payment efficiently, if at all and whether a carrier becomes reputationally restricted or economically erased.

54. Plaintiff alleges that these determinations are made without statutory authority, without transparent criteria, and without meaningful internal appeal rights that resemble due process.

55. Plaintiff alleges the overall effect is a privatized governance structure over trucking: FMCSA grants operating authority, but the Enterprise determines whether that authority can function in the marketplace, get paid or haul any freight at all.

56. Plaintiff alleges that this privatized governance is economically coercive and constitutes the structural foundation for the enterprise-level claims that follow, including racketeering enterprise conduct, anticompetitive restraints, and wrongful financial leverage through liens and payment diversion.

**FIRST AMENDED COMPLAINT**

**(SECTIONS X–XIV)**

**SECTION X – ENTERPRISE DEFINITION & CONTINUITY (RICO §1962(c))**

40

Plaintiff alleges that Defendants collectively constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and Ohio R.C. 2923.31(C), known herein as the **Integrated Freight Data-Control Conglomerate Enterprise.**

The Enterprise has a common purpose: to extract economic value from motor carriers by controlling access to freight, compliance verification, identity validation, payment routing, and reputational standing through centralized digital platforms.

The Enterprise maintains relationships among Defendants through API integrations, reciprocal verification systems, shared data pipelines, coordinated onboarding requirements, and aligned financial incentives.

The Enterprise has continuity, both closed-ended and open-ended, as Defendants' conduct has occurred continuously since at least 2021, continues to the present, and threatens future repetition absent judicial intervention.

**SECTION XI – RICO PREDICATE ACTS (WIRE FRAUD & EXTORTION)**

Plaintiff alleges Defendants engaged in wire fraud in violation of 18 U.S.C. § 1343 by transmitting interstate electronic communications to:

41

• file and maintain unauthorized UCC liens,

• circulate Notices of Assignment without authority,

• misrepresent payment status and "short pays,"

• coerce acceptance of wallet systems, pooled money and surveillance terms,

• suppress or manipulate carrier identity and compliance signals.

Plaintiff alleges extortion under 18 U.S.C. § 1951, as Defendants obtained property (receivables, data, leverage) with consent induced by fear of economic harm, including loss of freight access, nonpayment, reputational destruction, and physical stranding.

## SECTION XII – ANTITRUST MARKET DEFINITIONS

Relevant markets include:

1. Digital Freight Visibility & Load Access Platforms;

2. Carrier Identity & Fraud Verification Systems;

3. Compliance & Insurance Onboarding Gatekeeping;

4. Factoring, Receivable Control & Payment Routing;

5. Carrier Reputation & Risk Scoring Systems.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Plaintiff alleges Defendants possess monopoly power or a dangerous probability thereof in each market, reinforced by vertical and horizontal integration.

## SECTION XIII – SHERMAN ACT §1 (UNLAWFUL RESTRAINT OF TRADE)

Defendants entered into combinations and conspiracies to restrain trade by coordinating platform rules that force carriers to submit to unified systems or be excluded entirely.

These restraints suppress competition, raise barriers to entry, and favor offshore and anonymous actors willing to masquerade as multiple legitimate carriers to book freight and reissue the loads as independent dispatchers to any unwitting Carrier that is not matched with the load and the broker. The Enterprise knows this is occurring on a widespread scale but they benefit from the freight being hauled for next to nothing.  The double brokers are interested in cargo theft, and the unwitting carriers are getting cargo claims against them when they never had any transaction with the broker at all.  This effectively has the carriers insurance cancelled and puts the carrier out of business for cargo theft.

## SECTION XIV – SHERMAN ACT §2

## (MONOPOLIZATION & ATTEMPTED MONOPOLIZATION)

43

Defendants willfully acquired and maintained monopoly power through exclusionary conduct, including coercive onboarding, payment manipulation, retaliatory reputation systems, and surveillance-based access controls.

 Plaintiff was excluded, underpaid, and endangered as a direct result.

**ANTITRUST REMEDIES & STRUCTURAL RELIEF**

Plaintiff alleges that monetary damages alone are insufficient to remedy the competitive harm inflicted by Defendants' coordinated conduct. The Enterprise has distorted freight markets through surveillance-based exclusion, coercive onboarding, payment leverage, and reputational enforcement mechanisms that will continue absent court-ordered structural relief.

Plaintiff therefore seeks broad injunctive and equitable remedies under the Sherman Act, Ohio antitrust law, and the Court's inherent equitable powers, tailored to dismantle the unlawful market structure rather than merely punish past conduct.

Plaintiff seeks the appointment of a Special Master for each primary Defendant entity, at Defendants' sole cost and expense, to oversee compliance, auditing, and remediation of anticompetitive practices. Each Special Master shall possess authority to access systems, records, algorithms, onboarding rules, payment-routing mechanisms, and data-sharing agreements relevant to carrier access and payment control.

Plaintiff further seeks a structural injunction requiring the creation of a neutral, court-supervised electronic oversight system ("Enterprise "EOE" Electronic Oversight Extension") distinct but similar from carrier-owned ELDs. This system shall mirror, log, and archive relevant metadata

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

from Enterprise platforms—including identity verification, onboarding decisions, freight visibility restrictions, and payment-routing actions—for preservation, transparency, and future judicial review and future litigants for discovery.

Plaintiff alleges such an oversight EOE system is necessary because Defendants currently operate opaque digital gatekeeping systems immune from regulatory audit, allowing exclusionary conduct to remain hidden from carriers, regulators, and courts.

Plaintiff seeks an injunction prohibiting Defendants from conditioning freight access, onboarding approval, or payment processing on mandatory surveillance integrations, including ELD APIs, phone-tracking applications, or real-time location feeds unrelated to legitimate safety regulation.

Plaintiff further seeks an order prohibiting the use of encrypted or anonymized communication channels—including free Gmail for Email, use of WhatsApp, Telegram, Google Voice, VOIP numbers, and non-domain email services—for broker-carrier onboarding, load tendering, identity verification, or payment communications within Defendants' platforms and load board access. That only verified US phone services, landline and cell services are actual phone numbers, not spoof numbers and are registered to the FMCSA for brokers and carriers. That the only parties to gain any access have active MC#'s and are established through the Carrier, brokers as verified agents or employees of the carriers and brokers.

Plaintiff alleges that such tools as free Gmail for Email, use of WhatsApp, Telegram, Google Voice, VOIP numbers, and non-domain email services  enable anonymity, offshore impersonation, double brokering, and straw-man hauling schemes, and that their continued use constitutes an unreasonable restraint of trade.

45

Plaintiff seeks a mandatory broker verification registry requiring all brokers utilizing Defendants' platforms to verify domestic business registration, local IP Addresses and U.S. domiciled only, and domain-based email infrastructure, with metadata logging sufficient to demonstrate compliance and deter offshore manipulation.

Plaintiff further seeks structural separation remedies requiring Defendants to segregate identity verification, compliance onboarding, load-board visibility, factoring/payment services, and reputational scoring into firewalled divisions, prohibiting cross-use of data to coerce carriers or suppress competition and break up the alleged monopoly.

Plaintiff seeks an injunction prohibiting Carrier411 or any similar reputational platform from publishing or enforcing carrier-impacting designations without notice, neutral review, opportunity to cure, and documented evidentiary support subject to Special Master oversight.

Plaintiff alleges that without these remedies, Defendants will continue to profit from market foreclosure, carrier collapse, and artificial demand for so-called fraud prevention services generated by the very instability Defendants create. The brokers are the customer and if fraud was dismantled there would be no further incentive for brokers to pay $150-$500. A month to weed out suspicious carriers.

Plaintiff alleges that the requested relief is narrowly tailored to restore competitive conditions, protect lawful carriers, preserve supply-chain integrity, and prevent future violations of antitrust and racketeering laws.

**RICO Predicate Acts – Wire Fraud & Extortion**

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Plaintiff alleges that Defendants engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and Ohio Revised Code § 2923.32 through repeated acts of wire fraud and extortion carried out via interstate electronic systems.

WIRE FRAUD (18 U.S.C. § 1343)

Defendants knowingly devised and executed a scheme to defraud Plaintiff and similarly situated carriers by transmitting materially false and misleading representations through interstate wires, including but not limited to:

• Electronic filing of unauthorized UCC-1 financing statements claiming blanket security interests without any executed agreement.

• Transmission of Notices of Assignment falsely asserting ownership of carrier receivables.

• Digital payment statements reflecting fabricated shortages, unexplained holds, and one-cent deposits.

• Electronic onboarding portals (Highway, RMIS, DAT, Truckstop) transmitting false "fraud" flags and non-compliance designations.

• Electronic communications coercing carriers to accept wallet systems, surveillance access, or rights waivers as a condition of payment.

Each transmission was made for the purpose of obtaining money, data, or control of receivables by false pretenses and constitutes a separate act of wire fraud.

**EXTORTION (18 U.S.C. § 1951 – Hobbs Act)**

Defendants wrongfully obtained Plaintiff's property and economic concessions through fear of economic harm by:

47

• Threatening or effectuating payment withholding unless Plaintiff surrendered control of receivables.

• Maintaining fraudulent liens to block alternative financing.

• Issuing one-penny deposits to exert financial pressure.

• Conditioning payment release on acceptance of surveillance, wallet systems, or rights waivers.

• Leveraging Carrier411 reputational blacklisting as coercive force.

Defendants knew that withholding payments from an active carrier would deprive Plaintiff of fuel, food, insurance continuity, and physical safety while on the road, thereby creating life-threatening leverage.

**ENTERPRISE CONTINUITY**

These acts were not isolated. They represent open-ended continuity as Defendants' standard operating model, carried out through integrated platforms, shared data pipelines, and common economic incentives designed to extract value from dependent carriers.

The predicate acts directly injured Plaintiff's business, property, and safety and form the basis for civil RICO liability under federal and Ohio law.

**COUNT [ I ] — RICO (18 U.S.C. § 1962(c) and (d))**

48

(Against All Defendants)

## A. RICO's Scope and Applicability to Legitimate Enterprises

1. Congress enacted the Racketeer Influenced and Corrupt Organizations Act ("RICO") to address systemic, ongoing misconduct carried out through legitimate enterprises, not merely traditional organized crime.

2. The Supreme Court has held that an enterprise under RICO may be entirely lawful in form, so long as it conducts its affairs through a pattern of racketeering activity. United States v. Turkette, 452 U.S. 576, 580–81 (1981).

3. Civil RICO is not limited to mob-type cases. It applies broadly to commercial settings where coordinated actors use lawful structures to accomplish unlawful ends. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498–99 (1985).

4. An association-in-fact enterprise requires only:

   (a) a common purpose,

   (b) relationships among the participants, and

   (c) longevity sufficient to pursue that purpose.

   Boyle v. United States, 556 U.S. 938, 946 (2009).

5. No formal hierarchy, written agreement, or centralized command is required.

49

---

**B. The Enterprise**

6. Defendants Total Quality Logistics, LLC (TQL), C.H. Robinson Worldwide, Inc., Truckstop.com, LLC, DAT Freight & Analytics, RMIS, Highway, Carrier411, Truckstop Factoring / Truckstop Payments, Denim, LoadPay, MacroPoint, and associated brokers and platform operators constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

7. The Enterprise's common purpose was to control carrier access to freight, reputation, payment routing, and market participation, while suppressing transparency and extracting disproportionate economic benefit from carriers.

8. The Enterprise's relationships were functional and complementary:

   o Brokers (TQL, C.H. Robinson, Megellen) authored and enforced non-negotiable freight terms and payment refusals;

   o Load boards (DAT, Truckstop Load Board and 123Loadboard) functioned as market gateways;

   o Onboarding platforms (RMIS, Highway) controlled eligibility;

   o Reputation systems (Carrier411) enforced discipline by proxy;

   o Tracking systems (MacroPoint) generated punitive triggers;

50

     ○   Factoring/payment entities (Truckstop Factoring, Denim, LoadPay) controlled receivables through NOAs.

9. The Enterprise exhibited open-ended continuity, operating for years as the regular way Defendants conducted business and continuing into the present. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 241–42 (1989).

---

## C. Pattern of Racketeering Activity

10. From at least 2018 through the present, Defendants conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, consisting of multiple related predicate acts, including:

## 1. Wire Fraud (18 U.S.C. § 1343)

11. Defendants Truckstop, DAT, RMIS, Highway, Denim, LoadPay, and Truckstop Factoring, in coordination with brokers TQL and C.H. Robinson, transmitted materially false and misleading representations via interstate wires that:

- Factoring was optional;
- Direct payment, paper check, or Quick Pay were viable alternatives; and
- Platform controls were neutral compliance measures.

51

12. In reality, once Notices of Assignment were issued and transmitted electronically, all non-factoring payment paths were eliminated, rendering those representations false and misleading.

13. A RICO plaintiff need not prove reliance on each misrepresentation where the scheme was executed through interstate wires and caused direct injury. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 649–50 (2008).

---

## 2. Extortion by Economic Fear (18 U.S.C. § 1951)

14. Defendants TQL and C.H. Robinson withheld earned freight payments after performance, enforcing NOAs issued by Truckstop Factoring, Denim, and LoadPay, knowing that carriers depended on immediate payment for basic necessities.

15. When carriers sought to restore payment, factoring entities conditioned release on waiver of legal rights, and brokers continued to enforce the NOAs knowing payment would otherwise remain blocked.

16. The wrongful use of economic fear to obtain property constitutes extortion even absent physical threats. United States v. Capo, 817 F.2d 947, 951–52 (2d Cir. 1987).

---

## 3. Coercive Surveillance, Reputation Control, and Retaliation

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

17. Defendants Carrier411, DAT, Truckstop, RMIS, Highway, and MacroPoint functioned as enterprise enforcement mechanisms, enabling:

- Blacklisting.
- Reputational destruction.
- Retaliation for disputing payments or requesting transparency.

18. Courts recognize that control over access to a market or livelihood, combined with economic pressure, supports RICO liability. United States v. Philip Morris USA Inc., 449 F. Supp. 2d 1, 852–53 (D.D.C. 2006).

---

## D. Proximate Cause and Injury

19. Plaintiff suffered concrete financial injury, including withheld receivables, lost business opportunities, and exclusion from interstate commerce.

20. The injuries were the direct and foreseeable result of Defendants coordinated conduct. Hemi Group, LLC v. City of New York, 559 U.S. 1, 12 (2010).

---

## E. Conspiracy (18 U.S.C. § 1962(d))

53

21. Each Defendant knowingly agreed and conspired to conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

---

**WHY RICO APPLIES AND WHY SPECIAL MASTERS ARE REQUIRED**

**1. Why RICO Applies Here**

- This case involves legitimate companies using lawful structures to execute unlawful schemes — the precise conduct RICO was designed to reach. Turkette; Sedima.
- The Enterprise satisfies Boyle: common purpose (control and extraction), relationships (interlocking platforms), and longevity (years of standardized practice).
- The conduct is not a series of contract disputes; it is systemic coercion enforced through infrastructure.

As the Supreme Court recognized, RICO addresses ongoing methods of doing business, not episodic misconduct. H.J. Inc.

54

## 2. Why Ordinary Injunctions Are Insufficient

22. Defendants' misconduct is:

- Distributed across platforms.

- Hidden within proprietary systems.

- Enforced by proxy through reputation and exclusion.

23. Without independent oversight, Defendants can continue the same conduct under different labels, platforms, or affiliates.

Courts confronting entrenched RICO enterprises have recognized that structural remedies are necessary. United States v. Local 560 (IBT), 780 F.2d 267, 295–96 (3d Cir. 1985).

## 3. Authority to Appoint Special Masters

24. Courts possess inherent equitable authority to appoint Special Masters to:

- Supervise compliance.

- Audit records.

- Prevent recurrence of RICO violations.

55

25. Courts have repeatedly imposed trustees, monitors, and master's where enterprises used complexity and opacity to evade lawful oversight. Local 560; United States v. Local 30, Roofers Union, 871 F.2d 401, 408–09 (3d Cir. 1989).

---

## 4. Why Special Masters Are Necessary in This Case

26. The Enterprise operates through:

- Multiple brokers.

- Multiple platforms.

- Multiple payment entities.

- Interconnected data systems.

27. Only a court-appointed Special Master can:

- Forensically trace payment routing.

- Audit NOA enforcement.

- Monitor Carrier411 and platform retaliation.

- Ensure escrow or neutral payment handling.

- Prevent continued intimidation during litigation.

56

28. Absent such oversight, Defendants retain unilateral power to:

- Withhold payment.

- Blacklist carriers.

- Destroy evidence.

- Chill participation in this litigation.

---

**5. Narrow, Proportionate Relief**

29. Plaintiff does not seek to dismantle the freight brokerage industry.

30. Plaintiff seeks narrow, proportionate equitable relief tailored to prevent ongoing RICO violations, consistent with long-standing precedent authorizing structural remedies where necessary to restore lawful commerce and fair trade.

**COUNT II — DECLARATORY JUDGMENT** (R.C. Chapter 2721)

31. Plaintiff incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully restated herein.

32. An actual, present, and justiciable controversy exists between Plaintiff and Defendants concerning the parties' respective rights, duties, and legal relations arising from Defendants' coordinated use of payment controls, compliance determinations, data systems, contractual instruments, and security filings affecting Plaintiff's trucking operations and receivables.

33. Plaintiff seeks a declaration pursuant to R.C. Chapter 2721 to determine the legality and enforceability of Defendants' practices and instruments, including but not limited to: (a) the filing and maintenance of one or more UCC-1 financing statements purporting to encumber Plaintiff's accounts or receivables; (b) the issuance and enforcement of Notices of Assignment or payment-redirection instructions to brokers or third parties; and (c) the conditioning of carrier approval, load access, or payment on compliance with undisclosed, overbroad, or unauthorized requirements.

34. Plaintiff alleges that Defendants lacked lawful authority to file or maintain blanket security interests against Plaintiff's receivables absent a valid and enforceable security agreement authorizing such scope, and that the asserted liens and payment controls exceeded any legitimate contractual purpose. Plaintiff further alleges that Defendants' practices operated to interfere with Plaintiff's right to receive payment for completed transportation services and to participate in interstate commerce on lawful terms.

35. Plaintiff seeks a judicial declaration determining, among other things, that:

58

36. (a) any UCC-1 financing statement filed against Plaintiff without proper authorization or contractual basis is void, unenforceable, or subject to termination or limitation;

37. (b) any Notice of Assignment or payment-redirection instruction issued or enforced beyond the scope of a valid agreement is invalid and without legal effect;

38. (c) Defendants lack authority to condition carrier approval, continued eligibility, or payment on undisclosed liens, data restrictions, or coordinated platform enforcement not agreed to by Plaintiff; and

39. (d) Plaintiff is entitled to conduct its trucking operations free from unlawful interference with payment, credit, and market access.

40. Declaratory relief is necessary and appropriate because Defendants' challenged conduct is ongoing or capable of repetition, and because a declaration of rights will resolve uncertainty, guide the parties' future conduct, and prevent continuing harm. Plaintiff lacks an adequate remedy at law to resolve these issues absent a declaration from this Court.

41. Accordingly, Plaintiff respectfully requests that this Court enter a declaratory judgment defining the parties' rights and obligations as set forth herein, together with such further legal and equitable relief as the Court deems just and proper.

42.

## COUNT IV — TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND CONTRACTUAL RELATIONS

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Plaintiff incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully restated herein.

Plaintiff maintained existing and prospective business relationships and contractual relationships with freight brokers, shippers, and payment counterparties in connection with the lawful transportation of goods in interstate commerce. These relationships included the reasonable expectation of payment for completed transportation services and continued participation in broker-carrier transactions absent lawful cause for exclusion.

Defendants had knowledge of Plaintiff's business relationships and contractual expectations by virtue of their roles as payment processors, factoring entities, broker platforms, compliance services, data and tracking providers, and participating brokers operating within interconnected systems used to manage carrier approval, load access, and payment flow.

Defendants intentionally and improperly interfered with Plaintiff's business and contractual relationships by, among other actions, asserting and enforcing purported liens or payment-redirection mechanisms, issuing or honoring Notices of Assignment beyond lawful or agreed scope, restricting carrier approval or eligibility through coordinated platform controls,

60

and communicating or implementing adverse compliance or payment determinations that were not supported by valid contractual authority.

Defendants' interference was not privileged or justified, was undertaken outside the scope of any legitimate business purpose, and was designed or foreseeably operated to disrupt Plaintiff's ability to receive payment, maintain broker relationships, and continue operating without interruption.

As a direct and proximate result of Defendants' tortious interference, Plaintiff suffered damages including, but not limited to, delayed or withheld payments, loss of business opportunities, disruption of existing relationships, impairment of cash flow and credit, and consequential financial harm.

Defendants' conduct was undertaken willfully, knowingly, or with reckless disregard for Plaintiff's rights, entitling Plaintiff to recover compensatory damages and such additional relief as may be available under applicable law.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Accordingly, Plaintiff respectfully requests judgment against Defendants for damages resulting from tortious interference, together with costs, interest, and such other legal and equitable relief as the Court deems just and proper.

## COUNT V — OHIO ANTITRUST / RESTRAINT OF TRADE

(Prospective Business Expectancy)

Plaintiff incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully restated herein.

Defendants, individually and as participants in a coordinated enterprise, engaged in contracts, combinations, and conspiracies in restraint of trade in violation of Ohio's antitrust and competition laws, including R.C. 1331.01 et seq., by implementing and enforcing interrelated systems that collectively controlled carrier approval, access to freight, payment flow, compliance status, and ongoing eligibility to participate in the interstate freight market.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

The relevant market includes the market for brokered freight transportation services and associated carrier access, compliance approval, and payment processing, in which Defendants collectively exercised substantial control through integrated platforms, data-sharing arrangements, standardized enforcement mechanisms, and aligned contractual instruments. Defendants' conduct operated to exclude, discipline, or disadvantage motor carriers, particularly small and mid-sized carriers, without legitimate competitive justification.

As part of this coordinated restraint, Defendants interfered with Plaintiff's prospective business expectancies, including Plaintiff's reasonable expectation of entering into future broker-carrier transactions, booking freight, and receiving payment for transportation services in the ordinary course of business. Defendants accomplished this interference through coordinated approval denials, payment restrictions, lien assertions, data-based risk designations, and platform-based enforcement actions that foreclosed Plaintiff's access to future business opportunities.

Defendants' conduct constituted an unreasonable restraint of trade because it was not ancillary to any procompetitive purpose, was not reasonably necessary to achieve legitimate business objectives, and instead functioned to concentrate control over market access, payment routing, and carrier participation within the Enterprise. The cumulative effect of Defendants' actions was to suppress competition, reduce carrier choice, and force market exit or exclusion.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Plaintiff alleges that Defendants possessed and exercised market power in the relevant market by virtue of their combined control over broker platforms, compliance systems, payment rails, factoring services, and data infrastructure, and that Defendants used this power to foreclose Plaintiff and similarly situated carriers from competing on fair and lawful terms.

As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff suffered damages including loss of prospective business opportunities, diminished market access, reduced revenue, increased operating costs, and economic harm flowing from exclusionary practices. Plaintiff also suffered harm of the type the antitrust laws were intended to prevent.

Plaintiff seeks all relief available under Ohio law for antitrust violations, including injunctive relief to prevent ongoing restraints of trade, declaratory relief, compensatory damages, and any enhanced or equitable relief authorized by statute, together with costs, interest, and such other relief as the Court deems just and proper.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

**SUPPORTING HISTORICAL FACTS, ALL BROKER CONTRACTS, STIPULATIONS AND STRUCTURAL IMBALANCE**.

(Historical Formation, Coercive Operation, and Detrimental Effects on Carriers)

---

### I. Historical Authorship and One-Sided Formation of Broker Contracts

1. From the inception of the modern freight brokerage industry, rate confirmations, broker–carrier agreements, and freight terms have always been authored exclusively by brokers, including Defendant's CH ROBINSON and TQL.

2. These documents were never the product of bilateral negotiation. Instead, they were uniformly drafted by brokers to reflect broker-only interests, allocating discretion, remedies, and control to the broker while minimizing carrier rights.

3. Long before the emergence of modern technology platforms, carriers were required to accept broker-drafted terms as a prerequisite to hauling freight, with no realistic opportunity to modify or negotiate those terms.

65

4. This historical imbalance is not incidental. It is structural and intentional, and it forms the foundation upon which later technological restrictions were built.

---

## II. Escalation Through Technology and Platform Enforcement

5. As technology platforms emerged, brokers did not rebalance this relationship. Instead, platforms were used to compound and operationalize existing asymmetries.

6. Systems governing onboarding, compliance, tracking, payment routing, and carrier scoring introduced additional layers of restriction, monitoring, and enforcement, all designed around broker-authored rules.

7. These platforms did not create mutual accountability. They amplified broker control, enabling exclusion, payment interference, and punitive enforcement without individualized adjudication or meaningful appeal.

8. What began as one-sided paper contracts evolved into a digitally enforced regime, where carriers are constantly monitored, scored, and penalized based on opaque standards they did not draft and cannot challenge.

---

## III. Illusory Consent and Coercive Acceptance

9. Broker contracts and rate confirmations are presented as voluntary agreements. In reality, they operate under economic compulsion.

66

10. Independent truck drivers and small carriers are uniquely vulnerable to coercion because:

    a. They operate alone or with minimal staff.

    b. They are physically confined to their vehicles for extended periods, weeks and months at a time.

    c. Their ability to eat, fuel their trucks, heat or cool their cabs, and return home is contingent on prompt payment for completed loads.

11. Brokers are aware of this dependency and structure terms accordingly, knowing that carriers must accept coercive conditions or face immediate financial harm.

12. Consent obtained under such conditions is not the product of equal bargaining power; it is the product of duress embedded in market structure.

---

## IV. "Gotcha" Enforcement, Hidden Traps, and Punitive Controls

13. Modern broker practices rely on technical violations and hidden conditions to penalize carriers post-performance.

14. Tracking platforms, such as MacroPoint and similar tools, are used not merely for shipment visibility but as punitive instruments, where alleged "violations" — often minor, automated, or unavoidable — are later invoked to justify payment delay, reduction, or exclusion or no payment at all.

15. These violations are frequent:

a. Undefined or vaguely defined.

b. Enforced retroactively.

c. Not subject to neutral review.

d. Disproportionately punitive relative to any alleged harm.

16. This system places carriers under constant stress and surveillance, where a single technical issue can result in lost income or market exclusion.

---

## V. Payment Control as Leverage and Financial Abuse

17. Payment terms are the most powerful leverage point in the broker–carrier relationship.

18. Although broker documents purport to offer multiple payment methods, those options are frequently rendered unavailable in practice, particularly after Notices of Assignment or platform flags are applied.

19. Carriers are then forced into factoring or delayed payment structures they were told were optional, converting payment into a mechanism of control rather than compensation.

20. The cumulative effect is financial pressure used to compel compliance, not merely to settle accounts.

---

## VI. Suppression of Statutory Rate Transparency

68

21. Federal law requires brokers, upon request, to provide carriers with transparency regarding the compensation paid by the shipper for a load.

22. In practice, carriers who request this information are subjected to:

   a. Retaliation.

   b. Blacklisting.

   c. Denial of future loads.

   d. Exclusion from platforms or broker networks.

23. Carriers are routinely required, explicitly or implicitly, to waive their right to rate transparency as a condition of continuing to receive freight.

24. Brokers further enforce this suppression by treating any disclosure by a shipper — even accidental — as "back solicitation," placing the carrier at risk of termination or blacklisting.

---

## VII. Real-World Consequences and Unjust Enrichment

25. These practices are not theoretical. They have real and immediate consequences.

26. In one such instance, a receiver openly disparaged Plaintiff's work, declaring hostility toward the carrier and stating that the service rendered was not "worth" the shipper's payment.

69

27. The shipper paid approximately $4,000 for the transportation of the freight. Plaintiff received approximately $1,200, while the broker retained the remainder.

28. Plaintiff did not solicit the shipper, request disclosure, or provoke the exchange. Nonetheless, the incident illustrates how information asymmetry and suppressed transparency enable unjust enrichment.

29. Carriers perform the physical labor, assume the operational risk, and bear the expense, while brokers retain disproportionate financial benefit shielded by contractual opacity.

---

## VIII. Structural Imbalance, Not Isolated Misconduct

30. The conditions described herein are not the result of isolated bad actors or individual disputes.

31. They are the predictable outcome of:

   a. Uniform broker-drafted contracts.

   b. Non-negotiable access terms.

   c. Platform-enforced compliance regimes.

   d. Payment control mechanisms.

   e. Suppression of transparency; and

   f. Retaliatory exclusion.

70

32. Together, these elements form a self-reinforcing system that disadvantages carriers and concentrates power and profit among brokers and affiliated entities.

---

## IX. Purpose of These Supporting Pages

33. These pages do not seek to invalidate broker contracts wholesale.

34. They are submitted to demonstrate:

   a. The historical and structural origins of imbalance.

   b. The coercive operation of broker terms in practice.

   c. The need for equitable limitations on enforcement; and

   d. The necessity of judicial oversight where payment and access to commerce are conditioned on unilateral, opaque controls.

35. Narrow declaratory and injunctive relief is required to prevent continued abuse without rewriting contracts, while restoring fundamental fairness to the carrier–broker relationship.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

---

**OHIO RICO / ANTITRUST BRIDGE — PLATFORM-BASED ENFORCEMENT, PROXY INTIMIDATION, AND MARKET GATEKEEPING**

(Association-in-Fact Enterprise; Pattern of Corrupt Activity; Combination in Restraint of Trade)

---

## I. Enterprise Structure and Obligatory Gatekeepers

1. At all relevant times, Total Quality Logistics, LLC ("TQL"), C.H. Robinson Worldwide Inc., and all other Brokers and factors, Truckstop.com, LLC, DAT Freight & Analytics, RMIS, Highway, Carrier411, Truckstop Factoring / Truckstop Payments, Denim, LoadPay, and MacroPoint operated as an association-in-fact enterprise within the meaning of Ohio's Corrupt Activity Act and federal RICO.

72

2. The Enterprise's common purpose was to control access to freight, carrier reputation, payment routing, and market participation, while suppressing transparency and extracting disproportionate economic benefit from carriers.

3. The Enterprise's structure relies on platforms that function as obligatory toll booths, including:

   o DAT Freight & Analytics and the Truckstop Load Board (load access);

   o RMIS and Highway (onboarding, verification, eligibility);

   o Carrier411 (reputation scoring, warnings, and exclusion);

   o MacroPoint (tracking and enforcement triggers);

   o Truckstop Factoring, Denim, and LoadPay (payment capture and NOA enforcement).

4. These platforms are not optional in practice. The largest brokers in the United States, including TQL and C.H. Robinson, rely on them as mandatory infrastructure, rendering participation in interstate freight commerce effectively impossible without submission to their combined rules.

---

## II. Carrier411 as a Proxy Enforcement and Fear Mechanism

5. Carrier411 operates as a reputational enforcement arm of the Enterprise, allowing brokers and affiliated entities to post warnings, flags, and derogatory comments that follow carriers across the industry.

6. A negative Carrier411 entry functions as an industry-wide blacklist, often resulting in immediate denial of loads by brokers who rely on Carrier411 as a proxy risk signal.

73

7. Carriers understand that:

  o Disputing payment;

  o Questioning an NOA;

  o Requesting statutory rate transparency;

  o Complaining about platform abuse; or

  o Refusing coercive terms

may trigger a Carrier411 posting that effectively ends their ability to operate.

8. This creates enterprise-wide discipline by fear, where carriers are kept "in check" not by direct threats from any one broker, but by the known consequences of reputational destruction enforced by proxy.

---

## III. Online Intimidation, Surveillance, and Targeting

9. The Enterprise's enforcement is not limited to formal platforms. Carriers who challenge practices are subjected to:

  o Online targeting;

  o Harassment;

  o Monitoring of social media activity, including Facebook pages;

  o Public disparagement intended to chill dissent.

10. These acts reinforce platform-based exclusion and serve as informal but effective intimidation, signaling to other carriers the consequences of non-compliance.

11. Such conduct further evidence coordination and shared objectives, not isolated actions.

74

**IV. Load Boards as Market Toll Booths**

(DAT and Truckstop Load Board)

12. DAT Freight & Analytics and the Truckstop Load Board function as the primary marketplaces for freight access.

13. Access to these load boards is a practical necessity for carriers, and brokers routinely post loads exclusively or primarily through them.

14. When combined with:

- RMIS and Highway onboarding requirements;

- Carrier411 reputational control; and

- Factoring-based payment capture,

These load boards operate as market toll booths, extracting compliance as the price of entry.

75

15. A carrier excluded, flagged, or blacklisted on these interconnected systems is effectively removed from the market, regardless of performance or legality of the underlying dispute.

---

## V. Ohio Corrupt Activity Act — Pattern of Corrupt Activity

16. Under Ohio law, an enterprise exists where persons are associated for a common purpose and engage in ongoing conduct.

17. Defendants engaged in a pattern of corrupt activity, consisting of repeated, related incidents including:

- Enforcement of Notices of Assignment by brokers TQL and C.H. Robinson at the direction or for the benefit of Truckstop Factoring, Denim, and LoadPay;

- Platform-based exclusion and flagging through RMIS, Highway, and Carrier411;

- Reputational intimidation through Carrier411 postings and online targeting;

- Payment diversion and refusal of direct payment;

- Use of MacroPoint tracking "violations" as punitive triggers.

18. These incidents are not isolated. They are repeatable, standardized practices used across the Enterprise and applied to carriers nationwide.

---

## VI. Ohio Antitrust (Valentine Act) — Combination in Restraint of Trade

19. Independently and in the alternative, Defendants' coordinated conduct constitutes a combination, contract, or conspiracy in restraint of trade under Ohio antitrust law.

20. By acting in concert to:

- Gate access to loads;

- Control reputation;

- Suppress transparency;

- Channel payment through controlled financial intermediaries; and

- Punish dissent through exclusion,

Defendants restrained carriers' ability to compete, negotiate, and operate freely in the marketplace.

21. No single Defendant could accomplish this alone. The restraint arises from interlocking platform dependence and mutual enforcement.

---

77

## VII. Transition to Sherman Act §§ 1–2

22. The same conduct constitutes a contract, combination, or conspiracy in restraint of trade in interstate commerce in violation of Sherman Act § 1.

23. Further, the Enterprise's control over:

- Load access (DAT, Truckstop Load Board);
- Carrier eligibility (RMIS, Highway);
- Reputation (Carrier411);
- Payment routing (Truckstop Factoring, Denim, LoadPay);

demonstrates market power and exclusionary conduct sufficient to support claims under Sherman Act § 2 for monopolization, attempted monopolization, or maintenance of monopoly power.

24. Carriers who do not submit to Enterprise rules are excluded, blacklisted, or financially coerced, while compliant actors are allowed to participate—classic exclusionary conduct.

## VIII. Purpose and Relief

25. Plaintiff does not seek to dismantle lawful brokerage operations.

26. Plaintiff seeks declaratory, injunctive, and equitable relief to:

78

- Prevent use of reputational platforms as coercive weapons;

- Require neutrality and due process in payment disputes;

- Prohibit retaliation for exercising statutory rights;

- Restore access to interstate commerce free from proxy intimidation.

27. Judicial intervention is required to prevent the continued operation of a private, platform-based enforcement regime that substitutes fear and exclusion for lawful competition.

# I. WHAT RACKETEERING IS — STATUTORY, HISTORICAL, AND JUDICIAL FRAMEWORK

## A. Congressional Purpose of RICO

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, was enacted to eradicate organized, ongoing criminal conduct carried out through legitimate-appearing enterprises.

Congress expressly found that racketeering schemes had evolved beyond street crime and were being conducted through:

- Corporations,

79

- Contractual relationships,

- Financial intermediaries,

- And industry-wide systems insulated by complexity and fragmentation.

RICO therefore targets patterns of conduct, not isolated acts, and enterprises, not merely individual wrongdoers.

---

## B. RICO Is Not Limited to the Mafia — Supreme Court Authority

Although RICO was famously used to dismantle mafia families, the Supreme Court has repeatedly held that:

RICO applies to any enterprise—legitimate or illegitimate—that conducts its affairs through a pattern of racketeering activity.

Key controlling cases include:

- United States v. Turkette, 452 U.S. 576 (1981)

  → An enterprise may be entirely legitimate and still be a RICO enterprise.

- Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985)

  → RICO is to be construed broadly; civil RICO is not limited to traditional organized crime.

- H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)

→ A "pattern" requires related acts plus continuity, which may be closed-ended or open-ended.

- Boyle v. United States, 556 U.S. 938 (2009)

  → An association-in-fact enterprise requires only:

  1. A common purpose
  2. Relationships among associates
  3. Longevity sufficient to pursue that purpose

No hierarchy, formal structure, or single mastermind is required.

---

## C. Modern RICO: Corporate & Platform-Based Enterprises

Modern RICO cases routinely involve:

- Financial services
- Insurance
- Logistics
- Technology platforms
- Payment processors

Courts recognize racketeering where economic coercion, deception, and control of money flows are used systematically to extract value from a vulnerable class.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

This case fits squarely within that evolution.

---

## II. PATTERN OF RACKETEERING ACTIVITY

(18 U.S.C. §§ 1962(c), 1961(1), 1961(5))

---

### A. Enterprise Allegations (Incorporated)

Plaintiff incorporates by reference the Enterprise allegations identifying Total Quality Logistics, LLC ("TQL"), C.H. Robinson Worldwide, Inc., and all other Brokers, Truckstop.com, LLC, Truckstop Factoring / Truckstop Payments, RMIS, Highway, Denim, LoadPay, MacroPoint, and associated brokers, platforms, and payment entities as members of an association-in-fact enterprise.

---

### B. Overview of the Pattern

From at least 2018 through the present, Defendants conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, consisting of repeated and related acts of:

- Wire fraud (18 U.S.C. § 1343)

- Extortion by economic fear (Hobbs Act, 18 U.S.C. § 1951)

82

- Financial coercion and interference with commerce

- Deprivation of property through fraudulent and coercive means

These acts were not isolated, but formed a regular way of doing business.

---

## C. Predicate Act Category One — Wire Fraud

(18 U.S.C. § 1343)

### 1. Fraudulent Representations Regarding Optional Payment & Factoring

Defendants Truckstop, Truckstop Factoring, Denim, and LoadPay, in coordination with brokers including TQL and C.H. Robinson, transmitted representations via interstate wires that:

- Factoring was optional;

- Carriers could choose which loads to factor;

- Direct payment, Quick Pay, or paper check remained available alternatives.

These representations were materially false.

Once Notices of Assignment were issued by Truckstop Factoring, Denim, or LoadPay and transmitted electronically to brokers including TQL and C.H. Robinson, carriers were no longer able to access any non-factoring payment pathway.

83

## 2. Platform-Based Transmission of False Control Signals

Defendants Truckstop, RMIS, and Highway transmitted carrier status, payment restrictions, and compliance flags through interstate wires, representing that such controls were neutral or compliance-based.

In reality, these signals were used to:

- Enforce factoring capture;
- Justify payment refusal;
- Exclude carriers who disputed NOAs or requested transparency.

## D. Predicate Act Category Two — Extortion by Economic Fear

(18 U.S.C. § 1951)

## 3. Withholding Earned Compensation to Compel Submission

Defendants Megellen, TQL and C.H. Robinson withheld earned freight payments after performance, enforcing NOAs issued by Truckstop Factoring, Denim, or LoadPay, knowing that:

- Carriers depended on immediate payment for food, fuel, and basic survival;
- No neutral escrow or interpleader was offered;

84

- Payment would not be released absent compliance.

---

## 4. Waiver-Conditioned Releases as Extortionate Leverage

When carriers sought Letters of Release to restore payment, Truckstop Factoring, Denim, and LoadPay conditioned release on waiver of legal rights and claims.

Brokers including TQL and C.H. Robinson enforced the NOAs knowing that the carrier could not obtain a release without surrendering rights.

This constitutes obtaining property (earned receivables) by wrongful use of economic fear.

---

## E. Predicate Act Category Three — Coercive Surveillance & Punitive Enforcement

## 5. MacroPoint and Technical Violations as Enforcement Triggers

Defendant MacroPoint, acting in concert with TQL, C.H. Robinson, and other brokers, generated alleged "tracking violations" that were later used to:

- Delay payment;
- Reduce compensation;
- Justify carrier exclusion.

85

These violations were:

- Vaguely defined;

- Retroactively enforced;

- Not subject to neutral review.

---

## F. Predicate Act Category Four — Suppression of Statutory Transparency

## 6. Retaliation for Requesting Shipper Rate Disclosure

Federal law requires brokers to disclose shipper compensation upon request.

Defendants TQL, C.H. Robinson, Truckstop, RMIS, and Highway participated in a coordinated practice whereby carriers who requested transparency were:

- Blacklisted;

- Flagged across platforms;

- Denied future loads.

Carriers were compelled to waive statutory rights as a condition of continued market access.

86

**G. Predicate Act Category Five — Financial Capture & Unjust Enrichment**

**7. Diversion of Freight Revenue Through the Enterprise**

Defendants TQL, C.H. Robinson, Truckstop, Denim, and LoadPay structured transactions so that:

- Shippers paid full freight rates;

- Carriers received a fraction;

- The balance was retained by brokers and financial intermediaries shielded by opacity.

This diversion was enabled by:

- Suppressed transparency;

- Platform-enforced silence;

- Retaliatory exclusion.

**H. Relatedness and Continuity**

**1. Relatedness**

All racketeering acts:

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

- Had the same purpose (control payment and access);

- Involved the same victims (carriers);

- Used the same methods (contracts, platforms, NOAs, surveillance);

- Benefited the same participants (brokers, platforms, factors).

## 2. Continuity

- Closed-ended continuity: Acts occurred repeatedly over years.

- Open-ended continuity: Practices continue as the regular way Defendants conduct business.

---

## I. Liability Under 18 U.S.C. § 1962(c) and (d)

Each Defendant:

- Conducted or participated in the conduct of the Enterprise's affairs;

- Through a pattern of racketeering activity;

- And conspired to do the same.

## ENTERPRISE SCHEME SUMMARY "THE SCRIPT"

## Organized Nationwide Carrier Rate Suppression

## Overview of the Scheme

88

Defendants collectively participate in an organized, technology-driven enterprise that suppresses motor carrier rates nationwide by removing negotiation, standardizing coercive surveillance, and enforcing punishment through payment controls. Although each defendant plays a different role, their conduct is interdependent and produces a single outcome: carriers are paid less everywhere, cannot negotiate anywhere, and are told "this is just the market." This is a narrated and **scripted** plan.

The scheme operates across state lines and affects virtually every freight lane, converting what were once regional backhauls into a permanent national condition of artificially low rates.

---

## ROLE OF EACH DEFENDANT IN THE ENTERPRISE

**1.**

**C.H. Robinson Worldwide, Inc. — Market-Setting Broke**

C.H. Robinson is one of the largest freight brokers in North America and functions as a rate anchor for the industry. Even when a carrier is not enrolled in its network, C.H. Robinson:

- Solicits carriers into the same surveillance ecosystem,
- Declares invasive tracking "industry standard," and
- Normalizes the idea that rates are non-negotiable.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Because of its size, C.H. Robinson does not need to explicitly collude; its practices become the benchmark that smaller brokers follow to remain "competitive." When C.H. Robinson says "this is the rate," the market adjusts downward.

---

**2.**

**Magellan Transport Logistics — Transaction-Level Enforcement**

Magellan represents how mid-tier brokers operationalize the scheme. It:

- Issues rate confirmations with GPS tracking monetized as a line item,

- Requires MacroPoint tracking,

- Receives full performance and tracking compliance,

- Then short-pays carriers anyway—in identical dollar amounts ($300 per load).

Magellan demonstrates that this is not a pricing dispute, but post-performance rate suppression, where brokers retain unilateral power to reduce pay after delivery, knowing carriers lack leverage once the freight is moved.

---

**3.**

**MacroPoint, Inc. — Surveillance and Punishment Infrastructure**

MacroPoint is the technological backbone of the scheme. It enables brokers to:

- Force drivers to use personal phones for continuous tracking,

- Convert normal connectivity gaps into "violations," and

- Justify rate reductions and short payments.

MacroPoint transforms visibility into leverage. Tracking is no longer about delivery—it becomes a pretext to discipline carriers financially, regardless of on-time performance.

---

**4.**

**Highway / RMIS / Platform Defendants — Gatekeeping and Exclusion**

These platform defendants act as private regulators:

- Controlling who may access freight,

- Requiring submission of sensitive data,

- Enforcing uniform compliance profiles.

Carriers who resist the system are excluded, not because of safety or performance, but because they do not submit to the enterprise's control mechanisms. This eliminates competitive pressure that would otherwise force brokers to raise rates.

---

**5.**

91

**Factoring / Payment Control Defendants**

Factoring and payment-linked defendants:

- Reinforce broker control by restricting cash flow,

- Lock carriers into dependency,

- Make it economically impossible to reject low-paying freight.

Together, they ensure that carriers cannot afford to walk away, even when rates fall below operating cost.

---

## HOW THE SCHEME ELIMINATES NEGOTIATION

Under normal market conditions, a carrier can negotiate based on:

- Equipment availability,

- Fuel costs,

- Deadhead,

- Urgency.

Under the Enterprise's system:

- Rates are pre-set by algorithm and "market dashboards,"

- Brokers refuse counteroffers,

92

- Carriers are told "that's the rate" or the call ends.

There is no bilateral negotiation. The carrier either accepts the suppressed rate or is excluded.

---

## FLORIDA AS THE EXAMPLE — BUT NOT THE EXCEPTION

Florida is used as the justification, not the cause.

Brokers like TQL routinely pay under $1.00 per mile out of Florida, with the sole explanation:

"It's Florida. Everybody pays less than a dollar."

This is not a market explanation—it is a script.

What matters legally is that:

- The same logic is applied everywhere,

- Every outbound lane is labeled a "bad backhaul,"

- Every inbound lane is priced as if carriers have no alternative.

As a result:

- Florida loads are cheap because they're Florida,

- Texas loads are cheap because they're Texas,

- Midwest loads are cheap because they're Midwest,

93

- California loads are cheap because they're California.

Every region is treated as a permanent backhaul.

---

## THE NATIONAL EFFECT: EVERY LOAD IS A CHEAP BACKHAUL

The Enterprise has eliminated the traditional concept of:

- Headhaul vs. backhaul,

- Seasonal rate variation,

- Regional supply-demand correction.

Instead:

- All loads are priced at or below marginal cost,

- Fuel increases are not passed through,

- Carriers absorb inflation while brokers maintain margins.

Because the same platforms, tracking tools, and payment controls are used nationwide, rate suppression is uniform across state lines, satisfying the interstate commerce element.

---

## WHY THIS IS NOT "JUST THE MARKET"

94

This is not independent decision-making. It is:

- Standardized technology,

- Uniform scripts,

- Shared platforms,

- Identical penalty structures,

- Identical refusal to negotiate.

Carriers are not negotiating against individual brokers; they are negotiating against a closed system that has already decided the rate.

That is organized rate suppression, not competition.

---

**CORE THEORY FOR THE COURT**

Defendants replaced open market negotiation with a private, technology-enforced regime that suppresses carrier rates nationwide, eliminates bargaining, and punishes carriers after performance—resulting in every lane functioning as a permanent low-pay backhaul regardless of geography.

**DAMAGES AND ECONOMIC IMPACT**

**Enterprise-Wide Rate Suppression and Expert Economics**

95

## A. Economic Theory of Harm (How the Scheme Depresses Prices)

The Enterprise's conduct causes harm through price suppression, not isolated billing disputes. Defendants collectively replaced open, bilateral rate negotiation with a closed, technology-enforced pricing system that fixes carrier compensation at artificially low levels.

From an economic perspective, the scheme operates by:

1.  Eliminating Negotiation

    Brokers uniformly refuse counteroffers. Carriers face a binary choice: accept the posted rate or lose access to freight entirely. This removes the normal market mechanism that allows prices to rise when capacity tightens.

2.  Creating Artificial Oversupply Signals

    Broker platforms and dashboards present freight as perpetually oversupplied, even when equipment and drivers are scarce. These signals are reinforced industry-wide, anchoring rates downward.

3.  Imposing Surveillance-Backed Enforcement

    Phone-based tracking (MacroPoint) is used not merely for visibility but as leverage, enabling post-performance punishment. This deters carriers from rejecting low rates, because payment itself becomes uncertain.

4.  Shifting Risk Without Compensation

Costs normally borne by brokers—visibility gaps, infrastructure limitations, payment certainty—are shifted onto carriers without corresponding rate increases.

Economically, this produces **monopsony-like** conditions: many carriers competing to sell services into a market controlled by a small number of dominant buyers using common tools and rules.

---

## B. Why "Every Load Becomes a Cheap Backhaul"

Traditionally, freight markets distinguish between:

- Headhaul lanes (high demand, higher rates), and
- Backhaul lanes (imbalanced, lower rates).

The Enterprise eliminates this distinction.

Through standardized pricing scripts ("that's the market"), algorithmic rate posting, and refusal to negotiate, every region is treated as structurally disadvantaged, regardless of actual supply-demand conditions.

Florida illustrates the mechanism, not an exception:

- Brokers pay under $1.00 per mile out of Florida,
- Justification: "It's Florida—everyone pays under a dollar,"
- No negotiation permitted.

97

The same justification is applied elsewhere:

- Texas is cheap because "capacity is loose,"

- Midwest is cheap because "rates are down,"

- California is cheap because "outbound is bad."

An economist will testify that when every lane is priced as a backhaul, the pricing model is no longer market-responsive. It is administratively suppressed.

---

## C. Direct Damages to Carriers (Micro-Level)

At the carrier level, damages are concrete and measurable.

### 1. Per-Load Underpayment

Carriers are paid below competitive rates for each load. In addition, brokers impose post-delivery deductions (commonly $250–$350) tied to tracking or compliance pretexts, even when loads are delivered on time.

These are not liquidated damages. They are penalties that reduce compensation below the already suppressed base rate.

### 2. Forced Acceptance Below Cost

98

Operating costs (fuel, insurance, equipment, labor) rise independently of broker pricing. When rates fall below operating cost, carriers incur:

- Negative margins per mile,

- Increased debt,

- Inability to reinvest or exit bad lanes.

An economist will calculate but-for rates using cost-plus or competitive benchmark models and show that actual payments fall materially below those benchmarks.

---

### D. Aggregate and Class-Wide Damages (Macro-Level)

The Enterprise's conduct causes market-wide harm, not isolated losses.

An expert economist will demonstrate:

1. Price Suppression Across Markets

   Using lane-level data, average broker-paid rates can be compared to:

   - Historical rates before platform dominance,

   - Spot market indices absent enforcement mechanisms,

   - Cost-adjusted benchmarks.

2. Uniform Downward Pricing Patterns

99

The same depressed pricing appears across unrelated geographies, which is inconsistent with independent decision-making and consistent with coordinated conduct.

3. Suppressed Variance

Normal markets show price dispersion. Here, rates cluster tightly at low levels, indicating administrative pricing rather than competitive bidding.

4. Excess Broker Margin Capture

As carrier rates fall, broker spreads remain stable or increase, demonstrating that savings are not passed through to shippers proportionally.

---

**E. Causation (Why Defendants' Conduct Caused the Harm)**

The causal link is direct:

- Defendants control access to freight,

- Defendants impose non-negotiable pricing,

- Defendants enforce compliance through surveillance and payment control,

- Carriers cannot reject rates without exclusion.

Absent the Enterprise:

- Carriers would negotiate based on equipment scarcity and cost,

- Rates would vary by lane and season,

- Brokers would compete for capacity by raising offers.

The Enterprise's tools remove those competitive responses, causing predictable price suppression.

---

### F. Damages Methodology (Expert Testimony Framework)

An economist retained in this case will calculate damages using accepted methods, including:

1. But-For Pricing Models

   Estimating what carriers would have been paid absent the Enterprise's restraints.

2. Benchmark Comparisons

   Comparing suppressed rates to:

   - Independent carrier-to-shipper contracts,

   - Non-platform transactions,

   - Historical pre-platform pricing.

3. Regression Analysis

   Controlling for fuel, distance, equipment, and seasonality to isolate the effect of Enterprise conduct on rates.

4. Aggregate Loss Calculation

101

Multiplying per-mile or per-load suppression by the number of affected loads over time.

These methodologies are standard, peer-reviewed, and routinely accepted by courts.

---

## G. Summary for the Court

Defendants' concerted use of shared platforms, surveillance enforcement, and payment control suppresses carrier rates nationwide, eliminates negotiation, and converts every lane into a permanent low-pay backhaul. The resulting damages are measurable, predictable, and directly attributable to the Enterprise's conduct, and will be proven through expert economic analysis

## RICO ENTERPRISE, LINKAGES, AND DAMAGES

## Nationwide Rate Suppression Through Surveillance, Gatekeeping, and Payment Control

## A. The Association-in-Fact Enterprise (Named Defendants and Linkages)

At all relevant times, Truckstop, LLC; Internet Truckstop Payments, LLC; RMIS; Denim; Highway; MacroPoint, Inc.; C.H. Robinson Worldwide, Inc.; and Magellan Transport Logistics (collectively, the "Enterprise"), together with John Doe Brokers and Platform Entities, constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The Enterprise had relationships, a common purpose, and longevity sufficient to pursue that purpose.

## Common Purpose

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

To suppress carrier compensation nationwide, eliminate negotiation, and shift risk and cost to carriers by conditioning access to freight and payment on non-statutory surveillance, platform gatekeeping, and post-performance payment controls.

**Relationships and Functional Linkages (By Defendant)**

- C.H. Robinson Worldwide, Inc. (Market-Setting Broker).

  As a dominant broker, C.H. Robinson sets pricing norms and declares invasive tracking "industry standard," anchoring rates downward. Its requirements normalize the Enterprise's rules and are followed by smaller brokers to remain "competitive."

- Magellan Transport Logistics (Transaction-Level Enforcer).

  Magellan operationalizes the scheme at the load level by issuing rate confirmations that mandate MacroPoint tracking, monetize "GPS tracking" as a line item, then short-pay carriers post-delivery (e.g., $300 per load) despite documented compliance, demonstrating standardized enforcement rather than error.

- MacroPoint, Inc. (Surveillance & Punishment Infrastructure).

  MacroPoint supplies the phone-based, real-time tracking that brokers require. It flags interruptions inherent to interstate travel and transmits data brokers use to justify rate reductions and withheld pay, converting visibility into economic discipline.

103

- Highway (Carrier Profiling & Data Interfacing).

  Highway aggregates carrier data and enforces uniform onboarding and compliance gates, enabling brokers to exclude carriers unwilling to submit to the Enterprise's controls and thereby remove competitive pressure to raise rates.

- RMIS (Compliance Gatekeeper).

  RMIS functions as a private regulator, controlling access by profile status and reinforcing uniform requirements across brokers, further foreclosing negotiation and entry.

- Truckstop, LLC (Marketplace & Platform).

  Truckstop provides the loadboard and market dashboards that broadcast uniform pricing signals and scripts ("that's the rate"), facilitating non-negotiable offers across lanes and regions.

- Internet Truckstop Payments, LLC (Payment Control).

  This entity links platform participation to payment flow, amplifying broker leverage and ensuring carriers cannot practically refuse suppressed rates without jeopardizing cash flow.

- Denim (Factoring/Payment Dependency).

  Denim reinforces the scheme by locking carriers into payment dependency, making it economically infeasible to reject low rates or challenge post-delivery deductions.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Interdependence: Brokers set and enforce rates; MacroPoint supplies surveillance leverage; Highway/RMIS gate access; Truckstop disseminates pricing signals; Payments/Factoring enforce compliance through cash flow. Each defendant's conduct depends on and reinforces the others.

---

### B. The Racketeering Scheme (How the Enterprise Suppresses Rates)

1. Elimination of Negotiation.

   Offers are posted as non-negotiable; counteroffers are refused; calls end. Carriers must accept or be excluded.

2. Surveillance-Backed Enforcement.

   Mandatory phone tracking (MacroPoint) converts ordinary connectivity gaps into "violations," enabling post-performance penalties unrelated to delivery.

3. Gatekeeping & Exclusion.

   Highway/RMIS profiles exclude non-compliant carriers, removing rivals that would otherwise bid rates up.

4. Payment Control.

   Platform payments and factoring ensure carriers cannot walk away, even when rates fall below cost.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

5. Nationwide Standardization.

The same tools, scripts, and penalties operate across states, converting every lane into a permanent low-pay backhaul (e.g., Florida paid under $1.00/mile with the refrain "everybody pays less," replicated nationwide).

---

## C. Predicate Acts and Continuity (Brief)

Defendants conducted and participated in the Enterprise's affairs through a pattern of racketeering activity, including repeated use of interstate wires (platform postings, tracking transmissions, payment communications) to induce acceptance of suppressed rates, justify deductions, and withhold compensation. The acts are related (same purpose, victims, methods) and continuous (ongoing, standardized, nationwide).

---

## D. Causation (Direct Link to Carrier Harm)

Defendants' coordinated conduct directly caused carrier losses by:

- Fixing effective prices at artificially low levels,
- Removing negotiation as a market corrective,
- Imposing predictable post-delivery deductions (commonly $250–$350 per load),
- Forcing acceptance through exclusion and payment dependency.

106

Absent the Enterprise, carriers would negotiate based on cost, scarcity, and lane conditions; rates would vary and rise when capacity tightens. The Enterprise suppresses that response.

---

## E. RICO DAMAGES (18 U.S.C. § 1964(c)) — MEASURABLE AND TREBLED

**Compensable Damages**

Plaintiff and similarly situated carriers suffered injury to business and property by reason of the RICO violations, including:

1. Per-Load Underpayment:

   Payments below competitive "but-for" rates on each load.

2. Post-Performance Deductions:

   Standardized short pays (e.g., $250–$350) imposed despite on-time delivery and tracking compliance.

3. Forced Below-Cost Operations:

   Acceptance of rates beneath operating cost due to exclusion and cash-flow coercion.

4. Lost Profits & Opportunity Costs:

107

Inability to negotiate higher rates or reallocate capacity.

## Proof and Quantification

Damages will be proven through expert economic analysis, including:

- But-for pricing models (cost-plus and competitive benchmarks),
- Benchmark comparisons (pre-platform periods, non-platform transactions),
- Regression analysis controlling for fuel, distance, equipment, and seasonality,
- Aggregation across affected loads and time.

## Mandatory Trebling and Fees

Under 18 U.S.C. § 1964(c), Plaintiff seeks:

- Treble damages (three times actual damages),
- Costs and reasonable attorneys' fees, and
- Equitable relief as appropriate.

Trebling is warranted because the harms are systemic, foreseeable, and intended consequences of the Enterprise's design.

---

## F. One-Sentence Summary for the Court

108

By coordinating surveillance, gatekeeping, platform pricing, and payment control, Defendants replaced open negotiation with a private enforcement regime that suppresses carrier rates nationwide; the resulting underpayments and deductions are direct RICO damages subject to mandatory trebling

## DEFENDANT: INTERNET TRUCKSTOP PAYMENTS, LLC

("Truckstop Payments")

## A. Role in the Enterprise and Market Function

Internet Truckstop Payments, LLC is a central financial actor within the Integrated Freight Data-Control Conglomerate Enterprise. Plaintiff alleges that Truckstop Payments designed, implemented, and operated a system in which small motor carriers and owner-operators were unable to receive payment for hauling freight unless they surrendered control of their receivables and payment routing to Defendants' proprietary platforms.

109

Once subjected to this system, carriers were unable to freely exit without risking loss of income, business continuity, credit access, or operational viability. Payments were delayed, fragmented, unexplained, or withheld, and carriers lacked any practical mechanism to audit, challenge, or bypass Defendants' control while remaining active in the freight market.

Truckstop Payments did not function as a neutral payment processor. Plaintiff alleges it exercised discretionary control over who was paid, when payment was released, how payment amounts were calculated or disbursed, and whether carriers could continue operating long enough to haul subsequent loads. This authority was exercised deliberately, repeatedly, and across state lines.

---

## B. RICO — Conduct or Participation

(Reves v. Ernst & Young Standard)

Truckstop Payments conducted and participated in the affairs of the Enterprise by designing, directing, and enforcing financial choke points that governed carrier survival within the freight ecosystem. Specifically, Truckstop Payments:

- exercised decision-making authority over carrier receivables and payment routing;
- controlled the timing, release, fragmentation, and withholding of payments;

110

- coordinated payment control with load-access, onboarding, and compliance platforms; and

- enforced compliance through liens, assignments, and non-negotiable platform rules.

Plaintiff alleges this constituted active management and operation of the Enterprise, not the passive provision of financial services.

---

## C. Wire Fraud

(18 U.S.C. § 1343)

## 1. Scheme to Defraud

Plaintiff alleges that Truckstop Payments devised and executed a scheme to defraud carriers by representing that payments would be fast, transparent, accurate, and based on broker remittances, while concealing material facts regarding payment calculation, internal holds, offsets, delays, and discretionary control.

111

In practice, Defendants allegedly:

- concealed payment methodologies;

- delayed or fragmented payments without explanation;

- issued nominal or token payments;

- retained custody of full proceeds while claiming payment authority; and

- used liens, assignments, and platform lock-in to prevent carrier exit.

The purpose of the scheme was to retain custody and control of carrier funds and to force continued dependence on Defendants' systems.

## 2. Use of Interstate Wires

To execute the scheme, Truckstop Payments repeatedly used interstate wire communications, including:

- electronic Notices of Assignment transmitted to brokers;

- electronic payment routing instructions;

- platform dashboards displaying misleading payment information;

- automated emails and portal communications;

- ACH and electronic funds transfer systems; and

- interstate servers and cloud-based ledgers.

Each transmission furthered the scheme by reinforcing Defendants' control, preventing direct broker-to-carrier payment, and concealing the true disposition of funds.

## 3. Material Misrepresentations and Omissions

Plaintiff alleges that Defendants' wire communications were fraudulent because they:

- misrepresented that payments reflected broker remittances;

- omitted material facts about internal holds, offsets, and delays;

- failed to disclose the absence of independent audit rights; and

- failed to disclose that liens and assignments would be used to block exit.

A reasonable carrier would not surrender control of receivables if these facts were disclosed.

## 4. Intent

113

Plaintiff alleges Defendants acted knowingly and intentionally. The payment system was engineered to maximize leverage, prevent competition, lock carriers into dependence, and shift financial risk entirely onto carriers. The same practices were applied repeatedly to numerous carriers over time.

---

## D. Pattern of Racketeering Activity

Plaintiff alleges that Defendants' acts constitute a pattern of racketeering activity because they were related, served the same purpose of financial control, and were continuous, posing a threat of ongoing criminal conduct. The system remains operational.

---

## E. Antitrust — Sherman Act § 1 (Restraint of Trade)

Truckstop Payments coordinated with load boards, onboarding gatekeepers, compliance platforms, and brokers to condition access to freight on acceptance of Defendants' payment-control systems. Plaintiff alleges this coordination constitutes a contract, combination, or conspiracy in restraint of trade.

114

The anticompetitive effects include:

- foreclosure of alternative payment methods;

- suppression of carrier autonomy;

- early elimination of new carriers; and

- transfer of leverage from carriers to brokers and platforms.

Plaintiff alleges this conduct is not competition on the merits but coercion through infrastructure control.

---

## F. Antitrust — Sherman Act § 2 (Monopolization / Attempt)

Plaintiff alleges Truckstop Payments acquired and maintained market power by controlling essential gateways, foreclosing alternatives, imposing non-negotiable terms, and using liens and assignments to punish exit. Relevant markets include freight payment processing for small carriers, carrier receivables control, and broker-mandated payment routing tied to load access.

---

## G. Causation and Damages

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

As a direct and proximate result of Defendants' conduct, Plaintiff alleges she lost access to earned income, was unable to meet basic operational and personal expenses, suffered business collapse and personal harm, and remains exposed to ongoing economic peril. These harms were foreseeable and profitable to Defendants.

---

## H. Enterprise Financial Coercion Through Blanket Asset Encumbrance

(UCC-1–Based Control)

At the center of Defendants' conduct is a UCC-1 financing statement filed by Truckstop Payments purporting to grant a security interest in all present and future assets of the carrier for a five-year term, including assets unrelated to factoring or freight.

Plaintiff alleges:

- the lien asserted control over personal and business assets, bank accounts, future income, and after-acquired property;

- the scope far exceeded any legitimate commercial justification;

- the lien effectively prevented refinancing, exit, or alternative payment arrangements; and

- Defendants failed to clearly disclose the breadth and consequences of the encumbrance.

116

Plaintiff alleges the lien functioned as a coercive enforcement mechanism, not risk management, and was integral to Defendants' racketeering and anticompetitive scheme.

---

## I. Summary

Plaintiff alleges that Internet Truckstop Payments, LLC transformed a purported payment service into an economic gatekeeping system that foreclosed competition, coerced carriers, and exercised unlawful control over receivables and market access through coordinated enterprise conduct, wire fraud, blanket asset encumbrance, and restraint of trade.

---

## STATUTORY VIOLATIONS — DEFENDANT-SPECIFIC APPLICATION

(Sherman Act + RICO + Racketeering — Truckstop Load Board)

---

## DEFENDANT: INTERNET TRUCKSTOP, INC.

117

d/b/a Truckstop Load Board

(Dominant Freight Load Board – Market Access Controller)

---

## I. IDENTITY, OWNERSHIP, AND PLATFORM ROLE

Internet Truckstop, Inc. ("Truckstop") operates one of the largest electronic freight load boards in the United States, providing nationwide freight postings and broker-to-carrier matching across interstate commerce.

Truckstop is:

- Not a motor carrier

- Not a freight broker

- Not a freight forwarder

- Not a government regulator

Truckstop nevertheless functions as a primary gatekeeper to freight access, controlling visibility, eligibility, and market participation for carriers nationwide.

118

Truckstop is the parent company of RMIS, having acquired RMIS in or about 2018, and operates the load board in tight integration with RMIS compliance determinations.

---

## II. INTEGRATION WITH RMIS AND DEPENDENCE ON COMPLIANCE STATUS

Truckstop conditions effective access to its load board on a carrier's RMIS compliance status.

In practice:

- RMIS serves as the carrier data and compliance authority
- Truckstop Load Board serves as the market access enforcement mechanism
- Brokers rely on both in tandem
- Carriers have no meaningful alternative

This integration forms a closed-loop system controlling:

- Eligibility
- Visibility
- Load access
- Economic survival

119

## III. AUTOMATIC 24–48 HOUR "BLACKOUT" UPON RMIS PROFILE CHANGES

Truckstop enforces a 24–48 hour blackout period on carriers whenever any change is made to the carrier's RMIS profile, including minor, non-substantive updates, such as:

- Changing a truck number

- Updating equipment details

- Correcting clerical information

- Making routine administrative edits

During this blackout period:

- The carrier is effectively removed from the Truckstop marketplace

- Load visibility is restricted or suspended

- Brokers refuse to tender freight

- Income is immediately disrupted

This blackout occurs automatically, without:

- Notice

120

- Hearing

- Emergency exception

- Carrier consent

- Opportunity to dispute or expedite

---

## IV. COERCIVE EFFECT AND ECONOMIC HARM

The blackout mechanism functions as a punitive and coercive enforcement tool, not a legitimate safety or compliance measure.

Even trivial changes result in:

- Immediate market exclusion

- Lost loads and revenue

- Broker distrust

- Reputational harm

Carriers are thus discouraged from correcting errors or updating records, forced to choose between:

121

- Maintaining inaccurate information, or

- Losing access to the market

This creates a perverse incentive structure that benefits brokers and platforms while harming carriers.

---

## V. ABSENCE OF REGULATORY AUTHORITY OR DUE PROCESS

Truckstop has no statutory authority to:

- Suspend a carrier's market access

- Impose blackout penalties

- Enforce compliance sanctions

Yet it does so anyway, without:

- FMCSA oversight

- Due process protections

- Neutral review

- Carrier-side appeal

122

Truckstop acts as a private regulator, imposing economic punishment outside the law.

---

## VI. SHERMAN ACT § 1 — CONCERTED RESTRAINT OF TRADE

15 U.S.C. § 1

Truckstop knowingly participates in contracts, combinations, and conspiracies with RMIS and broker customers to restrain trade in interstate commerce.

The restraint includes:

- Coordinated denial of market access
- Collective refusal to deal during blackout periods
- Conditioning freight access on submission to a single compliance system

This conduct constitutes a group boycott and concerted refusal to deal.

---

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

## VII. SHERMAN ACT § 2 — ATTEMPTED MONOPOLIZATION

15 U.S.C. § 2

Truckstop has attempted to monopolize the freight-load access and carrier eligibility market by:

- Integrating load access with RMIS compliance
- Penalizing carriers for routine updates
- Eliminating practical alternatives
- Locking carriers into its ecosystem

This monopoly power is maintained through coercion and dependency, not competition.

---

## VIII. RICO — ASSOCIATION WITH AND CONDUCT OF AN ENTERPRISE

18 U.S.C. § 1962(c)

Truckstop is associated with and conducts the affairs of an enterprise-in-fact consisting of:

124

- Truckstop Load Board

- RMIS

- Truckstop Factoring

- Broker customers (including TQL)

Within the enterprise, Truckstop serves as the market-access enforcement arm, executing exclusions generated by RMIS data changes.

---

## IX. RACKETEERING PREDICATE ACTS (NON-MAIL)

**A.**

**Wire Fraud — 18 U.S.C. § 1343**

Truckstop engages in a scheme to defraud carriers by:

- Representing fair and continuous market access

- Concealing automatic blackout penalties

- Failing to disclose the consequences of minor RMIS updates

- Omitting material facts regarding integration with RMIS

125

Carriers pay subscription fees while unknowingly subject to undisclosed suspension mechanisms.

---

**B.**

**Hobbs Act Extortion — 18 U.S.C. § 1951**

Truckstop facilitates extortion by obtaining property through the wrongful use of economic fear, including:

- Threat of sudden loss of market access
- Forced compliance with RMIS demands
- Economic pressure to avoid updates or corrections

The property obtained includes:

- Subscription revenue
- Compliance concessions
- Control over carrier behavior
- Economic leverage

126

## X. RICO CONSPIRACY

18 U.S.C. § 1962(d)

Truckstop knowingly conspired with RMIS and broker customers to further the enterprise's unlawful objectives.

Each participant is liable for the acts of the others.

## XI. AGGRAVATING FACTORS

Truckstop:

- Owns RMIS
- Controls a dominant load board
- Enforces automatic blackouts
- Penalizes minor administrative changes

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

- Provides no due process

Yet exercises extra-legal control over interstate commerce.

---

## XII. LIABILITY

Truckstop is jointly and severally liable for:

- Antitrust damages

- Racketeering damages

- Lost income from blackout periods

- Treble damages under the Sherman Act and RICO

128

**DEFENDANT: DAT FREIGHT & ANALYTICS, LLC**

(d/b/a DAT Load Board; DAT Solutions, LLC)

("DAT")

**A. Role in the Enterprise and Market Function**

DAT Freight & Analytics, LLC operates one of the largest and most influential digital freight-matching and load-visibility platforms in the United States. Plaintiff alleges that DAT functions as a primary gateway to freight access, providing brokers with near-exclusive visibility and control over load postings while conditioning carrier participation on compliance with broker-centric rules and integrated third-party platforms.

DAT is not a neutral marketplace. Plaintiff alleges that DAT operates as a broker-first infrastructure provider, whose systems materially determine whether carriers can see, bid on, or secure freight, and whose policies shape how brokers select, monitor, and exclude carriers from the market.

129

## B. Enterprise Conduct and Participation

Plaintiff alleges that DAT conducted and participated in the affairs of the Integrated Freight Data-Control Conglomerate Enterprise by providing the essential load-access layer upon which other Enterprise Defendants depended to enforce compliance, payment control, and exclusion.

DAT's participation included:

- controlling carrier visibility to available freight;
- integrating or deferring to third-party onboarding, compliance, and verification platforms;
- enabling broker-imposed conditions on carrier participation; and
- reinforcing adverse compliance or risk designations generated by other Enterprise members.

Plaintiff alleges that DAT's role was active and knowing, not incidental, as its platform architecture and policies amplified the coercive effects of the Enterprise as a whole.

## C. Broker-Centric Design and Lack of Carrier Protections

130

Plaintiff alleges that DAT's platform is structurally designed to benefit brokers while offering no meaningful protections or reciprocal obligations for carriers. Specifically, Plaintiff alleges that DAT:

- does not meaningfully verify brokers despite brokers' control over rates, payment, and load representation;
- permits brokers to require compliance with external platforms as a condition of freight access;
- allows or normalizes communications through non-traditional or opaque channels; and
- provides carriers with limited recourse when loads are misrepresented, payments are delayed, or disputes arise.

As a result, carriers allegedly bear disproportionate risk while brokers retain control and anonymity.

---

## D. Facilitation of Opaque and Offshore Practices

131

Plaintiff alleges that DAT's systems permit and normalize the use of non-transparent communication methods, including encrypted messaging applications, virtual phone numbers, and offshore contact points, without meaningful identity verification or domestic accountability.

Plaintiff alleges that this design:

- facilitates double brokering and load diversion;

- enables third parties to act in front of legitimate carriers;

- undermines payment certainty; and

- exposes carriers to fraud while providing brokers and platforms plausible deniability.

---

### E. Anticompetitive Effects and Restraint of Trade

Plaintiff alleges that DAT's conduct contributed to an unlawful restraint of trade by:

- conditioning carrier access to freight on submission to Enterprise-controlled systems;

- foreclosing alternative load-access channels in practice, given DAT's market dominance;

- suppressing competition among carriers through exclusion rather than performance; and

- reinforcing broker leverage at the expense of carrier autonomy.

132

Plaintiff alleges that carriers cannot reasonably compete in interstate freight transportation without access to DAT's load-visibility infrastructure, rendering DAT a de facto essential facility within the Enterprise.

---

## F. Coordination With Other Enterprise Defendants

Plaintiff alleges that DAT operated in concert with other Enterprise Defendants, including Truckstop, RMIS, Risk Factors, Highway App, and Truckstop Payments, such that:

- adverse compliance or risk signals were reflected in broker selection behavior on DAT;

- carriers subject to payment holds, liens, or verification flags were effectively sidelined;

- brokers used DAT visibility as leverage to impose Enterprise-mandated conditions; and

- carriers had no practical alternative to regain market access outside the Enterprise.

This coordination allegedly transformed DAT from a marketplace into an enforcement multiplier for enterprise-wide control.

---

133

## G. Causation and Harm

As a direct and proximate result of DAT's conduct, Plaintiff alleges that she:

- lost access to freight opportunities;

- faced diminished bargaining power and suppressed rates;

- suffered business interruption and instability; and

- was exposed to fraud and payment uncertainty.

Plaintiff alleges that these harms were foreseeable and flowed naturally from DAT's role as a gatekeeper within a coordinated enterprise.

## H. Summary

Plaintiff alleges that DAT Freight & Analytics, LLC functioned as the load-access backbone of the Integrated Freight Data-Control Conglomerate Enterprise, enabling and reinforcing broker-centric control, exclusionary practices, and anticompetitive restraints by conditioning carrier participation on opaque, non-reciprocal systems that deprived carriers of autonomy, transparency, and meaningful choice.

134

## DEFENDANT  — MAGELLAN TRANSPORT LOGISTICS

(Broker Defendant — Contractual Tracking Compliance Met; Compensation Unlawfully Withheld)

## Defendant

Magellan Transport Logistics ("Magellan") is a freight brokerage company engaged in interstate commerce. At all relevant times, Magellan issued written rate confirmations, tendered loads, mandated GPS tracking through MacroPoint, and controlled payment to motor carriers, including Plaintiff.

Magellan transacts business nationwide and exercised direct control over the terms, conditions, and compensation of the loads at issue.

---

## Contractual Rate Confirmation and Tracking Terms

135

Magellan issued a written Rate / Route Confirmation to Plaintiff for an interstate shipment in the total amount of $1,300.00, expressly itemized as follows:

- Linehaul: $1,000.00
- GPS Load Tracking: $300.00

The rate confirmation explicitly required:

- GPS tracking through FourKites or MacroPoint;
- Tracking to remain active for the entirety of the shipment;
- Drivers to keep the tracking application open at all times;
- Mobile data and GPS/location services to remain enabled;
- A stated $300 deduction for failure to accept or comply with GPS tracking.

Magellan therefore:

1. Required MacroPoint tracking, and
2. Charged and incorporated a $300 GPS tracking component into the agreed rate.

---

**Full Performance and Documented Compliance**

136

Plaintiff hauled two separate loads for Magellan under substantially identical terms.

For both loads:

- Plaintiff personally served as the driver;
- MacroPoint tracking was accepted, activated, and maintained;
- Plaintiff screenshot and preserved every MacroPoint location entry captured during transit;
- Freight was delivered as required, without cargo damage or service failure.

At no time did Magellan notify Plaintiff of:

- Any alleged tracking failure,
- Any late delivery,
- Any breach of contract during transit.

---

**Short Payment Despite Tracking Compliance**

137

Notwithstanding full contractual performance and documented GPS tracking compliance, Magellan short-paid Plaintiff by exactly $300 on each of the two loads, totaling $600 withheld.

The short payments:

- Match the exact dollar amount of the GPS tracking line item;

- Were imposed despite tracking being accepted and completed;

- Were not supported by any written amendment, notice, or proof of non-compliance;

- Were imposed after delivery, when Plaintiff no longer had leverage to dispute payment.

The repetition of the identical $300 deduction across two separate loads establishes that the conduct was not accidental, but rather the result of a standardized internal practice.

---

**MacroPoint as the Enforcement Mechanism**

Magellan required and relied upon MacroPoint, a phone-based real-time driver tracking platform, as part of its load compliance regime.

MacroPoint tracking is inherently dependent on:

138

- Cellular coverage,

- Mobile device battery life,

- GPS signal availability.

Even where tracking data is continuously captured—as it was here—Magellan retained unilateral discretion to deem compliance insufficient and withhold compensation.

Magellan's use of MacroPoint therefore functioned not merely as visibility, but as a post-performance enforcement and compensation-reduction tool.

---

**Unlawful Compensation Suppression**

Magellan's conduct constitutes:

- Breach of contract, by failing to pay the agreed rate despite full performance;

- Unlawful withholding of earned compensation, particularly the $300 GPS component already built into the rate;

- Unfair and deceptive trade practices, by charging for GPS tracking while simultaneously using tracking as a basis to deny payment;

- Participation in the Enterprise's surveillance-based compensation suppression scheme.

139

Magellan benefited financially by retaining the withheld amounts while shifting all compliance risk onto the carrier.

---

**Damages (Magellan)**

Plaintiff suffered direct, concrete, and measurable damages, including:

1.  $300 short payment on Load One

2.  $300 short payment on Load Two

Total direct damages: $600, exclusive of interest, costs, consequential damages, and statutory remedies.

The damages are corroborated by:

- The rate confirmation itself,

- MacroPoint tracking screenshots,

- Payment records reflecting the short pays.

140

**Legal Significance**

Magellan Transport Logistics is properly named as a defendant because it:

- Directly contracted with Plaintiff;

- Mandated MacroPoint tracking and monetized it as a line item;

- Received full performance and tracking compliance;

- Withheld compensation without lawful justification;

- Repeated the same deduction across multiple loads, evidencing policy rather than mistake.

141

**DEFENDANT — MACROPOINT, INC.**

(Core Platform Defendant — Surveillance, Enforcement, and Compensation Suppression)

**Defendant**

MacroPoint, Inc. ("MacroPoint") is a technology company that developed and operates one of the first and most widely adopted phone-based, real-time driver tracking platforms used in the United States freight brokerage industry. MacroPoint's system is integrated directly into broker transportation management systems and is deployed at the direction of brokers, not carriers or drivers.

MacroPoint conducts business nationwide and provides services to major national brokers, including C.H. Robinson, as well as numerous mid-size and smaller brokerages engaged in interstate commerce.

**Function and Control**

142

MacroPoint is not a neutral visibility tool. Its platform functions as a broker-controlled surveillance and enforcement mechanism that enables brokers to:

- Require drivers to install and activate tracking software on personal mobile phones;

- Monitor carrier compliance continuously and in real time;

- Flag "interruptions," "non-compliance," or "visibility failures";

- Transmit those flags to brokers for economic enforcement.

Drivers and carriers do not choose MacroPoint. Use of the platform is imposed as a non-negotiable condition of hauling brokered freight, rendering any purported consent illusory.

---

**Role in the Enterprise**

MacroPoint is a core and indispensable participant in the Enterprise. Without MacroPoint's platform, the Enterprise's ability to standardize continuous phone-based tracking, centralize carrier surveillance, and discipline carriers economically across broker networks could not operate at scale.

143

MacroPoint knowingly supplies the technological infrastructure that allows broker-defendants to enforce uniform, non-statutory requirements across interstate freight markets.

---

**Tracking Interruptions Are Inherent and Foreseeable**

MacroPoint's system is inherently dependent on continuous cellular service and uninterrupted phone functionality, conditions that cannot be guaranteed during ordinary interstate travel. In the normal course of business:

- Drivers travel through rural areas and geographic dead zones;

- Cellular signal drops temporarily;

- Phone batteries deplete or devices momentarily power down;

- Tracking pauses occur for reasons outside the carrier's or driver's control.

These interruptions are foreseeable, routine, and unavoidable.

---

**Punishment Mechanism Tied to Tracking Interruptions**

144

Notwithstanding these known limitations, broker-defendants using MacroPoint's platform treat tracking interruptions as violations and use MacroPoint data—or the absence of data—to trigger punitive economic consequences against carriers.

MacroPoint's platform is used to flag, document, and transmit interruption events, knowing those events will be relied upon by brokers as justification for withholding compensation or imposing penalties, even when:

- Freight is delivered on time;
- No cargo damage occurs;
- No contractual performance failure exists.

---

**Systematic Rate Deductions and Withheld Compensation**

As a direct result of MacroPoint-enabled tracking interruptions, broker-defendants routinely impose unilateral rate reductions and payment deductions, commonly ranging from $250 to $350 per load.

These deductions:

145

- Are standardized rather than individualized;

- Bear no reasonable relationship to any actual broker loss;

- Function as punitive, non-negotiated penalties rather than bona fide liquidated damages;

- Are imposed solely because tracking visibility was interrupted.

MacroPoint knew or was willfully blind to the fact that its platform was being used as a mechanism to suppress carrier compensation, yet continued to market, integrate, and operate the system without safeguards or limitations.

---

**Damages Theory (MacroPoint)**

MacroPoint's conduct enables a repeatable and predictable damages model:

1. Per-Load Losses

   Each tracking interruption predictably results in a $250–$350 deduction, regardless of delivery performance.

2. Cumulative Economic Harm

   Across multiple loads, these deductions compound into substantial losses, disproportionately harming small and independent carriers operating on thin margins.

146

3. Unlawful Risk Shifting

MacroPoint enables brokers to shift the inherent risks of cellular coverage, device limitations, and infrastructure failures onto carriers, even though those risks are outside carrier control.

4. Market-Wide Compensation Suppression

The systematic use of tracking-based penalties artificially depresses effective freight rates and distorts competition across the industry.

These damages were foreseeable and intended consequences of MacroPoint's integration into broker enforcement workflows.

---

**Anticompetitive and Unfair Effects**

MacroPoint's conduct contributes directly to:

- Unlawful tying of freight access to surveillance technology;
- Group-boycott effects excluding carriers unwilling or unable to submit to continuous phone-based tracking;
- Standardized punishment mechanisms enforced across broker networks;

147

- Suppression of carrier compensation without statutory or regulatory authority;

- Replacement of lawful regulation with private technological governance.

---

**Legal Significance**

MacroPoint is properly named as a defendant because it:

- Knowingly conducts and participates in the Enterprise's affairs;

- Provides essential infrastructure for coercive practices;

- Foreseeably enables systematic financial harm to carriers;

- Acts in concert with broker-defendants to enforce non-statutory mandates.

148

**DEFENDANT: DENIM LABS, INC.**

(d/b/a Denim Factoring)

Denim Labs, Inc. ("Denim") is a private, non-bank financial technology company that operates as a factoring, payment-control, and carrier-finance platform within the freight transportation industry. Upon information and belief, Denim has been acquired by, merged into, or placed under the control of Internet Truckstop Group, LLC and its affiliated payment entities, including Internet Truckstop Payments LLC, and now operates as part of the Truckstop financial ecosystem.

Denim is not a regulated financial institution, is not FDIC insured, and is not subject to routine banking supervision. Despite this, Denim exercises substantial control over carrier funds, receivables, payment routing, and financial decision-making, particularly for small and newly authorized carriers.

---

**Relationship to Truckstop and Enterprise Integration**

149

Upon information and belief:

1. Truckstop has acquired Denim or integrated Denim's factoring operations into Truckstop's payment infrastructure.

2. Denim's services are now marketed, required, or functionally tied to Truckstop's load board, payment platforms, and broker-facing systems.

3. Carriers using Truckstop are pressured or required to adopt Denim-related terms, wallets, or financial mechanisms in order to continue operating without disruption.

As a result, Denim no longer functions as an independent factor competing in an open market, but instead operates as a vertically integrated financial arm of the Truckstop enterprise.

---

**Core Function Within the Enterprise**

Denim's core role is to:

• interpose itself between brokers and carriers for payment;

• administer factoring-style payment arrangements;

150

• control timing, conditions, and release of funds; and

• impose financial terms that carriers cannot realistically refuse due to dependency on Truckstop-controlled freight access.

Through this role, Denim converts access to earned freight revenue into a conditional privilege, rather than a contractual right.

---

**Wallet-Based Financial Control and Forced Adoption**

Upon information and belief, Truckstop has required or attempted to require carriers to:

• accept Denim's wallet-based payment system;

• agree to Denim's revised Terms of Service; and

• route all or substantially all carrier funds through Denim-controlled accounts.

These wallet systems are structured such that:

151

• Denim and Truckstop retain full transactional visibility and control;

• carriers lack independent audit rights;

• funds may be delayed, offset, or withheld at the platform's discretion; and

• carriers are required to waive rights or indemnify the platform as a condition of use.

Refusal to consent to Denim's terms places carriers at risk of payment interruption, operational disruption, or exclusion from the Truckstop ecosystem.

---

**Coordination with UCC-1 Liens and Receivables Control**

Denim's operations are coordinated with Truckstop Payments' use of sweeping UCC-1 financing statements, which purport to encumber all present and future assets of carriers, including personal bank accounts, chattels, investment property, and after-acquired assets.

Denim benefits from and relies upon this lien structure because:

• carriers cannot seek alternative financing or payment solutions;

• carriers cannot exit Denim-controlled systems without catastrophic risk; and

• the lien enforces compliance even when Denim or Truckstop underperforms.

This coordination transforms Denim's role from a service provider into an enforcement mechanism within the Enterprise.

---

## RICO "Conduct or Participation" Allegations

Denim is alleged to have conducted and participated, directly and indirectly, in the affairs of the Integrated Freight Data-Control Conglomerate Enterprise, within the meaning of 18 U.S.C. § 1962(c) and Ohio R.C. 2923.32, by:

• operating payment and factoring systems essential to the Enterprise's control of carriers;

• implementing financial terms designed to prevent carrier exit;

• coordinating with Truckstop's load access and compliance systems; and

• benefiting from liens, assignments, and payment diversion schemes.

153

Denim's conduct was knowing, continuous, and integral to the Enterprise's purpose.

---

**Antitrust Role and Market Foreclosure**

Denim's integration into Truckstop's ecosystem contributes to:

• foreclosure of competing factors and payment processors;

• elimination of carrier choice in financing;

• tying of freight access to acceptance of Denim's financial terms; and

• consolidation of market power over small-carrier cash flow.

These effects constitute exclusionary conduct supporting Sherman Act §1 and §2 claims.

---

**Harm to Plaintiff and Class of Carriers**

154

As a direct and proximate result of Denim's conduct, Plaintiff and similarly situated carriers:

• lost control over their own earnings;

• were exposed to delayed, fragmented, or unexplained payments;

• were pressured to waive rights as a condition of survival; and

• were prevented from accessing competitive financial alternatives.

---

**Summary Allegation**

Plaintiff alleges that Denim Labs, Inc., as recently acquired or controlled by Truckstop, operates not as an independent factor, but as a critical financial enforcement arm of a larger enterprise designed to dominate, extract, and control motor carriers through unregulated payment and lien practices.

Accordingly, Denim Labs, Inc. is properly named as a Defendant and is jointly and severally liable for the racketeering, antitrust, and related harms alleged herein.

---

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

---

**DEFENDANT: LOADPAY LLC**

LoadPay LLC ("LoadPay") is a private, non-asset-based financial technology company operating within the freight transportation industry as a payment-routing, receivables-handling, and broker-carrier settlement platform. LoadPay is not a motor carrier, not a freight broker, and not a regulated financial institution. It operates as an internet-based intermediary designed to control the flow, timing, and conditions of freight payments between brokers and motor carriers.

LoadPay functions as a subsidiary or affiliated payment arm within the Truckstop ecosystem, operating in close coordination with Internet Truckstop Payments LLC, Truckstop Factoring, and other Truckstop-branded financial services. LoadPay's platform is marketed to brokers as a tool for "simplified payments," "secure settlements," and "fraud prevention," while in practice it operates as a mechanism for centralized payment custody and conditional disbursement.

**Core Function**

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

LoadPay's primary function is to interpose itself between brokers and carriers at the moment of payment, thereby removing direct broker-to-carrier settlement and replacing it with a platform-controlled payment process. Through LoadPay, brokers are encouraged or required to route payments into LoadPay-controlled systems, from which funds are then released to carriers subject to platform rules, holds, offsets, and internal determinations.

For carriers, LoadPay operates as a black-box payment gatekeeper. Carriers do not negotiate LoadPay's terms, do not audit its internal accounting, and do not control the timing or method of payment once funds are routed through the system. LoadPay provides no meaningful transparency into payment delays, deductions, or discrepancies and does not operate under the regulatory framework applicable to banks or trust custodians.

**Relationship to Truckstop Payments and Factoring**

LoadPay operates as an integrated financial component of the Truckstop enterprise. It complements and reinforces Truckstop Factoring by:

• creating broker adoption of Truckstop-aligned payment rails;

• centralizing payment custody away from carriers;

157

• normalizing delayed or conditional disbursement of freight proceeds; and

• reducing carriers' ability to receive direct payment from brokers.

Through this structure, LoadPay functions as a bridge between load access and financial control, ensuring that carriers who rely on Truckstop-affiliated load boards and onboarding systems are also funneled into Truckstop-affiliated payment infrastructure.

**Role Within the Enterprise**

LoadPay is a financial enforcement mechanism within the Integrated Freight Data-Control Conglomerate Enterprise alleged in this action. Its role is to operationalize the enterprise's control over money after carriers have already been subjected to identity verification, compliance onboarding, and data surveillance through other Defendants' platforms.

LoadPay's placement in the enterprise allows brokers and affiliated platforms to:

• delay payments without immediate consequence;

158

• fragment payments into partial or nominal amounts;

• impose unexplained holds or offsets; and

• deprive carriers of timely access to operating capital necessary for fuel, insurance, and basic subsistence.

This function is particularly coercive because carriers, unlike brokers, are capital-constrained and fuel-dependent. LoadPay exploits this asymmetry by holding funds while carriers remain exposed to real-world operational risks.

**Lack of Regulation and Fiduciary Safeguards**

LoadPay is not subject to banking regulation, not audited as a financial custodian, and not required to maintain escrow or trust accounts for carrier funds. Despite this, it exercises de facto custody and control over freight proceeds that are essential to carriers' survival.

Carriers are not provided with:

159

• audited account statements;

• enforceable timelines for payment;

• meaningful dispute resolution mechanisms; or

• statutory protections comparable to those governing regulated financial institutions.

**Enterprise Liability**

Plaintiff alleges that LoadPay knowingly participates in a coordinated enterprise with Truckstop-affiliated load boards, factoring entities, compliance portals, and data platforms. LoadPay's role is not incidental; it is a necessary financial choke point that enables the enterprise to convert data control and onboarding leverage into direct economic pressure on carriers.

Without LoadPay and similar payment-routing mechanisms, the enterprise's ability to impose financial discipline, retaliation, or exclusion would be materially diminished.

Accordingly, LoadPay is properly named as a Defendant and enterprise participant in this action

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

**DEFENDANT: GRIZELLA LLC (owned by Truckstop)**

(d/b/a SaferWatch / PostEverywhere)

Grizella LLC ("Grizella") is a private, non-asset-based technology company operating within the freight transportation industry as a carrier-data aggregation, monitoring, and distribution platform. Grizella is not a motor carrier, not a freight broker, not a factor, and not a government-regulated entity. It operates exclusively as an internet-based software intermediary whose products are designed for broker and platform use, not for carriers.

Grizella's primary commercial function is to collect, normalize, and disseminate motor-carrier information for consumption by freight brokers, load boards, and compliance gatekeepers. Through its products marketed as SaferWatch and PostEverywhere, Grizella supplies carrier-status signals, monitoring data, and profile indicators that brokers and broker-facing platforms rely upon when determining whether a carrier will be approved, delayed, restricted, or excluded from freight opportunities.

161

Grizella operates largely behind the scenes. Motor carriers typically do not create accounts with Grizella, are not notified when Grizella's data is consulted, and are not afforded meaningful notice, appeal, or correction rights regarding the information disseminated about them. As a result, carriers experience Grizella's influence indirectly—through broker onboarding denials, compliance rejections, load access interruptions, or unexplained exclusions—without transparency as to the source or basis of those decisions.

**Core Relationship to RMIS**

Grizella plays a critical upstream role in the compliance and onboarding ecosystem dominated by RMIS – Registry Monitoring Insurance Services. RMIS functions as a primary gatekeeper for broker onboarding and insurance verification. Grizella's data products supply carrier-monitoring and status information that is relied upon by brokers and broker-facing systems operating in parallel with RMIS workflows.

Although Grizella and RMIS are legally separate entities, their systems function as interoperable components of a single broker-centric decision stack. From the carrier's perspective, RMIS approval, Grizella-derived status signals, and broker onboarding outcomes are inseparable. A negative or ambiguous signal originating from Grizella-supplied data can materially affect

162

RMIS-mediated onboarding and broker decisions, even though the carrier is given no explanation and no opportunity to contest the underlying data.

This functional integration—rather than formal ownership—is what binds Grizella to the enterprise alleged herein. Grizella supplies data that RMIS-dependent brokers use to exercise exclusionary power over carriers, thereby reinforcing the same system of control alleged against the other Defendants.

**Role Within the Enterprise**

Grizella is a necessary node within the Integrated Freight Data-Control Conglomerate Enterprise alleged in this action. Its role is to amplify and distribute carrier-risk signals that:

• enable brokers to screen, rank, and exclude carriers at scale;

• reinforce compliance gatekeeping imposed by RMIS and affiliated platforms;

• operate without regulatory oversight or audit requirements;

• impose unilateral consequences on carriers without reciprocal obligations; and

163

• contribute to the structural imbalance between brokers and motor carriers.

Grizella's products do not verify brokers, do not police broker misconduct, and do not protect carriers from fraud. Instead, they operate exclusively to serve broker preferences by providing informational leverage over carriers, thereby increasing broker control while externalizing risk and burden onto carriers.

**Lack of Regulation and Due Process**

Grizella operates in a regulatory vacuum. It is not overseen by the FMCSA, DOT, FTC, or any other agency with authority over freight operations, safety, or carrier rights. Despite this absence of oversight, Grizella's data materially affects carriers' ability to access freight, maintain operations, and remain economically viable.

Carriers are afforded no due process, no standardized dispute resolution, and no meaningful correction mechanism for Grizella-distributed data. This absence of procedural safeguards is a core feature—not a flaw—of the enterprise's design, enabling rapid exclusion without accountability.

164

**Enterprise Liability**

Plaintiff alleges that Grizella knowingly participates in a continuing, coordinated enterprise with RMIS, Truckstop-affiliated platforms, load boards, and broker-facing systems, all of which share a common purpose: to centralize broker power and monetize carrier dependency through unregulated data control.

Grizella's conduct is not isolated. It is economically interdependent with, and functionally complementary to, the conduct of the other Defendants. Without Grizella's carrier-monitoring and dissemination role, the enterprise's exclusionary mechanisms would be materially less effective.

Accordingly, Grizella is properly named as a Defendant and enterprise participant in this action.

**STATUTORY VIOLATIONS — DEFENDANT-SPECIFIC APPLICATION**

(Sherman Act + RICO + Racketeering — RMIS)

---

165

**DEFENDANT: RMIS, INC.**

(Broker-Side Carrier Onboarding & Compliance Platform)

RMIS was acquired by Internet Truckstop, Inc. in or about 2018, and has since operated as an integrated component of the Truckstop platform ecosystem, alongside the Truckstop Load Board and Truckstop Factoring.

---

## I. IDENTITY, ACQUISITION, AND PLATFORM POSITION

RMIS, Inc. ("RMIS") is not a motor carrier, not a freight broker, not a freight forwarder, and not a government regulator.

It holds no FMCSA operating authority and has no statutory enforcement power.

Following its acquisition by Internet Truckstop, RMIS became part of a vertically aligned broker-facing infrastructure designed to:

166

- Onboard carriers on behalf of brokers

- Centralize carrier compliance determinations

- Control eligibility for freight access

- Aggregate and warehouse sensitive carrier data

RMIS operates nationwide and is widely used by major freight brokers, including Ohio-based brokers, as a mandatory gatekeeping tool.

---

## II. TRUE CUSTOMER VS. TRUE SUBJECT

RMIS's actual customers are brokers, not carriers.

Brokers:

- Pay RMIS

- Set the compliance expectations

- Rely on RMIS determinations

- Benefit from centralized exclusion

167

Carriers, by contrast:

- Do not meaningfully negotiate RMIS terms

- Are not protected by RMIS

- Are not afforded due process

- Are compelled to comply

The carrier is not a customer — the carrier is the subject.

---

## III. COERCIVE MARKET ACCESS AND FORCED CAPITULATION

RMIS functions as a mandatory checkpoint for carriers seeking access to freight.

In practice:

- Refusal or failure to comply with RMIS results in denial of loads

- Brokers treat RMIS status as dispositive

- Market access is foreclosed without RMIS approval

168

Carriers therefore capitulate under economic duress, not consent.

This coercion is magnified by RMIS's integration into the Truckstop–broker–factoring ecosystem, leaving carriers with no practical alternative.

---

## IV. FORCED DISCLOSURE OF PRIVATE COMPANY INFORMATION

RMIS requires carriers to upload and continuously maintain extensive private and sensitive company information, including but not limited to:

- Insurance policies and limits
- Operating authority documentation
- Corporate and ownership details
- Business identifiers and records
- Safety and compliance data

This data is:

- Warehoused by RMIS
- Shared with brokers

169

- Retained indefinitely

- Outside carrier control

RMIS provides:

- No carrier-side fiduciary duty

- No statutory data-handling obligations

- No neutral oversight

- No meaningful audit rights

Carriers are forced to surrender sensitive data to a non-regulated third party as the price of survival.

---

## V. ABSENCE OF DUE PROCESS AND NEUTRAL REVIEW

RMIS compliance determinations:

- Are opaque

- Are broker-aligned

- Lack evidentiary standards

170

- Provide no neutral hearing

- Offer no meaningful appeal

Errors, misinformation, or adverse inputs can:

- Instantly disqualify a carrier

- Cascade across broker networks

- Cause immediate economic harm

RMIS acts as judge and executioner, without lawful authority.

---

## VI. SHERMAN ACT § 1 — CONCERTED RESTRAINT OF TRADE

15 U.S.C. § 1

RMIS knowingly participates in contracts, combinations, and conspiracies with brokers and Truckstop-affiliated entities to restrain trade in interstate commerce.

171

The restraint includes:

- Collective refusal to deal with non-approved carriers

- Standardized exclusion enforced across brokers

- Conditioning freight access on RMIS participation

This constitutes a group boycott implemented through a private platform.

---

## VII. SHERMAN ACT § 2 — ATTEMPTED MONOPOLIZATION

15 U.S.C. § 2

Through its widespread adoption and Truckstop integration, RMIS has attempted to monopolize the carrier onboarding and eligibility layer of the freight market by:

- Eliminating alternative onboarding paths

- Locking brokers into a single system

- Forcing carrier dependence

- Foreclosing competition

172

This monopoly power is maintained through coercion and dependency, not efficiency.

---

## VIII. RICO — ASSOCIATION WITH AND CONDUCT OF AN ENTERPRISE

18 U.S.C. § 1962(c)

RMIS is associated with and conducts the affairs of an enterprise-in-fact consisting of:

- Freight brokers (including TQL)

- Internet Truckstop / Truckstop Load Board

- Truckstop Factoring

- Other broker-aligned platforms

The enterprise has:

- A common purpose (broker dominance and risk externalization)

- Ongoing relationships

- Coordinated conduct

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

RMIS serves as the compliance and data-collection arm of the enterprise.

---

## IX. RACKETEERING PREDICATE ACTS (NON-MAIL)

**A.**

**Wire Fraud — 18 U.S.C. § 1343**

RMIS engages in a scheme to defraud carriers by:

- Holding itself out as a neutral compliance platform
- Concealing broker-side alignment
- Omitting conflicts created by Truckstop ownership
- Failing to disclose the economic consequences of disqualification

Carriers rely on these misrepresentations to their detriment.

---

**B.**

**Hobbs Act Extortion — 18 U.S.C. § 1951**

174

RMIS facilitates extortion by enabling brokers to obtain property through wrongful use of economic fear, including:

- Threat of market exclusion
- Threat of loss of livelihood
- Threat of reputational harm

The property obtained includes:

- Private company data
- Compliance concessions
- Economic leverage
- Control over carrier operations

---

## X. RICO CONSPIRACY

18 U.S.C. § 1962(d)

175

RMIS knowingly agreed and conspired with Truckstop, brokers, and other enterprise members to further the enterprise's unlawful objectives.

---

## XI. AGGRAVATING FACTORS

RMIS:

- Has no FMCSA authority
- Is owned by a dominant load-board/factoring company
- Controls carrier eligibility nationwide
- Hoards sensitive carrier data
- Provides no due process

Yet exercises extra-legal control over interstate commerce.

---

## XII. LIABILITY

RMIS is jointly and severally liable for:

176

- Antitrust damages

- Racketeering damages

- Loss of business and income

- Treble damages under the Sherman Act and RICO

## STATUTORY VIOLATIONS — DEFENDANT-SPECIFIC APPLICATION

(Sherman Act + RICO + Racketeering — HIGHWAY.com / Highway App)

---

## DEFENDANT: HIGHWAY TECHNOLOGIES, INC.

d/b/a HIGHWAY.com / Highway App

(Broker-Customer Platform – Market Access Gatekeeper – Compliance Toll Booth)

---

## I. TRUE ROLE, DESIGN, AND CUSTOMER BASE

177

HIGHWAY.com ("Highway") is not a motor carrier, not a freight broker, and not a freight forwarder.

It holds no FMCSA operating authority and does not transport freight.

Highway is a platform-only company whose customers are freight brokers, not carriers.

The platform is designed to:

- Screen carriers on behalf of brokers
- Control access to freight markets
- Centralize carrier compliance data
- Act as a gatekeeper and toll booth to load access

Carriers do not contract with Highway as customers in any meaningful sense; instead, carriers are subjected to Highway's requirements as a condition of market participation.

---

## II. MARKET ACCESS DENIAL AND COERCIVE QUALIFICATION

178

Highway requires carriers to "qualify" through its platform in order to gain or retain access to broker freight.

Failure to qualify results in:

- Denial of load tenders

- Loss of broker relationships

- Market exclusion

- Economic harm

Highway imposes these requirements without regulatory authority, yet its determinations function as industry-wide disqualifications.

There is:

- No due process

- No neutral adjudication

- No statutory appeal rights

- No independent oversight

179

## III. PRIVATE DOCUMENT HOSTING AND DATA HOARDING

Highway requires carriers to upload and maintain extensive private and sensitive documents, including but not limited to:

- Insurance certificates
- Operating authority documents
- Identification and business records
- Safety and compliance information

Highway:

- Retains this data indefinitely
- Controls access to it
- Shares it with brokers
- Does not provide carrier-side auditing or meaningful control

Carriers are compelled to surrender sensitive documents to a non-regulated third party with no fiduciary duty, no statutory data-handling obligations, and no carrier-side protections.

---

## IV. THE "TOLL BOOTH" TO FREIGHT

Highway operates as a toll booth to freight access.

180

Without Highway approval:

- Brokers refuse to tender loads

- Carriers are excluded from the market

- Competition is foreclosed

Highway thus inserts itself into the freight market as a mandatory intermediary, extracting value while assuming no transportation risk and no regulatory accountability.

---

## V. ELD API INTEGRATION AND BAD-ACTOR ACCESS

Highway integrates directly with carrier ELD systems via API, granting the platform access to:

- Location data

- Operational movement

- Driver activity

This integration introduces heightened risk when:

- Accounts are accessed by unauthorized users

- Bad actors are attached to carrier profiles

- Offshore or third-party entities gain access

181

- Credentials are shared or compromised

Highway knew or should have known that API-level access to ELD data presents significant security and privacy risks, yet failed to prevent or remediate:

- Unauthorized account access
- Data misuse
- Surveillance of carriers without consent or oversight

---

## VI. SHERMAN ACT § 1 — UNLAWFUL RESTRAINT OF TRADE

15 U.S.C. § 1

Highway knowingly participates in contracts, combinations, and conspiracies with brokers and platform partners to restrain trade in interstate commerce.

The restraint includes:

- Collective denial of market access
- Standardized disqualification criteria
- Broker-aligned enforcement
- Suppression of carrier autonomy

Highway's platform enables a concerted refusal to deal, enforced digitally and at scale.

182

## VII. SHERMAN ACT § 2 — ATTEMPTED MONOPOLIZATION

15 U.S.C. § 2

Highway has attempted to monopolize the carrier-qualification and market-access layer of the freight economy by:

- Centralizing compliance decisions
- Eliminating alternative verification paths
- Conditioning participation on Highway approval
- Locking brokers into a single screening system

This monopoly power is maintained through coercion and dependency, not competition.

## VIII. RICO — ENTERPRISE CONDUCT

18 U.S.C. § 1962(c)

Highway is associated with and conducts the affairs of an enterprise-in-fact consisting of:

- Freight brokers
- Platform operators
- Data aggregators
- Compliance and verification services

183

Highway functions as the compliance and enforcement arm of the enterprise.

---

## IX. RACKETEERING PREDICATE ACTS (NON-MAIL)

**A.**

**Wire Fraud — 18 U.S.C. § 1343**

Highway engages in a scheme to defraud carriers by:

- Holding itself out as a neutral verification platform

- Concealing broker-aligned incentives

- Failing to disclose data-retention practices

- Omitting material facts regarding account access and security risks

Carriers are induced to surrender data and access rights under false pretenses.

---

**B.**

**Hobbs Act Extortion — 18 U.S.C. § 1951**

Highway facilitates extortion by enabling brokers to obtain property through economic fear, including:

184

- Loss of access to freight

- Platform-based disqualification

- Surveillance-enabled pressure

The property obtained includes:

- Data

- Compliance concessions

- Market access control

- Economic leverage

---

**C.**

**Financial Concealment — 18 U.S.C. §§ 1956, 1957**

By integrating with broker and factoring ecosystems, Highway enables:

- Justification of payment delays

- Concealment of adverse actions

- Lack of transparent reconciliation

All outside regulated financial safeguards.

185

## X. RICO CONSPIRACY

18 U.S.C. § 1962(d)

Highway knowingly conspired with brokers and platform participants to further the enterprise's unlawful objectives.

## XI. AGGRAVATING FACTORS

Highway:

- Has no FMCSA authority
- Controls access to freight
- Hoards sensitive carrier data
- Integrates directly with ELD systems
- Enables bad-actor access
- Denies due process

Yet exercises extra-legal control over interstate commerce.

186

## XII. LIABILITY

Highway is jointly and severally liable for:

- Antitrust damages

- Racketeering damages

- Carrier economic losses

- Treble damages under Sherman Act and RICO

## DEFENDANT: TRUCKSTOP FACTORING / INTERNET TRUCKSTOP PAYMENTS, LLC

(Factoring Arm — Payment Control, Receivables Capture, and Enforcement Mechanism)

## I. IDENTITY, POSITION, AND FUNCTION IN THE MONOPOLY

Truckstop Factoring (including its payment/factoring arm operating as Internet Truckstop Payments, LLC and/or related Truckstop entities) is a factoring and payment-control enterprise embedded within the larger Truckstop ecosystem, including:

- Truckstop Load Board (market access / visibility)

- RMIS (carrier onboarding / compliance gatekeeping)

187

- Broker customers (including TQL and others)

Truckstop Factoring is not a motor carrier, not a freight broker, and not a regulated trust/escrow institution, yet it exercises decisive power over:

- Carrier receivables
- Broker payment routing
- Carrier cash flow
- Whether and when the carrier is paid at all

Truckstop Factoring functions as the financial enforcement arm of the closed-loop monopoly.

---

## II. NOTICE OF ASSIGNMENT USED TO BLOCK DIRECT BROKER PAYMENTS

Truckstop Factoring used a Notice of Assignment ("NOA") as a coercive payment-routing instrument to prevent brokers from paying All Directions Trucking directly.

In practice, the NOA was used to:

- Redirect broker payments away from All Directions Trucking and into Truckstop-controlled channels
- Make Truckstop the mandatory intermediary for payment clearance
- Deprive the carrier of normal, direct commercial payment relationships
- Create leverage to delay, withhold, or fragment payments without transparency

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

The NOA's effect was to convert ordinary broker-to-carrier payment into a forced, platform-controlled payment pipeline where the carrier's access to its own earnings depended on Truckstop's unilateral discretion.

---

## III. BLANKET UCC-1 FILING ASSERTING CONTROL OVER RECEIVABLES

Truckstop Factoring further entrenched this control by filing a blanket UCC-1 financing statement (as alleged) asserting a security interest over broad categories of carrier property—commonly including accounts/receivables and proceeds—thereby:

- Encumbering All Directions Trucking's receivables
- Chilling or obstructing alternative financing/factoring options
- Reinforcing Truckstop's gatekeeping power over payments
- Creating additional coercive leverage against the carrier's ability to operate

This was not merely administrative. In the closed-loop ecosystem, the UCC-1 operates as a market-control weapon that amplifies the NOA and restricts carrier autonomy over cash flow and credit.

---

## IV. "PENNY DEPOSITS" AND FRACTIONAL PAYMENTS AS PAYMENT COERCION

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Truckstop Factoring engaged in a pattern of issuing nominal "penny deposits" and/or de minimis partial payments to All Directions Trucking.

These deposits:

- Do not reflect meaningful invoice reconciliation
- Are not accompanied by transparent accounting
- Are inconsistent with normal factoring standards
- Function as an economic pressure tactic and control signal

The penny deposits serve as:

- A mechanism to keep the carrier financially tethered
- A tactic to avoid full and timely payment while maintaining technical activity
- A method to obscure what is owed and when it will be released

Combined with the NOA and UCC-1, this practice keeps the carrier trapped inside Truckstop's payment channel while being paid piecemeal with no meaningful explanation.

---

## V. LACK OF TRANSPARENCY, RECONCILIATION, AND OVERSIGHT

Truckstop Factoring's payment practices are characterized by:

- Lack of complete, timely reconciliations

190

- Opaque offsets/adjustments

- Unilateral payment timing

- No neutral audit process

- No carrier-side due process

As a result, the carrier cannot reliably determine:

- Which broker payments were received

- Which invoices were credited or withheld

- Why partial amounts were issued

- What amounts remain outstanding

- When full payment will be released

This opacity is central to the coercive model.

---

## VI. CLOSED-LOOP CONTROL AND CONFLICT OF INTEREST TO THE CARRIER

For All Directions Trucking, Truckstop Factoring's conduct created an irreconcilable conflict of interest:

- Brokers (including major brokers) are the platform customers and traffic source

- Truckstop controls load access and compliance pipelines via affiliated services

- Truckstop Factoring controls the payment route via NOA and receivables capture

- The carrier becomes the captive party who must capitulate to survive

191

The same ecosystem that controls access to work also controls whether the carrier gets paid for completed work—creating a coercive dependency loop.

---

## VII. SHERMAN ACT § 1 — CONCERTED RESTRAINT OF TRADE

15 U.S.C. § 1

Truckstop Factoring knowingly entered into and furthered contracts, combinations, and conspiracies with:

- Truckstop Load Board
- RMIS
- Broker customers and platform participants

to restrain trade by:

- Forcing payment routing through Truckstop via NOAs
- Blocking direct broker-to-carrier payments
- Encumbering carrier receivables through blanket UCC filings
- Using payment control to enforce compliance and exclusion

This conduct constitutes a concerted refusal to deal and platform-enforced group boycott implemented through payment control.

192

## VIII. SHERMAN ACT § 2 — MONOPOLIZATION / ATTEMPTED MONOPOLIZATION

15 U.S.C. § 2

Truckstop Factoring participated in monopolization or attempted monopolization of the carrier liquidity and receivables channel by:

- Capturing receivables through NOA practices
- Locking carriers out of alternative financing through blanket UCC filings
- Maintaining dominance through payment timing coercion and opacity
- Reinforcing dependency on the Truckstop ecosystem for both work and payment

This is willful maintenance of power through coercion, not competition.

## IX. RICO — ENTERPRISE CONDUCT

18 U.S.C. § 1962(c)

Truckstop Factoring is associated with and conducts the affairs of an enterprise-in-fact consisting of:

- Truckstop Load Board
- RMIS

193

- Broker participants

- Payment and compliance intermediaries

Truckstop Factoring's role is the receivables capture and enforcement function, using payment control to sustain the enterprise's objectives.

---

## X. RACKETEERING PREDICATE ACTS (NON-MAIL)

### A.

### Wire Fraud — 18 U.S.C. § 1343

Truckstop Factoring executed a scheme to defraud through interstate electronic communications by:

- Representing prompt payment and transparent factoring

- Using NOA routing to seize payment control

- Issuing penny deposits/fragmented payments without reconciliation

- Concealing true payment status, offsets, and outstanding balances

---

### B.

### Hobbs Act Extortion — 18 U.S.C. § 1951

194

Truckstop Factoring obtained property through wrongful economic fear by:

- Blocking direct broker payment using the NOA

- Holding receivables hostage through payment routing control

- Using blanket UCC leverage to restrict carrier alternatives

- Forcing capitulation through cash-flow starvation

The property obtained includes:

- Control of receivables and proceeds

- Economic leverage over the carrier's survival

- Forced concessions and compliance

---

## C.

### Financial Concealment / Money Laundering — 18 U.S.C. §§ 1956, 1957

Through opaque routing, partial deposits, and concealment of payment flows, Truckstop

Factoring enabled:

- Obscuring the source and timing of receivable proceeds

- Concealing true balances owed

- Retaining and moving funds without transparent reconciliation

---

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

## XI. RICO CONSPIRACY

18 U.S.C. § 1962(d)

Truckstop Factoring knowingly conspired with Truckstop and other enterprise members to further these unlawful objectives, including payment capture, coerced dependency, and market exclusion.

---

## XII. LIABILITY

Truckstop Factoring is jointly and severally liable for:

- Antitrust damages

- Racketeering damages

- Loss of income and business interruption

- Treble damages under the Sherman Act and Civil RICO

---

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

**DEFENDANT: CARRIER 411**

(Broker-Facing Blacklisting Platform – Non-Carrier, Non-Broker, Non-Regulated)

---

## I. TRUE FUNCTION, DESIGN, AND CUSTOMER BASE

Carrier 411 is not a motor carrier, not a freight broker, not a freight forwarder, and not a regulated transportation intermediary.

It holds no FMCSA authority, no DOT authority, and no transportation credentials of any kind.

197

Carrier 411 is a broker-designed, broker-facing reputation and reporting platform whose actual customers are freight brokers and factoring companies, not carriers.

Its core purpose is to allow brokers and their affiliates to:

- Publish derogatory reports about carriers
- Flag carriers for alleged issues such as late delivery, disputes, chargebacks, or subjective disagreements
- Circulate unverified allegations across broker networks
- Influence broker decision-making at scale

Carrier 411 does not transport freight, does not arrange transportation, and does not assume liability for any shipment. Yet it wields extraordinary economic power over carriers without regulation or accountability.

## II. BLACKLISTING, COERCION, AND ABSENCE OF DUE PROCESS

Carrier 411 maintains the unilateral ability to effectively blacklist a carrier nationwide, thereby cutting off access to loads, brokers, and payment opportunities across interstate commerce.

Critically:

- Carriers have no meaningful due process
- No neutral investigation

198

- No evidentiary standards

- No hearing

- No impartial review

- No guaranteed right to respond

- No enforceable appeal process

A single broker entry — even arising from a petty disagreement, billing dispute, or minor delay — can be amplified platform-wide and treated as industry-wide disqualification.

Once flagged:

- Brokers refuse to tender loads

- Factoring companies restrict or deny funding

- Carriers are economically isolated

- Business operations collapse

Carrier 411 thus functions as a private, unregulated punishment system, imposing economic death penalties without lawful authority.

---

## III. BROKER AND FACTOR LEVERAGE — ECONOMIC BLACKMAIL

Carrier 411 enables and facilitates economic blackmail:

- Brokers threaten carriers with negative Carrier 411 postings

199

- Brokers condition removal or non-publication on concessions, chargebacks, or forced compliance
- Carriers are coerced into accepting losses to avoid reputational destruction

Carrier 411 knowingly provides the mechanism and leverage for this coercion while disclaiming responsibility.

Factoring companies, as paying customers and downstream enforcers, rely on Carrier 411 flags to:

- Suspend funding
- Delay payments
- Justify withholding receivables
- Apply financial pressure

This creates a closed loop of coercion:

Broker → Carrier 411 → Factor → Carrier

---

## IV. SHERMAN ACT § 1 — UNLAWFUL RESTRAINT OF TRADE

15 U.S.C. § 1

Carrier 411 knowingly participates in contracts, combinations, and conspiracies with brokers and factoring companies to restrain trade in interstate commerce.

The restraint is effectuated by:

200

- Coordinated blacklisting

- Collective refusal to deal

- Shared exclusionary signals

- Parallel enforcement against carriers

Carriers are not judged on price, service, or competition, but on platform-controlled reputation scores generated by parties with adverse financial interests.

This constitutes a group boycott and concerted refusal to deal, which is per se unlawful or, alternatively, unlawful under the rule of reason due to overwhelming anticompetitive effects.

---

## V. SHERMAN ACT § 2 — ATTEMPTED MONOPOLIZATION

15 U.S.C. § 2

Carrier 411 has attempted to monopolize the carrier-reputation and eligibility layer of the freight market by:

- Centralizing broker perception control

- Making participation unavoidable

- Eliminating alternative reputational channels

- Leveraging broker dominance to impose platform dependency

This monopoly power is not achieved through superior service, but through structural coercion and exclusionary coordination.

201

---

## VI. RICO — ENTERPRISE CONDUCT

18 U.S.C. § 1962(c)

Carrier 411 is associated with and conducts the affairs of an enterprise-in-fact consisting of:

- Freight brokers

- Factoring companies

- Payment intermediaries

- Broker-aligned platforms

The enterprise shares:

- A common purpose (carrier control and risk offloading)

- Ongoing relationships

- Coordinated conduct

Carrier 411 serves as the reputational enforcement arm of the enterprise.

---

## VII. RACKETEERING PREDICATE ACTS (NON-MAIL)

**A.**

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

**Wire Fraud — 18 U.S.C. § 1343**

Carrier 411 engages in a scheme to defraud carriers through interstate electronic communications by:

- Holding itself out as an objective safety or compliance resource

- Concealing broker bias and financial conflicts

- Failing to disclose the absence of due process

- Misrepresenting the consequences and permanence of reports

Carriers are induced to participate in an ecosystem that systematically strips them of rights and bargaining power.

---

**B.**

**Hobbs Act Extortion — 18 U.S.C. § 1951**

Carrier 411 facilitates extortion by enabling brokers and factors to obtain property through wrongful use of economic fear, including:

- Threats of blacklisting

- Threats of business destruction

203

- Threats of funding withdrawal

The property obtained includes:

- Money

- Chargebacks

- Unpaid services

- Receivables

- Compliance concessions

Carrier 411 is not a passive publisher — it is a knowing enabler of this coercive scheme.

---

## C.

### Financial Concealment / Money Laundering — 18 U.S.C. §§ 1956, 1957

Carrier 411's integration with factoring and broker payment practices enables:

- Concealment of the true reasons for nonpayment

- Justification of withheld funds

- Obscured financial flows

All occurring outside any regulated financial framework, with:

204

- No fiduciary duties

- No auditing

- No reconciliation

- No escrow protections

---

## VIII. RICO CONSPIRACY

18 U.S.C. § 1962(d)

Carrier 411 knowingly conspired with brokers and factoring companies to further the enterprise's unlawful objectives.

Each defendant is liable for the acts of the others.

---

## IX. AGGRAVATING FACTORS

Carrier 411:

- Has no FMCSA authority

- Has no transportation license

- Has no statutory oversight

- Provides no due process

205

- Operates a private blacklist

- Facilitates carrier destruction

Yet exercises extra-legal power over interstate commerce.

---

## X. LIABILITY

Carrier 411 is jointly and severally liable for:

- Economic destruction of carriers

- Anticompetitive market foreclosure

- Racketeering damages

- Treble damages under Sherman Act and RICO

206

**Defendant C.H. Robinson Worldwide, Inc.**

C.H. Robinson Worldwide, Inc. ("C.H. Robinson") is a Minnesota-based freight brokerage and logistics corporation engaged in interstate commerce throughout the United States, including Ohio. C.H. Robinson is one of the largest freight brokers in North America and exercises substantial market power over carrier access to freight, brokered loads, and industry standards governing carrier participation.

---

**BASIS FOR INCLUSION AS DEFENDANT**

**Industry-Wide Coercive Practices and Conditional Access to Freight**

207

1. Although Plaintiff is not enrolled as a carrier within C.H. Robinson's proprietary carrier network, C.H. Robinson directly solicited Plaintiff via electronic communications inviting Plaintiff to participate in its brokered freight ecosystem.

2. In those communications, C.H. Robinson explicitly conditioned participation on compliance with:

   o Mandatory integration with Highway, a third-party carrier data and monitoring platform;

   o Electronic Logging Device (ELD) data interfacing through Highway;

   o Real-time GPS tracking of trucks and drivers through MacroPoint or similar tracking applications tied to drivers' personal mobile devices.

3. The communications represented that such requirements were:

   o "Expected in the industry,"

   o "Standard practice," and

   o "Unavoidable" if a carrier wishes to access brokered freight.

4. Plaintiff was informed, directly or by implication, that there is "no getting away from" continuous, real-time surveillance of trucks and drivers, including location tracking beyond pickup and delivery verification.

---

## ROLE IN THE ENTERPRISE AND PATTERN OF CONDUCT

5. C.H. Robinson is a strategic partner and active participant in the same third-party platform ecosystem challenged in this action, including Highway and MacroPoint, which collectively:

208

- o Aggregate sensitive carrier and driver data;

- o Enforce standardized surveillance requirements across multiple brokers;

- o Function as gatekeepers controlling access to freight markets.

6. These platforms are not neutral safety tools, but rather private regulatory mechanisms operating outside any statutory authority, imposed by brokers for the brokers' exclusive benefit.

7. Through its scale, market dominance, and integration with these platforms, C.H. Robinson:

- o Reinforces industry-wide coercion;

- o Normalizes invasive data extraction;

- o Amplifies exclusionary practices against small and independent carriers.

---

## ANTICOMPETITIVE AND COERCIVE EFFECTS

8. C.H. Robinson's conduct contributes to:

- o A de facto requirement that carriers surrender sensitive operational, location, and driver data to multiple third parties;

- o The elimination of meaningful consent, as refusal results in exclusion from freight opportunities;

- o The displacement of statutory regulation with private, unregulated data regimes.

9. Small carriers, including Plaintiff, are placed in an impossible position:

- o Either submit to invasive, continuous monitoring unrelated to load security or payment;

209

- o  Or be excluded from participation in interstate freight markets dominated by major brokers such as C.H. Robinson.

---

## CONCERTED ACTION AND ENTERPRISE LIABILITY

10. C.H. Robinson did not act independently, but in concert with other broker-defendants and third-party platforms, forming a coordinated enterprise that:

- o  Imposes uniform technological mandates;
- o  Shares or centralizes carrier data;
- o  Restricts competition under the guise of "industry standards."

11. This conduct constitutes:

- o  Concerted action in restraint of trade;
- o  Unfair and deceptive practices;
- o  Participation in a broader pattern of coercion affecting interstate commerce.

---

## GOOD-FAITH BASIS AND EVIDENTIARY SUPPORT

12. Plaintiff possesses:

- o  Written electronic communications from C.H. Robinson;
- o  Documentation referencing Highway onboarding and MacroPoint tracking;
- o  Industry representations asserting mandatory compliance.

210

13. Plaintiff pleads these allegations in good faith, based on direct communications and observable industry practices, and anticipates discovery will further establish the full scope of C.H. Robinson's role within the enterprise.

---

.

## A. RICO — C.H. Robinson–Specific Overt Acts

(18 U.S.C. §§ 1962(c) & (d); relies on Enterprise Definition above)

## Overt Acts as to Defendant C.H. Robinson Worldwide, Inc.

1. **Solicitation as Enterprise Act.** In furtherance of the Enterprise's common purpose, C.H. Robinson transmitted electronic communications to Plaintiff soliciting participation in its brokered freight ecosystem, thereby initiating Enterprise-related contact across state lines.

2. **Conditioning Participation on Third-Party Platforms.** C.H. Robinson conditioned access to freight opportunities on Plaintiff's mandatory compliance with third-party platforms integral to the Enterprise, including Highway (carrier profiling and ELD interfacing) and MacroPoint (real-time GPS tracking via drivers' mobile devices).

3. **Misrepresentation of "Industry Standard."** C.H. Robinson represented that continuous live tracking and ELD data interfacing were "expected in the industry" and unavoidable,

211

thereby normalizing coercive surveillance and inducing carriers to submit to the Enterprise's unregulated data regime.

4. Data Extraction Without Statutory Basis. By requiring ELD interfacing and continuous tracking as a condition of access, C.H. Robinson sought to obtain and control sensitive carrier and driver data unrelated to load security or payment, outside any statutory or regulatory mandate, and for the benefit of brokers and platform partners.

5. Use of Interstate Wires. C.H. Robinson used interstate electronic communications and data transmissions to solicit, condition, and enforce these requirements, constituting use of the wires in furtherance of the Enterprise's affairs.

6. Reinforcement of Enterprise Gatekeeping. Through its market dominance, C.H. Robinson reinforced Enterprise-wide exclusion, whereby carriers unwilling to submit to invasive monitoring are effectively barred from brokered freight markets.

7. Agreement and Conspiracy. C.H. Robinson knowingly agreed and conspired with other Enterprise members—brokers and platform operators—to implement uniform technological mandates, thereby conducting and participating in the Enterprise's affairs through a pattern of racketeering activity.

8. Continuity. These acts were related and continuous, sharing the same purpose, victims (small and independent carriers), methods (platform conditioning and surveillance), and results (exclusion, data control, and market restraint), and occurred over a substantial period as part of an ongoing scheme.

---

## B. Antitrust — C.H. Robinson–Specific Conduct

212

(Sherman Act §§ 1 & 2; state analogs; relies on Enterprise Definition)

**Anticompetitive Conduct by C.H. Robinson Worldwide, Inc.**

9. Concerted Refusal to Deal / Group Boycott. C.H. Robinson participated in a concerted refusal to deal by conditioning access to brokered freight on compliance with uniform third-party platform mandates, aligning with other brokers and platform defendants to exclude non-compliant carriers.

10. Unlawful Tying and Coercion. C.H. Robinson tied access to freight (the tying product) to mandatory acceptance of Highway and MacroPoint services (the tied products), forcing carriers to accept invasive tracking and data interfacing on a take-it-or-leave-it basis.

11. Standard-Setting Without Authority. By declaring surveillance mandates to be "industry standard," C.H. Robinson participated in private standard-setting that foreclosed competition, displaced lawful regulatory processes, and raised rivals' costs, particularly for small carriers.

12. Market Power and Foreclosure. As one of the largest freight brokers, C.H. Robinson possesses substantial market power and used that power to foreclose a meaningful share of the market to carriers unwilling to surrender sensitive data, reducing output and choice.

13. Facilitation Through Platforms. C.H. Robinson's integration with Highway and MacroPoint facilitated information asymmetries and centralized control, enabling brokers to monitor, discipline, and exclude carriers at scale.

14. Harm to Competition (Not Just Competitors). The conduct harms competition by entrenching a broker-centric gatekeeping system, suppressing independent carrier participation, chilling entry, and standardizing coercive surveillance across the industry.

15. Interstate Commerce. C.H. Robinson's conduct substantially affects interstate commerce, as the solicitation, conditioning, and exclusion occurred through interstate communications and impacted freight movements across state lines.

16. No Procompetitive Justification. The challenged restraints are not reasonably necessary for safety or payment assurance and exceed any legitimate business need, particularly where less restrictive alternatives exist.

## C. OHIO STATE LAW CLAIMS

(C.H. Robinson Worldwide, Inc. — Ohio-Specific Analogues)

---

### COUNT I Ohio Valentine Act

(Ohio Rev. Code §§ 1331.01–1331.99)

### Unlawful Combinations, Trusts, and Restraints of Trade

1. Defendant C.H. Robinson Worldwide, Inc. is a "person" and "combination" within the meaning of Ohio Rev. Code § 1331.01, and at all relevant times engaged in trade and commerce affecting the State of Ohio.

2. In concert with other Enterprise members, C.H. Robinson entered into, participated in, and enforced combinations and agreements that restrained trade in violation of Ohio Rev. Code §§ 1331.01–1331.03.

3. C.H. Robinson conditioned access to brokered freight on carriers' mandatory compliance with third-party surveillance and data-interfacing platforms, including Highway and MacroPoint, thereby excluding non-compliant carriers from meaningful participation in the market.

4. These restraints were horizontal and vertical in nature, unreasonable per se or under the rule of reason, and resulted in:

   o Reduced carrier choice;

   o Artificial standardization of invasive surveillance;

   o Suppression of independent carriers' ability to compete.

5. C.H. Robinson's conduct substantially lessened competition and tended to create a monopoly in broker-controlled freight markets, in violation of Ohio public policy favoring free and open competition.

6. Plaintiff suffered direct and proximate injury to its business and property within Ohio as a result of these violations.

---

**COUNT II Ohio Deceptive Trade Practices Act (ODTPA)**

(Ohio Rev. Code §§ 4165.01–4165.04)

**Deceptive and Unfair Business Practices**

215

7.  C.H. Robinson engaged in deceptive trade practices in violation of Ohio Rev. Code § 4165.02, including but not limited to:

   a. Representing that invasive surveillance, continuous tracking, and ELD interfacing were "industry standard" or unavoidable, when such practices are not mandated by law;

   b. Failing to disclose the scope, duration, and downstream use of carrier and driver data;

   c. Creating the false impression that refusal to submit to third-party platforms would be non-viable for any carrier seeking freight.

8.  These misrepresentations and omissions were made in the course of C.H. Robinson's business, affected Ohio commerce, and were likely to deceive carriers and distort competitive decision-making.

9.  Plaintiff was damaged or likely to be damaged by such deceptive trade practices, including loss of business opportunities and coerced exclusion from freight markets.

---

**COUNT III Ohio Common-Law Unfair Competition**

(Unjust Methods of Competition; Abuse of Market Power)

10. C.H. Robinson engaged in unfair competition under Ohio common law by employing coercive, exclusionary, and deceptive practices that violate established norms of fair dealing.

11. Such conduct includes:

216

- Leveraging market dominance to force acceptance of third-party surveillance tools unrelated to the essential transaction;

- Shifting compliance and monitoring burdens onto carriers without statutory authority;

- Participating in coordinated platform-based exclusion that disadvantages small carriers.

12. These practices constitute unjust methods of competition and abuse of market power, causing foreseeable harm to Plaintiff and the competitive process.

13. Plaintiff is entitled to injunctive relief, damages, and equitable remedies under Ohio law.

---

**COUNT IV  Declaratory & Injunctive Relief (Ohio Law)**

14. An actual and justiciable controversy exists regarding whether C.H. Robinson may lawfully:

- Condition freight access on non-statutory surveillance mandates;

- Impose third-party data extraction as a prerequisite to participation in interstate commerce affecting Ohio.

15. Plaintiff seeks a declaration that such practices violate Ohio antitrust and unfair-competition law, and an injunction prohibiting their continuation.

217

**DEFENDANT: RISK FACTORS®**

(a compliance, risk-scoring, and carrier-profiling product operated by RMIS and integrated with Truckstop.com)

**A. Role in the Enterprise and Market Function**

218

Risk Factors® is a compliance and carrier-risk scoring system operated as part of the Integrated Freight Data-Control Conglomerate Enterprise. Plaintiff alleges that Risk Factors functions as a broker-facing gatekeeping tool that assigns opaque risk designations to motor carriers and transmits those designations to brokers, onboarding platforms, and payment systems as a basis for approving, delaying, or denying access to freight and payment.

Risk Factors is not a neutral reporting service. Plaintiff alleges it operates as a decision-influencing mechanism that materially affects whether a carrier may onboard with brokers, remain approved, or receive payment, despite carriers having no meaningful ability to audit, correct, or challenge the underlying data or scoring logic.

---

## B. Enterprise Conduct and Participation

Plaintiff alleges that Risk Factors conducted and participated in the affairs of the Enterprise by supplying adverse compliance and risk signals that were relied upon by other Enterprise members to justify exclusion, delay, or restriction of carriers.

Risk Factors' role included:

- generating and disseminating carrier "risk" indicators;

- integrating those indicators into broker onboarding and approval workflows;

- coordinating with RMIS, Truckstop, and affiliated platforms to reinforce adverse determinations; and

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

- operating as a justification layer for payment delay, denial, or heightened control.

Plaintiff alleges this conduct constituted active participation in enterprise decision-making, not passive data publication.

---

## C. Lack of Transparency, Due Process, and Carrier Control

Plaintiff alleges that Risk Factors:

- does not disclose the full criteria used to generate risk scores or flags;

- does not provide carriers with advance notice of adverse designations;

- does not offer meaningful appeal, correction, or verification mechanisms;

- does not distinguish between verified risk and unverified data inputs; and

- presents broker-facing conclusions without corresponding carrier-facing explanation.

As a result, carriers are allegedly judged, restricted, or excluded based on undisclosed determinations that directly affect their livelihoods.

---

## D. Anticompetitive Effects and Restraint of Trade

Plaintiff alleges that Risk Factors' risk designations were used as a coercive market filter, contributing to an unlawful restraint of trade by:

- conditioning access to freight on compliance with opaque scoring systems;

- foreclosing carriers from broker relationships without clear cause;

- suppressing competition among carriers through exclusion rather than performance; and

- reinforcing broker leverage while depriving carriers of negotiating power.

Plaintiff alleges that these effects were not incidental but flowed from Risk Factors' integration into a vertically aligned ecosystem controlling onboarding, freight visibility, and payment.

---

## E. Coordination With Other Enterprise Defendants

Plaintiff alleges that Risk Factors operated in concert with other Enterprise Defendants, including RMIS, Truckstop.com, Truckstop Payments, Highway App, and DAT, such that:

- adverse Risk Factors signals were relied upon by RMIS for onboarding eligibility;

- brokers used Risk Factors outputs to deny or delay carrier approval;

- payment platforms used Risk Factors-linked compliance status to justify holds or restrictions; and

- carriers had no viable alternative path to market access outside the Enterprise.

This coordination allegedly transformed Risk Factors from a reporting tool into an enforcement mechanism within the Enterprise.

---

## F. Causation and Harm

221

As a direct and proximate result of Risk Factors' conduct, Plaintiff alleges that she:

- faced onboarding delays or denials unrelated to performance;

- experienced impaired access to freight opportunities;

- suffered payment disruptions tied to compliance status; and

- incurred economic harm and business instability.

Plaintiff alleges these harms were foreseeable consequences of deploying opaque risk scoring as a gatekeeping mechanism without procedural safeguards.

---

## G. Summary

Plaintiff alleges that Risk Factors® functioned as a central compliance and risk-designation engine within the Integrated Freight Data-Control Conglomerate Enterprise, supplying opaque, broker-centric risk signals that were used to exclude, discipline, or control motor carriers without transparency, due process, or competitive justification, thereby contributing to unlawful restraint of trade, enterprise-level coordination, and systemic harm to carriers.

(Standalone Defendant Profile & Conduct Summary)

---

## I. Defendant Identification

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Defendant: Total Quality Logistics, LLC

Common Name: TQL

Business Type: National freight brokerage

Principal Place of Business: Milford, Ohio

Industry Role: Intermediary broker arranging interstate transportation of freight by motor carriers

Interstate Commerce: Yes — nationwide brokerage operations

---

## II. Role in the Freight Transaction

1. TQL operates as the author and drafter of its broker–carrier agreements, freight confirmations, invoicing instructions, and payment terms.

2. TQL requires motor carriers to accept its standardized terms as a condition of accessing freight, without negotiation or modification.

3. TQL controls:

   o   Load tendering

   o   Invoicing procedures

   o   Payment timelines

   o   Payment routing

4. TQL utilizes third-party onboarding and compliance platforms, including Highway, to gate carrier access and eligibility.

223

### III. Payment Terms and Represented Options

5. TQL's freight documentation and invoicing instructions represent that carriers may submit paperwork and receive payment through:

   o   Standard mail (paper check)

   o   Overnight invoicing

   o   Email invoicing

   o   Fax

   o   Document scanning platforms

   o   "Quick Pay" options at stated percentage discounts

6. These documents represent Quick Pay and expedited payment as optional, not mandatory.

7. The freight documents do not disclose that acceptance of loads may result in:

   o   Loss of direct payment capability

   o   Mandatory routing of payment through a factor

   o   Elimination of paper check or Quick Pay options due to third-party NOAs

### IV. Enforcement of Notice of Assignment (NOA)

8. TQL received and enforced a Notice of Assignment ("NOA") issued by Truckstop-affiliated factoring entities claiming the right to receive payment on Plaintiff's loads.

224

9. Upon receipt of the NOA, TQL refused to remit payment directly to Plaintiff, notwithstanding:

   o Plaintiff's objection to the NOA

   o Plaintiff's request for direct payment

   o Plaintiff's request for paper check or Quick Pay alternatives

10. TQL treated the NOA as dispositive and controlling without:

- Independent verification of carrier consent

- Judicial determination

- Escrow or neutral holding of funds

---

## V. Absence of Genuine Alternative Payment Path

11. After enforcement of the NOA, the payment options represented in TQL's freight documents were no longer practically available to Plaintiff.

12. Requests for paper check or Quick Pay were refused or rendered unavailable due to the NOA.

13. As a result, factoring became the only functional method of payment, notwithstanding prior representations that factoring was optional.

---

## VI. Knowledge of Waiver-Conditioned Release

14. Plaintiff sought a Letter of Release ("LOR") to restore direct payment.

15. Truckstop Factoring conditioned issuance of the LOR on waiver of legal rights and claims by Plaintiff.

16. TQL continued to enforce the NOA knowing that:

- Plaintiff could not obtain a release without waiving rights; and

- Direct payment was therefore effectively foreclosed.

---

## VII. Effect on Carrier Compensation and Market Access

17. TQL's enforcement of the NOA:

- Withheld earned freight charges

- Eliminated all non-factoring payment options

- Conditioned payment on submission to a private financial regime

18. TQL did not offer escrow, interpleader, or court-supervised alternatives.

---

## VIII. Relief Implicated

19. TQL's conduct gives rise to claims for:

- Declaratory relief

- Injunctive relief

226

- Damages

- Equitable oversight relating to payment routing and NOA enforcement

---

## DEFENDANT — TOTAL QUALITY LOGISTICS, LLC (TQL)

(Standalone Defendant Profile & Conduct Summary)

---

## I. Defendant Identification

Defendant: Total Quality Logistics, LLC

Common Name: TQL

Business Type: National freight brokerage

Principal Place of Business: Milford, Ohio

Industry Role: Intermediary broker arranging interstate transportation of freight by motor carriers

Interstate Commerce: Yes — nationwide brokerage operations

---

## II. Role in the Freight Transaction

227

1. TQL operates as the author and drafter of its broker–carrier agreements, freight confirmations, invoicing instructions, and payment terms.

2. TQL requires motor carriers to accept its standardized terms as a condition of accessing freight, without negotiation or modification.

3. TQL controls:

   o Load tendering

   o Invoicing procedures

   o Payment timelines

   o Payment routing

4. TQL utilizes third-party onboarding and compliance platforms, including Highway, to gate carrier access and eligibility.

---

## III. Payment Terms and Represented Options

5. TQL's freight documentation and invoicing instructions represent that carriers may submit paperwork and receive payment through:

   o Standard mail (paper check)

   o Overnight invoicing

   o Email invoicing

   o Fax

   o Document scanning platforms

   o "Quick Pay" options at stated percentage discounts

6. These documents represent Quick Pay and expedited payment as optional, not mandatory.

228

7. The freight documents do not disclose that acceptance of loads may result in:

   o Loss of direct payment capability

   o Mandatory routing of payment through a factor

   o Elimination of paper check or Quick Pay options due to third-party NOAs

---

## IV. Enforcement of Notice of Assignment (NOA)

8. TQL received and enforced a Notice of Assignment ("NOA") issued by Truckstop-affiliated factoring entities claiming the right to receive payment on Plaintiff's loads.

9. Upon receipt of the NOA, TQL refused to remit payment directly to Plaintiff, notwithstanding:

   o Plaintiff's objection to the NOA

   o Plaintiff's request for direct payment

   o Plaintiff's request for paper check or Quick Pay alternatives

10. TQL treated the NOA as dispositive and controlling without:

- Independent verification of carrier consent

- Judicial determination

- Escrow or neutral holding of funds

---

## V. Absence of Genuine Alternative Payment Path

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

11. After enforcement of the NOA, the payment options represented in TQL's freight documents were no longer practically available to Plaintiff.

12. Requests for paper check or Quick Pay were refused or rendered unavailable due to the NOA.

13. As a result, factoring became the only functional method of payment, notwithstanding prior representations that factoring was optional.

---

## VI. Knowledge of Waiver-Conditioned Release

14. Plaintiff sought a Letter of Release ("LOR") to restore direct payment.

15. Truckstop Factoring conditioned issuance of the LOR on waiver of legal rights and claims by Plaintiff.

16. TQL continued to enforce the NOA knowing that:

- Plaintiff could not obtain a release without waiving rights; and

- Direct payment was therefore effectively foreclosed.

---

## VII. Effect on Carrier Compensation and Market Access

17. TQL's enforcement of the NOA:

- Withheld earned freight charges

- Eliminated all non-factoring payment options

230

- Conditioned payment on submission to a private financial regime

18. TQL did not offer escrow, interpleader, or court-supervised alternatives.

---

## VIII. Relief Implicated

19. TQL's conduct gives rise to claims for:

- Declaratory relief
- Injunctive relief
- Damages
- Equitable oversight relating to payment routing and NOA enforcement

---

## WHEREFORE, PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sandra Worthing Alves, d/b/a All Directions Trucking, respectfully prays that this Honorable Court, the Cuyahoga County Court of Common Pleas, enter judgment in her favor and against all Defendants, jointly and severally, and grant the following relief:

## A. COMPENSATORY DAMAGES

1. An award of compensatory damages in the amount of Eighty Thousand United States Dollars (US $80,000.00), representing:

231

a. Lost loads and lost revenue.

b. Wrongfully delayed, diverted, or withheld freight payments.

c. One-cent ("penny") deposits and fabricated short-pay practices;

d. Fuel deprivation, inability to purchase food, and inability to maintain insurance.

e. Operational shutdowns, onboarding denials, and exclusion from freight markets.

f. Credit impairment and business harm caused by fraudulent UCC filings.

g. Reputational injury within the trucking industry;

h. Emotional distress, humiliation, fear, and physical danger while stranded over 1,200 miles from home.

2. An order trebling all compensatory damages pursuant to:

a. Ohio Revised Code § 2923.34(E) (Ohio Civil RICO);

b. 18 U.S.C. § 1964(c) (Federal Civil RICO);

c. 15 U.S.C. § 15 (Sherman Act), as applicable.

## B. PUNITIVE DAMAGES

3. An award of punitive damages in the amount of Fifty Million United States Dollars (US $50,000,000.00) against Defendants, jointly and severally, to punish and deter Defendants' willful, malicious, reckless, and enterprise-driven misconduct, including:

a. Filing and maintaining fraudulent blanket UCC liens;

b. Weaponizing payment delays and penny deposits to exert economic coercion.

232

c. Endangering Plaintiff's physical safety by withholding funds necessary for fuel, heat, and food.

d. Facilitating offshore fraud networks and double-brokering schemes.

e. Monetizing surveillance, identity exploitation, and carrier data harvesting.

f. Participating in an integrated scheme that has contributed to the collapse of over 113,000 American motor carriers.

## C. DECLARATORY RELIEF

4. A declaration that UCC-1 Financing Statement No. OH00290660927 is unauthorized, fraudulent, void, and of no legal effect.

5. A declaration that Plaintiff never granted, signed, or authorized any security interest, assignment of receivables, lien, or collateral pledge to any Defendant.

6. A declaration that Defendants possess no lawful ownership, lien, encumbrance, or security interest in Plaintiff's assets, receivables, bank accounts, equipment, or business operations.

## D. INJUNCTIVE AND EQUITABLE RELIEF

7. A Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction prohibiting Defendants from:

a. Enforcing or maintaining the fraudulent UCC lien.

b. Issuing or circulating any Notice of Assignment affecting Plaintiff.

233

c. Intercepting, delaying, diverting, or withholding payments owed to Plaintiff.

d. Blocking or restricting Plaintiff's access to freight marketplaces.

e. Imposing surveillance-based ELD API requirements as a condition of hauling freight.

f. Sharing, monetizing, or transmitting Plaintiff's data to offshore or third-party actors.

8. Structural injunctive relief requiring Defendants, at their sole cost and expense, to:

 a. Submit to ongoing oversight by a Court-appointed Special Master.

 b. Undergo full forensic audits of financial systems, factoring practices, and payment-routing mechanisms.

 c. Eliminate offshore access to carrier identity, onboarding, and payment systems through analytics-based domain enforcement.

 d. Prohibit the use of VOIP numbers, Google Voice, Gmail-only identities, Telegram, WhatsApp, and similar anonymizing tools for broker or dispatcher access.

 e. Implement a verified domestic broker registry with metadata validation.

 f. Implement a court-supervised Enterprise Electronic Logging Device ("E-ELD") mirror system that captures and archives enterprise-level surveillance, payment, identity, and routing metadata for government and judicial review.

**E. DISGORGEMENT AND RESTITUTION**

9. Disgorgement of all profits wrongfully obtained by Defendants from:

 a. Fraudulent factoring practices.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

b. Payment float and delayed disbursements.

c. Unauthorized data harvesting and monetization.

d. Surveillance-based revenue models.

e. Offshore dispatch facilitation.

10. Full restitution of all funds wrongfully withheld, diverted, or seized from Plaintiff.

**F. COSTS, FEES, AND INTEREST**

11. An award of all costs of suit, including filing fees, service fees, investigative costs, and expert costs.

11. Pre-judgment and post-judgment interest at the maximum rate permitted by Ohio law.

**G. OTHER RELIEF**

12. Establish escrowed money of $100. dollars to $50 million dollars for appointment of software engineer Special Masters and two 2 court approved appointed attorneys for each Special Master,, one for Cuyahoga County and another Attorney in the jurisdiction of the defendant for Judicial oversight and scaled in the amount of Special Masters and Funds to reflect and calibrate how many will be needed per defendant.

13. Such other and further legal, equitable, statutory, and injunctive relief as this Court deems just, proper, and necessary to remedy the full scope of harm to Plaintiff and to protect the integrity of interstate commerce and the American supply chain.

**Evidence & Exhibit Index (No Exhibits Attached)**

235

Plaintiff provides the following Evidence and Exhibit Index to identify materials supporting the allegations in this First Amended Complaint. Plaintiff expressly reserves the right to supplement, amend, and produce these materials during discovery. No exhibits are attached at this stage.

EXHIBIT CATEGORY A — RECORDED CALLS & AUDIO EVIDENCE

A-1. Recorded telephone interviews with offshore dispatchers and brokers (2022–2025), including individuals located in Pakistan and other foreign jurisdictions, describing:

• control of multiple U.S. MC numbers,

• commission structures (approximately five percent (5%) per truckload),

• data retention practices (ACH, MC, W-9, insurance, ELD access),

• double-brokering methods and straw-man carrier usage.

A-2. Recorded calls with factoring representatives regarding:

• "no obligation" representations,

• unexplained short payments,

• one-cent deposits,

• refusal to release funds or Notices of Assignment.

EXHIBIT CATEGORY B — ELECTRONIC COMMUNICATIONS

B-1. Telegram message threads documenting:

• ELD manipulation and hours-of-service falsification,

• offshore dispatch coordination,

• instructions to operate beyond lawful driving limits.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

B-2. WhatsApp and VOIP communications used by offshore brokers and dispatchers to:

• impersonate carriers,

• negotiate freight,

• substitute unauthorized drivers.

B-3. Screenshots of Google Voice and non-domestic contact numbers associated with broker

and dispatcher communications facilitated through DAT and related platforms.

## EXHIBIT CATEGORY C — ELD & TELEMATICS EVIDENCE

C-1. Screenshots and documentation showing backend ELD edits and log manipulation.

C-2. Comparative evidence showing lawful Garmin ELD use versus API-integrated surveillance

ELD systems favored by brokers.

C-3. Industry documentation and technical references regarding remote-disable and API

telemetry capabilities.

## EXHIBIT CATEGORY D — PLATFORM RECORDS & DIGITAL FLAGS

D-1. Highway App records showing unauthorized "claimed" authority and delayed

decommission.

D-2. RMIS onboarding records reflecting automatic access shutdowns.

D-3. Carrier411 records evidencing reputational coercion and blacklist threat mechanisms.

## EXHIBIT CATEGORY E — FINANCIAL & LIEN DOCUMENTATION

E-1. UCC-1 Financing Statement No. OH00290660927.

E-2. Notices of Assignment circulated to brokers.

E-3. Payment statements reflecting penny deposits, unexplained holds, and shortages.

E-4. Broker confirmations of full payment contradicting factoring statements.

EXHIBIT CATEGORY F — SOCIAL MEDIA & PUBLIC ADMISSIONS

F-1. TikTok and social media videos of offshore dispatchers boasting of:

- dispatching fifty (50) or more trucks per dispatcher,

- commission-based revenue,

- overseas operations managing U.S. freight.

EXHIBIT CATEGORY G — GOVERNMENT & INDUSTRY MATERIALS

G-1. FMCSA authority records for Plaintiff.

G-2. Industry reports and warnings regarding:

- double brokering,

- cargo theft,

- offshore dispatching fraud,

- ELD manipulation.

Plaintiff states that these materials are within her possession, custody, or control, or will be obtained through discovery, subpoenas, and court-supervised forensic review under the requested structural relief and Special Master oversight.

238

**Instructions for Certified Service of Process**

**Cuyahoga County Court of Common Pleas**

Plaintiff respectfully requests that the Clerk of Court issue service of process by Certified Mail, Return Receipt Requested, pursuant to Ohio Civ.R. 4.1(A)(1), upon the following Defendants at the addresses listed below. Plaintiff is proceeding pro se. Plaintiff understands that service will be completed by the Clerk and docketed accordingly.

Defendant 1.
**Internet Truckstop Payments, LLC**
c/o Registered Agent
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 2.
**Internet Truckstop Group, LLC**
c/o Registered Agent
222 North Plymouth Avenue

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

New Plymouth, Idaho 83655

Defendant 3.
**Truckstop.com, LLC**
also known as Truckstop; Truckstop Load Board; The Internet Truckstop
c/o Registered Agent
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 4.
**Truckstop Factoring**
a trade name and operating division of Internet Truckstop Payments, LLC
c/o Internet Truckstop Payments, LLC
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 5.
**RMIS – Registry Monitoring Insurance Services, LLC**
c/o Registered Agent
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 6.
**Grizella, Inc.**
c/o RMIS, LLC
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 7.
**Risk Factors®**
c/o RMIS, LLC
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 8.
**SaferWatch®**
c/o RMIS, LLC
222 North Plymouth Avenue
New Plymouth, Idaho 83655

Defendant 9.

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

**Denim, Inc.**
c/o Registered Agent
1444 South Entertainment Avenue, Suite 110
Boise, Idaho 83709

Defendant 10.
**C.H. Robinson Worldwide, Inc.**
c/o Registered Agent
14701 Charlson Road
Eden Prairie, Minnesota 55347

Defendant 11.
**Magellan Transport Logistics, Inc.**
8505 Baycenter Road
Jacksonville, Florida 32256

Defendant 12.
**MacroPoint, Inc.**
c/o Registered Agent
3350 Riverwood Parkway, Suite 1900
Atlanta, Georgia 30339

Defendant 13.
**Total Quality Logistics, LLC (TQL)**
c/o Registered Agent
4289 Ivy Pointe Boulevard
Cincinnati, Ohio 45245

Defendant 14.
**DAT Freight & Analytics, LLC**
c/o Registered Agent
8405 SW Nimbus Avenue
Beaverton, Oregon 97008

Defendant 15.
**Highway App, Inc.**
c/o Registered Agent
440 North Wolfe Road
Sunnyvale, California 94085

Electronically Filed 12/17/2025 10:10 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3705248 / CLEV1

Defendant 16.
**John Doe Brokers 1–29,061**
To be identified

Defendant 17.
**John Doe Factoring Partners 1–100**
To be identified

**John Doe Defendants**

John Doe Brokers 1–29,061 and John Doe Factoring Partners 1–100 are named as placeholder

defendants whose identities are presently unknown to Plaintiff.

Plaintiff respectfully requests that service upon John Doe Defendants be deferred until such time

as their identities are discovered through investigation, discovery, subpoena, or court order.

Upon identification, Plaintiff will promptly move to amend the complaint and request issuance of

service.

Plaintiff requests that proof of service be entered upon the docket upon completion.

Respectfully submitted,

Sandra Worthing Alves-

All Directions Trucking

242

243