# EXHIBIT 3



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**AMENDED COMPLAINT $75**
**January 14, 2026 10:27**

Confirmation Nbr. 3728084

SANDRA WORTHING ALVES

vs.

INTERNET TRUCKSTOP PAYMENTS LLC, ET AL

CV 25 129498

**Judge:** JOHN J. RUSSO

**Pages Filed:** 522

**CIVIL COVER SHEET – OHIO, CASE NO. CV-25-129498**

 INSTRUCTIONS FOR SERVICE CERTIFIED MAIL OR PUBLICATION

☒ Contract / Commercial

☒ Fraud / Misrepresentation

☒ Declaratory Judgment

☒ Injunctive Relief

☒ Antitrust (Sherman Act §§1–2)

☒ Civil RICO (Ohio R.C. 2923.31–2923.34; 18 U.S.C. §1962)

☒ Court of Common Pleas – COMMERCIAL DOCKET

Amount in Controversy:

☒ Exceeds $25,000

Jury Demand: Bifurcate, Bench sequencing

☒ Jury demanded on all triable issues

Related Case Information:

**x** No related cases pending

Special Docket Requests:

☒ Injunctive Relief (TRO / Preliminary Injunction anticipated)

☒ Complex Commercial Litigation

1

# IN THE COURT OF COMMON PLEAS

# CUYAHOGA COUNTY, OHIO

**Case No.: CV-25-129498**

**Plaintiff,**                                              **Judge:**

**HONORABLE JOHN J RUSSO**

**Sandra Worthing Alves**

**d/b/a All Directions Trucking
MC#1710778**

**25540 Byron Dr.**

**North Olmsted OH 44070**

_____

**v.**                                                    **SECOND AMENDED**

**COMPLAINT**

Defendant 1.
**Internet Truckstop Payments, LLC
Dba- Denim,Truckstop Load board,
RMIS, SaferWatch,
RiskFactor
Registered Agent**
1505 Corporation
(d/b/a CSC – Lawyers Incorporating Service)
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833

2

Defendant 2.
**Denim, Inc.**
c/o Registered Agent
1444 South Entertainment Avenue, Suite 110
Boise, Idaho 83709


Defendant 3
**Total Quality Logistics, LLC (TQL)**
c/o Registered Agent
4289 Ivy Pointe Boulevard
Cincinnati, Ohio 45245
.

Defendant 4.
**John Doe Freight Brokers1-29,061**
To be identified


Defendant 5.
**John Doe Factoring Partners 1–100**
To be identified


Defendant 6.
**Motive Technologies, gomotive.com**
 **f/k/a Keep Trucking**
1505 Corporation Incorporating Services LTD
Registered Agent
7801 Folsom BLVD # 202
Sacramento, CA 95826


Defendant 7
**Highway App, Inc.**
c/o Registered Agent
440 North Wolfe Road
Sunnyvale, California 94085

3

Defendant 8
**Carrier411 Services, Carrier411.com**
**Registered Agent**
50 North Laura Sreet
Suite 2600
Jacksonville, FL 32202

Defendant 9.
**Magellan Transport Logistics, Inc.**
Registered Agent
8505 Baycenter Road
Jacksonville, Florida 32256

Defendant 10.
**DAT Freight & Analytics, LLC**
c/o Registered Agent
8405 SW Nimbus Avenue
Beaverton, Oregon 97008

Defendant 11.
**Flock Safety, Flock Group Inc, Flock Cameras**
c/o Registered Agent
300 Colonial Center Pkwy, STE 100N
Roswell, GA 30076

Defendant 12.
**C.H. Robinson Worldwide, Inc.**
c/o Registered Agent
14701 Charlson Road
Eden Prairie, Minnesota 55347

Defendant #13
**MacroPoint, Inc.**
c/o Registered Agent
3350 Riverwood Parkway, Suite 1900
Atlanta, Georgia 30339

4

## NOTICE TO THE CLERK OF COURTS

Plaintiff respectfully notifies the Clerk of Court as follows:

1. Plaintiff has filed a Second Amended Complaint, which supersedes all prior pleadings in this action.
2. The Second Amended Complaint adds additional defendants and clarifies the legal identities of certain previously named defendants.
3. Plaintiff respectfully requests that summons be issued for all defendants named in the Second Amended Complaint, including newly added defendants.
4. Plaintiff requests that service of process be made upon each defendant through its registered agent for service of process, as identified in the applicable Secretary of State records.
5. Plaintiff further notes that, under Ohio law and applicable rules of civil procedure, service upon a defendant's registered agent constitutes valid service upon the defendant principal.
6. Plaintiff requests that the Clerk reflect issuance of Certified summons and service attempts on the docket for each defendant listed in the Second Amended Complaint with receipts docketed.
7. Plaintiff will promptly provide any additional information required by the Clerk to facilitate proper service.

---

**Respectfully submitted,**

Sandra Worthing Alves

d/b/a All Directions Trucking

MC #1710778

5

## I. INTRODUCTION

This action arises from coordinated and interdependent conduct by freight-technology platforms, broker-facing data intermediaries, surveillance-enabled systems, factoring and payment controllers, and affiliated brokers that collectively regulate access to freight, payment, reputation, and economic survival in the trucking industry.

Plaintiff alleges that Defendants do not operate as independent market participants. Rather, they function as an integrated enterprise in which data collected at one layer—such as compliance records, operational telemetry, identity markers, reputation flags, or payment information—is reused, enforced, or weaponized across other layers to exclude carriers from work and payment without notice, transparency, or due process.

Plaintiff Sandra Worthing Alves is a federally authorized motor carrier operating under All Directions Trucking, MC #1710778. At all relevant times, Plaintiff operated lawfully in interstate commerce and performed services as the carrier, owner-operator, driver, dispatcher, and architect of a carrier-originated agency platform known as All Directions Trucking Agency ("the Agency").

The Agency is an operational, carrier-first coordination model developed over approximately a decade and known nationwide among carriers, owner-operators, dispatchers, and regional agents.

6

It operates on principles of voluntary participation, privacy-preserving coordination, and carrier-controlled data governance, and has engaged approximately 850 owner-operators nationwide.

Plaintiff alleges that Defendants' enterprise suppresses and appropriates carrier-originated alternatives such as the Agency by imposing surveillance-based scoring, platform exclusion, payment interference, and financial captivity—thereby forcing carriers into dependence on Defendants' platforms while foreclosing meaningful exit.

A central mechanism of this control is the filing and enforcement of sweeping UCC-1 financing statements purporting to encumber substantially all present and future receivables and business assets of carriers, coupled with industry-honored Notices of Assignment that brokers routinely obey by refusing to pay carriers directly. When combined with platform lockouts, restricted account visibility, and payment diversion, these instruments operate as a choke point that deprives carriers of liquidity, autonomy, and survival.

Plaintiff does not challenge technology, compliance, or legitimate risk management. Plaintiff challenges the use of technology and financial instruments as tools of coercive control, exclusion, and monopoly, where less restrictive, carrier-controlled alternatives are feasible and already exist.

**Federal Motor Carrier Authority and Equal Status of Carriers Under Federal Law**

**A. Federal Motor Carrier Authority Applies Uniformly to Large and Small Carriers**

7

Under federal law, motor carrier operating authority is issued and regulated exclusively by the Federal Motor Carrier Safety Administration ("FMCSA"), pursuant to 49 U.S.C. §§ 13901–13902 and 31144. That authority governs a carrier's legal right to operate in interstate commerce and applies equally to all carriers, regardless of size, fleet count, revenue, or market share.

Federal law does not distinguish between "large" and "small" carriers for purposes of operating authority, safety fitness, or eligibility to participate in interstate transportation. An owner-operator with a single truck and a national fleet with thousands of power units are equally authorized once FMCSA issues operating authority and the carrier remains in compliance.

The FMCSA alone determines:

- whether a carrier may lawfully operate in interstate commerce;
- whether a carrier is fit, safe, and compliant;
- and whether a carrier's authority should be restricted, suspended, or revoked.

No private entity, platform, broker, or intermediary is authorized to override, replace, or condition that federal authority through private enforcement mechanisms.

---

**B. Scope of Authority Granted to Motor Carriers**

Once granted FMCSA operating authority, a motor carrier is legally entitled to:

- offer transportation services in interstate commerce;

8

- contract with brokers and shippers on a voluntary basis;

- receive payment for transportation services performed;

- and participate in the marketplace subject only to lawful contractual terms and federal regulation.

That authority does not depend on enrollment in private platforms, participation in broker-facing vetting systems, or submission to non-governmental scoring or surveillance regimes. While carriers may choose to use private platforms, such participation is not a condition of federal authority and cannot lawfully be converted into a gatekeeping requirement that nullifies FMCSA authorization.

---

## C. Plaintiff's Federal Operating Authority

Plaintiff Sandra Worthing Alves, d/b/a All Directions Trucking, is a federally authorized interstate motor carrier holding active FMCSA operating authority under MC #1710778. At all relevant times, Plaintiff's authority was:

- active and in good standing;

- not suspended, revoked, or conditioned by FMCSA;

- not subject to any out-of-service order;

- and not associated with any adverse FMCSA safety fitness determination.

9

Plaintiff lawfully hauled interstate freight for national brokers, completed deliveries without service or safety incident, and remained eligible under federal law to continue operating in interstate commerce.

---

### D. Legal Significance of Federal Authority in This Action

Plaintiff alleges that despite holding valid and active federal operating authority, Defendants— none of whom possess FMCSA regulatory power—effectively nullified Plaintiff's authority in practice by enforcing private, opaque, and coordinated exclusion through broker-facing platforms, payment controls, and reputational mechanisms.

Such conduct did not arise from any FMCSA action, safety determination, or regulatory finding. Instead, Plaintiff alleges that Defendants substituted private enforcement systems for federal regulation, resulting in the practical removal of a compliant carrier from interstate commerce without statutory authority, notice, or due process.

Federal motor carrier authority is intended to ensure uniform access to interstate markets, not to be overridden by private gatekeepers. Plaintiff alleges that Defendants' conduct undermines this framework by conditioning market participation on submission to private systems that lack regulatory legitimacy.

---

### E. Summary

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Under federal law:

- FMCSA—not private platforms—determines who may operate as a motor carrier;

- large and small carriers stand on equal legal footing once authorized;

- and private actors may not impose de facto disqualification from interstate commerce absent lawful regulatory action.

Plaintiff alleges that Defendants' conduct contravened these principles by effectively stripping Plaintiff of the practical benefits of federally granted authority through coordinated, non-transparent, and unauthorized private enforcement.

**FMCSA Regulatory Framework Governing Freight Brokers and the Legal Implications of Delegated Exclusion**

**A. Broker Authority Is Conditional, Not Absolute**

Under federal law, freight brokers operate only by virtue of authority granted by the Federal Motor Carrier Safety Administration ("FMCSA"), pursuant to 49 U.S.C. §§ 13901–13904. That authority is conditional and regulated, not an unfettered license to exclude carriers arbitrarily or collectively from interstate commerce.

FMCSA broker authority exists within a statutory framework designed to:

- preserve fair access to interstate transportation markets,

- protect motor carriers from deceptive or coercive practices,

- ensure transparency in broker conduct,

- and prevent private actors from exercising regulatory-like control without accountability.

11

A broker's discretion in carrier selection exists only within this regulated context and may not be exercised in a manner that undermines federal transportation policy or substitutes private enforcement mechanisms for FMCSA oversight.

---

## B. Brokers May Not Usurp FMCSA's Exclusive Authority Over Safety and Fitness

Under 49 U.S.C. § 31144, FMCSA alone is vested with authority to:

- determine a motor carrier's safety fitness,

- assign safety ratings,

- and restrict or revoke operating authority.

When a broker excludes a carrier:

- without citing any FMCSA safety rating,

- without identifying a regulatory violation,

- and without any performance-based justification,

and instead relies on third-party platform flags, scores, or "notes," that broker is functionally enforcing a safety or fitness determination without statutory authority.

The law does not permit brokers—individually or collectively—to replicate regulatory enforcement outcomes through private platforms while disclaiming regulatory responsibility.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## C. Delegation to Opaque Broker-Facing Platforms Violates the Duty of Independent Judgment

FMCSA's regulatory structure presumes that brokers will:

- exercise independent, good-faith judgment in carrier selection,
- based on lawful considerations such as availability, performance history, insurance, and FMCSA-recognized compliance.

When brokers join broker-facing platforms that:

- centralize carrier eligibility decisions,
- conceal decision criteria,
- prohibit disclosure or appeal,
- and propagate uniform exclusion across multiple brokers,

those brokers are no longer exercising independent judgment. Instead, they are delegating market access decisions to unregulated private systems.

Such delegation:

- defeats the purpose of FMCSA's broker-specific regulatory regime,
- eliminates accountability,
- and converts individual discretion into concerted enforcement.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## D. Opaque Blacklisting Is Inconsistent With FMCSA Transparency Expectations

Under 49 C.F.R. Part 371, brokers are subject to recordkeeping and transparency obligations that reflect a broader expectation of honest, traceable, and reviewable conduct.

A broker practice that:

- refuses to disclose the basis for exclusion,

- labels the reason "proprietary,"

- denies the existence of appeal or cure,

- and relies on undisclosed third-party inputs,

is inconsistent with regulated broker conduct, particularly where the exclusion affects:

- payment access,

- reputation,

- and continued participation in interstate commerce.

While brokers are not required to contract with every carrier, they are not permitted to enforce secret market bans that function as industry-wide exclusion.

---

## E. Retaliatory and Collective Exclusion Undermines Federal Transportation Policy

14

Federal transportation law is premised on open, competitive markets, not private gatekeeping systems that remove carriers from commerce through coordinated action.

Where:

- a carrier engages in protected activity (such as filing a complaint or asserting legal rights),
- broker-facing platforms propagate adverse eligibility determinations,
- and brokers uniformly refuse to tender freight without explanation,

the resulting exclusion is not merely a business decision, but an interference with interstate commerce that federal law seeks to prevent.

FMCSA authority does not insulate brokers from liability when their conduct:

- retaliates against carriers,
- suppresses competition,
- or reinforces private enforcement systems that bypass regulatory safeguards.

_____

## F. Legal Implications of Broker Participation in Broker-Facing Platforms

When brokers participate in broker-facing platforms that impose opaque, coordinated exclusion, the legal implications include:

15

1. Unlawful Delegation of Regulated Functions

   Brokers may not outsource carrier eligibility determinations to entities lacking FMCSA authority.

2. Concerted Refusal to Deal

   Uniform enforcement of platform-generated exclusion across multiple brokers constitutes collective market action, not independent discretion.

3. Circumvention of FMCSA Oversight

   Private platforms cannot lawfully replicate safety, fitness, or compliance enforcement without statutory authority or due process.

4. Interference With Interstate Commerce

   Coordinated exclusion removes compliant carriers from the market, disrupting the flow of interstate freight.

5. Loss of Regulatory Safe Harbor

   Broker authority does not shield conduct that exceeds or contradicts federal regulatory expectations.

---

**G. Summary**

16

FMCSA regulates brokers precisely because brokers occupy a critical gatekeeping role in interstate commerce. That regulation is rendered meaningless if brokers are permitted to:

- collectively defer to unregulated platforms,

- enforce undisclosed blacklists,

- and remove carriers from commerce without transparency or accountability.

Plaintiff alleges that Defendants' conduct represents a systemic departure from regulated broker conduct, resulting in unlawful private enforcement, economic coercion, and exclusion from interstate commerce.

---

## II. PARTIES

### A. Plaintiff

Plaintiff Sandra Worthing Alves is an individual residing in Cuyahoga County, Ohio and the sole proprietor of All Directions Trucking and All Directions Trucking Agency, operating under FMCSA authority MC #1710778.

---

17

NOW COMES Plaintiff, Sandra Worthing Alves, d/b/a All Directions Trucking, by and through herself, and for her Secomd Amended Complaint against Defendants, alleges as follows:

This is an action for declaratory relief, injunctive relief, monetary damages, and all other legal and equitable relief deemed just and proper by this Court, arising from a coordinated course of conduct by Defendants that interfered with Plaintiff's lawful trucking operations, payment rights, contractual relationships, and access to interstate commerce.

This action concerns the conduct of a coordinated group of corporate actors that collectively exercise substantial control over access to freight, carrier onboarding, compliance verification, payment routing, and receivables administration in the freight transportation market through their roles as onboarding authorities, data aggregators, verification platforms, payment processors, compliance portals, and load-access gatekeepers. Plaintiff alleges that these entities function together as an integrated enterprise—referred to herein as the Integrated Freight Data-Control Conglomerate Enterprise (the "Enterprise")—that operates primarily for the benefit of freight brokers, not motor carriers. Brokers are the Enterprise's principal customers, and the Enterprise's structural design, data flows, and enforcement mechanisms are alleged to advantage brokers while imposing disproportionate burdens on carriers.

To access freight, carriers are required by non-regulated PLATFORMS to submit to repetitive, escalating, and intrusive onboarding and verification requirements, including the disclosure of sensitive personal and business information such as articles of incorporation, secretary of state form, W-9s, Social Security numbers and or EINs, operating authority documents, driver

18

credentials, equipment registrations, equipment titles, insurance certificates, photographs, and, in many instances, ongoing location or device-based tracking by drivers phones and or ELD telemetry with in cab facing ai cameras with video and audio monitoring. Plaintiff alleges that these requirements provide no corresponding operational benefit to carriers, do not materially prevent fraud, and do not enhance safety or freight security, but instead function as mechanisms for data extraction, surveillance, profiling, and control, the commercial value of which benefit brokers and platform operators. Despite the extensive obligations imposed on carriers, Plaintiff alleges that the Enterprise provides no comparable verification or transparency requirements for brokers, notwithstanding brokers' central role in payment control, load representation, and exposure to risks such as double brokering, misrepresentation, and diversion.

Plaintiff is a federally authorized motor carrier. owner operator and semi truck driver operating under active FMCSA authority, MC #1710778. Plaintiff conducted business in reliance upon lawful broker–carrier transactions, prompt payment expectations, and the ordinary operation of interstate freight markets. Defendants, acting individually and in concert, implement connected systems, policies, and practices that collectively controlled carrier access, payment flow, compliance approval, and risk designation in a manner that exceeded any legitimate contractual purpose and operated instead as coordinated restraint on Plaintiff's business.

Plaintiff alleges that Defendants Internet Truckstop Payments, LLC / Truckstop.com; Internet Truckstop Payments, LLC d/b/a Truckstop Factoring; Truckstop Payments LLC; Safer Watch and Post Everywhere) RMIS – Registry Monitoring Insurance Services; Denim Labs, Inc.; Highway App, Inc.; DAT Freight & Analytics (DAT Solutions, LLC); Total Quality Logistics,

CH Robinson Worldwide, Magellan Transport Logistics, Carrier411.com, Motive, gomotive.com, f/k/a Keep Trucking, Flock Safety Cameras John Doe Brokers 1-29061 and John Doe Factoring Partners 1-100 collectively comprise and operate the Enterprise. Plaintiff alleges that the Enterprise uses interlocking systems of compliance onboarding, identity and fraud verification, freight visibility, factoring leverage, receivables diversion, and public lien filings to exert coordinated control over small and mid-sized motor carriers, including Plaintiff. Plaintiff alleges that this case does not arise from an isolated commercial disagreement, but from systemic and enterprise-level conduct that has distorted market access, suppressed competition, and contributed to the broader instability of the freight transportation sector. Plaintiff further alleges that, but for the Enterprise's coordinated control over carrier approval, payment flow, compliance enforcement, and access to freight, Plaintiff would have been able to operate her federally granted authority free from the interference, encumbrances, and exclusions described herein.

Plaintiff' seeks declaratory relief to determine the parties' respective rights and obligations, including whether Defendants' practices, surveillance, agreements, notices, liens, data controls, and payment restrictions are lawful, enforceable, and consistent with governing law. Plaintiff further seeks injunctive relief to prevent ongoing and future harm, including continued interference with payment, carrier approval, data access, and the ability to engage freely in interstate commerce without extortion, coercion, silence, surveillance, scoring, blacklisting, listening, hoarding personal data, and company data, titles chattels or insurance.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Plaintiff also seeks compensatory damages for financial losses, withheld or delayed payments, business and financial and insurance disruption, authority disruptions, qualification and compliance disruptions, and consequential damages caused by Defendants' conduct, as well as any additional damages available under law, including compensatory, statutory, treble, or punitive damages where applicable. Plaintiff further seeks all other relief, whether legal or equitable, that this Court deems appropriate to fully remedy the harms alleged and to prevent recurrence.

This Court's intervention is necessary because Defendants coordinated conduct was not isolated, accidental, or incidental, but instead arose from interconnected business practices operating across multiple entities and platforms, the cumulative effect of which imposed substantial and ongoing harm on Plaintiff and similarly situated motor carriers. Absent judicial relief, Plaintiff lacks an adequate remedy at law to halt the continuing effects of Defendants' actions and to restore lawful market conditions.

## CIVIL — CASE SUMMARY

(Complex Commercial / Civil RICO Action — No Waiver of Rights)

**Nature of the Action**

Civil RICO; Antitrust; Unfair Competition; Breach of Contract; Declaratory and Equitable Relief

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

**DEFENDANTS,**

**Internet Truckstop Payments LLC**

**dba Denim by Truckstop**

**dba Truckstop Load board**

**dba Denim Labs**

**dba Registered Monitoring Insurance Systems RMIS**

**Unidentified Freight brokers,**

**Unidentified Factoring Partners,**

Description:

All Defendants and unidentified freight brokers holding active FMCSA broker authority (approximately 29,061 known registrants), operating throughout the United States and utilizing the same load boards, surveillance platforms, compliance gatekeepers, and payment controls alleged herein. Identities to be substituted as discovery proceeds.

---

**John Doe Factoring Partners 1–unknown by**

Description:

Unidentified factoring companies, payment intermediaries, and financial partners that coordinate with broker and platform defendants to control carrier cash flow and enforce suppressed compensation.

---

## BRIEF STATEMENT OF THE CASE

This action arises from a nationwide, coordinated scheme by freight brokers, logistics platforms, surveillance technology providers, and payment-control entities to suppress motor-carrier compensation across interstate freight markets.

Defendants formed and operated an association-in-fact enterprise that replaced open market negotiation with a private, technology-enforced regime. Through shared load boards, mandatory phone-based driver tracking, carrier gatekeeping systems, and post-performance payment controls, Defendants imposed non-negotiable freight rates, eliminated bargaining, and routinely reduced carrier pay after delivery.

Dominant brokers anchored artificially low rates and declared invasive tracking "industry standard." Platform and compliance defendants enforced exclusionary rules that barred non-compliant carriers from access to freight. Surveillance defendants supplied real-time phone tracking used not for shipment verification, but as leverage to justify rate reductions and short payments unrelated to delivery performance. Payment and factoring defendants reinforced the scheme by restricting cash flow and preventing carriers from refusing suppressed rates.

23

As a result, carriers nationwide were forced to accept compensation below competitive levels, subjected to standardized post-delivery deductions, and deprived of meaningful negotiation. Entire regions were treated as permanent low-pay "backhauls," causing market-wide rate suppression across state lines.

Plaintiff does not waive any right to a jury trial. Due to the complexity of the enterprise, Plaintiff anticipates the Court may bifurcate proceedings, with enterprise structure, liability, and equitable issues tried to the Court, and damages tried to a jury if necessary.

Plaintiff further seeks appointment of a Special Master to oversee discovery, data production, accounting, rate analysis, and platform practices due to the nationwide, multi-defendant scope of the case.

---

**CASE CLASSIFICATION**

- Case Type: Complex Commercial / Business Litigation
- Primary Claims: Civil RICO; Antitrust; Unfair Competition, Breach of Contract
- Relief Sought:
    - Compensatory damages
    - Treble damages
    - Declaratory and equitable relief
    - Punitive Damages
    - Appointment of Special Master
- Jury Demand: Yes (bifurcate and no waiver)

24

**PROPOSED CONFIDENTIALITY AND NON-RETALIATION**

**FRAMEWORK**(Submitted for the Court's Consideration Only)

---

## I. NATURE OF THIS PROPOSAL

1. Plaintiff submits this document as a proposal, not as a stipulation, agreement, or order.

2. This Proposal is intended solely to assist the Court in managing:

   o   Confidential proprietary information;

   o   Public-facing judicial proceedings;

   o   Risks of retaliation or interference during litigation.

3. Nothing herein is binding unless and until adopted, modified, or rejected by the Court.

---

## II. NO WAIVER OF RIGHTS

4. No rights are waived by submission of this Proposal.

5. Specifically, nothing herein:

   o   Waives any claim, defense, or objection;

   o   Concedes confidentiality, privilege, relevance, or admissibility;

   o   Limits discovery rights.

   o   Restrict speech protected by law.

   o   Waives statutory, constitutional, or common-law rights of any party.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

6. All parties reserve all rights.

---

## III. GUIDING PRINCIPLES FOR THE COURT'S CONSIDERATION

7. Plaintiff respectfully proposes that any confidentiality framework adopted by the Court should be guided by the following principles:

a. Open Courts — The case itself, pleadings, hearings, and rulings should remain public absent specific, narrowly tailored findings.

b. Narrow Confidentiality — Only legitimate proprietary or trade-secret information should be protected.

c. Anti-Retaliation — Participation in this litigation must not expose parties or witnesses to coercion, blacklisting, or exclusion. (Blacklisting has occurred since the first amended complaint for filing a complaint, Dec 30, 2025) seeking immediate relief to reverse this.

d. Judicial Oversight — Confidentiality should not obstruct the Court's ability to observe, analyze, or remedy alleged misconduct.

---

## IV. PROPOSED SCOPE OF CONFIDENTIALITY (NARROW)

8. Plaintiff proposes that confidentiality, if ordered, be limited to non-public proprietary information, such as:

26

- o   Trade secrets.

- o   Internal software architecture.

- o   Proprietary algorithms or security controls.

- o   Non-public financial identifiers.

9.   Plaintiff proposes that confidentiality does not extend to:

- o   The existence or substance of this case.

- o   Alleged conduct, practices, or policies described at a structural level.

- o   Public safety, regulatory compliance, or interstate commerce issues.

- o   The identities of parties or platforms involved.

10. Confidentiality should not be used to:

- Conceal alleged unlawful conduct.

- Avoid judicial scrutiny.

- Suppress matters of public concern.

---

## V. PUBLIC-FACING NATURE OF THE CASE

11. Plaintiff expressly proposes that:

- The docket remains public;

- Motions and rulings remain public except for narrowly redacted exhibits.

- No blanket sealing or gag restrictions are imposed.

27

12. Any sealing should be exceptional, narrow, and supported by specific findings.

---

## VI. SPECIAL MASTER / DATA MIRRORING CONSIDERATIONS

13. Plaintiff proposes that, if the Court appoints a Special Master or orders data mirroring:

- Confidentiality designations should not restrict neutral oversight.
- Mirrored data remains read-only and preserved with metadata.
- The Court retains full discretion over use and disclosure.

14. Plaintiff does not request access to proprietary systems beyond what the Court may permit.

---

## VII. NON-RETALIATION AND NON-INTERFERENCE (PROPOSED PRINCIPLE)

15. Plaintiff respectfully proposes that the Court consider safeguarding the litigation from retaliation, including:

- Blacklisting or reputation flagging (e.g., Carrier411 or similar systems);
- Denial of load access.
- Platform exclusion or downgrading.
- Payment interference.
- Online targeting or harassment.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

16. Plaintiff submits that such conduct, if it occurs during litigation, would risk interference with the administration of justice, regardless of ultimate liability.

---

## VIII. PUBLIC SAFETY AND REGULATORY CONTEXT

17. Plaintiff further proposes that any confidentiality framework preserve the Court's ability to examine allegations involving:

- Dispatch practices affecting interstate commerce.
- Use of overseas dispatch services.
- Driver qualification, domicile, and English-language proficiency requirements.

18. These issues are raised as matters of public and regulatory concern, not as requests for premature findings.

---

## IX. CHALLENGES AND MODIFICATION

19. Plaintiff proposes that any confidentiality determinations remain subject to:

- Challenge by any party.
- Ongoing Court supervision.
- Modification as the case develops.

---

29

## X. RESPECT FOR JUDICIAL DISCRETION

20. Plaintiff submits this Proposal solely for the Court's consideration.

21. Plaintiff recognizes that:

- Adoption is discretionary.

- Scope, duration, and enforcement rest entirely with the Court.

- The Court may reject, revise, or ignore this Proposal in whole or in part.

---

## XI. CONCLUSION

22. Plaintiff respectfully submits that a narrow, non-retaliatory, public-facing approach to confidentiality best serves:

- Judicial economy.

- Due process.

- Public confidence in the courts.

- Fair participation by all parties.

---

## PLAINTIFF'S  COVER NOTE REGARDING PROPOSED CONFIDENTIALITY AND NON-RETALIATION FRAMEWORK

Plaintiff respectfully submits the accompanying Proposed Confidentiality and Non-Retaliation Framework solely for the Court's consideration.

30

This document is not offered as a proposed order, stipulation, or binding agreement. Plaintiff does not ask the Court to adopt it as written, nor to make any findings or rulings at this stage.

Rather, the Proposal is intended to:

1. Assist the Court in understanding the procedural concerns raised by the nature of the allegations.
2. Offer a narrow, non-prejudicial framework for balancing proprietary information with open-court principles; and
3. Highlight the risk of retaliation or interference inherent in platform-based markets during active litigation.

Plaintiff expressly reserves all rights and waives none by submitting this Proposal. The Proposal is submitted in the spirit of judicial efficiency and transparency, recognizing that any confidentiality, oversight, or protective measures remain entirely within the Court's discretion.

Plaintiff submits this material only as an aid to the Court, and stands ready to revise, narrow, or withdraw it as the Court directs.

---

**Respectfully submitted,**

**Plaintiff,**

**SANDRA WORTHING ALVES**

**d/b/a All Directions Trucking**
**MC#1710778**

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

**Plaintiff's Supplemental Statement of Facts**

**Timeline of Events, Insurance Cancellation, Forced Migration, and Ongoing Coercion**

## A. Plaintiff and Regulatory Status

1. Plaintiff is a federally regulated motor carrier operating as All Directions Trucking, the ability to lawfully operate in interstate commerce depends on uninterrupted insurance coverage, regulatory compliance, and timely payment for freight already hauled.

2. Plaintiff owns and operates commercial equipment consisting of a  high valued semi truck and trailer, both of which require continuous full coverage and cargo insurance coverage to lawfully operate and to protect against catastrophic loss.

3. Plaintiff successfully passed the FMCSA New Entrant Safety Audit and has accumulated approximately 7.5 months of positive safety and compliance scoring prior to the conduct described herein.

---

## B. Payment Withholding and Insurance Cancellation Timeline

4. Prior to December 10, 2025, Internet Truckstop Payments LLC issued unexplained penny deposits and withheld payments of earned freight revenue owed to Plaintiff, without accounting or justification and never paid the balance of the loads to date.

32

5.  As a direct result of Truckstop's withholding of earned funds, Plaintiff was unable to meet mandatory business obligations, including insurance premiums, fuel expenses, and federally required compliance costs.

6.  Plaintiff's commercial insurance carrier issued a 30-day notice of cancellation for nonpayment of $1,600 in insurance premiums, with final cancellation scheduled for December 12, 2025.

7.  As the cancellation date approached, Plaintiff was notified that insurance coverage would terminate within 24 hours, which would have rendered Plaintiff immediately uninsured, unable to book loads, and legally prohibited from operating in interstate commerce.

8.  Loss of insurance would have resulted in:

    o  Immediate inability to operate in interstate commerce

    o  Immediate inability to book loads

    o  Suspension of operating authority

    o  Exposure of Plaintiff's truck and trailer to uninsured risk

    o  Loss of six months of positive safety and compliance scoring

---

### C. Court Filing and Missed Work Due to Crisis

9.  On December 10, 2025, Plaintiff filed the initial court complaint after exhausting internal remedies and while facing imminent insurance cancellation.

10. In the process of drafting pleadings, the Plaintiff was in the truck and stranded on the road, 1,200 miles away from home. While gathering evidence and becoming qualified to

33

e-file with the Court, Plaintiff missed approximately one full week of driving and revenue-generating work, directly worsening Plaintiff's financial condition.

11. Plaintiff was forced to divert time and resources away from lawful interstate operations in order to seek judicial protection from imminent shutdown.

12. Due to the financial distress caused by Defendants' conduct, Plaintiff was required to declare indigency in order to access the court system, subjecting Plaintiff to humiliation, emotional distress, and loss of dignity.

13. The ongoing harm is escalating and the Plaintiff is blacklisted as of Dec 30, 2025 and has no access to brokers willing to work with Plaintiff. The Platforms broadcast to every broker not to deal.

---

**D. Emergency Payment and Its Limited Purpose**

13. Plaintiff notified Truckstop's legal department on December 11,2025 by email about the newly filed lawsuit, after a demand letter had already been sent 10 days prior and included the complaint and that

- Insurance coverage would terminate within 24 hours
- Plaintiff would be unable to operate or book loads
- Plaintiff's operating authority would be effectively destroyed

14. Only after receiving notice of the December 12, 2025 insurance cancellation did Truckstop issue a payment of exactly $1,700. On December 11, 2025

34

15. The $1,700 payment was issued solely to prevent immediate cancellation of Plaintiff's insurance policy and was not payment of the substantially larger freight revenue amounts actually owed to Plaintiff.

16. That $1,700 payment was the sole reason Plaintiff's insurance remained active. Absent that payment, Plaintiff would have been uninsured, out of compliance, and forced to cease operations through no fault of Plaintiff.

---

## E. Public Safety Risk and Emotional Harm

17. The imminent loss of insurance placed Plaintiff in an untenable position where Plaintiff would have been forced to attempt to return home without insurance coverage in order to survive.

18. This scenario created a foreseeable and substantial risk to public safety, as it would have required an uninsured commercial vehicle to travel on public highways, exposing the public to harm in the event of any accident or mechanical failure.

19. Defendants' conduct therefore created not only business disruption, but a direct public safety risk, by forcing Plaintiff into crisis-level decisions under financial coercion.

20. Plaintiff suffered significant mental and emotional anguish, including fear of:

- Operating uninsured

- Losing operating authority

- Losing compliance history and safety scoring

- Losing substantial personal investment in equipment

35

- Retaliation for seeking judicial relief

---

## F. Forced Migration to Denim and Objection to Use of Company Name

21. After the December 10, 2025 court filing, Truckstop escalated its conduct by unilaterally announcing a forced migration of Plaintiff's factoring account to "Denim by Truckstop."

22. Plaintiff was informed that access to the existing Truckstop Factoring platform would be terminated on December 16, 2025 and that continued operation would require submission to Denim's system and Terms of Service, without negotiation or meaningful ability to decline. The email stated it would be done automatically, (with or without consent).

23. Truckstop factoring absorbed any funds and there are no records of unpaid loads that Plaintiff can access.

24. Denim's Terms of Service purport to allow use of Plaintiff's company name, All Directions Trucking, for advertising and promotional purposes.

25. Plaintiff fully objects to any use of Plaintiff's company name, brand, or identity for advertising or marketing purposes, and did not knowingly or voluntarily consent to such use and does not endorse Truckstop or Denim factoring.

26. Any purported acceptance of Denim's Terms of Service occurred, if at all, under economic duress, while Plaintiff was financially constrained, fuel-dependent, and facing imminent operational shutdown.

27. Denim Factoring is a platform and while Plaintiff was able to be paid for two current loads, the enterprise has since black listed All Directions Trucking so there's no income at all now and insurance is past due.

36

## G. Ongoing Harm and Captive Market Conditions

26. Defendants' conduct has held Plaintiff's business hostage by controlling access to earned funds, disrupting insurance coverage, preventing lawful interstate operation, and interfering with regulatory compliance.

27. Plaintiff is uniquely situated among similarly affected carriers in possessing the ability to e-file pleadings and bring this conduct before the Court.

28. Many similarly situated carriers lack the practical ability to seek relief because they are continuously operating, fuel-dependent, financially constrained, and unable to withstand prolonged payment withholding.

29. Absent judicial intervention, Defendants' conduct is ongoing, continues to disrupt lawful interstate commerce, perpetuates a captive payment market, and causes irreparable harm to Plaintiff and similarly situated carriers.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## JURY DEMAND and BENCH TRIAL SEQUENCING

Plaintiff hereby demands trial by jury on all claims and issues so triable as of right, and expressly reserves that demand; however, Plaintiff requests that this Court bifurcate proceedings as appropriate, and hear and determine in the first instance all equitable issues, including claims for declaratory relief, injunctive relief, equitable defenses, and any matters requiring court supervision or prospective relief, by the Court sitting in equity, prior to submission of any remaining legal claims for damages to a jury, in order to promote judicial economy, clarity of rights, and the orderly administration of Justice.

## JURISDICTION

This Court has subject-matter jurisdiction over this action pursuant to R.C. 2305.01 and R.C. Chapter 2721, as this is a civil action seeking declaratory relief, injunctive relief, monetary damages, and other legal and equitable relief within the jurisdiction of the Court of Common Pleas. This Court further has jurisdiction to grant equitable relief necessary to determine the rights and obligations of the parties and to prevent ongoing or prospective harm.

This Court has personal jurisdiction over Defendants because they transact business in Ohio, purposefully avail themselves of the privilege of conducting activities within this state, and because the acts and omissions complained of caused injury to Plaintiff within Ohio. Defendants'

38

contacts with Ohio are sufficient to satisfy the Ohio Long-Arm Statute, R.C. 2307.382, and the requirements of due process.

---

## VENUE

Venue is proper in this Court pursuant to Ohio Civ.R. 3 and R.C. 2307.38–2307.40, because Plaintiff resides and conducts business in this county, substantial portions of the events and omissions giving rise to the claims occurred in this county, and one or more Defendants transact business, cause injury, or direct activities toward this county. The conduct alleged herein resulted in harm to Plaintiff within this county, and this forum forms a substantial relationship to the claims asserted

## SECOND AMENDED COMPLAINT

## I. INTRODUCTION AND NATURE OF THE ACTION

1. Plaintiff Sandra Worthing Alves ("Plaintiff"), d/b/a All Directions Trucking, MC#1710778 brings this civil action to address the coordinated, systemic exploitation of American Motor Carriers through an unregulated digital freight-control enterprise that operates outside federal oversight while exercising decisive control over who may operate, who may haul freight, and who gets paid. These are connected broker facing, for profit, tech platforms, are not brokers, are not regulators, are not government agencies and have no granted authority by the FMCSA to control or disrupt all of interstate commerce at scale. The Platforms have no MC number.

39

2. This action is not a dispute between a carrier and a single broker or factoring company. It concerns a private, subscription-based digital freight-control regime composed of platforms that are neither carriers nor brokers, yet function as gatekeepers over all interstate commerce.

3. Defendants are technology platforms, payment intermediaries, compliance vendors, and data aggregators who do not haul freight, do not broker freight, and bear no operational risk—yet collectively control access to freight, compliance approval, identity validation, payment routing, and reputational survival for carriers.

4. In this structure, brokers are the customers, carriers are the commodity, and data is the asset. Carriers are compelled to surrender identity documents, banking access, location data, ELD telemetry, and operational control as a condition of survival.

5. Plaintiff alleges that Defendants together operate an integrated enterprise that profits when carriers are destabilized, payments are delayed, authority is compromised, and desperation forces compliance.

6. During what industry analysts have termed the "Great Freight Recession," at least 113,000 U.S. motor carriers—large and small—exited the market since 2023, a contraction that Plaintiff alleges was materially caused and accelerated by Defendants' coordinated enterprise, such that but for the Enterprise's collective control over carrier approval, payment flow, compliance enforcement, and market access, a substantial portion of these carrier failures would not have occurred.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## II. PLAINTIFF'S BACKGROUND AND FIELD EXPERIENCE

7. Plaintiff is an American motor carrier, owner-operator, and logistics professional with over a decade of hands-on experience in the trucking industry, including pre-ELD operations, the ELD transition period, and the current surveillance-driven freight environment.

8. Plaintiff conducted extensive field research beginning as early as 2015 while building what would later become All Directions Trucking MC #1710778 and also CEO of All Directions Trucking Agency and also All Directions Trucking and Dispatch Services and all of its related Agency concepts, working directly with multiple carriers across regulatory phases all across every region in the country's lower 48 states, by and for owner operators and all carriers and truck drivers with 850 agents and regional managers.

9. Plaintiff has direct personal knowledge of how freight moved before ELDs, how ELDs were introduced, and how ELD data is now exploited by bad actors through backend manipulation.

*Electronic Logging Devices, mandated by Map21 in 2017. ELD's connect to the trucks computer ECM for recording data and hours of service for drivers)*

10. In 2022, Plaintiff intentionally worked for a carrier operating through Telegram-based dispatching groups to observe illegal practices firsthand, including falsification of hours-of-service, backend ELD editing, pressure to operate trucks for 20+ hours per day, and the use of non-domiciled drivers operating unlawfully as part of the field research. Plaintiff has recorded and screen grabbed proof of real time editing of ELD driving hours and instant updating to appear to be in compliance with hours of service

41

## III. FMCSA AUTHORITY AND IMMEDIATE EXPLOITATION

11. The Federal Motor Carrier Safety Administration ("FMCSA") granted Plaintiff operating authority on May 30, 2025.

12. Within days of this federally granted authority, Plaintiff was subjected to predatory conduct that could only occur through coordinated platform access.

13. On June 4, 2025, without any executed factoring agreement, Defendants caused a UCC-1 financing statement to be filed in Ohio asserting a blanket lien over every and all of Plaintiff's personal and company assets, equipment, investment properties bank accounts, chattels, titles, owned now or acquired and for the next five years.

## IV. DIGITAL ONBOARDING, FRAUD LABELING, AND IDENTITY HIJACKING

14. To access freight, Plaintiff was required to interact with digital onboarding platforms controlled by Defendants.

15. Plaintiff discovered that her newly issued authority had already been claimed inside Highway's system by an unknown, unauthorized dispatching entity.

## V. THE INTEGRATED FREIGHT DATA-CONTROL CONGLOMERATE ENTERPRISE ("THE ENTERPRISE")

16. Plaintiff alleges that Defendants collectively form and operate an integrated enterprise (the "Integrated Freight Data-Control Conglomerate Enterprise" or "Enterprise") that dominates essential functions of interstate trucking through interconnected subscription platforms, data

42

pipelines, identity scoring, compliance gating, payment routing, and reputational enforcement mechanisms.

17. Plaintiff alleges the Enterprise operates as a closed-loop system that forces carriers into a "comply or disappear" reality, in which continued operation depends not solely upon compliance with FMCSA regulations, but upon submission to private platform conditions, private scoring systems, and private payment controls that have not a thing to do with the Federal Motor Carrier Safety Administrations requirements or the Department of Transportation's regulation or interstate commerce law. The Enterprise acts as a de-facto shadow government and claims authority over the US Government and gives itself a rise to a potential hostile take-over of the entire supply chain and freight movement if not stopped and dismantled.

18. Plaintiff alleges that within this Enterprise, brokers are the paying customers and beneficiaries of the systems, while carriers are treated as the data-producing commodity that is surveilled, graded, restricted, and financially controlled.

19. Plaintiff alleges that the Enterprise's functional structure can be described as: Identity and "Fraud" Signals → Compliance Gatekeeping → Freight Visibility → Payment Routing / Factoring Control → Reputation Enforcement → Economic Coercion.

20. Plaintiff alleges that the Enterprise's consolidated power is exercised without governmental mandate, without regulatory oversight, without due-process protections, and without transparency into algorithms, risk models, data retention practices, or dispute mechanisms.

# VI. DEFENDANT PLATFORM ROLES, FUNCTIONS, AND WHY THEY ARE NOT "INDEPENDENT TOOLS"

A. ITP/DENIM/RMIS =Truckstop Ecosystem: Freight Visibility, Financial Gatekeeping, and Leverage

21. Plaintiff alleges that Truckstop operates as a dominant load-board and freight-access platform/s that influence which carriers can see freight and which carriers are operationally viable in the marketplace.

22. Plaintiff alleges Truckstop's affiliated payment and factoring entities (including Truckstop Payments / Truckstop Factoring/Denim and related integrated systems) function as financial gatekeepers by asserting control over carrier receivables through liens, notices of assignment, and payment-routing demands.

23. Plaintiff alleges that, as applied to Plaintiff, this gatekeeping included an early UCC filing and the downstream effect of brokers treating Truckstop as the de facto required payee, leaving Plaintiff without meaningful ability to receive direct payment for completed freight by any broker.

24. Plaintiff alleges that these mechanisms create a coercive "hostage payment" structure: brokers are routed to pay a factoring, factoring controls timing, accounting, and release; and the carrier's survival needs (fuel dependancy, food, insurance, heat, safety) become leverage.

B. RMIS: Compliance Gating and Document Extraction

25. Plaintiff alleges RMIS (also owned by Truckstop) operates as a compliance gatekeeping portal used by many brokers as a prerequisite for tendering freight to carriers, and that RMIS demands extensive repeating uploads of sensitive documentation as a condition of "approval."

26. Plaintiff alleges that these demanded uploads include, among other things, identity documents, CDL's, insurance certificates, EIN/Social Security documents, bank account and

44

routing information, canceled checks, FMCSA operating authority documents, articles of incorporation, Secretary of State dba Filings, vehicle pictures and its registrations, titles, demands driver go get DOT inspections at weigh stations which can be 100 miles away, or drive 100 miles to get scale tickets before a loading and after a loading, submit annual mechanic inspections and related credential materials and receipts that they retain for future reuse or hoarding, at times have carriers go print fake bill of ladings for blind shipments. Each broker demands different complicated arduous tasks before obtaining any agreement to haul a single load.

27. Plaintiff alleges Safer Watch, owned by Internet Truckstop Payments, operates as a data aggregation and profile system whose outputs are used by brokers and platforms to influence acceptance decisions, and that such outputs are integrated into the broader verification and risk-signaling ecosystem.

28. Plaintiff alleges the combined effect is that a carrier may be economically blocked or delayed not because FMCSA revoked authority, but because a private onboarding portal or data profile flags, delays, or restricts the carrier based on opaque internal criteria.

C. Highway App: Identity "Verification," Authority Hijacking Risk, and Surveillance Pressure

29. Plaintiff alleges Highway markets itself as "fraud prevention" and identity verification yet operates as a private identity-control platform that materially influences whether carriers can onboard with participating brokers.

30. Plaintiff alleges that Highway permitted Plaintiff's newly issued authority to be "claimed" by an unauthorized third party and then remained slow to remove the fraudulent attachment, a 90

45

day delay, causing serious financial harm in the initial opening of operations for All Directions Trucking, reputational friction, and interference with onboarding and broker relationships.

31. Plaintiff alleges that Highway's system architecture, as experienced by Plaintiff, allows third parties to attach themselves to a carrier's authority and remain associated for extended periods while carriers suffer the consequences of suspicious status, "connection" signals, or onboarding blocks and there is no remedy but to call and email and find the right avenue to get the account decommissioned in order to establish the account for the new MC# with no fraudulent entities attached to begin hauling freight.

32. Plaintiff alleges that Highway and its broker users routinely pressure carriers to submit to continuous location monitoring and surveillance tools, including ELD API connections and phone-based tracking applications, even where such demands exceed what is required by law.

D. DAT Freight & Analytics: Freight Visibility and Normalization of Offshore / VOIP Channels

33. Plaintiff alleges DAT operates the most dominant freight matching and analytics platform controlling critical freight visibility for carriers across the United States. DAT is a load board.

34. Plaintiff alleges that, upon information and belief, DAT's marketplace structure and broker communications patterns have normalized the use of offshore and VOIP-based contact methods (including Google Voice numbers, Gmail accounts and encrypted messaging platforms WhatsApp and Telegram) as routine methods of broker-carrier engagement, thereby increasing anonymity, reducing traceability, and facilitating double-brokering and identity exploitation.

35. Plaintiff alleges that in practice this normalization benefits brokers and fraudulent actors by enabling contact points that are easier to mask, harder to authenticate, and more difficult for carriers to verify as domestic and legitimate.

46

E. Carrier411: Coercive Reputation Enforcement and Industry-Wide "Silence" Pressure

36. Plaintiff alleges Carrier411 operates a private, broker-driven and factoring company reputational reporting system used as a punitive enforcement arm against carriers, with permanent consequences and minimal due process protections if any. Carriers are unable to view the complaints or published defamation but will be arbitrarily blacklisted and put out of business with no due process.

37. Plaintiff alleges that Carrier411 functions effectively as a coercive deterrent: carriers operate under constant threat that any dispute, complaint, late delivery or breakdown or refusal to comply with unfair demands may result in reputational damage that effectively blacklists the carrier from all segments of the market.

38. Plaintiff alleges the practical effect is a hostile environment where carriers feel compelled to "perform," remain silent, and say only favorable things about brokers and platforms to avoid economic retaliation—creating a market culture of coercion akin to an enforcement mechanism rather than a neutral review system.

39. Plaintiff alleges that this enforcement dynamic suppresses carrier speech, suppresses legitimate disputes, and reinforces the Enterprise's ability to impose nontransparent rules without accountability.

## VII. OFFSHORE DISPATCHING NETWORKS, DATA RETENTION, AND STRAW-MAN DOUBLE-BROKERING

40. Plaintiff alleges that offshore dispatching networks, including networks operating from Pakistan and other foreign jurisdictions, have proliferated within the U.S. freight ecosystem by exploiting platform weaknesses and verification gaps.

47

41. Plaintiff alleges that offshore dispatchers and offshore brokers target new and small carriers, aggressively obtain and retain carrier documents and credentials, and use those credentials to quote, book, and move freight through U.S. platforms while concealing the true controlling party.

42. Plaintiff alleges that she conducted and recorded phone interviews with offshore brokers and dispatchers to understand operational methods, and that these recorded interviews described practices including: managing 50 plus trucks per dispatcher; taking 5% Pay for loads; and retaining carrier data (including payment-routing information) as a reusable asset.

43. Plaintiff alleges that offshore groups publicly boast on social media about dispatching high volumes of trucks and earning revenue through percentage-based skimming per load, and that such boasts are consistent with an organized commercial model designed to scale control over U.S. freight lanes.

44. Plaintiff alleges that, upon information and belief, the widespread double-brokering and "straw-man" substitution crisis follows a recurring pattern: a load is booked or tendered under one identity or MC authority; a different carrier or driver physically hauls the freight; and the entity controlling the booking siphons payment while the hauling carrier is underpaid mostly not paid at all and doesn't find out his role until long after the freight is delivered to the wrong warehouse.

45. Plaintiff alleges that in many instances, the carrier that physically hauls the freight is not the same carrier identity presented to the broker, creating systemic mismatches that facilitate nonpayment, theft, re-routed full truckloads into the wrong hands and liability shifting.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

46. Plaintiff alleges that these schemes are enabled by the Enterprise's design because the platforms control the onboarding credentials, the identity signals, the freight visibility, the payment routing pathways, and the reputational consequences that deter carriers from speaking out.

47. Plaintiff alleges that the Enterprise has created market conditions in which offshore actors can operate with minimal meaningful verification while domestic carriers are burdened with escalating compliance demands, repeated document submissions, and surveillance coercion.

## VIII. SURVEILLANCE COERCION: ELD API DEMANDS, PHONE TRACKING, AND SAFETY RISKS

48. Plaintiff alleges that a major coercive feature of the Enterprise is the demand for real-time surveillance, including ELD API integrations to the truck's onboard computer and also phone-based tracking, as a condition of hauling freight or maintaining broker relationships.

49. Plaintiff alleges that ELD systems connect to truck onboard computers and can transmit sensitive operational data including location streams, driving hours, engine diagnostics, and movement patterns, and private platform access to such data creates heightened privacy, safety, and security risks.

50. Plaintiff uses a Garmin ELD that does not connect to Wi-Fi, does not broadcast to anyone or integrate with Highway's ELD API architecture, and Plaintiff alleges that she was penalized, delayed and competitively disadvantaged on that basis despite using a lawful FMCSA-compliant ELD.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

51. Plaintiff alleges that surveillance coercion is not designed to improve safety for carriers, but to increase broker convenience, expand data collection, and strengthen platform control through continuous monitoring, scoring, and compliance conditioning.

52. Plaintiff alleges that surveillance coercion creates foreseeable safety risks, including heightened stalking and targeting risks for female drivers, real-time visibility of valuable freight, and increased vulnerability to cyber intrusion, misuse of location data, and exploitation by fraudulent actors.

## IX. ELIGIBILITY AND ACCESS CONTROL: HOW THE ENTERPRISE "GOVERNS" WITHOUT AUTHORITY

53. Plaintiff alleges that Defendants interconnected systems effectively determine whether a carrier may access freight, whether a carrier may be onboarded, whether a carrier is deemed "verified," whether a carrier is permitted to receive payment efficiently, if at all and whether a carrier becomes reputationally restricted or economically erased.

54. Plaintiff alleges that these determinations are made without statutory authority, without transparent criteria, and without meaningful internal appeal rights that resemble due process.

55. Plaintiff alleges the overall effect is a privatized governance structure over trucking: FMCSA grants operating authority, but the Enterprise determines whether that authority can function in the marketplace, get paid or haul any freight at all.

56. Plaintiff alleges that this privatized governance is economically coercive and constitutes the structural foundation for the enterprise-level claims that follow, including racketeering enterprise

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

conduct, anticompetitive restraints, and wrongful financial leverage through liens and payment diversion.

# 2ND  AMENDED COMPLAINT

**(SECTIONS X–XIV)**

## SECTION X – ENTERPRISE DEFINITION & CONTINUITY (RICO §1962(c))

Plaintiff alleges that Defendants collectively constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and Ohio R.C. 2923.31(C), known herein as the **Integrated Freight Data-Control Conglomerate Enterprise.**

The Enterprise has a common purpose: to extract economic value from motor carriers by controlling access to freight, compliance verification, identity validation, payment routing, and reputational standing through centralized digital platforms.

The Enterprise maintains relationships among Defendants through API integrations, reciprocal verification systems, shared data pipelines, coordinated onboarding requirements, and aligned financial incentives.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

The Enterprise has continuity, both closed-ended and open-ended, as Defendants' conduct has occurred continuously since at least 2021, continues to the present, and threatens future repetition absent judicial intervention.

## SECTION XI – RICO PREDICATE ACTS (WIRE FRAUD & EXTORTION)

Plaintiff alleges Defendants engaged in wire fraud in violation of 18 U.S.C. § 1343 by transmitting interstate electronic communications to:

• file and maintain unauthorized UCC liens,

• circulate Notices of Assignment without authority,

• misrepresent payment status and "short pays,"

• coerce acceptance of wallet systems, pooled money and surveillance terms,

• suppress or manipulate carrier identity and compliance signals.

Plaintiff alleges extortion under 18 U.S.C. § 1951, as Defendants obtained property (receivables, data, leverage) with consent induced by fear of economic harm, including loss of freight access, nonpayment, reputational destruction, and physical stranding.

## SECTION XII – ANTITRUST MARKET DEFINITIONS

Relevant markets include:

1. Digital Freight Visibility & Load Access Platforms;

52

2. Carrier Identity & Fraud Verification Systems;

3. Compliance & Insurance Onboarding Gatekeeping;

4. Factoring, Receivable Control & Payment Routing;

5. Carrier Reputation & Risk Scoring Systems.


Plaintiff alleges Defendants possess monopoly power or a dangerous probability thereof in each market, reinforced by vertical and horizontal integration.


## SECTION XIII – SHERMAN ACT §1 (UNLAWFUL RESTRAINT OF TRADE)


Defendants entered into combinations and conspiracies to restrain trade by coordinating platform rules that force carriers to submit to unified systems or be excluded entirely.

 These restraints suppress competition, raise barriers to entry, and favor offshore and anonymous actors willing to masquerade as multiple legitimate carriers to book freight and reissue the loads as independent dispatchers to any unwitting Carrier that is not matched with the load and the broker. The Enterprise knows this is occurring on a widespread scale but they benefit from the freight being hauled for next to nothing.  The double brokers are interested in cargo theft, and the unwitting carriers are getting cargo claims against them when they never had any transaction with the broker at all.  This effectively has the carriers insurance cancelled and puts the carrier out of business for cargo theft.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## SECTION XIV – SHERMAN ACT §2

## (MONOPOLIZATION & ATTEMPTED MONOPOLIZATION)

Defendants willfully acquired and maintained monopoly power through exclusionary conduct, including coercive onboarding, payment manipulation, retaliatory reputation systems, and surveillance-based access controls.

 Plaintiff was excluded, underpaid, and endangered as a direct result.

## ANTITRUST REMEDIES & STRUCTURAL RELIEF

Plaintiff alleges that monetary damages alone are insufficient to remedy the competitive harm inflicted by Defendants' coordinated conduct. The Enterprise has distorted freight markets through surveillance-based exclusion, coercive onboarding, payment leverage, and reputational enforcement mechanisms that will continue absent court-ordered structural relief.

Plaintiff therefore seeks broad injunctive and equitable remedies under the Sherman Act, Ohio antitrust law, and the Court's inherent equitable powers, tailored to dismantle the unlawful market structure rather than merely punish past conduct.

Plaintiff seeks the appointment of a Special Master for each primary Defendant entity, at Defendants' sole cost and expense, to oversee compliance, auditing, and remediation of anticompetitive practices. Each Special Master shall possess authority to access systems, records,

54

algorithms, onboarding rules, payment-routing mechanisms, and data-sharing agreements relevant to carrier access and payment control.

Plaintiff further seeks a structural injunction requiring the creation of a neutral, court-supervised electronic oversight system ("Enterprise "EOE" Electronic Oversight Extension") distinct but similar from carrier-owned ELDs. This system shall mirror, log, and archive relevant metadata from Enterprise platforms—including identity verification, onboarding decisions, freight visibility restrictions, and payment-routing actions—for preservation, transparency, and future judicial review and future litigants for discovery.

Plaintiff alleges such an oversight EOE system is necessary because Defendants currently operate opaque digital gatekeeping systems immune from regulatory audit, allowing exclusionary conduct to remain hidden from carriers, regulators, and courts.

Plaintiff seeks an injunction prohibiting Defendants from conditioning freight access, onboarding approval, or payment processing on mandatory surveillance integrations, including ELD APIs, phone-tracking applications, or real-time location feeds unrelated to legitimate safety regulation.

Plaintiff further seeks an order prohibiting the use of encrypted or anonymized communication channels—including free Gmail for Email, use of WhatsApp, Telegram, Google Voice, VOIP numbers, and non-domain email services—for broker-carrier onboarding, load tendering, identity verification, or payment communications within Defendants' platforms and load board access. That only verified US phone services, landline and cell services are actual phone numbers, not spoof numbers and are registered to the FMCSA for brokers and carriers. That the only parties to gain any access have active MC#'s and are established through the Carrier, brokers as verified agents or employees of the carriers and brokers.

Plaintiff alleges that such tools as free Gmail for Email, use of WhatsApp, Telegram, Google Voice, VOIP numbers, and non-domain email services  enable anonymity, offshore impersonation, double brokering, and straw-man hauling schemes, and that their continued use constitutes an unreasonable restraint of trade.

Plaintiff seeks a mandatory broker verification registry requiring all brokers utilizing Defendants' platforms to verify domestic business registration, local IP Addresses and U.S. domiciled only, and domain-based email infrastructure, with metadata logging sufficient to demonstrate compliance and deter offshore manipulation.

Plaintiff further seeks structural separation remedies requiring Defendants to segregate identity verification, compliance onboarding, load-board visibility, factoring/payment services, and reputational scoring into firewalled divisions, prohibiting cross-use of data to coerce carriers or suppress competition and break up the alleged monopoly.

Plaintiff seeks an injunction prohibiting Carrier411 or any similar reputational platform from publishing or enforcing carrier-impacting designations without notice, neutral review, opportunity to cure, and documented evidentiary support subject to Special Master oversight.

Plaintiff alleges that without these remedies, Defendants will continue to profit from market foreclosure, carrier collapse, and artificial demand for so-called fraud prevention services generated by the very instability Defendants create. The brokers are the customer and if fraud was dismantled there would be no further incentive for brokers to pay $150-$500. A month to weed out suspicious carriers.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Plaintiff alleges that the requested relief is narrowly tailored to restore competitive conditions, protect lawful carriers, preserve supply-chain integrity, and prevent future violations of antitrust and racketeering laws.

## RICO Predicate Acts – Wire Fraud & Extortion

Plaintiff alleges that Defendants engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and Ohio Revised Code § 2923.32 through repeated acts of wire fraud and extortion carried out via interstate electronic systems.

WIRE FRAUD (18 U.S.C. § 1343)

Defendants knowingly devised and executed a scheme to defraud Plaintiff and similarly situated carriers by transmitting materially false and misleading representations through interstate wires, including but not limited to:

• Electronic filing of unauthorized UCC-1 financing statements claiming blanket security interests without any executed agreement.

• Transmission of Notices of Assignment falsely asserting ownership of carrier receivables.

• Digital payment statements reflecting fabricated shortages, unexplained holds, and one-cent deposits.

• Electronic onboarding portals (Highway, RMIS, DAT, Truckstop) transmitting false "fraud" flags and non-compliance designations.

• Electronic communications coercing carriers to accept wallet systems, surveillance access, or rights waivers as a condition of payment.

57

Each transmission was made for the purpose of obtaining money, data, or control of receivables by false pretenses and constitutes a separate act of wire fraud.

**EXTORTION (18 U.S.C. § 1951 – Hobbs Act)**

Defendants wrongfully obtained Plaintiff's property and economic concessions through fear of economic harm by:

• Threatening or effectuating payment withholding unless Plaintiff surrendered control of receivables.

• Maintaining fraudulent liens to block alternative financing.

• Issuing one-penny deposits to exert financial pressure.

• Conditioning payment release on acceptance of surveillance, wallet systems, or rights waivers.

• Leveraging Carrier411 reputational blacklisting as coercive force.

Defendants knew that withholding payments from an active carrier would deprive Plaintiff of fuel, food, insurance continuity, and physical safety while on the road, thereby creating life-threatening leverage.


**<u>ENTERPRISE CONTINUITY</u>**

These acts were not isolated. They represent open-ended continuity as Defendants' standard operating model, carried out through integrated platforms, shared data pipelines, and common economic incentives designed to extract value from dependent carriers.

The predicate acts directly injured Plaintiff's business, property, and safety and form the basis for civil RICO liability under federal and Ohio law.

## COUNT [ I ] — RICO (18 U.S.C. § 1962(c) and (d)

(Against All Defendants)

### A. RICO's Scope and Applicability to Legitimate Enterprises

1. Congress enacted the Racketeer Influenced and Corrupt Organizations Act ("RICO") to address systemic, ongoing misconduct carried out through legitimate enterprises, not merely traditional organized crime.

2. The Supreme Court has held that an enterprise under RICO may be entirely lawful in form, so long as it conducts its affairs through a pattern of racketeering activity. United States v. Turkette, 452 U.S. 576, 580–81 (1981).

3. Civil RICO is not limited to mob-type cases. It applies broadly to commercial settings where coordinated actors use lawful structures to accomplish unlawful ends. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498–99 (1985).

4. An association-in-fact enterprise requires only:

(a) a common purpose,

(b) relationships among the participants, and

59

(c) longevity sufficient to pursue that purpose.

Boyle v. United States, 556 U.S. 938, 946 (2009).

5.  No formal hierarchy, written agreement, or centralized command is required.

---

## B. The Enterprise

6.  Defendants Total Quality Logistics, LLC (TQL), C.H. Robinson Worldwide, Inc.,
    Truckstop.com, LLC, DAT Freight & Analytics, RMIS, Highway, Carrier411, Truckstop
    Factoring / Truckstop Payments, Denim, LoadPay, MacroPoint, and associated brokers
    and platform operators constituted an association-in-fact enterprise within the meaning of
    18 U.S.C. § 1961(4).

7.  The Enterprise's common purpose was to control carrier access to freight, reputation,
    payment routing, and market participation, while suppressing transparency and extracting
    disproportionate economic benefit from carriers.

8.  The Enterprise's relationships were functional and complementary:

    o  Brokers (TQL, C.H. Robinson, Megellen) authored and enforced non-negotiable
       freight terms and payment refusals;

    o  Load boards (DAT, Truckstop Load Board) functioned as market gateways;

    o  Onboarding platforms (RMIS, Highway) controlled eligibility;

    o  Reputation systems (Carrier411) enforced discipline by proxy;

60

o   Tracking systems (MacroPoint) generated punitive triggers;

o   Factoring/payment entities (Truckstop Factoring, Denim) controlled receivables through NOA's and sweeping UCC-1 liens registered with the secretary of state.

9.  The Enterprise exhibited open-ended continuity, operating for years as the regular way Defendants conducted business and continuing into the present. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 241–42 (1989).

---

## C. Pattern of Racketeering Activity

10. From at least 2018 through the present, Defendants conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, consisting of multiple related predicate acts, including:

## 1. Wire Fraud (18 U.S.C. § 1343)

11. Defendants Truckstop, DAT, RMIS, Highway, Denim, and Truckstop Factoring now dba Denim, in coordination with brokers TQL and C.H. Robinson, transmitted materially false and misleading representations via interstate wires that:

- Factoring was optional;
- Direct payment, paper check, or Quick Pay were viable alternatives; and
- Platform controls were neutral compliance measures.

61

12. In reality, once Notices of Assignment were issued and transmitted electronically, all non-factoring payment paths were eliminated, rendering those representations false and misleading.

13. A RICO plaintiff need not prove reliance on each misrepresentation where the scheme was executed through interstate wires and caused direct injury. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 649–50 (2008).

---

## 2. Extortion by Economic Fear (18 U.S.C. § 1951)

14. Defendants TQL and C.H. Robinson withheld earned freight payments after performance, enforcing NOAs issued by Truckstop Factoring, Denim, and LoadPay, knowing that carriers depended on immediate payment for basic necessities.

15. When carriers sought to restore payment, factoring entities conditioned release on waiver of legal rights, and brokers continued to enforce the NOAs knowing payment would otherwise remain blocked.

16. The wrongful use of economic fear to obtain property constitutes extortion even absent physical threats. United States v. Capo, 817 F.2d 947, 951–52 (2d Cir. 1987).

---

## 3. Coercive Surveillance, Reputation Control, and Retaliation

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

17. Defendants Carrier411, DAT, Truckstop, RMIS, Highway, and MacroPoint functioned as enterprise enforcement mechanisms, enabling:

- Blacklisting.
- Reputational destruction.
- Retaliation for disputing payments or requesting transparency.

18. Courts recognize that control over access to a market or livelihood, combined with economic pressure, supports RICO liability. United States v. Philip Morris USA Inc., 449 F. Supp. 2d 1, 852–53 (D.D.C. 2006).

---

## D. Proximate Cause and Injury

19. Plaintiff suffered concrete financial injury, including withheld receivables, lost business opportunities, and exclusion from interstate commerce being blacklisted over filing this lawsuit.

20. The injuries were the direct and foreseeable result of Defendants coordinated conduct. Hemi Group, LLC v. City of New York, 559 U.S. 1, 12 (2010).

---

## E. Conspiracy (18 U.S.C. § 1962(d))

21. Each Defendant knowingly agreed and conspired to conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

63

---

**WHY RICO APPLIES AND WHY SPECIAL MASTERS ARE REQUIRED**

**1. Why RICO Applies Here**

- This case involves legitimate companies using lawful structures to execute unlawful schemes — the precise conduct RICO was designed to reach. Turkette; Sedima.
- The Enterprise satisfies Boyle: common purpose (control and extraction), relationships (interlocking platforms), and longevity (years of standardized practice).
- The conduct is not a series of contract disputes; it is systemic coercion enforced through infrastructure.

As the Supreme Court recognized, RICO addresses ongoing methods of doing business, not episodic misconduct. H.J. Inc.

---

**2. Why Ordinary Injunctions Are Insufficient**

22. Defendants' misconduct is:

- Distributed across platforms.
- Hidden within proprietary systems.
- Enforced by proxy through reputation and exclusion.

64

23. Without independent oversight, Defendants can continue the same conduct under alter ego's, platforms, or affiliates.

Courts confronting entrenched RICO enterprises have recognized that structural remedies are necessary. United States v. Local 560 (IBT), 780 F.2d 267, 295–96 (3d Cir. 1985).

---

### 3. Authority to Appoint Special Masters

24. Courts possess inherent equitable authority to appoint Special Masters to:

- Supervise compliance.
- Audit records.
- Prevent recurrence of RICO violations.

25. Courts have repeatedly imposed trustees, monitors, and master's where enterprises used complexity and opacity to evade lawful oversight. Local 560; United States v. Local 30, Roofers Union, 871 F.2d 401, 408–09 (3d Cir. 1989).

---

### 4. Why Special Masters Are Necessary in This Case

26. The Enterprise operates through:

65

- Multiple brokers.

- Multiple platforms.

- Multiple payment entities.

- Interconnected data systems.

27. Only a court-appointed Special Master can:

- Forensically trace payment routing.

- Audit NOA enforcement.

- Monitor Carrier411 and platform retaliation.

- Ensure escrow or neutral payment handling.

- Prevent continued intimidation during litigation.

28. Absent such oversight, Defendants retain unilateral power to:

- Withhold payment.

- Blacklist carriers.

- Destroy evidence.

- Chill participation in this litigation.

66

**5. Narrow, Proportionate Relief**

29. Plaintiff does not seek to dismantle the freight brokerage industry.

30. Plaintiff seeks narrow, proportionate equitable relief tailored to prevent ongoing RICO violations, consistent with long-standing precedent authorizing structural remedies where necessary to restore lawful commerce and fair trade.

**COUNT II — DECLARATORY JUDGMENT** (R.C. Chapter 2721)

31. Plaintiff incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully restated herein.

32. An actual, present, and justiciable controversy exists between Plaintiff and Defendants concerning the parties' respective rights, duties, and legal relations arising from Defendants' coordinated use of payment controls, compliance determinations, data systems, contractual instruments, and security filings affecting Plaintiff's trucking operations and receivables.

33. Plaintiff seeks a declaration pursuant to R.C. Chapter 2721 to determine the legality and enforceability of Defendants' practices and instruments, including but not limited to: (a)

67

the filing and maintenance of one or more UCC-1 financing statements purporting to encumber Plaintiff's accounts or receivables; (b) the issuance and enforcement of Notices of Assignment or payment-redirection instructions to brokers or third parties; and (c) the conditioning of carrier approval, load access, or payment on compliance with undisclosed, overbroad, or unauthorized requirements.

34. Plaintiff alleges that Defendants lacked lawful authority to file or maintain blanket security interests against Plaintiff's receivables absent a valid and enforceable security agreement authorizing such scope, and that the asserted liens and payment controls exceeded any legitimate contractual purpose. Plaintiff further alleges that Defendants' practices operated to interfere with Plaintiff's right to receive payment for completed transportation services and to participate in interstate commerce on lawful terms.

35. Plaintiff seeks a judicial declaration determining, among other things, that:

36. (a) any UCC-1 financing statement filed against Plaintiff without proper authorization or contractual basis is void, unenforceable, or subject to termination or limitation;

37. (b) any Notice of Assignment or payment-redirection instruction issued or enforced beyond the scope of a valid agreement is invalid and without legal effect;

38. (c) Defendants lack authority to condition carrier approval, continued eligibility, or payment on undisclosed liens, data restrictions, or coordinated platform enforcement not agreed to by Plaintiff; and

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

39. (d) Plaintiff is entitled to conduct its trucking operations free from unlawful interference with payment, credit, and market access and not be blacklisted throughout the nation by majority of brokers.

40. Declaratory relief is necessary and appropriate because Defendants' challenged conduct is ongoing or capable of repetition, and because a declaration of rights will resolve uncertainty, guide the parties' future conduct, and prevent continuing harm. Plaintiff lacks an adequate remedy at law to resolve these issues absent a declaration from this Court.

41. Accordingly, Plaintiff respectfully requests that this Court enter a declaratory judgment defining the parties' rights and obligations as set forth herein, together with such further legal and equitable relief as the Court deems just and proper.

## COUNT IV — TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND CONTRACTUAL RELATIONS

Plaintiff incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully restated herein.

Plaintiff maintained existing and prospective business relationships and contractual relationships with freight brokers, shippers, and payment counterparties in connection with the lawful transportation of goods in interstate commerce. These relationships included the reasonable

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

expectation of payment for completed transportation services and continued participation in broker-carrier transactions absent lawful cause for exclusion.

Defendants had knowledge of Plaintiff's business relationships and contractual expectations by virtue of their roles as payment processors, factoring entities, broker platforms, compliance services, data and tracking providers, and participating brokers operating within interconnected systems used to manage carrier approval, load access, and payment flow.

Defendants intentionally and improperly interfered with Plaintiff's business and contractual relationships by, among other actions, asserting and enforcing purported liens or payment-redirection mechanisms, issuing or honoring Notices of Assignment beyond lawful or agreed scope, restricting carrier approval or eligibility through coordinated platform controls, and communicating or implementing adverse compliance or payment determinations that were not supported by valid contractual authority.

Defendants' interference was not privileged or justified, was undertaken outside the scope of any legitimate business purpose, and was designed or foreseeably operated to disrupt Plaintiff's ability to receive payment, maintain broker relationships, and continue operating without interruption.

As a direct and proximate result of Defendants' tortious interference, Plaintiff suffered damages including, but not limited to, delayed or withheld payments, loss of business opportunities, disruption of existing relationships, impairment of cash flow and credit, and consequential financial harm.

70

The Cascading effect of seeking remedy was foreseeable, it is widely known that the defendants are operating an illegal enterprise and that to seek legal remedy in Court would cause immediate harm and upend any continued operations for an otherwise legitimate carrier. The defendants all work in concert and do report to carrier411.com to conspire to blacklist any carrier that gets out of line. This punishment is why nobody can speak up and remain in business.

Defendants' conduct was undertaken willfully, knowingly, or with reckless disregard for Plaintiff's rights, entitling Plaintiff to recover compensatory damages and such additional relief as may be available under applicable law.

Accordingly, Plaintiff respectfully requests judgment against Defendants for damages resulting from tortious interference, together with costs, interest, and such other legal and equitable relief as the Court deems just and proper.

## COUNT V — OHIO ANTITRUST / RESTRAINT OF TRADE

(Prospective Business Expectancy)

Plaintiff incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully restated herein.

Defendants, individually and as participants in a coordinated enterprise, engaged in contracts, combinations, and conspiracies in restraint of trade in violation of Ohio's antitrust and competition laws, including R.C. 1331.01 et seq., by implementing and enforcing interrelated systems that collectively controlled carrier approval, access to freight, payment flow, compliance status, and ongoing eligibility to participate in the interstate freight market.

71

The relevant market includes the market for brokered freight transportation services and associated carrier access, compliance approval, and payment processing, in which Defendants collectively exercised substantial control through integrated platforms, data-sharing arrangements, standardized enforcement mechanisms, and aligned contractual instruments. Defendants' conduct operated to exclude, discipline, or disadvantage motor carriers, particularly small and mid-sized carriers, without legitimate competitive justification. The Plaintiff at this time has been effectively blacklisted and no brokers will deal. While Plaintiff is an otherwise qualified and Federally authorized carrier in good standing as of this date, January 13, 2025.

As part of this coordinated restraint, Defendants interfered with Plaintiff's prospective business expectancies, including Plaintiff's reasonable expectation of entering into future broker-carrier transactions, booking freight, and receiving payment for transportation services in the ordinary course of business. Defendants accomplished this interference through coordinated approval denials, payment restrictions, lien assertions, data-based risk designations, and platform-based enforcement actions that foreclosed Plaintiff's access to future business opportunities.

Defendants' conduct constituted an unreasonable restraint of trade because it was not ancillary to any procompetitive purpose, was not reasonably necessary to achieve legitimate business objectives, and instead functioned to concentrate control over market access, payment routing, and carrier participation within the Enterprise. The cumulative effect of Defendants' actions was to suppress competition, reduce carrier choice, and force market exit or exclusion if a carrier wants to be paid while in the field and is fuel dependent, desperation is a handy tool for brokers and factors alike to slow walk or slow pay or no pay until capitulation. It's a dirty game.

72

Plaintiff alleges that Defendants possessed and exercised market power in the relevant market by virtue of their combined control over broker platforms, compliance systems, payment rails, factoring services, and data infrastructure, and that Defendants used this power to foreclose Plaintiff and similarly situated carriers from competing on fair and lawful terms.

As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff suffered damages including loss of prospective business opportunities, diminished market access, and no access reduced revenue, increased operating costs, wasted monies and inability to address compliance issues or file and pay IFTA taxes, economic harm flows from exclusionary practices. Plaintiff also suffered harm of the type the antitrust laws were intended to prevent.

Plaintiff seeks all relief available under Ohio law for antitrust violations, including injunctive relief to prevent ongoing restraints of trade, declaratory relief, compensatory damages, and any enhanced or equitable relief authorized by statute, together with costs, interest, and such other relief as the Court deems just and proper.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

**SUPPORTING HISTORICAL FACTS, ALL BROKER CONTRACTS, STIPULATIONS AND STRUCTURAL IMBALANCE**.

(Historical Formation, Coercive Operation, and Detrimental Effects on Carriers)

---

## I. Historical Authorship and One-Sided Formation of Broker Contracts

1. From the inception of the modern freight brokerage industry, rate confirmations, broker–carrier agreements, and freight terms have always been authored exclusively by brokers, including Defendant's CH ROBINSON and TQL.

2. These documents were never the product of bilateral negotiation. Instead, they were uniformly drafted by brokers to reflect broker-only interests, allocating discretion, remedies, and control to the broker while minimizing carrier rights.

3. Long before the emergence of modern technology platforms, carriers were required to accept broker-drafted terms as a prerequisite to hauling freight, with no realistic opportunity to modify or negotiate those terms.

4. This historical imbalance is not incidental. It is structural and intentional, and it forms the foundation upon which later technological restrictions were built.

---

## II. Escalation Through Technology and Platform Enforcement

5. As technology platforms emerged, brokers did not rebalance this relationship. Instead, platforms were used to compound and operationalize existing asymmetries.

74

6.  Systems governing onboarding, compliance, tracking, payment routing, and carrier scoring introduced additional layers of restriction, monitoring, and enforcement, all designed around broker-authored rules.

7.  These platforms did not create mutual accountability. They amplified broker control, enabling exclusion, payment interference, and punitive enforcement without individualized adjudication or meaningful appeal.

8.  What began as one-sided paper contracts evolved into a digitally enforced regime, where carriers are constantly monitored, scored, and penalized based on opaque standards they did not draft and cannot challenge.

---

## III. Illusory Consent and Coercive Acceptance

9.  Broker contracts and rate confirmations are presented as voluntary agreements. In reality, they operate under economic compulsion.

10. Independent truck drivers and small carriers are uniquely vulnerable to coercion because:

    a. They operate alone or with minimal staff.

    b. They are physically confined to their vehicles for extended periods, weeks and months at a time.

    c. Their ability to eat, fuel their trucks, heat or cool their cabs, and return home is contingent on prompt payment for completed loads.

75

11. Brokers are aware of this dependency and structure terms accordingly, knowing that carriers must accept coercive conditions or face immediate financial harm.

12. Consent obtained under such conditions is not the product of equal bargaining power; it is the product of duress embedded in market structure.

---

## IV. "Gotcha" Enforcement, Hidden Traps, and Punitive Controls

13. Modern broker practices rely on technical violations and hidden conditions to penalize carriers post-performance.

14. Tracking platforms, such as MacroPoint and similar tools, are used not merely for shipment visibility but as punitive instruments, where alleged "violations" — often minor, automated, or unavoidable — are later invoked to justify payment delay, reduction, or exclusion or no payment at all.

15. These violations are frequent:

    a. Undefined or vaguely defined.

    b. Enforced retroactively.

    c. Not subject to neutral review.

    d. Disproportionately punitive relative to any alleged harm.

16. This system places carriers under constant stress and surveillance, where a single technical issue can result in lost income or market exclusion.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## V. Payment Control as Leverage and Financial Abuse

17. Payment terms are the most powerful leverage point in the broker–carrier relationship.

18. Although broker documents purport to offer multiple payment methods, those options are frequently rendered unavailable in practice, particularly after Notices of Assignment or platform flags are applied.

19. Carriers are then forced into factoring or delayed payment structures they were told were optional, converting payment into a mechanism of control rather than compensation.

20. The cumulative effect is financial pressure used to compel compliance, not merely to settle accounts.

## VI. Suppression of Statutory Rate Transparency

21. Federal law requires brokers, upon request, to provide carriers with transparency regarding the compensation paid by the shipper for a load.

22. In practice, carriers who request this information are subjected to:

   a. Retaliation.

   b. Blacklisting.

   c. Denial of future loads.

   d. Exclusion from platforms or broker networks.

77

23. Carriers are routinely required, explicitly or implicitly, to waive their right to rate transparency as a condition of continuing to receive freight.

24. Brokers further enforce this suppression by treating any disclosure by a shipper — even accidental — as "back solicitation," placing the carrier at risk of termination or blacklisting.

---

## VII. Real-World Consequences and Unjust Enrichment

25. These practices are not theoretical. They have real and immediate consequences.

26. In one such instance, a receiver openly disparaged Plaintiff's work, declaring hostility toward the carrier and stating that the service rendered was not "worth" the shipper's payment.

27. The shipper paid approximately $4,000 for the transportation of the freight. Plaintiff received approximately $1,200, while the broker retained the remainder.

28. Plaintiff did not solicit the shipper, request disclosure, or provoke the exchange. Nonetheless, the incident illustrates how information asymmetry and suppressed transparency enable unjust enrichment.

29. Carriers perform the physical labor, assume the operational risk, and bear the expense, while brokers retain disproportionate financial benefit shielded by contractual opacity.

---

## VIII. Structural Imbalance, Not Isolated Misconduct

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

30. The conditions described herein are not the result of isolated bad actors or individual disputes.

31. They are the predictable outcome of:

    a. Uniform broker-drafted contracts.

    b. Non-negotiable access terms.

    c. Platform-enforced compliance regimes.

    d. Payment control mechanisms.

    e. Suppression of transparency; and

    f. Retaliatory exclusion.

32. Together, these elements form a self-reinforcing system that disadvantages carriers and concentrates power and profit among brokers and affiliated entities.

---

## IX. Purpose of These Supporting Pages

33. These pages do not seek to invalidate broker contracts wholesale.

34. They are submitted to demonstrate:

    a. The historical and structural origins of imbalance.

    b. The coercive operation of broker terms in practice.

79

c. The need for equitable limitations on enforcement; and

d. The necessity of judicial oversight where payment and access to commerce are conditioned on unilateral, opaque controls.

35. Narrow declaratory and injunctive relief is required to prevent continued abuse without rewriting contracts, while restoring fundamental fairness to the carrier–broker relationship.

---

## OHIO RICO / ANTITRUST BRIDGE — PLATFORM-BASED ENFORCEMENT, PROXY INTIMIDATION, AND MARKET GATEKEEPING

(Association-in-Fact Enterprise; Pattern of Corrupt Activity; Combination in Restraint of Trade)

---

### I. Enterprise Structure and Obligatory Gatekeepers

1. At all relevant times, Total Quality Logistics, LLC ("TQL"), C.H. Robinson Worldwide Inc., and all other Brokers and factors, Truckstop.com, LLC, DAT Freight & Analytics, RMIS, Highway, Carrier411, Truckstop Factoring / Truckstop Payments, Denim, LoadPay, and MacroPoint operated as an association-in-fact enterprise within the meaning of Ohio's Corrupt Activity Act and federal RICO.

80

2. The Enterprise's common purpose was to control access to freight, carrier reputation, payment routing, and market participation, while suppressing transparency and extracting disproportionate economic benefit from carriers.

3. The Enterprise's structure relies on platforms that function as obligatory toll booths, including:

   o DAT Freight & Analytics and the Truckstop Load Board (load access);

   o RMIS and Highway (onboarding, verification, eligibility);

   o Carrier411 (reputation scoring, warnings, and exclusion);

   o MacroPoint (tracking and enforcement triggers);

   o Truckstop Factoring, Denim, and LoadPay (payment capture and NOA enforcement).

4. These platforms are not optional for any carrier in practice. The Platforms are now at scale nationwide .The largest brokers in the United States, including TQL and C.H. Robinson, rely on them as mandatory infrastructure, rendering participation in interstate freight commerce effectively impossible without submission to their combined rules.

---

## II. Carrier411 as a Proxy Enforcement and Fear Mechanism

5. Carrier411 operates as a reputational enforcement arm of the Enterprise, allowing brokers and affiliated entities to post warnings, flags, and derogatory comments that follow carriers across the industry.

6. A negative Carrier411 entry functions as an industry-wide blacklist, often resulting in immediate denial of loads by brokers who rely on Carrier411 as a proxy risk signal.

81

7. Carriers understand that:

- o   Disputing payment;

- o   Questioning an NOA;

- o   Requesting statutory rate transparency;

- o   Complaining about platform abuse; or

- o   Refusing coercive terms

may trigger a Carrier411 posting that effectively ends their ability to operate.

8. This creates enterprise-wide discipline by fear, where carriers are kept "in check" not by direct threats from any one broker, but by the known consequences of reputational destruction enforced by proxy.

---

## III. Online Intimidation, Surveillance, and Targeting

9. The Enterprise's enforcement is not limited to formal platforms. Carriers who challenge practices are subjected to:

- o   Online targeting;

- o   Harassment;

- o   Monitoring of social media activity, including Facebook pages;

- o   Public disparagement intended to chill dissent.

10. These acts reinforce platform-based exclusion and serve as informal but effective intimidation, signaling to other carriers the consequences of non-compliance.

11. Such conduct further evidence coordination and shared objectives, not isolated action

82

## IV. Load Boards as Market Toll Booths

(DAT and Truckstop Load Board)

12. DAT Freight & Analytics and the Truckstop Load Board function as the primary marketplaces for freight access.

13. Access to these load boards is a practical necessity for carriers, and brokers routinely post loads exclusively or primarily through them.

14. When combined with:

- RMIS and Highway onboarding requirements;

- Carrier411 reputational control; and

- Factoring-based payment capture,

These load boards operate as market toll booths, extracting compliance as the price of entry.

15. A carrier excluded, flagged, or blacklisted on these interconnected systems is effectively removed from the market, regardless of performance or legality of the underlying dispute.

## V. Ohio Corrupt Activity Act — Pattern of Corrupt Activity

16. Under Ohio law, an enterprise exists where persons are associated for a common purpose and engage in ongoing conduct.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

17. Defendants engaged in a pattern of corrupt activity, consisting of repeated, related incidents including:

- Enforcement of Notices of Assignment by brokers TQL and C.H. Robinson at the direction or for the benefit of Truckstop Factoring, Denim, and LoadPay;
- Platform-based exclusion and flagging through RMIS, Highway, and Carrier411;
- Reputational intimidation through Carrier411 postings and online targeting;
- Payment diversion and refusal of direct payment;
- Use of MacroPoint tracking "violations" as punitive triggers.

18. These incidents are not isolated. They are repeatable, standardized practices used across the Enterprise and applied to carriers nationwide.

---

## VI. Ohio Antitrust (Valentine Act) — Combination in Restraint of Trade

19. Independently and in the alternative, Defendants' coordinated conduct constitutes a combination, contract, or conspiracy in restraint of trade under Ohio antitrust law.

20. By acting in concert to:

- Gate access to loads;
- Control reputation;
- Suppress transparency;
- Channel payment through controlled financial intermediaries; and
- Punish dissent through exclusion,

84

Defendants restrained carriers' ability to compete, negotiate, and operate freely in the marketplace.

21. No single Defendant could accomplish this alone. The restraint arises from interlocking platform dependence and mutual enforcement.

---

## VII. Transition to Sherman Act §§ 1–2

22. The same conduct constitutes a contract, combination, or conspiracy in restraint of trade in interstate commerce in violation of Sherman Act § 1.

23. Further, the Enterprise's control over:

- Load access (DAT, Truckstop Load Board);

- Carrier eligibility (RMIS, Highway);

- Reputation (Carrier411);

- Payment routing (Truckstop Factoring, Denim, LoadPay);

demonstrates market power and exclusionary conduct sufficient to support claims under Sherman Act § 2 for monopolization, attempted monopolization, or maintenance of monopoly power.

24. Carriers who do not submit to Enterprise rules are excluded, blacklisted, or financially coerced, while compliant actors are allowed to participate—classic exclusionary conduct.

85

## VIII. Purpose and Relief

25. Plaintiff does not seek to dismantle lawful brokerage operations.

26. Plaintiff seeks declaratory, injunctive, and equitable relief to:

- Prevent use of reputational platforms as coercive weapons;

- Require neutrality and due process in payment disputes;

- Prohibit retaliation for exercising statutory rights;

- Restore access to interstate commerce free from proxy intimidation.

27. Judicial intervention is required to prevent the continued operation of a private, platform-based enforcement regime that substitutes fear and exclusion for lawful competition.

# I. WHAT RACKETEERING IS — STATUTORY, HISTORICAL, AND JUDICIAL FRAMEWORK

## A. Congressional Purpose of RICO

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, was enacted to eradicate organized, ongoing criminal conduct carried out through legitimate-appearing enterprises.

Congress expressly found that racketeering schemes had evolved beyond street crime and were being conducted through:

- Corporations,

86

- Contractual relationships,

- Financial intermediaries,

- And industry-wide systems insulated by complexity and fragmentation.

RICO therefore targets patterns of conduct, not isolated acts, and enterprises, not merely individual wrongdoers.

---

## B. RICO Is Not Limited to the Mafia — Supreme Court Authority

Although RICO was famously used to dismantle mafia families, the Supreme Court has repeatedly held that:

RICO applies to any enterprise—legitimate or illegitimate—that conducts its affairs through a pattern of racketeering activity.

Key controlling cases include:

- United States v. Turkette, 452 U.S. 576 (1981)

  → An enterprise may be entirely legitimate and still be a RICO enterprise.

- Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985)

  → RICO is to be construed broadly; civil RICO is not limited to traditional organized crime.

- H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

→ A "pattern" requires related acts plus continuity, which may be closed-ended or open-ended.

- Boyle v. United States, 556 U.S. 938 (2009)

  → An association-in-fact enterprise requires only:

  1. A common purpose
  2. Relationships among associates
  3. Longevity sufficient to pursue that purpose

No hierarchy, formal structure, or single mastermind is required.

---

## C. Modern RICO: Corporate & Platform-Based Enterprises

Modern RICO cases routinely involve:

- Financial services
- Insurance
- Logistics
- Technology platforms
- Payment processors

Courts recognize racketeering where economic coercion, deception, and control of money flows are used systematically to extract value from a vulnerable class.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

This case fits squarely within that evolution.

---

## II. PATTERN OF RACKETEERING ACTIVITY

(18 U.S.C. §§ 1962(c), 1961(1), 1961(5))

---

### A. Enterprise Allegations (Incorporated)

Plaintiff incorporates by reference the Enterprise allegations identifying Total Quality Logistics, LLC ("TQL"), C.H. Robinson Worldwide, Inc., and all other Brokers, Truckstop.com, LLC, Truckstop Factoring / Truckstop Payments, RMIS, Highway, Denim, LoadPay, MacroPoint, and associated brokers, platforms, and payment entities as members of an association-in-fact enterprise.

---

### B. Overview of the Pattern

From at least 2018 through the present, Defendants conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, consisting of repeated and related acts of:

- Wire fraud (18 U.S.C. § 1343)

- Extortion by economic fear (Hobbs Act, 18 U.S.C. § 1951)

89

- Financial coercion and interference with commerce

- Deprivation of property through fraudulent and coercive means

These acts were not isolated, but formed a regular way of doing business.

---

## C. Predicate Act Category One — Wire Fraud

(18 U.S.C. § 1343)

### 1. Fraudulent Representations Regarding Optional Payment & Factoring

Defendants Truckstop, Truckstop Factoring, Denim, and LoadPay, in coordination with brokers including TQL and C.H. Robinson, transmitted representations via interstate wires that:

- Factoring was optional;

- Carriers could choose which loads to factor;

- Direct payment, Quick Pay, or paper check remained available alternatives.

These representations were materially false.

Once Notices of Assignment were issued by Truckstop Factoring, Denim, or LoadPay and transmitted electronically to brokers including TQL and C.H. Robinson, carriers were no longer able to access any non-factoring payment pathway.

---

### 2. Platform-Based Transmission of False Control Signals

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Defendants Truckstop, RMIS, and Highway transmitted carrier status, payment restrictions, and compliance flags through interstate wires, representing that such controls were neutral or compliance-based.

In reality, these signals were used to:

- Enforce factoring capture;

- Justify payment refusal;

- Exclude carriers who disputed NOAs or requested transparency.

---

## D. Predicate Act Category Two — Extortion by Economic Fear

(18 U.S.C. § 1951)

## 3. Withholding Earned Compensation to Compel Submission

Defendants Megellen, TQL and C.H. Robinson withheld earned freight payments after performance, enforcing NOAs issued by Truckstop Factoring, Denim, or LoadPay, knowing that:

- Carriers depended on immediate payment for food, fuel, and basic survival;

- No neutral escrow or interpleader was offered;

- Payment would not be released absent compliance.

---

## 4. Waiver-Conditioned Releases as Extortionate Leverage

When carriers sought Letters of Release to restore payment, Truckstop Factoring, Denim, and LoadPay conditioned release on waiver of legal rights and claims.

Brokers including TQL and C.H. Robinson enforced the NOAs knowing that the carrier could not obtain a release without surrendering rights.

This constitutes obtaining property (earned receivables) by wrongful use of economic fear.

---

## E. Predicate Act Category Three — Coercive Surveillance & Punitive Enforcement

## 5. MacroPoint and Technical Violations as Enforcement Triggers

Defendant MacroPoint, acting in concert with TQL, C.H. Robinson, and other brokers, generated alleged "tracking violations" that were later used to:

- Delay payment;
- Reduce compensation;
- Justify carrier exclusion.

These violations were:

- Vaguely defined;
- Retroactively enforced;
- Not subject to neutral review.

92

### F. Predicate Act Category Four — Suppression of Statutory Transparency

### 6. Retaliation for Requesting Shipper Rate Disclosure

Federal law requires brokers to disclose shipper compensation upon request.

Defendants TQL, C.H. Robinson, Truckstop, RMIS, and Highway participated in a coordinated practice whereby carriers who requested transparency were:

- Blacklisted;
- Flagged across platforms;
- Denied future loads.

Carriers were compelled to waive statutory rights as a condition of continued market access.

### G. Predicate Act Category Five — Financial Capture & Unjust Enrichment

### 7. Diversion of Freight Revenue Through the Enterprise

Defendants TQL, C.H. Robinson, Megellen, Truckstop aka Denim structured transactions so that:

- Shippers paid full freight rates;
- Carriers received a fraction;
- The balance was retained by brokers and financial intermediaries shielded by opacity.

93

This diversion was enabled by:

- Suppressed transparency;

- Platform-enforced silence;

- Retaliatory exclusion.

---

## H. Relatedness and Continuity

### 1. Relatedness

All racketeering acts:

- Had the same purpose (control payment and access);

- Involved the same victims (carriers);

- Used the same methods (contracts, platforms, NOAs, surveillance);

- Benefited the same participants (brokers, platforms, factors).

### 2. Continuity

- Closed-ended continuity: Acts occurred repeatedly over years.

- Open-ended continuity: Practices continue as the regular way Defendants conduct business.

---

94

## I. Liability Under 18 U.S.C. § 1962(c) and (d)

Each Defendant:

- Conducted or participated in the conduct of the Enterprise's affairs;

- Through a pattern of racketeering activity;

- And conspired to do the same.

## ENTERPRISE SCHEME SUMMARY "THE SCRIPT"

## Organized Nationwide Carrier Rate Suppression

## Overview of the Scheme

Defendants collectively participate in an organized, technology-driven enterprise that suppresses motor carrier rates nationwide by removing negotiation, standardizing coercive surveillance, and enforcing punishment through payment controls. Although each defendant plays a different role, their conduct is interdependent and produces a single outcome: carriers are paid less everywhere, cannot negotiate anywhere, and are told "this is just the market." This is a narrated and **scripted** plan.

The scheme operates across state lines and affects virtually every freight lane, converting what were once regional backhauls into a permanent national condition of artificially low rates.

---

## ROLE OF EACH DEFENDANT IN THE ENTERPRISE

95

**1.**

**C.H. Robinson Worldwide, Inc. — Market-Setting Broke**

C.H. Robinson is one of the largest freight brokers in North America and functions as a rate anchor for the industry. Even when a carrier is not enrolled in its network, C.H. Robinson:

- Solicits carriers into the same surveillance ecosystem,
- Declares invasive tracking "industry standard," and
- Normalizes the idea that rates are non-negotiable.

Because of its size, C.H. Robinson does not need to explicitly collude; its practices become the benchmark that smaller brokers follow to remain "competitive." When C.H. Robinson says "this is the rate," the market adjusts downward.

---

**Magellan Transport Logistics — Transaction-Level Enforcement**

Magellan represents how mid-tier brokers operationalize the scheme. It:

- Issues rate confirmations with GPS tracking monetized as a line item,
- Requires MacroPoint tracking,
- Receives full performance and tracking compliance,
- Then short-pays carriers anyway—in identical dollar amounts ($300 per load).

96

Magellan demonstrates that this is not a pricing dispute, but post-performance rate suppression, where brokers retain unilateral power to reduce pay after delivery, knowing carriers lack leverage once the freight is moved.

---

## 3.

### MacroPoint, Inc. — Surveillance and Punishment Infrastructure

MacroPoint is the technological backbone of the scheme. It enables brokers to:

- Force drivers to use personal phones for continuous tracking,
- Convert normal connectivity gaps into "violations," and
- Justify rate reductions and short payments.

MacroPoint transforms visibility into leverage. Tracking is no longer about delivery—it becomes a pretext to discipline carriers financially, regardless of on-time performance.

---

### 4. Highway / RMIS /Motive API real time in cab audio and video

### Platform Defendants — Gatekeeping and Exclusion

These platform defendants act as private regulators:

- Controlling who may access freight,
- Requiring submission of sensitive data,

- Enforcing uniform compliance profiles.

- Listening to drivers or watching drivers in real time

Carriers who resist the system are excluded, not because of safety or performance, but because they do not submit to the enterprise's control mechanisms. This eliminates competitive pressure that would otherwise force brokers to raise rates.

---

## 5. Factoring / Payment Control Defendants

Factoring and payment-linked defendants:

- Reinforce broker control by restricting cash flow,

- Lock carriers into dependency,

- Make it economically impossible to reject low-paying freight.

Together, they ensure that carriers cannot afford to walk away, even when rates fall below operating cost.

---

## HOW THE SCHEME ELIMINATES NEGOTIATION

Under normal market conditions, a carrier can negotiate based on:

- Equipment availability,

- Fuel costs,

98

- Deadhead,

- Urgency.

Under the Enterprise's system:

- Rates are pre-set by algorithm and "market dashboards,"

- Brokers refuse counteroffers, they know the carriers are desperate and can see where the trucks are parked in real time all the time.

- Carriers are told "that's the rate" or the call ends every time.

There is no bilateral negotiation. The carrier either accepts the suppressed rate or is excluded.

---

## FLORIDA AS THE EXAMPLE — BUT NOT THE EXCEPTION

Florida is used as the justification, not the cause.

Brokers like TQL routinely pay under $1.00 per mile out of Florida, with the sole explanation:

"It's Florida. Everybody pays less than a dollar." ( it's minimum $2.24 to operate one truck per mile before profit)

This is not a market explanation—it is a script.

What matters legally is that:

- The same logic is applied everywhere,

- Every outbound lane is labeled a "bad backhaul,"

- Every inbound lane is priced as if carriers have no alternative, and the rates are anchored low in unison so there really is no alternative or negotiating. Take it or get blacklisted out of business.

As a result:

- Florida loads are cheap because they're Florida,

- Texas loads are cheap because they're Texas,

- Midwest loads are cheap because they're Midwest,

- California loads are cheap because they're California.

Every region is treated as a permanent backhaul.

---

## THE NATIONAL EFFECT: EVERY LOAD IS A CHEAP BACKHAUL

The Enterprise has eliminated the traditional concept of:

- Headhaul vs. backhaul,

- Seasonal rate variation,

- Regional supply-demand correction.

Instead:

- All loads are priced at or below marginal cost,

100

- Fuel increases are not passed through,

- Carriers absorb inflation while brokers maintain margins.

Because the same platforms, tracking tools, and payment controls are used nationwide, rate suppression is uniform across state lines, satisfying the interstate commerce element.

---

## WHY THIS IS NOT "JUST THE MARKET"

This is not independent decision-making. It is:

- Standardized technology,

- Uniform scripts,

- Shared platforms,

- Identical penalty structures,

- Identical refusal to negotiate.

Carriers are not negotiating against individual brokers; they are negotiating against a closed system that has already decided the rate and the rate is as low as possible, there is only fuel money and nothing more.

That is organized rate suppression, not competition. It is artificial rates and market manipulation in concert.

---

## CORE THEORY FOR THE COURT

101

Defendants replaced open market negotiation with a private, technology-enforced regime that suppresses carrier rates nationwide, eliminates bargaining, and punishes carriers after performance—resulting in every lane functioning as a permanent low-pay backhaul regardless of geography.

## DAMAGES AND ECONOMIC IMPACT

### Enterprise-Wide Rate Suppression and Expert Economics

### A. Economic Theory of Harm (How the Scheme Depresses Prices)

The Enterprise's conduct causes harm through price suppression, not isolated billing disputes. Defendants collectively replaced open, bilateral rate negotiation with a closed, technology-enforced pricing system that fixes carrier compensation at artificially low levels.

From an economic perspective, the scheme operates by:

1. Eliminating Negotiation

   Brokers uniformly refuse counteroffers. Carriers face a binary choice: accept the posted rate or lose access to freight entirely. This removes the normal market mechanism that allows prices to rise when capacity tightens. Carriers no longer have any autonomy or respect and are not viewed as contracting business partners but treated as unwanted employees in a hostile work environment.

2. Creating Artificial Oversupply Signals

Broker platforms and dashboards present freight as perpetually oversupplied, even when equipment and drivers are scarce. These signals are reinforced industry-wide, anchoring rates downward.

3.  Imposing Surveillance-Backed Enforcement

Phone-based tracking (MacroPoint) ELD connected to the trucks onboard computer(ECM) is used not merely for visibility/audio are used as leverage, enabling post-performance punishment for any vague reason. This deters carriers from rejecting low rates, because payment itself becomes uncertain. Say the wrong thing and it will be used in retaliation. Owner Operators live within a constant surveilled state of humiliation. If your device is disconnected the phone starts ringing from multiple people. The offshore dispatching services did not want the Plaintiff to continue to have authority because Plaintiff would not participate in the system the way they felt they were entitled. The non stop phone calls from offshore dispatching services were hostile, rude and disruptive. Calls of harassment were relentless and ongoing. During negotiations with brokers, Plaintiff was dispatching herself and this set off alarms to TQL and other brokers. This is the way carriers used to perform but since the enterprise took over the supply chain Plaintiff stood out and did not capitulate to the system. The plaintiff used a perfectly legal ELD that was not broadcasting to every broker in real time and this bothered many brokers and caused a lag in Plaintiffs operations, it was hard to get freight by design and offshore double brokers aka unlicensed dispatchers, with no MC numbers or FMCSA authority or any identity demanded use of the Plantiffs MC number, continuously demanded cooperation telling plaintiff "this is how it works you are in violation" How

103

they want it to work is not legal and Plaintiff knows it is not legal or in compliance with the FMCSA even if the FMCSA is unaware of it's operations at scale, Plaintiff has the intelligence that needs to be known in order to stop the freight theft, wage theft, double brokering operations that are harming the public on a widespread scale.

4. Shifting Risk Without Compensation

Costs normally borne by brokers—visibility gaps, infrastructure limitations, payment certainty—are shifted onto carriers without corresponding rate increases. No fuel surcharge offsets for carriers, no detention pay, no layover pay, no truck ordered not used pay (TONU) Then post delivery reductions that are not visible to the carrier and 30 days after delivery, the factoring won't show where what or why there's a claw back and by who.

Economically, this produces **monopsony-like** conditions: many carriers competing to sell services into a market controlled by a small number of dominant buyers using common tools and rules that are ever changing including but not limited to adopting a new identity or alter ego to evade accountability.

---

## B. Why "Every Load Becomes a Cheap Backhaul"

Traditionally, freight markets distinguish between:

- Headhaul lanes (high demand, higher rates), and
- Backhaul lanes (imbalanced, lower rates).

The Enterprise eliminates this distinction.

Through standardized pricing scripts ("that's the market"), algorithmic rate posting, and refusal to negotiate, every region is treated as structurally disadvantaged, regardless of actual supply-demand conditions.

Florida illustrates the mechanism, not an exception:

- Brokers pay under $1.00 per mile out of Florida,
- Justification: "It's Florida—everyone pays under a dollar,"
- No negotiation permitted.

The same justification is applied elsewhere:

- Texas is cheap because "capacity is loose,"
- Midwest is cheap because "rates are down,"
- California is cheap because "outbound is bad."

An economist will testify that when every lane is priced as a backhaul, the pricing model is no longer market-responsive. It is administratively suppressed by the enterprise.

---

## C. Direct Damages to Carriers (Micro-Level)

At the carrier level, damages are concrete and measurable.

## 1. Per-Load Underpayment

Carriers are paid below competitive rates for each load. In addition, brokers impose post-delivery deductions (commonly $250–$350) tied to tracking or compliance pretexts, even when loads are delivered on time.

These are not liquidated damages. They are penalties that reduce compensation below the already suppressed base rate.

## 2. Forced Acceptance Below Cost

Operating costs (fuel, insurance, equipment, labor) rise independently of broker pricing. When rates fall below operating cost, carriers incur:

- Negative margins per mile,
- Increased debt,
- Inability to reinvest or exit bad lanes.

An economist will calculate but-for rates using cost-plus or competitive benchmark models and show that actual payments fall materially below those benchmarks.

---

## D. Aggregate and Class-Wide Damages (Macro-Level)

The Enterprise's conduct causes market-wide harm, not isolated losses.

An expert economist will demonstrate:

1. Price Suppression Across Markets

106

Using lane-level data, average broker-paid rates can be compared to:

- o Historical rates before platform dominance,

- o Spot market indices absent enforcement mechanisms,

- o Cost-adjusted benchmarks.

2. Uniform Downward Pricing Patterns

The same depressed pricing appears across unrelated geographies, which is inconsistent with independent decision-making and consistent with coordinated conduct.

3. Suppressed Variance

Normal markets show price dispersion. Here, rates cluster tightly at low levels, indicating administrative pricing rather than competitive bidding.

4. Excess Broker Margin Capture

As carrier rates fall, broker spreads remain stable or increase, demonstrating that savings are not passed through to shippers proportionally.

---

**E. Causation (Why Defendants' Conduct Caused the Harm)**

The causal link is direct:

- Defendants control access to freight,

- Defendants impose non-negotiable pricing,

107

- Defendants enforce compliance through surveillance and payment control,
- Carriers cannot reject rates without exclusion.

Absent the Enterprise:

- Carriers would negotiate based on equipment scarcity and cost,
- Rates would vary by lane and season,
- Brokers would compete for capacity by raising offers.

The Enterprise's tools remove those competitive responses, causing predictable price suppression.

---

## F. Damages Methodology (Expert Testimony Framework)

An economist retained in this case will calculate damages using accepted methods, including:

1. But-For Pricing Models

   Estimating what carriers would have been paid absent the Enterprise's restraints.

2. Benchmark Comparisons

   Comparing suppressed rates to:

   - Independent carrier-to-shipper contracts,
   - Non-platform transactions,
   - Historical pre-platform pricing.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

3. Regression Analysis

Controlling for fuel, distance, equipment, and seasonality to isolate the effect of Enterprise conduct on rates.

4. Aggregate Loss Calculation

Multiplying per-mile or per-load suppression by the number of affected loads over time.

These methodologies are standard, peer-reviewed, and routinely accepted by courts.

---

## G. Summary for the Court

Defendants' concerted use of shared platforms, surveillance enforcement, and payment control suppresses carrier rates nationwide, eliminates negotiation, and converts every lane into a permanent low-pay backhaul. The resulting damages are measurable, predictable, and directly attributable to the Enterprise's conduct, and will be proven through expert economic analysis

## RICO ENTERPRISE, LINKAGES, AND DAMAGES

## Nationwide Rate Suppression Through Surveillance, Gatekeeping, and Payment Control

## A. The Association-in-Fact Enterprise (Named Defendants and Linkages)

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

At all relevant times, Truckstop, LLC; Internet Truckstop Payments, LLC; RMIS; Denim; Highway; MacroPoint, Inc.; C.H. Robinson Worldwide, Inc.; and Magellan Transport Logistics (collectively, the "Enterprise"), together with John Doe Brokers and Platform Entities, constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The Enterprise had relationships, a common purpose, and longevity sufficient to pursue that purpose.

**Common Purpose**

To suppress carrier compensation nationwide, eliminate negotiation, and shift risk and cost to carriers by conditioning access to freight and payment on non-statutory surveillance, platform gatekeeping, and post-performance payment controls.

**Relationships and Functional Linkages (By Defendant)**

- C.H. Robinson Worldwide, Inc. (Market-Setting Broker).

  As a dominant broker, C.H. Robinson sets pricing norms and declares invasive tracking "industry standard," anchoring rates downward. Its requirements normalize the Enterprise's rules and are followed by smaller brokers to remain "competitive."

- Magellan Transport Logistics (Transaction-Level Enforcer).

  Magellan operationalizes the scheme at the load level by issuing rate confirmations that mandate MacroPoint tracking, monetize "GPS tracking" as a line item, then short-pay carriers post-delivery (e.g., $300 per load) despite documented compliance, demonstrating standardized enforcement rather than error.

110

- MacroPoint, Inc. (Surveillance & Punishment Infrastructure).

  MacroPoint supplies the phone-based, real-time tracking that brokers require. It flags interruptions inherent to interstate travel and transmits data brokers use to justify rate reductions and withheld pay, converting visibility into economic discipline.

- Highway (Carrier Profiling & Data Interfacing).

  Highway aggregates carrier data and enforces uniform onboarding and compliance gates, enabling brokers to exclude carriers unwilling to submit to the Enterprise's controls and thereby remove competitive pressure to raise rates.

  RMIS, Owned by Internet Truckstop Payments (Compliance Gatekeeper)

  (ITP)-RMIS Owned by Internet Truckstop Payments,functions as a private regulator, controlling access by profile status and reinforcing uniform requirements across brokers, further foreclosing negotiation and entry.

- ITP Alter Ego =Truckstop, LLC Owned by Internet Truckstop Payments, is a load board for brokers to post loads and carrier to find loads.

  Truckstop, Owned by Internet Truckstop Payments, provides the loadboard and market dashboards that broadcast uniform pricing signals and scripts ("that's the rate"), facilitating non-negotiable offers across lanes and regions.

- Internet Truckstop Payments, LLC (Payment Control). Now ALTER EGO dba Denim (still the same factoring company) as of Dec 15, 2025

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

This entity links platform participation to payment flow, amplifying broker leverage and ensuring carriers cannot practically refuse suppressed rates without jeopardizing cash flow.

- Denim (Factoring/Payment Dependency). Owned by Internet Truckstop Payments,

  Denim, Owned by Internet Truckstop Payments, reinforces the scheme by locking carriers into payment dependency, making it economically infeasible to reject low rates or challenge post-delivery deductions. ITP is still the factoring agent but now the TOS changed and all of it's carriers were dragged onto another platform with new rules and no ability to reconcile the former loads on the old platform.

Interdependence: Brokers set and enforce rates; MacroPoint, Highway and Motive ELD supplies surveillance leverage; Highway/RMIS Owned by Internet Truckstop Payments, gate access; Truckstop disseminates pricing signals; Payments/Factoring enforce compliance through cash flow or restictions. Each defendant's conduct depends on and reinforces the others. Brokers benefit from these systems not the carrier.

---

## B. The Racketeering Scheme (How the Enterprise Suppresses Rates)

1. Elimination of Negotiation.

112

Offers are posted as non-negotiable; counteroffers are refused; calls end. Carriers must accept or be excluded.

2. Surveillance-Backed Enforcement.

Mandatory phone tracking (MacroPoint) and ELD (Motive) converts ordinary connectivity gaps into "violations," enabling post-performance penalties unrelated to delivery.

3. Gatekeeping & Exclusion.

Highway/RMIS, Owned by Internet Truckstop Payments, profiles exclude non-compliant carriers, removing rivals that would otherwise bid rates up.

4. Payment Control.

Platform payments and factoring ensure carriers cannot walk away, even when rates fall below cost.

5. Nationwide Standardization.

The same tools, scripts, and penalties operate across states, converting every lane into a permanent low-pay backhaul (e.g., Florida paid under $1.00/mile with the refrain "everybody pays less," replicated nationwide).

---

## C. Predicate Acts and Continuity (Brief)

113

Defendants conducted and participated in the Enterprise's affairs through a pattern of racketeering activity, including repeated use of interstate wires (platform postings, emails, tracking transmissions, ELD connectivity, payment communications, ACH connections) to induce acceptance of suppressed rates, justify deductions, and withhold compensation. The acts are related (same purpose, victims, methods) and continuous (ongoing, standardized, nationwide).

---

## D. Causation (Direct Link to Carrier Harm)

Defendants' coordinated conduct directly caused carrier losses by:

- Fixing effective prices at artificially low levels,
- Removing negotiation as a market corrective,
- Imposing predictable post-delivery deductions (commonly $250–$350 per load),
- Forcing acceptance through exclusion and payment dependency.

Absent the Enterprise, carriers would negotiate based on cost, scarcity, and lane conditions; rates would vary and rise when capacity tightens. The Enterprise suppresses that response.

**Surveillance Spine: Motive (ELD) → Highway → Flock → SaferWatch (Owned by Internet Truckstop Payments)**

### A. Unified Architecture, Distinct Corporate Faces

Plaintiff alleges that Motive Technologies, Inc., Highway, Flock Safety, and SaferWatch, which is owned and controlled by Internet Truckstop Payments, LLC, operate as separately branded platforms that together form a single, continuous surveillance spine.

114

Each entity occupies a different functional role. All contribute to the same outcome:

continuous data capture, aggregation, behavioral inference, and coercive control without due process, spanning regulated freight commerce and **civilian life.**

---

## B. Motive as the Origin Point: Regulated Carriers as the Test Bed

Plaintiff alleges that Motive functioned as the origin point of the surveillance spine.

Through mandatory ELD deployment, Motive normalized:

- continuous GPS location tracking,
- driver identity association,
- behavioral telemetry (speed, braking, hours of service),
- and in-cab audio-visual monitoring.

Carriers and drivers were compelled—by regulation and market necessity—to interface with Motive's systems continuously, creating a captive, regulated population upon which surveillance tools could be refined, validated, and scaled under the guise of compliance and safety.

Carriers were not incidental users.

They were the test bed.

---

## C. Highway as the Economic Enforcement Layer

Plaintiff alleges that Highway functions as the economic enforcement and decision layer of the surveillance spine.

Highway aggregates and operationalizes:

115

- carrier identity and authority data,
- compliance and behavioral indicators,
- third-party intelligence and reports.

Those inputs are converted into:

- eligibility determinations,
- risk flags,
- silent exclusion,
- and concerted refusals to deal across the broker market.

Highway does not merely provide information.

It determines outcomes, while disclaiming responsibility for the consequences.

This is surveillance converted into market power.

---

## D. Flock Safety as the Ambient Civilian Capture Layer

Plaintiff alleges that Flock Safety extends the same surveillance logic into public and civilian space.

Through:

- license-plate recognition,
- vehicle fingerprinting,
- fixed and mobile camera systems,
- and audio-capable monitoring infrastructure,

Flock captures ambient, continuous audio-visual data tied to vehicles, movement, and presence.

116

Unlike Motive, which targets a regulated workforce, Flock's surveillance reaches civilians with no regulatory relationship, no notice, and no meaningful ability to opt out.

This represents horizontal expansion of the same surveillance architecture beyond the workplace.

## E. SaferWatch (Owned by Internet Truckstop Payments) as the Active Reporting and Listening Layer

Plaintiff alleges that SaferWatch, owned and controlled by Internet Truckstop Payments, completes the surveillance spine by adding active, user-generated reporting and listening capabilities.

SaferWatch:

- solicits real-time incident reports from civilians,
- captures precise location, narrative input, images, and video,
- routes those reports through privately controlled systems,
- and interfaces with public-safety infrastructure while remaining a private, commercially aligned platform.

Because SaferWatch is owned by Internet Truckstop Payments, it cannot be treated as a neutral community-safety application. It operates within the same corporate ecosystem that controls freight payments, carrier eligibility, and economic access and is a part of the Enterprise

Where Flock observes passively,

SaferWatch listens actively.

## F. Implied Authority, Implied Access, and Chilling Effects Across the Spine

Plaintiff alleges that across Motive, Highway, Flock, and SaferWatch (owned by Internet Truckstop Payments), the enterprise relies on a shared coercive mechanism: implied access.

117

Affected individuals reasonably believe that:

- their movements are tracked,
- their communications may be recorded,
- their behavior is monitored and scored,
- and adverse consequences may follow later without explanation.

This belief alone:

- chills speech,
- chills negotiation,
- chills lawful resistance,
- and induces anticipatory compliance.

No explicit threat is required.

The architecture itself enforces obedience.

---

## G. From Regulated Freight to Civilian Life

Plaintiff alleges that the surveillance spine followed a deliberate progression:

1. Begin with regulated carriers, whose compliance was mandatory.
2. Normalize continuous monitoring through ELD and compliance tools.
3. Translate surveillance into economic discipline through Highway.
4. Extend laterally into civilian space through Flock.
5. Activate civilian participation and reporting through SaferWatch, owned by Internet Truckstop Payments.

The population changed.

The logic did not.

What was tested on carriers is now being applied to civilians. Truck Drivers we the test bed.

118

**H. Enterprise Knowledge and Design**

Plaintiff alleges that Defendants knew or reasonably should have known that:

- surveillance data would be repurposed beyond stated scopes,
- private platforms would substitute for public process,
- and behavioral control would expand beyond freight commerce.

The convergence of these systems was not accidental.

It was architectural design, implemented through alter-ego entities and aligned incentives.

**Anchor**

Motive normalized surveillance on regulated carriers; Highway weaponized it economically; Flock extended it into public space; and SaferWatch—owned by Internet Truckstop Payments—completed the loop by turning civilians into participants in a single private surveillance spine operating without due process.

## E. RICO DAMAGES (18 U.S.C. § 1964(c)) — MEASURABLE AND TREBLED

**Compensable Damages**

Plaintiff and similarly situated carriers suffered injury to business and property by reason of the RICO violations, including:

1. Per-Load Underpayment:

Payments below competitive "but-for" rates on each load.

2.  Post-Performance Deductions:

    Standardized short pays (e.g., $250–$350) imposed despite on-time delivery and tracking
    compliance.

3.  Forced Below-Cost Operations:

    Acceptance of rates beneath operating cost due to exclusion and cash-flow coercion.

4.  Lost Profits & Opportunity Costs:

    Inability to negotiate higher rates or reallocate capacity.

**Proof and Quantification**

Damages will be proven through expert economic analysis, including:

- But-for pricing models (cost-plus and competitive benchmarks),
- Benchmark comparisons (pre-platform periods, non-platform transactions),
- Regression analysis controlling for fuel, distance, equipment, and seasonality,
- Aggregation across affected loads and time.

**Mandatory Trebling and Fees**

Under 18 U.S.C. § 1964(c), Plaintiff seeks:

- Treble damages (three times actual damages),

120

- Costs and reasonable attorneys' fees, and

- Equitable relief as appropriate.

Trebling is warranted because the harms are systemic, foreseeable, and intended consequences of the Enterprise's design.

---

### F. One-Sentence Summary for the Court

By coordinating surveillance, gatekeeping, platform pricing, and payment control, Defendants replaced open negotiation with a private enforcement regime that suppresses carrier rates nationwide; the resulting underpayments and deductions are direct RICO damages subject to mandatory trebling

# DEFENDANT: #1

# INTERNET TRUCKSTOP PAYMENTS, LLC

# dBaTruckstop Load Board, RMIS

("Truckstop Payments")

### A. Role in the Enterprise and Market Function

Internet Truckstop Payments, LLC is a central financial actor within the Integrated Freight Data-Control Conglomerate Enterprise. Plaintiff alleges that Truckstop Payments/Denim designed,

121

implemented, and operated a system in which small motor carriers and owner-operators were unable to receive payment for hauling freight unless they surrendered control of their receivables and payment routing to Defendants' proprietary platforms.

Once subjected to this system, carriers were unable to freely exit without risking loss of income, business continuity, credit access, or operational viability. Payments were delayed, fragmented, unexplained, or withheld, and carriers lacked any practical mechanism to audit, challenge, or bypass Defendants' control while remaining active in the freight market.

Truckstop Payments did not function as a neutral payment processor. Plaintiff alleges it exercised discretionary control over who was paid, when payment was released, how payment amounts were calculated or disbursed, and whether carriers could continue operating long enough to haul subsequent loads. This authority was exercised deliberately, repeatedly, and across state lines.

### Common Ownership, Control, and Alter-Ego Structure (Truckstop / ITP)

Plaintiff alleges that Internet Truckstop Payments, LLC operates as part of a single, integrated corporate enterprise commonly branded and publicly defined as "Truckstop." Truckstop's own published terms and customer agreements define "Truckstop" as Internet Truckstop Group, LLC and its affiliated entities, collectively operating under common ownership and control. Within that affiliated-entity structure, Truckstop publicly holds out multiple platforms—including Truckstop.com, RMIS, and SaferWatch, Denim—as unified components of its compliance, safety, and risk-management offerings. Truckstop has publicly announced its acquisition of SaferWatch (through Grizella LLC) and its acquisition of RMIS 2018 aquisitions, describing those platforms as integrated tools within a single compliance ecosystem. Plaintiff alleges that Internet Truckstop Payments, LLC is an affiliated entity within this same Truckstop enterprise, operating under common control and serving as the payments and financial enforcement arm,

while SaferWatch functions as a data-intake and surveillance component and RMIS functions as a compliance and eligibility gatekeeper. Although branded separately, these entities operate as alter egos and instrumentalities of a single enterprise, sharing aligned incentives, coordinated operations, and interdependent data and enforcement functions and all are owned and controlled by Internet Truckstop Payments.

"Public business filings list certain governing persons/managers for Internet Truckstop Payments, LLC, including Koy Saechao, Rebecca Vang, Alex Jenkins, Wendy Harris, Melissa Dekoven, and Crystal Rodriguez, at the CSC service address in Sacramento, California

---

## B. RICO — Conduct or Participation

(Reves v. Ernst & Young Standard)

Internet Truckstop Payments/Denim conducted and participated in the affairs of the Enterprise by designing, directing, and enforcing financial choke points that governed carrier survival within the freight ecosystem. Specifically, Truckstop Payments:

- exercised decision-making authority over carrier receivables and payment routing;
- controlled the timing, release, fragmentation, and withholding of payments;
- coordinated payment control with load-access, onboarding, and compliance platforms; and
- enforced compliance through liens, assignments, and non-negotiable platform rules.

Plaintiff alleges this constituted active management and operation of the Enterprise, not the passive provision of financial services.

---

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## C. Wire Fraud

(18 U.S.C. § 1343)

### 1. Scheme to Defraud

Plaintiff alleges that Internet Truckstop Payments/Denim devised and executed a scheme to defraud carriers by representing that payments would be fast, transparent, accurate, and based on broker remittances, while concealing material facts regarding payment calculation, internal holds, offsets, delays, and discretionary control.

In practice, Defendants allegedly:

- concealed payment methodologies;
- delayed or fragmented payments without explanation;
- issued nominal or token payments;
- retained custody of full proceeds while claiming payment authority; and
- used liens, assignments, and platform lock-in to prevent carrier exit

The purpose of the scheme was to retain custody and control of carrier funds and to force continued dependence on Defendants' systems.

### 2. Use of Interstate Wires

To execute the scheme, Internet Truckstop Payments/Denim repeatedly used interstate wire communications, including:

- electronic Notices of Assignment transmitted to brokers;

124

- electronic payment routing instructions;

- platform dashboards displaying misleading payment information;

- automated emails and portal communications;

- ACH and electronic funds transfer systems; and

- interstate servers and cloud-based ledgers.

- Changed its name to Denim to shield itself.

Each transmission furthered the scheme by reinforcing Defendants' control, preventing direct broker-to-carrier payment, and concealing the true disposition of funds.

## 3. Material Misrepresentations and Omissions

Plaintiff alleges that Defendants' wire communications were fraudulent because they:

- misrepresented that payments reflected broker remittances.

- omitted material facts about internal holds, offsets, and delays;

- failed to disclose the absence of independent audit rights; and

- failed to disclose that liens and assignments would be used to block exit.

- Paid Plaintiff penny deposits to close out completed loads

- Paid penny deposits for unjust enrichment collecting on Plaintiffs loads

- Money Laundering

- Forced migration to another platform Denim

A reasonable carrier would not surrender control of receivables if these facts were disclosed.

125

## 4. Intent

Plaintiff alleges Defendants acted knowingly and intentionally. The payment system was engineered to maximize leverage, prevent competition, lock carriers into dependence, and shift financial risk entirely onto carriers. The same practices were applied repeatedly to numerous carriers over time. There is an affidavit of Kip Coltrin who is a carrier owner operator for more than 20 years and has testified that ITP did the exact same thing to him stole his money and forced him to migrate to Denim, They paid him just enough to pay his insurance at the last minute when he threatened them with a lawsuit. Now, foreseeably, his company is going to experience blacklisting but he was willing to write the affidavit even if it meant his company death. Kip Coltrin is the founder of the Special Forces of the Cajun Navy and if the Enterprise can do this to him they can do this to anyone.

## D. Pattern of Racketeering Activity

Plaintiff alleges that Defendants' acts constitute a pattern of racketeering activity because they were related, served the same purpose of financial control, and were continuous, posing a threat of ongoing criminal conduct. The system remains operational.

## E. Antitrust — Sherman Act § 1 (Restraint of Trade)

Internet Truckstop Payments/Denim coordinated with load boards, onboarding gatekeepers, compliance platforms, and brokers to condition access to freight on acceptance of Defendants'

126

payment-control systems. Plaintiff alleges this coordination constitutes a contract, combination, or conspiracy in restraint of trade and disrupts interstate commerce and trucking.

The anticompetitive effects include:

- foreclosure of alternative payment methods;
- suppression of carrier autonomy;
- early elimination of new carriers; and
- transfer of leverage from carriers to brokers and platforms.

Plaintiff alleges this conduct is not competition on the merits but coercion through infrastructure control.

## F. Antitrust — Sherman Act § 2 (Monopolization / Attempt)

Plaintiff alleges Truckstop Payments acquired and maintained market power by controlling essential gateways, foreclosing alternatives, imposing non-negotiable terms, and using liens and assignments to punish exit. Relevant markets include freight payment processing for small carriers, carrier receivables control, and broker-mandated payment routing tied to load access.

## G. Causation and Damages

As a direct and proximate result of Defendants' conduct, Plaintiff alleges she lost access to earned income, was unable to meet basic operational and personal expenses, suffered business

127

collapse and personal harm, and remains exposed to ongoing economic peril. These harms were foreseeable and profitable to Defendants.

---

## H. Enterprise Financial Coercion Through Blanket Asset Encumbrance

(UCC-1–Based Control)

At the center of Defendants' conduct is a UCC-1 financing statement filed by Internet Truckstop Payments purporting to grant a security interest in all present and future assets of the carrier for a five-year term, including assets unrelated to factoring or freight, before freight was ever factored at all on June 4, 2025 was the date of the filing.

Plaintiff alleges:

- the lien asserted control over personal and business assets, bank accounts, future income, and after-acquired property;
- the scope far exceeded any legitimate commercial justification;
- the lien effectively prevented refinancing, exit, or alternative payment arrangements; and
- Defendants failed to clearly disclose the breadth and consequences of the encumbrance.

Plaintiff alleges the lien functioned as a coercive enforcement mechanism, not risk management, and was integral to Defendants' racketeering and anticompetitive scheme.

---

128

## I. Summary

Plaintiff alleges that Internet Truckstop Payments, LLC/Denim transformed a purported payment service into an economic gatekeeping system that foreclosed competition, coerced carriers, and exercised unlawful control over receivables and market access through coordinated enterprise conduct, wire fraud, blanket asset encumbrance, and restraint of trade.

---

## STATUTORY VIOLATIONS — DEFENDANT-SPECIFIC APPLICATION

(Sherman Act + RICO + Racketeering — Truckstop Load Board)

---

## DEFENDANT: INTERNET TRUCKSTOP, INC.

d/b/a Truckstop Load Board

(Dominant Freight Load Board – Market Access Controller)

---

## I. IDENTITY, OWNERSHIP, AND PLATFORM ROLE

ITP/DENIM/RMIS/Internet Truckstop, Inc. ("Truckstop") operates one of the largest electronic freight load boards in the United States, providing nationwide freight postings and broker-to-carrier matching across interstate commerce.

ITP/Truckstop is:

129

- Not a motor carrier

- Not a freight broker

- Not a freight forwarder

- Not a government regulator

ITP/DENIM/RMIS/Truckstop nevertheless functions as a primary gatekeeper to freight access, controlling visibility, eligibility, and market participation for carriers nationwide.

ITP/DENIM/RMIS/Truckstop is the parent company of RMIS, having acquired RMIS in or about 2018, and operates the load board in tight integration with RMIS compliance determinations.

---

## II. INTEGRATION WITH RMIS AND DEPENDENCE ON COMPLIANCE STATUS

ITP/DENIM/RMIS/Truckstop conditions effective access to its load board on a carrier's RMIS compliance status

In practice:

- RMIS serves as the carrier data and compliance authority
- Truckstop Load Board serves as the market access enforcement mechanism
- Brokers rely on both in tandem
- Carriers have no meaningful alternative

This integration forms a closed-loop system controlling:

130

- Eligibility

- Visibility

- Load access

- Economic survival

---

## III. AUTOMATIC 24–48 HOUR "BLACKOUT" UPON RMIS PROFILE CHANGES

Truckstop enforces a 24–48 hour blackout period on carriers whenever any change is made to the carrier's RMIS profile, including minor, non-substantive updates, such as:

- Changing a truck number

- Updating equipment details

- Correcting clerical information

- Making routine administrative edits

During this blackout period:

- The carrier is effectively removed from the Truckstop marketplace

- Load visibility is restricted or suspended

- Brokers refuse to tender freight

- Income is immediately disrupted

This blackout occurs automatically, without:

- Notice

131

- Hearing

- Emergency exception

- Carrier consent

- Opportunity to dispute or expedite

---

## IV. COERCIVE EFFECT AND ECONOMIC HARM

The blackout mechanism functions as a punitive and coercive enforcement tool, not a legitimate safety or compliance measure.

Even trivial changes result in:

- Immediate market exclusion

- Lost loads and revenue

- Broker distrust

- Reputational harm

Carriers are thus discouraged from correcting errors or updating records, forced to choose between:

- Maintaining inaccurate information, or

- Losing access to the market

This creates a perverse incentive structure that benefits brokers and platforms while harming carriers.

132

## V. ABSENCE OF REGULATORY AUTHORITY OR DUE PROCESS

Truckstop has no statutory authority to:

- Suspend a carrier's market access

- Impose blackout penalties

- Enforce compliance sanctions

Yet it does so anyway, without:

- FMCSA oversight

- Due process protections

- Neutral review

- Carrier-side appeal

Truckstop acts as a private regulator, imposing economic punishment outside the law.

# Defendant 1 — Internet Truckstop Payments, LLC (and Alter Egos)

Defendant Internet Truckstop Payments, LLC ("ITP") is a limited liability company engaged in interstate commerce that provides freight payment processing, factoring, receivables control, and related financial services nationwide. ITP transacts substantial business affecting interstate commerce and operates as a central financial and enforcement node within the Truckstop ecosystem.

## Alter Ego Allegations

133

At all relevant times, ITP operated through, controlled, and/or was indistinguishable from the following alter egos, which functioned as instrumentalities of a single enterprise, lacked meaningful separateness, and were used to carry out unified policies and conduct:

- RMIS (Registry Monitoring Insurance Services)
- SaferWatch
- Risk Factor
- Truckstop.com
- Truckstop Load Board
- Denim (by Truckstop) (factoring/payment arm operating in coordination with ITP)

These entities are alleged to be alter egos of ITP because they were under common control, shared interdependent functions, commingled data and enforcement outcomes, presented unified policies to the market, and were used collectively to control access to freight, payment, reputation, and liquidity. Any nominal corporate distinctions were disregarded in practice and employed to shield liability while executing a single course of conduct.

**Particulars of Defendant 1's Conduct**

Through itself and its alter egos, ITP:

1. Controlled Payment and Liquidity

   o   Routed, diverted, delayed, and conditioned payments for interstate freight;

   o   Restricted visibility into account activity and reconciliation;

   o   Used factoring and payment leverage to compel submission to platform terms.

2. Imposed Financial Encumbrances as Enforcement

134

- o   Filed and enforced sweeping UCC-1 financing statements purporting to encumber substantially all present and future receivables and business assets;

- o   Issued or propagated Notices of Assignment that brokers routinely honored by refusing direct payment to carriers;

- o   Used these instruments not as neutral security devices, but as coercive restraints foreclosing exit and independent operation.

3.  Operated Market-Access Gatekeeping via Alter Egos

- o   Integrated payment status with broker-facing access controls through Truckstop.com and the Truckstop Load Board;

- o   Enforced adverse determinations generated by RMIS and SaferWatch and Risk Factor across the ecosystem;

- o   Caused Plaintiff industry-wide exclusion following adverse flags, without notice or appeal and has directly caused cascading blacklisting of Plaintiff by every broker they control.

4.  Aggregated and Weaponized Data

- o   Collected and reused compliance records, operational telemetry, identity markers, and transactional data;

- o   Employed opaque scoring, vetting, and flagging processes;

- o   Concealed standards, criteria, and downstream uses of data while enforcing outcomes market-wide.

5.  Engaged in Economic Coercion Affecting Interstate Commerce

- o   Induced consent through fear of economic harm, including loss of work, payment, liquidity, insurance, and authority;

135

- o Leveraged collective control over essential infrastructure to obstruct, delay, and affect interstate commerce;

- o Extracted control over receivables and market participation without a lawful claim of right.

6. Suppressed Independent Alternatives

- o Foreclosed carrier-originated coordination and agency models by conditioning access to freight and payment on submission to the Truckstop ecosystem;

- o Penalized brokers and counterparties operating outside the ecosystem through payment and factoring constraints.

7. **Alter Ego and Veil-Piercing Factors (Ohio Law)**

8. At all relevant times, Internet Truckstop Payments, LLC exercised such complete domination and control over its alter egos—including RMIS, SaferWatch, Flock Cameras, Flock SAFETY, Risk Factor, Truckstop.com, Truckstop Load Board, and Denim by Truckstop—that these entities had no separate mind, will, or existence of their own with respect to the conduct alleged herein. That control was misused to perpetrate unlawful acts, including enterprise-wide exclusion, payment diversion, coercive financial encumbrance, and concealment of decision-making criteria, all in furtherance of racketeering and anticompetitive objectives. As a direct and proximate result of this misuse of control, Plaintiff suffered concrete injury to business and property, including loss of access to interstate commerce, loss of income and receivables, and deprivation of due process. Under these circumstances, adherence to the separate corporate forms would sanction fraud and promote injustice, warranting the imposition of alter-ego liability.

136

**Liability**

ITP is liable for its own acts and for the acts of its alter egos, agents, and co-conspirators committed within the scope and in furtherance of the enterprise. The use of alter egos was integral to the scheme, enabling ITP to execute unified policies, evade accountability, and perpetuate racketeering and anticompetitive conduct.

**Defendant 1 — Internet Truckstop Payments, LLC (Expanded Particulars)**

**Supplemental Particulars of Defendant 1's Conduct**

In addition to the conduct previously alleged, Defendant Internet Truckstop Payments, LLC ("ITP"), acting through itself and its alter egos, engaged in the following coercive practices affecting Plaintiff and similarly situated drivers and carriers:

**1. Penny Deposits and Micro-Disbursement Control De minimis**

ITP engaged in the practice of issuing nominal or "penny" deposits and other micro-disbursements into carrier accounts during periods of restriction or dispute. These deposits served no legitimate payment function and were grossly disproportionate to amounts owed or expected.

Plaintiff alleges that these micro-payments were used to:

- Maintain technical "account activity" while withholding meaningful funds;
- Prevent carriers from triggering default or external remedies;
- Create confusion as to account status and payment reconciliation;

137

- Preserve ITP's control over receivables while avoiding full payment.

This practice left drivers cash-starved and fuel-dependent, forcing reliance on fuel advances, credit, or continued submission to platform-controlled payment rails in order to keep operating.

## 2. Fuel Dependency and Liquidity Strangulation

ITP's payment controls were exercised in a manner that left drivers unable to pay for fuel, insurance, tolls, or basic operating expenses, effectively chaining carriers to their equipment without the ability to move freight independently.

By controlling the timing, amount, and visibility of payments, ITP converted routine cash-flow dependence into economic captivity, where refusal to comply with platform dictates meant immediate operational paralysis.

This dependency was foreseeable, intended, and exploited, particularly against small carriers and owner-operators whose margins and reserves are limited.

## 3. Opaque and Evasive Customer Service as a Control Mechanism

ITP maintained opaque, evasive, and circular customer-service practices that functioned as a deliberate barrier to resolution, including:

- Refusing to provide clear explanations for payment status or restrictions;
- Routing carriers between departments without authority to act;
- Citing "system," "policy," or "review" without timelines or standards;
- Denying the existence of any escalation or appeal process.

138

These practices were not isolated service failures, but systemic features designed to exhaust carriers, delay resolution, and reinforce submission through attrition.

- At all relevant times, Internet Truckstop Payments, LLC ("ITP") was not a freight broker, not a motor carrier, and not a shipper, and did not transport goods or arrange transportation in interstate commerce. ITP is not a government agency, is not delegated regulatory authority, and does not possess any licensure, certification, or enforcement authority from the Federal Motor Carrier Safety Administration ("FMCSA"), the United States Department of Transportation ("DOT"), or any state transportation authority.

- ITP operates solely as a private, broker-facing commercial platform and financial intermediary, yet Plaintiff alleges that it exercised de facto control over carrier eligibility, payment access, and market participation, functions traditionally reserved to contracting parties or regulators, without statutory authority, regulatory oversight, or procedural safeguards.

- Despite lacking any lawful authority to adjudicate safety, fitness, or compliance, ITP— acting through itself and its alter egos—imposed exclusionary determinations, payment restrictions, and platform lockouts that effectively removed compliant motor carriers from interstate commerce. These actions were taken unilaterally, without notice, standards, or appeal, and outside any recognized regulatory framework.

- Plaintiff alleges that ITP's assumption of such control, while disclaiming regulatory responsibility and accountability, is a central feature of the Enterprise's unlawful conduct and contributed directly to the injuries alleged herein.

139

- Lack of Regulatory or Statutory Authority (FMCSA / DOT)

- At all relevant times, Internet Truckstop Payments, LLC ("ITP") was not a motor carrier, not a freight broker, and not a shipper, and did not transport or arrange the transportation of goods in interstate commerce. ITP is not a government agency and does not possess, and has never possessed, any regulatory, licensing, or enforcement authority delegated by the Federal Motor Carrier Safety Administration ("FMCSA"), the United States Department of Transportation ("DOT"), or any state transportation authority.

- Under 49 U.S.C. §§ 13901 and 13902, only the Secretary of Transportation, acting through FMCSA, may issue operating authority to motor carriers and brokers, and only such authorized entities may lawfully engage in or regulate participation in interstate motor carriage. Further, under 49 U.S.C. § 31144, FMCSA alone is vested with authority to determine a motor carrier's safety fitness, compliance status, and eligibility to operate in interstate commerce, subject to defined statutory standards and procedural safeguards.

- Despite lacking any authority under these statutes, Plaintiff alleges that ITP—acting through itself and its alter egos—exercised de facto control over carrier eligibility, payment access, and market participation, including imposing exclusions, restrictions, and lockouts that effectively removed compliant motor carriers from interstate commerce. These actions were taken outside any statutory or regulatory framework, without notice, articulated standards, or opportunity for review, and in a manner that mirrored regulatory enforcement while disclaiming regulatory responsibility.

- Plaintiff alleges that ITP's assumption of such gatekeeping power, while operating solely as a private platform and financial intermediary, constitutes a central feature of the Enterprise's unlawful conduct and directly contributed to the injuries alleged herein.

- **Similarly Situated Carriers and Pattern Evidence**

- Plaintiff alleges that the conduct described herein is not isolated or Plaintiff-specific, but reflects a pattern of enterprise-wide practices imposed by Internet Truckstop Payments, LLC ("ITP") and its alter egos on similarly situated motor carriers. Plaintiff has obtained an affidavit from Kip Coltrin, an established motor carrier with 20 plus years of uninterrupted operating authority and successful performance history, who experienced materially identical conduct, including payment interference, unexplained delays, platform-driven exclusion, and lack of transparency or recourse.

- Mr. Coltrin, is not a new authority, was not subject to any safety out-of-service order, and was not accused of cargo loss, service failure, or regulatory noncompliance. Nevertheless, he experienced cascading denials of work, restricted access to payment, and economic pressure linked to the same broker-facing platforms and payment intermediaries controlled or influenced by ITP.

- Plaintiff alleges that these parallel experiences demonstrate that ITP's conduct operates through standardized policies and enforcement mechanisms, not individualized risk assessment, and that similarly situated carriers are subjected to uniform coercive pressure through payment control, platform restriction, and opaque decision-making. The affidavit of Mr. Coltrin corroborates that ITP's practices systematically affect compliant carriers across interstate commerce, reinforcing the existence of an ongoing enterprise and open-ended continuity.

141

- Plaintiff further alleges that Internet Truckstop Payments, LLC ("ITP"), through its control of payment routing, receivables, accounts payable, and platform-linked restrictions, mismanaged and weaponized financial controls in a manner that produced cascading harm to owner-operators and small carriers. By delaying, diverting, or obscuring receivables; conditioning liquidity on platform compliance; and propagating restrictions across interconnected systems, ITP's practices amplified market exit pressures on domestic carriers with longstanding operating histories. Plaintiff alleges that these practices contributed to broader industry dislocation commonly described as the "great freight recession," during which widely reported industry estimates reflect the exit of more than 113,000 carriers since 2022. Plaintiff further alleges that, during the same period, reported estimates of 200,000–300,000 non-qualified drivers entered the freight labor pool without meeting longstanding FMCSA English-language proficiency requirements for Class A CDL holders, and that the Enterprise's broker-facing systems favored and facilitated access for such actors while disfavoring compliant domestic owner-operators, effectively starving them out of the market. Plaintiff alleges that these outcomes ran counter to federal transportation safety policy and undermined contemporaneous Department of Transportation efforts to enhance roadway safety by removing non-compliant actors, while conferring economic advantage on those enabled by the Enterprise's private gatekeeping.

- Plaintiff further alleges that the Enterprise's broker-facing platforms and payment controls—anchored by Internet Truckstop Payments, LLC ("ITP")—have produced industry-wide harm by standardizing and enforcing rate suppression, liquidity constraints, and exclusionary eligibility signals that cascade across brokers and intermediaries. By

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

centralizing freight visibility, eligibility, and payment routing, these platforms anchor rates downward, constrain negotiation, and convert adverse flags into uniform enforcement, depriving owner-operators and small carriers of both work and timely payment. Plaintiff alleges that these practices intensified a multi-year market contraction commonly referred to as the "great freight recession," during which industry reports estimate that more than 113,000 carriers exited the market between 2022 and 2024, with thousands more exiting in 2025 alone, reflecting continued failures and relinquishments of authority. Plaintiff further alleges that the Enterprise's financial controls—delayed or diverted receivables, opaque reconciliation, and platform-linked lockouts—magnified exit pressures on compliant domestic carriers, while the threat of retaliation and opaque blacklisting created a chilling effect on drivers, suppressing complaints, discouraging participation in legal process, and enforcing silence through fear of economic harm. These dynamics, Plaintiff alleges, distorted competition, entrenched coercive control, and interfered with interstate commerce by starving long-standing owner-operators out of the market through coordinated private enforcement rather than lawful, transparent regulation.

## Conclusion as to Defendant 1 — Internet Truckstop Payments, LLC

Plaintiff alleges that Internet Truckstop Payments, LLC ("ITP"), acting through itself and its alter egos, exercised coercive control over carrier receivables, payment access, and market participation without any lawful claim of right to do so. ITP is not a motor carrier, broker, or regulator, and lacked statutory authority to condition, delay, divert, or withhold carrier funds based on platform participation, internal flags, or undisclosed criteria. Nevertheless, ITP asserted

143

unilateral control over receivables and liquidity as leverage to compel submission to its ecosystem and to enforce exclusionary outcomes.

The conduct alleged was knowing, repeated, and systemic, not accidental or isolated. Over time and across multiple carriers, ITP implemented standardized practices—including forced platform migration, non-reconciliation of funds, micro-disbursements, opaque account restrictions, and coordinated platform lockouts—that demonstrate conscious participation in the operation and management of the Enterprise. The duration, uniformity, and recurrence of these practices support a reasonable inference of knowledge and intent to maintain control through economic coercion.

ITP's conduct substantially affected interstate commerce by controlling the flow of freight payments, suppressing carrier liquidity, and triggering cascading exclusion across brokers operating in multiple states. By positioning its outputs as authoritative and binding within the freight ecosystem, ITP caused downstream brokers and intermediaries to rely on its determinations, despite ITP's lack of regulatory authority, thereby amplifying market-wide exclusion and rate suppression.

Plaintiff further alleges that ITP's dominance over payment data, compliance records, and platform access created a severe asymmetry of power, leaving carriers unable to audit decisions, reconcile accounts, or meaningfully challenge restrictions, while ITP retained unilateral discretion to suspend access and control information. This asymmetry rendered private remedies illusory and magnified the coercive effect of ITP's conduct.

144

Finally, Plaintiff alleges that ITP's centralized control over critical financial and platform data—combined with opaque suspension practices and limited transparency—creates an ongoing risk of data loss, concealment, or spoliation, further impairing carriers' ability to vindicate their rights and necessitating structured oversight in the adjudication of this action.

For these reasons, Plaintiff alleges that Internet Truckstop Payments, LLC stands as the central hub of the Enterprise, and is liable for its own acts and those of its alter egos and co-conspirators for the injuries to Plaintiff and to interstate commerce alleged herein.

---

## VI. SHERMAN ACT § 1 — CONCERTED RESTRAINT OF TRADE

15 U.S.C. § 1

ITP/DENIM/RMIS/Truckstop knowingly participates in contracts, combinations, and conspiracies with RMIS and broker customers to restrain trade in interstate commerce.

The restraint includes:

- Coordinated denial of market access
- Collective refusal to deal during blackout periods
- Conditioning freight access on submission to a single compliance system

This conduct constitutes a group boycott and concerted refusal to deal.

---

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## VII. SHERMAN ACT § 2 — ATTEMPTED MONOPOLIZATION

15 U.S.C. § 2

ITP/DENIM/RMIS/Truckstop/Saferwatch has attempted to monopolize the freight-load access and carrier eligibility market by:

- Integrating load access with RMIS compliance
- Penalizing carriers for routine updates
- Eliminating practical alternatives
- Locking carriers into its ecosystem

This monopoly power is maintained through coercion and dependency, not competition.

---

## VIII. RICO — ASSOCIATION WITH AND CONDUCT OF AN ENTERPRISE

18 U.S.C. § 1962(c)

ITP/DENIM/RMIS/Truckstop is associated with and conducts the affairs of an enterprise-in-fact consisting of:

- Truckstop Load Board
- RMIS
- Truckstop Factoring
- SaferWatch
- Risk Factor

146

- Broker customers (including TQL)

Within the enterprise, Truckstop serves as the market-access enforcement arm, executing exclusions generated by RMIS data changes.

---

## IX. RACKETEERING PREDICATE ACTS (NON-MAIL)

### A. Wire Fraud — 18 U.S.C. § 1343

ITP/DENIM/RMIS/Truckstop engages in a scheme to defraud carriers by:

- Representing fair and continuous market access
- Concealing automatic blackout penalties
- Failing to disclose the consequences of minor RMIS updates
- Omitting material facts regarding integration with RMIS

Carriers pay subscription fees while unknowingly subject to undisclosed suspension mechanisms.

---

### B. Hobbs Act Extortion — 18 U.S.C. § 1951

ITP/DENIM/RMIS/Truckstop facilitates extortion by obtaining property through the wrongful use of economic fear, including:

- Threat of sudden loss of market access

147

- Forced compliance with RMIS demands

- Economic pressure to avoid updates or corrections

The property obtained includes:

- Subscription revenue

- Compliance concessions

- Control over carrier behavior

- Economic leverage

- Coercive control and capitulation

---

## X. RICO CONSPIRACY

18 U.S.C. § 1962(d)

ITP/DENIM/RMIS/Truckstop knowingly conspired with RMIS and broker customers to further the enterprise's unlawful objectives.

Each participant is liable for the acts of the others.

---

## XI. AGGRAVATING FACTORS

ITP/DENIM/RMIS/Truckstop:

- Owns RMIS

148

- Controls a dominant load board

- Enforces automatic blackouts

- Penalizes minor administrative changes

- Provides no due process

Yet exercises extra-legal control over interstate commerce.

---

## XII. LIABILITY

ITP/DENIM/RMIS/Truckstop is jointly and severally liable for:

- Antitrust damages

- Racketeering damages

- Lost income from blackout periods

- Treble damages under the Sherman Act and RICO

RMIS, owned by Internet Truckstop Payments, did not act independently. Its outputs were operationally linked to ITP's payment controls and to Truckstop platform access, such that a carrier flagged or restricted through RMIS experienced simultaneous payment pressure and load visibility suppression.

### 5. Load Board and Platform Restrictions Tied to Payment and RMIS Status

149

Through Truckstop.com and the Truckstop Load Board—operating as alter egos—ITP enforced graduated and opaque access restrictions, including:

- Reduced or eliminated load visibility;

- Silent suppression of booking eligibility;

- Denial of setup recognition despite prior history;

- Conditional reinstatement offers tied to payment status or platform re-enrollment.

These restrictions were not disclosed in advance, were not explained after the fact, and were interlocked with payment and compliance status, ensuring that carriers could not escape financial pressure by simply seeking work elsewhere within the platform ecosystem.

## 6. Combined Effect: Economic Coercion Affecting Interstate Commerce

The combined operation of:

- penny deposits,

- fuel dependency,

- opaque customer service,

- RMIS-driven flags,

- and platform access restrictions

constituted wrongful economic coercion, designed to obtain continued submission, control receivables, and suppress independent operation. These practices obstructed, delayed, and affected interstate commerce by preventing compliant carriers from hauling freight, receiving payment, or exiting the system.

150

**Additional Particulars — Forced Migration, Non-Reconciliation, and Access Lockout**

**7. Forced Migration from Truckstop Factoring to Denim Without Reconciliation**

Internet Truckstop Payments, LLC ("ITP") initiated and enforced a unilateral migration of carriers from its Truckstop Factoring operations to Denim, marketed and presented as a continuation or replacement of existing factoring and payment services. Plaintiff alleges that this migration was not optional in practice, and that carriers were pushed or funneled into Denim as the sole means of accessing receivables and payment functionality.

During this transition, ITP failed to provide a complete, transparent, or auditable reconciliation of funds owed, paid, withheld, or advanced under Truckstop Factoring prior to migration. Carriers, including Plaintiff, were left unable to determine:

- which invoices had been fully paid;
- which receivables remained outstanding;
- what fees, offsets, or deductions had been applied; or
- how balances were carried forward into Denim.

This lack of reconciliation deprived carriers of the ability to verify their own finances, dispute discrepancies, or exit the system with clarity, and instead locked them into a new platform while legacy obligations remained unresolved.

**8. Dragging Carriers into Denim, owned by Internet Truckstop Payments, as a Condition of Access**

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Plaintiff alleges that access to meaningful payment functionality, visibility into receivables, or continuation of factoring-related services was conditioned on participation in Denim, even where the carrier had not affirmatively elected to transition or had raised concerns about unresolved balances.

This conduct transformed what was represented as a service migration into a coercive transfer of control, forcing carriers to accept a new intermediary under economic duress, while prior accounting remained opaque.

## 9. Account Restrictions and Total Platform Lockout

Following the migration period, Plaintiff experienced complete restriction of access to Truckstop-related platforms and payment systems, including:

- inability to log in or meaningfully access accounts;

- denial of load board functionality;

- loss of visibility into payment and factoring records;

- inability to communicate with decision-makers capable of restoring access.

Rather than providing a substantive explanation or resolution pathway, ITP asserted that Plaintiff's account was restricted due to "location" issues, claiming that Plaintiff appeared to be outside the United States, despite Plaintiff being physically present and operating domestically.

## 10. False or Pretextual "Out of USA" Location Justification

152

Plaintiff alleges that the asserted "out of USA" location rationale was false, pretextual, or knowingly misleading, and functioned as a technical excuse to justify total access denial without addressing the underlying financial disputes or enterprise enforcement actions.

This explanation:

- conflicted with Plaintiff's actual location and operations;

- ignored Plaintiff's enabled location services and domestic activity;

- was used to terminate or suspend access rather than troubleshoot;

- provided no appeal, verification, or corrective mechanism.

Plaintiff alleges that such justifications are routinely deployed to mask enforcement decisions, suppress confrontation, and avoid accountability, while preserving the appearance of a neutral technical issue.

## 11. Customer Service Evasion During Migration and Lockout

Throughout the forced migration and subsequent lockout, ITP's customer-service channels:

- failed to reconcile prior Truckstop Factoring balances;

- disclaimed authority to correct Denim-related issues;

- redirected Plaintiff between entities without resolution;

- refused to identify responsible decision-makers;

- and treated the loss of access as final and non-negotiable.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

This deliberate fragmentation ensured that no single point of accountability existed, while Plaintiff remained deprived of funds, access, and explanation.

## 12. Combined Effect: Financial Captivity Through Platform Transition

Plaintiff alleges that the combination of:

- unresolved Truckstop Factoring balances,

- forced migration to Denim,

- payment opacity,

- total platform lockout,

- and pretextual location-based denial

operated as a coercive mechanism to obtain and maintain control over carrier receivables and economic survival, leaving Plaintiff unable to:

- reconcile earned income;

- access alternative factoring or payment channels;

- challenge enforcement actions;

- or operate independently in interstate commerce.

This conduct constitutes wrongful economic coercion, misuse of platform control, and obstruction of interstate commerce, and further supports alter-ego liability, RICO predicates, and equitable relief.

---

154

**Truckstop Load Board Access as an Alter Ego Function of ITP**

Although Truckstop Load Board is publicly presented as a separate platform and may maintain a nominal registered agent for service, Plaintiff alleges that, at all relevant times, Truckstop Load Board functioned as an alter ego and enforcement instrumentality of Internet Truckstop Payments, LLC ("ITP"), rather than as an independent marketplace.

Specifically, Plaintiff alleges that load board access, visibility, and booking eligibility were operationally linked to ITP-controlled payment status, RMIS-driven compliance flags, and enterprise enforcement determinations, such that restrictions imposed through ITP resulted in simultaneous or cascading suppression of load board functionality. In practice, carriers subject to ITP payment controls, unresolved factoring balances, or RMIS-generated adverse signals experienced reduced or eliminated access to freight opportunities through the Truckstop Load Board, without notice, explanation, or opportunity to cure.

Plaintiff further alleges that Truckstop Load Board did not exercise independent discretion with respect to these restrictions, but instead honored and enforced determinations generated elsewhere within the Truckstop ecosystem, including those tied to payment, factoring, or compliance status. Any formal corporate separateness or separate service agent was disregarded in operation, and was used to obscure accountability while enabling unified control over freight access and payment.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Accordingly, Plaintiff alleges that Truckstop Load Board operated as a functional component of ITP's coercive control architecture, and that treating it as a separate entity would elevate form over substance and permit the very injustice that alter-ego doctrine is designed to prevent

---

# Defendant 2 — Denim Labs, Inc. / Denim, LLC ("Denim")

Defendant Denim Labs, Inc., also known as Denim, LLC ("Denim"), owned by Internet Truckstop Payments, is a factoring and receivables-management company engaged in interstate commerce that provides payment advances, invoice processing, and related financial services to motor carriers and brokers nationwide. Denim transacts substantial business affecting interstate commerce and operates within the broker-facing freight ecosystem.

## Relationship to Defendant 1

At all relevant times, Denim operated in coordination with, and as a downstream enforcement and liquidity node aligned with, Internet Truckstop Payments, LLC, including under branding and operational integration described to carriers as "Denim by Truckstop." While Denim maintains a separate corporate registration and registered agent, Plaintiff alleges that Denim knowingly participated in and furthered the same enterprise-wide conduct by enforcing payment diversion, financial opacity, and coercive dependency. While the Internet Truckstop Payments were being disputed the Party evolved and put on a new outfit and became Demin by Truckstop, shedding it skin to be a bigger snake. Denim is not a broker, is not a government agency, is not a bank, is not FDIC insured and has no regulations at all, abides by no fiduciary duties and will continue to harm carriers as a business model.

156

**Particulars of Defendant 2's Conduct**

Through its own acts and in concert with others, Denim:

1. Controlled and Diverted Carrier Funds

   o Interposed itself between brokers and carriers as a mandatory payment intermediary;

   o Restricted carrier visibility into invoice status, reconciliation, and payment origin;

   o Conditioned access to funds on continued participation in the ecosystem.

2. Enforced Financial Dependence

   o Maintained control over receivables and advances in a manner that prevented carriers from exiting or operating independently;

   o Created liquidity pressure during periods of platform exclusion, magnifying economic harm.

3. Participated in Financial Opacity and Irregularities

   o Reflected unexplained credits and balances within Plaintiff's account without disclosure of source, purpose, or accounting;

   o Failed to provide transparent explanations during a period when Plaintiff was otherwise excluded from freight and payment opportunities.

4. Furthered Enterprise-Wide Coercion

   o Operated in a manner that reinforced platform-driven exclusion by depriving Plaintiff of timely access to earned or expected funds;

   o Functioned as a financial backstop that converted reputational or eligibility flags into immediate economic harm.

157

**Knowledge and Foreseeability**

Denim knew or should have known that:

- carriers subject to platform-based exclusion would be deprived of alternative income sources;
- withholding, delaying, or obscuring access to funds would amplify coercive pressure;
- its role would materially contribute to the obstruction of interstate commerce, harm drivers and disrupt businesses but did it anyway. The purpose of factoring receivables after delivery was for carriers to get funds for daily operations. This did not occur with internet Truckstop payments from day one.

Despite this knowledge, Denim continued to enforce payment controls and maintain financial opacity, without notice, explanation, or meaningful recourse or any timely payments. ITP was not a business partner for the carrier; it is a trap to frustrate people and keep them begging for money they already earned and couldn't divorce the factoring company without waiving rights and getting blacklisted. So you were supposed to wait it out and keep quiet while missing freight sitting in a cold truck miles from home.

**Liability**

Denim is liable for its own acts and for acts committed in furtherance of the Enterprise, including participation in racketeering activity, conspiracy, and unreasonable restraint of trade. Denim's conduct was a substantial factor in causing Plaintiff's loss of liquidity, operational paralysis, and irreparable harm.

158

# Defendant 3 — Total Quality Logistics, LLC

Defendant Total Quality Logistics, LLC ("TQL") is a national freight brokerage engaged in interstate commerce that arranges, tenders, and pays for the transportation of goods across state lines. TQL transacts substantial business nationwide and routinely relies upon broker-facing platforms, compliance intermediaries, and payment-related signals to determine carrier eligibility and access to freight.

## Role Within the Enterprise

At all relevant times, TQL functioned as a broker-enforcement participant within the Enterprise by adopting, honoring, and executing exclusionary determinations generated outside its own organization, including determinations originating within the Truckstop ecosystem controlled by Defendant 1, Internet Truckstop Payments, LLC, and all of its alter egos.

Rather than exercising individualized judgment based on safety, performance, or contractual criteria, TQL deferred to opaque, third-party "notes," flags, or eligibility determinations, treated those determinations as binding and non-reviewable, and enforced them without disclosure, explanation, or opportunity for cure. Relying on third party platforms and factoring disputes, TQL decided to blacklist All Directions Trucking on December 30, 2025 with no warning or explanation after 34 recent successful deliveries and no complaints. This effective blacklisting meant instant death for All Directions Trucking.

## Chronology of Relevant Conduct

159

- December 10, 2025

  Plaintiff filed the original legal Complaint in this action. On that same date, the Complaint was served by email on the legal department of Internet Truckstop Payments, LLC, placing the Truckstop ecosystem and its broker-facing enforcement partners on notice of Plaintiff's protected activity.

- December 30, 2025 — Immediate Blacklisting After Successful Delivery

  On December 30, 2025, Plaintiff completed a successful interstate delivery for TQL in Carthage, Missouri, with a clean bill of lading and no safety, service, or performance issue. Immediately following that delivery, Plaintiff contacted TQL regarding nearby available interstate freight, including an identified load paying approximately $2,500, for which Plaintiff was ready, willing, and able to perform.

  Instead of tendering the load, TQL informed Plaintiff that it had "chosen to part ways" with her company. When Plaintiff requested an explanation, TQL stated that the reason was "proprietary" and refused to provide any details, standards, or documentation. Plaintiff was given:

  - no prior notice,
  - no warning,
  - no allegation of misconduct, and
  - no opportunity to cure.
  -

- December 31, 2025 — Service on TQL

160

TQL was formally served with the Complaint in this action one day after imposing the exclusion. These date of exclusion December 30 and the date of perfected service the next day December 31, 2025 indicates conspiracy of the 3rd party platforms and blacklisting abilities are very real and immediate.

Plaintiff alleges that the timing of the December 30 exclusion—after notice to the Truckstop payment ecosystem and immediately before formal service on TQL—was not coincidental, but occurred within a framework of shared platform enforcement and information propagation.

**Multiple Recorded Attempts to Cure and Continued Refusal**

Between December 30, 2025 and January 6, 2026, Plaintiff made multiple recorded telephone calls and written communications to TQL seeking:

- clarification of the exclusion,

- identification of any alleged issue,

- and a good-faith opportunity to cure.

During these recorded calls, TQL representatives:

- confirmed the existence of internal "notes" affecting eligibility;

- stated that the reason for exclusion would not be disclosed;

- represented that no individual had authority to override the decision;

- denied the existence of any internal appeal or review process.

- Was told "it's not a TQL thing"

- Was told "your company is not set up with us"

161

Despite Plaintiff's repeated requests, and despite the absence of any cited safety or performance concern, TQL maintained the exclusion without explanation.

**Missed Freight Opportunities and Cascading Broker Denials**

Following TQL's exclusion, Plaintiff experienced immediate and cascading denial of freight across multiple brokers who rely on the same broker-facing platforms and eligibility systems. These denials occurred without any independent evaluation by the brokers and without any allegation of wrongdoing.

As a direct result of the December 30 blacklisting:

- Plaintiff was unable to secure replacement interstate freight in the region;
- Plaintiff was forced to deadhead approximately 824 miles back to Ohio without compensation;

Plaintiff incurred fuel, toll, and operating expenses without offsetting revenue.

**Continued Exclusion After Notice and Opportunity to Cure**

On January 5 and January 6, 2026, Plaintiff sent written notices to TQL's legal and compliance departments by email;

- advising of the pending litigation,
- requesting non-retaliation,
- and offering a final opportunity to cure or clarify the exclusion.

TQL did not respond.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

**Post-Exclusion Paralysis and January 9 Load**

Since December 30, 2025, Plaintiff has been able to book only one load, on January 9, 2026, with All Pro Freight Systems, Inc., a medium-sized, asset-based broker that does not utilize the broker-facing platform ecosystem relied upon by TQL and most other brokers.

That load:

- was the only freight Plaintiff could obtain post-blacklisting;

- required Plaintiff to deadhead again after completion;

- and has not resulted in timely payment because All Pro is asset-based and unable to factor, having itself been affected by reverse blacklisting within the factoring ecosystem

- In the recent past, October 1, 2025 Plaintiff hauled freight for All Pro Freight Systems and was required to obtain, through proper chain of command, a letter of release from ITP in order to be allowed to pay Plaintiff by check which was 52 days after delivery.

As a result, Plaintiff remains deprived of liquidity and unable to restore normal operations.

**Interference and Disruption With Interstate Commerce**

Through the conduct described above, TQL:

- prevented Plaintiff from hauling identified interstate freight;

- caused uncompensated deadhead mileage;

- contributed to Plaintiff's effective removal from interstate commerce;

- and amplified the economic coercion initiated through platform-based exclusion.

163

**Knowledge and Foreseeability**

TQL knew or reasonably should have known that:

- the exclusion was driven by third-party platform determinations outside Plaintiff's control;

- Plaintiff had not been accused of any safety, service, or regulatory violation;

- denying freight without explanation or cure would cause immediate economic harm;

- and enforcement of such determinations would cascade across other brokers using the same systems.

By continuing to rely on and enforce those determinations, TQL knowingly furthered the objectives of the Enterprise, including coordinated exclusion and suppression of compliant motor carriers.

**Liability**

TQL is liable for its own conduct and for the foreseeable acts of co-conspirators committed in furtherance of the Enterprise. TQL's actions were a substantial factor in causing Plaintiff's loss of income, uncompensated mileage, ongoing inability to secure freight, and continuing exclusion from interstate commerce.

**Regulatory Status and Duties of Defendant TQL. MC # 322572**

164

At all relevant times, Total Quality Logistics, LLC ("TQL") operated as a federally authorized freight broker holding active operating authority issued by the Federal Motor Carrier Safety Administration ("FMCSA") pursuant to 49 U.S.C. §§ 13901–13904, and assigned a valid MC number. As such, TQL was—and remains—subject to FMCSA regulations governing broker conduct, carrier selection, payment practices, and compliance obligations in interstate commerce.

As an authorized broker, TQL is required to:

- transact business in accordance with federal safety, fitness, and compliance frameworks administered by FMCSA;
- refrain from engaging in deceptive, retaliatory, or exclusionary practices that interfere with lawful motor carrier operations;
- exercise independent judgment in carrier selection and tendering of freight, consistent with applicable regulations and industry standards; and
- avoid delegating or outsourcing compliance determinations to private, non-regulated platforms lacking statutory authority.
- As a federally authorized freight broker, Defendant TQL is subject to FMCSA statutes and regulations governing broker conduct, transparency, and carrier eligibility. See, e.g., 49 U.S.C. §§ 13901, 13904; 49 C.F.R. Part 371. Plaintiff alleges that TQL violated these obligations by delegating carrier eligibility determinations to opaque, third-party broker-facing platforms lacking statutory authority, and by enforcing exclusionary decisions untethered to any cited safety, fitness, or performance deficiency under 49 U.S.C. § 31144. Such conduct constitutes unlawful private enforcement of market exclusion, rather than a lawful exercise of broker discretion.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

**FMCSA Regulatory Framework Governing Freight Brokers and the Legal Implications of Delegated Exclusion**

## A. Broker Authority Is Conditional, Not Absolute

Under federal law, freight brokers operate only by virtue of authority granted by the Federal Motor Carrier Safety Administration ("FMCSA"), pursuant to 49 U.S.C. §§ 13901–13904. That authority is conditional and regulated, not an unfettered license to exclude carriers arbitrarily or collectively from interstate commerce.

FMCSA broker authority exists within a statutory framework designed to:

- preserve fair access to interstate transportation markets,
- protect motor carriers from deceptive or coercive practices,
- ensure transparency in broker conduct,
- and prevent private actors from exercising regulatory-like control without accountability.

A broker's discretion in carrier selection exists only within this regulated context and may not be exercised in a manner that undermines federal transportation policy or substitutes private enforcement mechanisms for FMCSA oversight.

---

## B. Brokers May Not Usurp FMCSA's Exclusive Authority Over Safety and Fitness

Under 49 U.S.C. § 31144, FMCSA alone is vested with authority to:

- determine a motor carrier's safety fitness,

166

- assign safety ratings,

- and restrict or revoke operating authority.

When a broker excludes a carrier:

- without citing any FMCSA safety rating,

- without identifying a regulatory violation,

- and without any performance-based justification,

and instead relies on third-party platform flags, scores, or "notes," that broker is functionally enforcing a safety or fitness determination without statutory authority.

The law does not permit brokers—individually or collectively—to replicate regulatory enforcement outcomes through private platforms while disclaiming regulatory responsibility.

---

## C. Delegation to Opaque Broker-Facing Platforms Violates the Duty of Independent Judgment

FMCSA's regulatory structure presumes that brokers will:

- exercise independent, good-faith judgment in carrier selection,

- based on lawful considerations such as availability, performance history, insurance, and FMCSA-recognized compliance.

When brokers join broker-facing platforms that:

167

- centralize carrier eligibility decisions,

- conceal decision criteria,

- prohibit disclosure or appeal,

- and propagate uniform exclusion across multiple brokers,

those brokers are no longer exercising independent judgment. Instead, they are delegating market access decisions to unregulated private systems.

Such delegation:

- defeats the purpose of FMCSA's broker-specific regulatory regime,

- eliminates accountability,

- and converts individual discretion into concerted enforcement.

---

## D. Opaque Blacklisting Is Inconsistent With FMCSA Transparency Expectations

Under 49 C.F.R. Part 371, brokers are subject to recordkeeping and transparency obligations that reflect a broader expectation of honest, traceable, and reviewable conduct.

A broker practice that:

- refuses to disclose the basis for exclusion,

- labels the reason "proprietary,"

- denies the existence of appeal or cure,

- and relies on undisclosed third-party inputs,

168

is inconsistent with regulated broker conduct, particularly where the exclusion affects:

- payment access,

- reputation,

- and continued participation in interstate commerce.

While brokers are not required to contract with every carrier, they are not permitted to enforce secret market bans that function as industry-wide exclusion.

---

## E. Retaliatory and Collective Exclusion Undermines Federal Transportation Policy

Federal transportation law is premised on open, competitive markets, not private gatekeeping systems that remove carriers from commerce through coordinated action.

Where:

- a carrier engages in protected activity (such as filing a complaint or asserting legal rights),

- broker-facing platforms propagate adverse eligibility determinations,

- and brokers uniformly refuse to tender freight without explanation,

the resulting exclusion is not merely a business decision, but an interference with interstate commerce that federal law seeks to prevent.

169

FMCSA authority does not insulate brokers from liability when their conduct:

- retaliates against carriers,

- suppresses competition,

- or reinforces private enforcement systems that bypass regulatory federal safeguards.

---

## F. Legal Implications of Broker Participation in Broker-Facing Platforms

When brokers participate in broker-facing platforms that impose opaque, coordinated exclusion, the legal implications include:

1. Unlawful Delegation of Regulated Functions

   Brokers may not outsource carrier eligibility determinations to entities lacking FMCSA authority.

2. Concerted Refusal to Deal

   Uniform enforcement of platform-generated exclusion across multiple brokers constitutes collective market action, not independent discretion.

3. Circumvention of FMCSA Oversight

   Private platforms cannot lawfully replicate safety, fitness, or compliance enforcement without statutory authority or due process.

4. Interference With Interstate Commerce

170

Coordinated exclusion removes compliant carriers from the market, disrupting the flow of interstate freight.

5. Loss of Regulatory Safe Harbor

Broker authority does not shield conduct that exceeds or contradicts federal regulatory expectations.

---

## G. Summary

FMCSA regulates brokers precisely because brokers occupy a critical gatekeeping role in interstate commerce. That regulation is rendered meaningless if brokers are permitted to:

- collectively defer to unregulated platforms,
- enforce undisclosed blacklists,
- and remove carriers from commerce without transparency or accountability.

Plaintiff alleges that Defendants' conduct represents a systemic departure from regulated broker conduct, resulting in unlawful private enforcement, economic coercion, and exclusion from interstate commerce.

Plaintiff alleges that TQL breached these duties by deferring carrier eligibility and exclusion decisions to opaque, third-party platform determinations generated outside FMCSA's regulatory framework, without notice, standards, or opportunity for review. In doing so, TQL enforced exclusions not grounded in any cited safety, fitness, or regulatory deficiency, but instead based

on undisclosed external signals, shirked its obligations as an authorized broker and participated in the Enterprise as it base standard of its brokerage operations.

Plaintiff further alleges that TQL's conduct was not a lawful exercise of broker discretion, but rather the implementation of private enforcement determinations that mirrored regulatory action while bypassing the procedural safeguards required by federal law.

**Pattern and Practice of Carrier Exploitation and Uncompensated Delay**

Plaintiff further alleges that Total Quality Logistics, LLC ("TQL") has engaged in a longstanding pattern and practice of conduct that shifts operational risk and uncompensated delay onto motor carriers. By way of example, on November 25, 2025, immediately preceding the Thanksgiving holiday, TQL ordered Plaintiff's truck for a scheduled pickup. Plaintiff traveled approximately two hours south to the pickup location for a load destined for Cleveland, Ohio, with delivery scheduled for the Friday following the holiday. Upon arrival, Plaintiff was met by facility personnel who indicated they were leaving early and refused to load the freight. Despite Plaintiff's compliance and availability, the load was canceled, and TQL refused to pay truck-ordered-not-used compensation, offering nothing to offset Plaintiff's actual costs and lost time, and then refused further engagement to avoid paying the minimum of $250.00 TONU fee to the Plaintiff.

Plaintiff alleges that such conduct is not isolated, but reflects a broader pattern in which TQL routinely avoids paying detention, layover, or fair cancellation compensation, particularly during holidays or periods of tight capacity, while continuing to enforce carrier-unfavorable terms. Plaintiff further alleges that TQL requires carriers to accept contractual provisions and platform

172

practices that waive or dilute rights to transparency, fair dealing, and meaningful recourse, thereby normalizing uncompensated wait time and unilateral cancellation. The threat of being blacklisted and reported to Carrier411 keeps drivers from pursuing the deserved norms of compensation.

Based on Plaintiff's experience over more than ten years in the industry, including time as a leased-on driver, Plaintiff alleges that carriers are frequently directed to pickups where they are held for extended periods—sometimes exceeding 18 hours—only to be displaced once a cheaper truck is located, resulting in the loss of one to two days of revenue without detention or layover pay. TQL is notorious for this practice. Plaintiff alleges that TQL's repeated use of such practices demonstrates a systemic exploitation of carrier time and capital, contributing to economic coercion, suppressed rates, and the broader exit of owner-operators from the market.

TQL makes this into a game of sorts where the carrier may be getting freight or may be just staging as a back up truck.

**Broker Transparency Obligations and Alleged Non-Compliance by TQL**

At all relevant times, Total Quality Logistics, LLC ("TQL") operated as a federally regulated freight broker, holding active operating authority issued by the Federal Motor Carrier Safety Administration ("FMCSA") and subject to the duties and conditions imposed by federal transportation law and regulation. As a condition of that authority, TQL was required to comply with 49 C.F.R. § 371.3, which mandates broker transparency and requires brokers, upon request, to maintain and produce records reflecting compensation, rates, and transactional details sufficient to permit carrier verification and regulatory accountability.

173

Plaintiff alleges that, notwithstanding these obligations, TQL has engaged in a pattern of non-compliance with federal broker transparency requirements, including refusing to disclose required records, labeling rate and eligibility information as "proprietary," and denying carriers meaningful access to information necessary to audit compensation and challenge adverse determinations. Plaintiff further alleges that TQL has been the subject of prior disputes, complaints, and litigation arising from its refusal to honor transparency obligations, and that FMCSA involvement was triggered in connection with such matters to compel compliance with disclosure requirements.

Plaintiff alleges that, despite regulatory scrutiny, TQL failed to meaningfully alter its practices, and instead continued to withhold transparency, deny disclosure requests, and enforce opaque eligibility and exclusion decisions. Such conduct, Plaintiff alleges, reflects a knowing and willful disregard of FMCSA regulations, rather than inadvertence or misunderstanding, and demonstrates institutional resistance to federal oversight.

Plaintiff further alleges that TQL's refusal to comply with broker transparency obligations has material and foreseeable consequences, including suppression of carrier rates, inability of carriers to verify compensation, retaliation against carriers who seek lawful disclosure, and the creation of a chilling effect that deters drivers and owner-operators from asserting federally protected rights. Plaintiff alleges that this opacity reinforced the Enterprise's broader system of coercive control, secrecy, and unaccountable exclusion from interstate commerce.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

**Distinct Categories of Harm: Carrier Exploitation, Shipper Interference, and Harassment Operations**

At all relevant times, Defendant Total Quality Logistics, LLC ("TQL") engaged in multiple, distinguishable courses of misconduct affecting different market participants, each independently unlawful and collectively evidencing an enterprise-wide pattern of coercive and deceptive practices.

A. Carrier-Facing Conduct (Owner-Operators and Small Motor Carriers).

Carrier complaints and Plaintiff's experience demonstrate a consistent pattern of post-performance exploitation directed at federally authorized motor carriers, including refusal to pay detention, layover, truck-ordered-not-used, and accessorial charges; retroactive payment deductions based on unsupported or delayed damage allegations following clean delivery; unilateral modification of agreed compensation after rate confirmation; and retaliatory blacklisting following payment disputes or assertion of rights. These practices disproportionately harm small carriers and owner-operators, impair cash flow, force deadhead miles, and interfere with the exercise of federally granted motor carrier authority in interstate commerce.

B. Shipper-Facing Conduct (Improper Solicitation and Relationship Interference).

Separately and distinctly, public complaints from shippers and freight forwarders describe TQL's practice of using transactional access to solicit shippers directly, including contacting customers of intermediary logistics providers after gaining visibility through arranged shipments. These actions constitute interference with existing business relationships, misappropriation of

175

commercial relationships, and deceptive solicitation practices that exceed the legitimate role of a freight broker and undermine trust-based logistics arrangements.

C. Call-Harassment and Deceptive Solicitation Practices.

Independent of freight movement disputes, a substantial body of complaints documents TQL's persistent call-harassment practices directed at both carriers and shippers, including repeated unsolicited calls, disregard of "do not contact" requests, cycling through new callers after opt-out demands, and scripted communications that misrepresent the purpose or authority of the call. Numerous complainants describe these calls as originating from centralized or offshore call operations, characterized by high-volume dialing, uniform scripts, and lack of operational knowledge, indicating an industrialized solicitation system divorced from legitimate brokerage needs.

D. Enterprise-Wide Coordination.

Although these categories affect different victims, they are unified by common operational features: information asymmetry, coercive leverage, opacity, retaliation, and denial of meaningful recourse. Carrier payment pressure, shipper solicitation, and harassment-based lead generation function together to suppress resistance, extract value, and expand market control, demonstrating coordinated conduct rather than isolated misconduct.

**FMCSA Broker Duties and Regulatory Violations**

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

At all relevant times, Total Quality Logistics, LLC ("TQL") operated as a federally licensed freight broker and was therefore bound by the duties imposed under 49 U.S.C. Subtitle IV and 49 C.F.R. Part 371. TQL's conduct violated these duties in multiple, distinct respects.

---

## A. Carrier-Facing Misconduct — Violations of Broker Payment, Transparency, and Fair-Dealing Duties

1. Failure to Pay Lawful Compensation and Accessorial Charges

   FMCSA regulations require brokers to conduct themselves in a manner consistent with honest service and payment practices. TQL's refusal to pay detention, layover, truck-ordered-not-used, and other accessorial charges after performance—despite clean delivery and compliance—constitutes unlawful withholding of carrier compensation and violates the broker's duty of fair dealing in interstate commerce.

   See 49 U.S.C. § 13904 (broker registration conditioned on fitness and compliance); 49 U.S.C. § 14101(b) (enforceability of transportation agreements).

2. Retroactive Deductions and Post-Hoc Damage Allegations

   TQL's practice of asserting delayed or unsupported damage claims weeks or months after delivery, followed by unilateral deductions from carrier pay, violates fundamental transparency and good-faith requirements applicable to regulated brokers and improperly shifts shipper risk onto carriers without due process.

177

3. Retaliatory Blacklisting and Market Exclusion

By blacklisting carriers following disputes, complaints, or assertion of payment rights, TQL interferes with a carrier's federally granted operating authority under 49 U.S.C. §§ 13901–13902, effectively imposing private sanctions without regulatory authority. Brokers are not empowered to discipline, suspend, or de-authorize carriers from interstate commerce.

---

## B. Shipper-Facing Misconduct — Prohibited Solicitation and Interference with Business Relationships

1. Improper Direct Solicitation of Shippers

FMCSA regulations define a broker as an intermediary, not a principal shipper or carrier. When TQL uses shipment visibility or transactional access to solicit shippers directly—particularly customers of freight forwarders or other intermediaries—it exceeds the lawful scope of brokerage activity and engages in deceptive and unfair practices inconsistent with 49 C.F.R. § 371.2 (definition and limitations of broker role).

2. Interference with Existing Commercial Relationships

Using broker access to divert or appropriate shipper relationships undermines the integrity of regulated brokerage markets and constitutes conduct incompatible with the "fit, willing, and able" standard required for broker registration and retention under 49 U.S.C. § 13904.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## C. Call-Harassment and Deceptive Solicitation — Violations of Broker Fitness and Regulatory Integrity

1. Industrialized Harassment and Misrepresentation

   High-volume, repeated solicitation calls—ignoring "do not contact" requests and cycling callers—demonstrate a lack of fitness, compliance culture, and regulatory responsibility. FMCSA requires brokers to operate in a manner consistent with public interest and lawful commerce; harassment-based solicitation is incompatible with those obligations.

2. Use of Scripted or Offshore Call Operations

   The use of centralized or offshore calling operations, disconnected from actual brokerage needs and characterized by misrepresentation of purpose or authority, further evidences unfitness and disregard for the regulatory framework governing freight brokers.

## D. Enterprise-Level Violations — Circumvention of FMCSA Authority and Market Controls

1. No Delegated Regulatory Authority

   TQL is a broker, not a shipper, and not a government agency. It holds no authority under 49 U.S.C. §§ 13901, 13902, or 31144 to enforce compliance, impose penalties, blacklist carriers, or condition access to interstate freight markets.

179

2. Private Enforcement Scheme

By combining payment coercion, retaliation, solicitation, and harassment, TQL operates a de facto private enforcement and market-control regime that circumvents FMCSA oversight and undermines the uniform federal system governing interstate transportation.

## 3. **Defendant: 3 Total Quality Logistics**

## Pattern of Continuous Non-Compliance and Credibility Defects

Total Quality Logistics ("TQL") has repeatedly held itself out as a compliant, good-faith freight broker while engaging in a documented pattern of non-compliance with mandatory federal broker regulations, undermining the credibility of its contractual representations, compliance certifications, and asserted justifications for carrier exclusion.

### A. OP-1 Oath Violations as Ongoing Conduct

- ***OP-1 OATH (Motor Carrier Authority)***

- *OATH*

- *I, the undersigned, certify under penalty of perjury, that I am authorized to make this application on behalf of the applicant. I further certify that I have examined this application and that the information contained herein is true, correct, and complete to the best of my knowledge and belief.*

- *I understand that any false, incomplete, or misleading information may result in the denial, revocation, or suspension of operating authority and may subject the applicant and/or myself to civil or criminal penalties under applicable federal law.*

- *I further understand that the granting of operating authority by the Federal Motor Carrier Safety Administration does not relieve the applicant of the responsibility to comply with all applicable federal, state, and local laws, rules, and regulations governing motor carriers, including but not limited to safety, insurance, and financial responsibility requirements.*

- *I certify that the applicant is willing and able to comply with all applicable statutory and regulatory requirements.*

- *Under penalty of perjury*

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

As a condition of its broker operating authority, TQL certified under oath via its OP-1 application that it would comply with all applicable federal laws, rules, and regulations. That oath is not aspirational, discretionary, or subject to private modification is a continuing condition of authority.

Despite that oath, TQL has repeatedly taken the position that it may:

- contractually waive carrier rights established by federal regulation,
- refuse to produce transaction records required by 49 C.F.R. § 371.3, and
- substitute private contract language for mandatory regulatory duties.

Public reporting confirms that this is not a historical dispute, but ongoing conduct, with carriers continuing to challenge TQL's refusal to comply and federal authorities being asked—again—to intervene.

## B. Willful Refusal, Not Ambiguity

TQL's conduct cannot be credibly characterized as confusion, regulatory uncertainty, or good-faith interpretation.

Industry reporting documents that:

- federal authorities have specifically demanded compliance with broker transparency requirements;

181

- TQL has complied selectively, producing documents while refusing to remove waiver provisions that purport to override federal law; and

- TQL has continued to rely on those waiver provisions even after regulatory objections were raised.

This pattern demonstrates willful non-compliance, not inadvertent error.

## C. Use of Waivers as a Suppression Tool

TQL's continued insistence on contractual waivers operates not merely as a paperwork device, but as a market control mechanism, designed to:

- suppress carrier access to pricing and transaction data,

- deter carriers from asserting statutory rights,

- and insulate broker margins from scrutiny.

The use of waivers in this manner directly conflicts with the regulatory framework governing broker conduct and contradicts the sworn assurances made to obtain operating authority.

## D. Credibility Impact on Retaliation and Blacklisting Claims

TQL's demonstrated willingness to:

- ignore regulatory directives,

- override federal law via private contract,

- and persist after formal objections

182

materially undermines the credibility of any assertion that:

- carrier exclusions are "neutral,"

- refusals to deal are "risk-based," or

- adverse outcomes are unrelated to carrier resistance or rights-assertion.

Where a broker has shown systemic disregard for regulatory obligations, its reliance on third-party blacklisting systems and opaque reputational tools must be viewed in context—as extensions of that same non-compliant conduct, rather than independent safety or fraud measures.

### E. Pattern, Not Isolated Dispute

The record reflects:

- multiple carriers,

- multiple years,

- repeated regulatory intervention requests,

- and continuing public controversy over the same conduct.

This establishes continuity, knowledge, and intent, all of which are relevant to antitrust analysis, enterprise conduct, and equitable relief.

### Total Quality Logistics, LLC

### Ongoing Non-Compliance, Public Outcry, and Regulatory Risk

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## A. Background: Judicial Order and Industry Notice

Plaintiff alleges that Total Quality Logistics, LLC ("TQL") was previously placed on clear notice—through litigation, judicial scrutiny, and industry-wide attention—that certain contractual provisions used to restrict carrier conduct, including mandatory waiver language, were unlawful and unenforceable.

In the widely publicized Pink Cheetah litigation, TQL was ordered to cease performing under, enforcing, or relying upon the challenged waiver provisions. That directive was not limited to the named plaintiffs; it addressed the legality of the contractual mechanism itself.

The purpose of that order was corrective: to bring TQL's broker conduct back into compliance with governing law and FMCSA regulations.

---

## B. Continued Use of Prohibited Waiver Language

Plaintiff alleges that despite the order, TQL continued to include, circulate, and rely upon the same or substantially similar waiver language in its carrier contracts and operational practices.

This continued conduct constitutes:

- knowing non-compliance,

- willful disregard of judicial instruction,

- and ongoing exposure of carriers to unlawful contractual restraint.

184

The issue is not inadvertent delay or clerical oversight. The waiver language remained embedded in TQL's contracting and performance pipeline after TQL was ordered not to perform under it.

---

## C. Public Outcry and Industry Pressure

Plaintiff further alleges that TQL's continued non-compliance has generated significant public outcry within the carrier community, including:

- widespread discussion among owner-operators and carriers,
- calls for regulatory intervention,
- and direct pressure on the Federal Motor Carrier Safety Administration to investigate and take enforcement action.

Carriers have publicly questioned why a federally regulated broker is permitted to continue operating while knowingly relying on contractual provisions a court has already determined to be improper.

This pressure is not theoretical. It reflects loss of confidence in regulatory oversight when non-compliance is tolerated.

---

## D. FMCSA Authority and Grounds for Suspension or Revocation

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Under FMCSA regulations, brokers are required to:

- operate in compliance with applicable law,

- refrain from coercive or deceptive practices,

- and maintain fitness to hold federal authority.

Plaintiff alleges that TQL's continued performance under prohibited waiver provisions demonstrates:

- lack of fitness,

- pattern and practice of non-compliance,

- and disregard for legal and regulatory constraints.

Such conduct provides grounds for FMCSA investigation, suspension, or revocation of broker authority, particularly where violations are knowing and ongoing.

---

### E. Harm to Plaintiff and Similarly Situated Carriers

Plaintiff alleges that TQL's continued reliance on unlawful waiver language directly harms carriers by:

- chilling the assertion of legal rights,

- suppressing lawful disputes and negotiation,

- enabling retaliation through exclusion and blacklisting,

- and forcing carriers to operate under coercive terms as a condition of access to freight.

186

Carriers are placed in an impossible position: accept unlawful terms or lose work.

## F. Pattern, Not Isolated Incident

Plaintiff alleges that TQL's conduct is not an isolated lapse, but part of a broader pattern of broker-side non-compliance, enabled by private platforms and tolerated through delayed enforcement.

The persistence of the waiver language after judicial intervention is probative of intent, not mistake.

## G. Public Interest Implications

Plaintiff alleges that allowing a major broker to continue operating under contract provisions a court has already ordered it not to perform under:

- undermines respect for judicial authority,
- erodes confidence in FMCSA oversight,
- and incentivizes other brokers to ignore compliance obligations.

The public interest favors prompt regulatory correction where judicial warnings have already been issued and disregarded.

187

## H. Requested Relief (As to TQL)

Plaintiff seeks relief including, but not limited to:

- declaratory relief that the challenged waiver provisions are unlawful and unenforceable;

- injunctive relief prohibiting further use or performance under such provisions;

- referral and cooperation with FMCSA for investigation of fitness and compliance;

- and such further relief as equity and public policy require.

## COUNTS AGAINST DEFENDANT

TOTAL QUALITY LOGISTICS, LLC

## COUNT I — Violation of 49 U.S.C. § 13904 (Unfitness and Non-Compliance as a Licensed Broker)

1. At all relevant times, Defendant was registered as a freight broker pursuant to 49 U.S.C. § 13904.

2. Broker registration is conditioned on continued fitness, willingness, and ability to comply with federal law and regulations governing interstate commerce.

3. Defendant engaged in systematic practices including:

   o withholding lawful carrier compensation,

   o retroactive and unsupported deductions,

188

     ○   retaliatory blacklisting,

     ○   deceptive solicitation, and

     ○   coercive conduct exceeding broker authority.

4. Such conduct demonstrates unfitness, bad faith, and non-compliance with statutory conditions required for broker registration.

5. Defendant's actions constitute a violation of 49 U.S.C. § 13904.

---

## COUNT II — Violation of 49 C.F.R. § 371.3 (Broker Transparency and Record-Keeping Requirements)

1. 49 C.F.R. § 371.3 requires brokers to maintain and disclose transaction records, including rates, charges, and compensation.

2. Defendant routinely:

     ○   obscured or denied access to transaction details,

     ○   failed to document or honor accessorial charges (detention, layover, TONU),

     ○   relied on opaque internal determinations to justify non-payment.

3. Defendant's failure to maintain and provide transparent records violates mandatory broker disclosure obligations.

4. These acts constitute violations of 49 C.F.R. § 371.3.

---

## COUNT III — Unlawful Withholding of Compensation in Violation of 49 U.S.C. § 14101(b)

189

1. 49 U.S.C. § 14101(b) recognizes the enforceability of transportation agreements and the obligation to honor agreed compensation.

2. Defendant withheld payment after performance, including:

   o   detention and layover compensation,

   o   truck-ordered-not-used charges,

   o   full linehaul payments following clean delivery.

3. Defendant imposed post-hoc conditions, unsupported claims, and unilateral deductions not contained in the governing agreement.

4. Defendant's conduct unlawfully interfered with enforceable transportation contracts, in violation of 49 U.S.C. § 14101(b).

---

## COUNT IV — Interference with Federally Granted Motor Carrier Authority (49 U.S.C. §§ 13901–13902)

1. Motor carriers operate under federal authority issued pursuant to 49 U.S.C. §§ 13901–13902.

2. Defendant is not a motor carrier, not a shipper, and not a government agency.

3. Defendant nevertheless:

   o   blacklisted carriers,

   o   excluded carriers from freight access,

   o   imposed private sanctions affecting interstate commerce.

4. Such actions unlawfully interfere with federally granted operating authority and exceed the lawful role of a broker.

5. Defendant violated 49 U.S.C. §§ 13901–13902 by imposing private market discipline without statutory authority.

---

## COUNT V — Deceptive and Coercive Practices Inconsistent with Broker Role (49 C.F.R. § 371.2)

1. 49 C.F.R. § 371.2 defines a broker as an intermediary arranging transportation for compensation.

2. Defendant exceeded this role by:

   o directly soliciting shippers using brokerage access using non brokers and wholesale off shore dispatching services to solicit shippers undercutting fair competition

   o diverting or appropriating shipper relationships,

   o misrepresenting its authority and role in transactions.

3. Such conduct constitutes deceptive and unfair practices incompatible with lawful brokerage activity.

4. Defendant violated 49 C.F.R. § 371.2.

---

## COUNT VI — Harassment-Based Solicitation and Lack of Regulatory Fitness (49 U.S.C. § 13904)

191

1. Defendant engaged in repeated, high-volume solicitation calls despite express "do not contact" requests, as reported the call harassments continue.

2. Defendant cycled callers, used scripted solicitation, and misrepresented purpose and authority.

3. Such conduct reflects a lack of compliance culture, integrity, and regulatory fitness.

4. Defendant's harassment-based solicitation violates the fitness requirements of 49 U.S.C. § 13904.

---

## COUNT VII — Unlawful Interference with Interstate Commerce

1. Defendant's combined practices of:

   o non-payment,

   o retaliation,

   o solicitation abuse,

   o market exclusion,

   o coercive leverage over carriers,

   substantially burden interstate commerce.

2. Defendant imposed private controls inconsistent with the uniform federal regulatory scheme governing freight brokerage.

3. Such conduct constitutes unlawful interference with interstate commerce in violation of federal transportation law.

192

**RICO, SHERMAN ACT, AND HOBBS ACT PREDICATE INTEGRATION**

(18 U.S.C. §§ 1961–1962; 18 U.S.C. § 1951; 15 U.S.C. §§ 1–2)

---

**A. RICO Enterprise Conduct — 18 U.S.C. § 1962(c)**

1. Defendant engaged in the conduct and participation of an enterprise affecting interstate commerce through a pattern of racketeering activity.
2. The enterprise operated through coercive control of payments, access to freight, and market exclusion, substituting private enforcement for federal regulation.
3. Predicate acts included extortion, wire fraud, and obstruction of lawful commerce, as set forth below.

---

**B. RICO Predicate Acts — Extortion Under Color of Economic Fear (Hobbs Act) — 18 U.S.C. § 1951**

1. Defendant knowingly obtained property—lawfully earned freight compensation—by wrongful use of economic fear, including:
   - withholding payment after performance,
   - threatening or imposing blacklisting,
   - conditioning payment on silence or compliance.

193

2. Victims reasonably feared loss of access to interstate freight markets, inability to operate, and financial ruin.

3. Such conduct constitutes Hobbs Act extortion, a RICO predicate under 18 U.S.C. § 1961(1).

---

## C. RICO Predicate Acts — Wire Fraud — 18 U.S.C. § 1343

1. Defendant used interstate wires to:

   o solicit loads,

   o induce performance,

   o promise compensation,

   o later deny payment through false or pretextual claims.

2. Defendant transmitted misrepresentations regarding authority, payment intent, damage claims, and record transparency.

3. Each transmission constituted an act of wire fraud, forming a pattern of racketeering activity.

---

## D. RICO Predicate Acts — Obstruction and Circumvention of Federal Regulatory Scheme

1. Defendant interfered with federally granted motor-carrier authority by:

   o imposing private sanctions,

   o excluding carriers from freight access,

194

o enforcing non-statutory compliance rules.

2. Such conduct obstructed and supplanted the FMCSA's exclusive regulatory authority, constituting unlawful enterprise conduct under RICO.

---

## SHERMAN ACT INTEGRATION

---

### E. Sherman Act § 1 — Unlawful Restraint of Trade (15 U.S.C. § 1)

1. Defendant participated in concerted practices that:

   o anchored freight rates downward,

   o enforced uniform broker-favorable terms,

   o punished carriers who resisted or complained.

2. These practices restrained trade by suppressing price competition, foreclosing market access, and coercing compliance.

3. The restraint was unreasonable, non-competitive, and not ancillary to any lawful purpose.

---

### F. Sherman Act § 2 — Monopolization / Attempted Monopolization (15 U.S.C. § 2)

1. Defendant exercised monopoly power, or attempted to do so, over access to freight and payment flows.

2. Defendant willfully maintained that power through:

195

- o coercive payment control,

- o retaliatory exclusion,

- o abuse of informational and market leverage.

3. Defendant's conduct harmed competition itself, not merely individual market participants.

---

## RICO CAUSATION AND DAMAGES

---

## G. Proximate Cause and Injury

1. Defendant's racketeering acts were the direct and proximate cause of:

- o lost compensation,

- o forced deadhead miles,

- o business collapse,

- o exclusion from interstate commerce.

2. Injuries were foreseeable, intended, and integral to the enterprise's operation.

## COUNT I — RICO (18 U.S.C. § 1962(c))

Against All RICO Defendants

196

1. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

2. At all relevant times, Defendants associated with and conducted the affairs of an enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of broker-facing platforms, payment and factoring intermediaries, vetting and eligibility systems, and participating brokers, including but not limited to Internet Truckstop Payments, LLC and Total Quality Logistics, LLC (collectively, the "Enterprise").

3. The Enterprise constituted an ongoing organization with relationships and continuity, and its activities affected interstate commerce by controlling access to freight, payment flows, and carrier eligibility across multiple states.

4. Defendants knowingly conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

---

## Racketeering Acts

5. Hobbs Act Extortion (18 U.S.C. § 1951).

   Defendants knowingly obtained and attempted to obtain property—namely, lawfully earned freight compensation, accessorial payments, and receivables—from carriers by the wrongful use of economic fear, including fear of blacklisting, loss of access to freight, payment delays, and financial ruin. Defendants conditioned payment, continued

197

eligibility, or relief from exclusion on silence, submission to platform controls, or acceptance of reduced compensation, without any lawful claim of right.

6. Wire Fraud (18 U.S.C. § 1343).

Defendants devised and executed a scheme to defraud carriers by using interstate wire communications to solicit freight, induce performance, represent payment terms and eligibility, and thereafter withhold or divert payment through false, pretextual, or undisclosed reasons, including fabricated damage claims, "proprietary" exclusions, and opaque platform flags. Each transmission constituted an act of wire fraud.

7. Circumvention of Federal Regulatory Authority.

Defendants knowingly supplanted and obstructed the federal regulatory framework governing interstate transportation by imposing private enforcement mechanisms— including carrier exclusion, eligibility scoring, and payment controls—without statutory authority. Defendants are not FMCSA, not motor carriers, and not empowered under 49 U.S.C. §§ 13901, 13902, or 31144 to discipline or disqualify carriers from interstate commerce, yet functioned as de facto regulators through coordinated private action.

---

## Pattern, Continuity, and Enterprise Operation

8. The racketeering acts were related and continuous, sharing common purposes, victims, methods, and results, including suppression of carrier compensation, coerced compliance, retaliation, and exclusion from the freight market.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

9. Defendants committed the racketeering acts over a substantial period and threatened continued criminal activity, establishing closed-ended and open-ended continuity.

10. Defendants knowingly participated in the operation or management of the Enterprise by designing, implementing, enforcing, and benefiting from systems of payment control, platform exclusion, and retaliatory enforcement that replaced lawful regulation with coercive private governance.

---

## Causation and Damages

11. Defendants' racketeering acts were the direct and proximate cause of Plaintiff's injuries, including but not limited to:

- loss of freight revenue and accessorial compensation,

- uncompensated deadhead miles,

- delayed or withheld receivables,

- exclusion from interstate commerce,

- loss of business goodwill and economic viability.

12. Plaintiff suffered concrete financial loss and ongoing harm as a foreseeable and intended consequence of Defendants' conduct.

---

## Statute of Limitations still Tolling

199

13. Defendants' conduct was inherently self-concealing through opaque platforms, "proprietary" determinations, non-disclosure, and retaliation, tolling applicable limitations periods until Plaintiff discovered the injury and its cause.

# Remedy as to

## Total Quality Logistics, LLC (TQL) with a 7 year look back on statute of limitations.

14. (FMCSA Compliance and Restitution)

15. As to Defendant Total Quality Logistics, LLC, Plaintiff seeks injunctive and equitable relief requiring TQL to bring its standard carrier contracts into full compliance with FMCSA orders and federal transportation law by removing any waiver provisions that purport to limit or eliminate a carrier's statutory rights, remedies, or causes of action. Plaintiff alleges that TQL continued to include and rely upon such waiver language after being ordered to cease doing so, thereby unlawfully shifting risk and suppressing carrier rights in interstate commerce.

16. Plaintiff further seeks restitution to affected carriers for the economic harm caused by TQL's unlawful contract provisions and post-performance enforcement practices. Restitution shall be calculated at a minimum base amount of $300 per load hauled by each carrier, representing the minimum economic injury and coercive impact per transaction, and trebled to $900 per load per carrier per load hauled as authorized by law, to account for willful noncompliance, deterrence, and unjust enrichment.

17. Such restitution is sought not as a penalty, but as equitable relief necessary to restore carriers to the position they would have occupied absent TQL's unlawful contract terms

and practices, and to deter continued use of prohibited waivers in federally regulated brokerage agreements.

---

## Relief

14. Plaintiff seeks all relief available under 18 U.S.C. § 1964, including treble damages, costs, attorneys' fees, injunctive and equitable relief necessary to dismantle the Enterprise

15. and prevent continued racketeering activity.

---

## DEFENDANT 4 — PARTICIPATING BROKER DEFENDANTS

### (Including John Doe Brokers 1–29,061)

### Status and Role

At all relevant times, Defendant **Broker Participants** consisted of federally authorized freight brokers operating under FMCSA-issued broker authority, including named brokers and John Doe Brokers 1–29,061, whose identities are presently unknown but ascertainable through discovery. Each Broker Defendant transacted business in interstate commerce and tendered freight to motor carriers nationwide.

201

Each Broker Defendant owed independent duties under federal law to exercise lawful broker discretion, comply with FMCSA regulations, and refrain from deceptive, retaliatory, or exclusionary conduct. None possessed regulatory authority to discipline, suspend, or disqualify motor carriers from interstate commerce.

---

### Participation in Broker-Facing Platforms and Delegated Enforcement

16. John Doe brokers are required to adhere to OP-1 Oath under penalty of perjury

17. Plaintiff alleges that the Broker Defendants collectively participated in broker-facing platforms and systems—including payment, vetting, eligibility, and tracking integrations—through which carrier access to freight was evaluated, restricted, or denied based on opaque and undisclosed criteria. Rather than exercising independent judgment, Broker Defendants delegated carrier eligibility determinations to shared third-party platforms and treated platform outputs as binding.

18. Perform and participate in the same platforms as TQL and subscribe to the blacklisting of carriers in an arbitrary joint effort to cause a carrier death and do and have made calls to antagonize and badger the blacklisted party to make sure they know the people with power, the brokers and factors and platforms get a sick enjoyment from it. Prank calls, ask for the Plaintiff and hang up. Repeat.

19. As a result, adverse flags, internal "notes," or eligibility restrictions generated within one platform were uniformly enforced across multiple brokers, producing cascading exclusion regardless of carrier performance, safety record, or contractual history.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

**Concerted Refusal to Deal and Cascading Blacklisting**

20. Plaintiff alleges that Broker Defendants engaged in a concerted refusal to deal by uniformly denying freight to carriers identified as ineligible by broker-facing platforms, without notice, explanation, or opportunity to cure. This conduct resulted in immediate and market-wide exclusion, forcing carriers to deadhead, lose income, and exit the marketplace.

21. Plaintiff alleges that once a carrier was flagged or excluded within the shared ecosystem, multiple brokers independently but predictably refused freight, demonstrating parallel conduct inconsistent with independent decision-making and consistent with coordinated enforcement.

---

**Rate Anchoring, Coercive Control, and Suppression of Carrier Speech**

22. Plaintiff further alleges that Broker Defendants relied on shared platforms to anchor rates downward, suppress negotiation, and condition access to work on acceptance of broker-favorable terms. Payment delays, denial of accessorials, and threats of exclusion were used to coerce compliance and silence complaints.

23. The threat of retaliation and loss of eligibility created a chilling effect, deterring carriers and drivers from asserting rights, reporting violations, or seeking regulatory or legal relief.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

**Interference with Federally Granted Motor Carrier Authority**

24. By enforcing private eligibility determinations and denying access to interstate freight markets, Broker Defendants interfered with federally granted motor carrier authority issued under 49 U.S.C. §§ 13901–13902, without statutory authority to do so. Such conduct substituted private market governance for federal regulation and removed compliant carriers from commerce through coordinated private action.

**Enterprise Participation and Liability**

25. Plaintiff alleges that each Broker Defendant knowingly participated in and benefited from the Enterprise, by enforcing platform-generated exclusions, honoring payment controls and Notices of Assignment, and perpetuating opaque eligibility determinations. Each Broker Defendant is liable for its own acts and for the foreseeable acts of co-conspirators that furthered the Enterprise's objectives and caused harm to Plaintiff and similarly situated carriers.

**Illustrative Broker Examples Within the Participating Broker Defendants**

26. Plaintiff alleges that the conduct described herein is exemplified by interactions with multiple federally authorized brokers, including TQL, C.H. Robinson Worldwide, Inc. and Magellan Logistics, which are pleaded as illustrative participants rather than as separately named defendants. These brokers each engaged in solicitation and tendering

204

practices that conditioned access to freight on compliance with broker-facing platforms, tracking integrations, or undisclosed eligibility criteria, and each refused to provide meaningful explanation or opportunity to cure when freight was denied.

27. Plaintiff alleges that these examples demonstrate that the exclusionary and coercive practices at issue are not broker-specific but instead arise from shared systems and uniform enforcement mechanisms across the brokerage market. Accordingly, Plaintiff pleads these brokers to show that the Enterprise's control operates horizontally, such that disrupting or enjoining unlawful conduct at any point in the system necessarily disrupts it throughout. Plaintiff therefore brings this action strategically against core Enterprise actors, alleging that breaking the monopoly anywhere breaks it everywhere, while reserving the right to name additional brokers as defendants if discovery so warrants.

**Surveillance and Intelligence Layer of the Enterprise**

**Pleading**

Plaintiff alleges that the Enterprise's exclusionary and coercive conduct is enabled by a surveillance and intelligence layer that supplies brokers with real-time and historical operational data used to monitor, score, and restrict carriers and drivers. This layer includes tracking, telematics, and vetting platforms that aggregate location, movement, compliance, and behavioral data and make that data actionable for broker-facing enforcement.

205

Within this layer, MacroPoint functions as a location and tracking tool that brokers use to obtain continuous shipment visibility and movement data as a condition of tendering freight using the drivers personal cellphone. Plaintiff alleges that Macro Point's integration normalized compulsory tracking and location disclosure and served as an early mechanism by which brokers conditioned access to work on submission to surveillance.

The Enterprise's modern enforcement, however, relies most heavily on Highway interfacing with the trucks in cab ELD and Ai enhanced audio and visual device provided by Motive technologies f/k/a ( Carrier facing platform ) **Keep Trucking**, Motive and Highway.com operate as intelligence hubs rather than mere tracking tools. These platforms aggregate telematics, identity, compliance, behavioral, and performance data and convert it into broker-facing eligibility signals, risk scores, and access determinations that are opaque to carriers and drivers. Plaintiff alleges that brokers treat these outputs as authoritative, despite the absence of statutory authority, transparency, or due process.

Plaintiff further alleges that the combined use of Macro Point, Highway, and Motive enables continuous surveillance, retrospective scrutiny, and real-time enforcement, transforming ordinary logistics coordination into a system of private monitoring and behavior control that feeds directly into payment restriction, eligibility denial, and market exclusion.

**Remedy as to**

**John Doe Broker Defendants**

206

(Disengagement from Surveillance and Conditional Disgorgement)

As to the John Doe Broker Defendants, Plaintiff seeks equitable relief requiring the immediate disengagement, suspension, and cessation of any direct or indirect connectivity to driver surveillance systems, including but not limited to ELD APIs, telematics feeds, real-time location data, audio, video, or behavioral analytics, pending final adjudication of this action.

Plaintiff further seeks conditional disgorgement and restitution whereby any John Doe Broker Defendant that continues to maintain, access, or rely upon such surveillance connectivity during the pendency of this litigation shall disgorge to affected carriers not less than $300 per load, assessed on a per-load basis, for each load tendered, hauled, or denied during the period of continued connectivity, until such broker affirmatively demonstrates disengagement.

This restitution mechanism is not punitive, but remedial and coercive in reverse, designed to restore economic balance and to prevent ongoing irreparable harm while allowing brokers to voluntarily and in good faith remove themselves from unlawful surveillance-based decision systems.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Plaintiff further seeks an accounting requiring each John Doe Broker Defendant to identify all current and prior integrations, interfaces, data feeds, or third-party platforms through which driver or carrier surveillance data was accessed, relied upon, or ingested, and to certify under oath the date and manner of disengagement.

Plaintiff expressly provides that any John Doe Broker Defendant may avoid further disgorgement by voluntarily terminating such surveillance connections in good faith and providing written proof of disengagement, without admission of liability, pending resolution of the merits.

Equity requires that brokers choose between surveillance-based market control and continued exposure to The Enterprise or pay restitution for each transaction affected by such connectivity.

**Special Master, Audit, and Payment Administration**

Plaintiff further seeks appointment of a Special Master, at the sole expense of each non-compliant broker defendant, to oversee auditing, certification, and restitution related to surveillance disengagement and conditional disgorgement obligations set forth herein. The Special Master shall be authorized to review broker data systems, contracts, integrations, and payment records solely for the purpose of verifying disengagement from ELD APIs, telematics feeds, or other driver surveillance connectivity, and to calculate restitution owed on a per-load basis.

208

To ensure neutrality, jurisdictional competence, and carrier protection, Plaintiff requests that the Special Master administer payments through two adjoining attorneys, one licensed in the broker's principal place of business or operational jurisdiction, and one licensed in the State of Ohio, to receive, hold, and disburse restitution funds to affected carriers under court supervision.

All costs associated with the Special Master, auditing, administration, and payment processing shall be borne entirely by the broker defendant(s) subject to such review. No carrier shall bear any cost, fee, or offset associated with enforcement, auditing, or restitution.

Brokers may avoid continued auditing and further restitution accrual by voluntarily and in good faith certifying complete disengagement from surveillance connectivity, subject to verification by the Special Master.

**Remedy — Disruption of Notices of Assignment (NOA) and Restoration of Direct Payment**

Plaintiff seeks equitable relief disrupting the continued enforcement and reliance upon Notices of Assignment (NOA) and related payment-control mechanisms used by factoring companies and affiliated intermediaries to restrain carrier compensation and market access. Plaintiff alleges that such NOAs were imposed, maintained, or honored in breach of contract, breach of fiduciary and

209

statutory duties, and as part of a coordinated enterprise designed to intercept, delay, or condition payment for completed transportation services.

As equitable relief, Plaintiff seeks an order voiding, suspending, or enjoining the enforcement of NOAs that were procured or maintained without valid, informed consent, beyond lawful scope, or in connection with wrongful liens, coercive practices, or enterprise-wide payment controls. The Court should further declare that brokers and shippers may pay carriers directly, notwithstanding any such NOA, where payment interference resulted from breach of contract, breach of duty, or unlawful enterprise conduct.

Plaintiff further seeks enterprise-wide restoration of direct payment, requiring brokers and shippers to remit compensation directly to carriers for all loads hauled or tendered during the period of unlawful NOA enforcement, and prohibiting factoring entities from intercepting or conditioning such payments absent a valid, narrowly tailored, and lawfully obtained assignment.

Plaintiff seeks disgorgement of all fees, spreads, interest, and retained funds obtained through the enforcement of unlawful NOAs and payment blocks, together with an accounting identifying all payment diversions and beneficiaries. This relief is sought to remove the chains placed on carriers, eliminate artificial payment friction, and restore lawful market conditions in interstate commerce.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

This remedy is necessary to cure breach of all contracts and breach of all duties owed to carriers, including duties of good faith and fair dealing, and to dismantle the financial control mechanisms that enabled ongoing harm.

Interference with direct payment to federally authorized carriers through unlawful NOAs obstructs FMCSA-regulated interstate commerce and serves no recognized safety or regulatory purpose.

To continue the status quo of slow pay or no pay or obstacles, delays and compounding fees and retroactive fines and short pay disrupts interstate commerce and fair trade and dealing, would otherwise continue to allow third parties to meddle with interstate commerce with no regulations, no accounting, no fiduciary duty and acts as a pay day lender with access to business banks accounts for claw backs for any reason at any time. Factoring companies are not FDIC insured.

**Remedial Directive — Restoration of Direct Payment in Modern Commerce (2025)**

Plaintiff alleges that in 2026, there is no legitimate commercial, technological, or operational justification for brokers to withhold, divert, or delay payment to federally authorized motor carriers through Notices of Assignment, factoring intermediaries, or payment-control chains. Modern accounting and payment systems—including direct ACH, QuickBooks, wire transfer,

211

and real-time settlement platforms—permit immediate, direct payment to carriers without friction, risk, or regulatory impediment.

Brokers routinely maintain the technical and financial capacity to pay carriers directly and contemporaneously with delivery. Any asserted reliance on factoring intermediaries, upstream reimbursement delays, or liquidity constraints reflects internal broker financing choices, not a lawful basis to burden carriers with delayed compensation, additional fees, or coerced assignments of receivables.

Accordingly, Plaintiff seeks relief directing brokers to pay carriers directly, notwithstanding any enterprise-tied NOA or factoring arrangement, where payment interference resulted from breach of contract, breach of duty, or coordinated enterprise conduct. Such direct payment is consistent with modern commercial practice, FMCSA-regulated interstate commerce, and the fundamental principle that a party who has performed transportation services is entitled to timely compensation without artificial intermediaries.

This remedy restores ordinary market function by removing unnecessary financial middlemen, eliminating coercive payment leverage, and ensuring that carriers are paid for completed work through readily available, widely used payment channels already employed across the industry.

212

In 2026, timely delivery requires timely payment, and direct payment to carriers is the ordinary course of modern commerce—not an exception requiring intermediaries.

Modern freight commerce operates on on-time delivery and on-time payment; any broker practice that separates the two is commercially obsolete and legally suspect.

**Remedy — On-Time Delivery Requires On-Time, Direct Payment**

Plaintiff alleges that the performance of transportation services in interstate commerce is complete upon on-time delivery, and that on-time payment is the corresponding obligation. In 2026, brokers possess routine access to direct payment systems—including ACH, QuickBooks, wire transfer, and real-time settlement platforms—that allow carriers to be paid promptly without reliance on factoring intermediaries, Notices of Assignment, or payment chains.

Plaintiff seeks relief directing that brokers who receive the benefit of on-time delivery must provide on-time, direct payment to the performing carrier, notwithstanding enterprise-tied NOAs or factoring arrangements that function to delay or condition compensation.

213

Where a broker fails or refuses to pay a carrier directly and on time, such failure constitutes:

- breach of contract,

- breach of the duty of good faith and fair dealing,

- unjust enrichment through retention of the benefit of performance,

- and continued participation in unlawful payment interference affecting interstate commerce.

As a remedial consequence, Plaintiff seeks:

- disgorgement of any sums retained, delayed, or diverted,

- restoration of direct payment obligations for all affected loads, and

- monetary restitution on a per-load basis for each instance of delayed or diverted payment, reflecting the economic and coercive harm imposed by nonpayment.

Brokers remain free to structure their internal financing and liquidity arrangements as they choose; however, a broker's inability or unwillingness to pay carriers directly and on time may not be shifted onto carriers through delay, assignment, or forced intermediaries. The risk of non-liquidity lies with the broker, not the performing carrier.

**Short Consequence**

214

A broker that cannot pay a carrier directly and on time is not entitled to retain the benefit of that carrier's performance.

In 2026, on-time delivery requires on-time payment, and direct payment to carriers through ordinary commercial systems is the default condition of lawful interstate commerce. No broker may impose net-30 or delayed payment terms unless the carrier affirmatively and knowingly opts into such terms in the rate confirmation. A broker's internal liquidity constraints, factoring arrangements, or reliance on third-party reimbursement do not justify delaying, diverting, or conditioning payment to a performing carrier. Failure to pay directly and on time constitutes breach of contract, breach of the duty of good faith and fair dealing, and unjust enrichment through retention of the benefit of performance. Each instance of delayed or diverted payment gives rise to disgorgement and per-load monetary restitution until payment compliance is restored.

Good-faith compliance shall be demonstrated through standardized certification submitted to a court-appointed administrator and reflected on a centralized compliance roster, with affidavits required only upon challenge or dispute.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## DEFENDANT #5

## John Doe Factoring Partners

(Unknown Factoring Entities and Financial Intermediaries)

### Parties and Identification

Defendant John Doe Factoring Partners are presently unknown factoring companies, financial intermediaries, assignees, processors, agents, or funding sources that participated in, benefited from, or facilitated the enterprise's unlawful control of carrier receivables, payment flows, and market access.

Plaintiff will amend this Complaint to substitute the true names of these Defendants when their identities are ascertained through discovery.

### Role in the Enterprise

John Doe Factoring Partners functioned as financial control nodes within the enterprise by acquiring, holding, enforcing, or honoring receivables assignments, UCC filings, payment blocks, and conditional payment mechanisms that deprived Plaintiff and similarly situated carriers of access to earned funds.

These Defendants were not passive lenders. They knowingly participated in a coordinated system designed to:

- intercept or redirect carrier payments,
- condition payment on platform compliance,

216

- impose blanket liens or assignments beyond lawful scope,

- and enforce economic submission through payment dependency.

## Racketeering Conduct

John Doe Factoring Partners participated in a pattern of racketeering activity by using interstate wires and financial systems to:

- enforce unlawful assignments and liens,

- withhold or delay earned receivables,

- compel continued platform participation under economic duress,

- and facilitate retaliation against carriers who challenged enterprise practices.

Their conduct constitutes knowing participation in the enterprise's affairs in violation of 18 U.S.C. § 1962(c).

## Antitrust and Market Restraint

By coordinating with broker-facing platforms, compliance databases, and payment processors, John Doe Factoring Partners helped implement a concerted refusal to deal that restrained trade and excluded carriers from the market unless they submitted to enterprise control over payments and data.

These practices suppressed competition, foreclosed alternative financing, and distorted pricing and access in the interstate freight market.

217

**Duress and Deprivation of Property**

Plaintiff alleges that John Doe Factoring Partners exploited carriers' dependence on cash flow, fuel, insurance, and regulatory standing to impose economic duress, depriving carriers of property without meaningful choice, notice, or opportunity to contest the deprivation.

**Disgorgement and Unjust Enrichment**

John Doe Factoring Partners were unjustly enriched by:

- fees, interest, spreads, or retained funds derived from intercepted receivables,
- profits earned through enforcement of unlawful assignments or liens,
- and enterprise-generated payment restrictions.

All such proceeds constitute ill-gotten gains subject to disgorgement.

**Relief Sought**

As to Defendant John Doe Factoring Partners, Plaintiff seeks:

- disgorgement of all profits, fees, and revenues derived from enterprise participation,
- an accounting to identify all payment flows and retained funds,
- treble damages as authorized by RICO,
- and such other monetary relief as justice requires.

218

Plaintiff does not seek to preserve or regulate these Defendants' business models, but seeks to strip the enterprise of unlawfully obtained financial gains and deter continued participation.

**Obsolescence of Intermediary Rent-Seeking in Modern Payments**

Plaintiff alleges that in 2026, there is no legitimate technological, regulatory, or economic necessity for layered intermediary "multiplier" entities that profit by making payment to a federally authorized motor carrier slower, more complex, opaque, and expensive. Modern ACH, real-time payments, and direct settlement systems allow brokers and shippers to pay carriers directly, securely, and efficiently without the insertion of third-party financial toll collectors.

The continued use of factoring partners, payment blockers, and receivables controllers within the enterprise serves no efficiency-enhancing purpose, but instead functions to:

- extract rents from unavoidable transactions,
- impose artificial friction on carrier compensation,
- and create leverage for coercive compliance unrelated to credit risk or fraud prevention.

Such conduct reflects intentional repeating payday loans, not value creation, and supports Plaintiff's claims for disgorgement of unjust enrichment, antitrust liability for restraint of trade, and racketeering through financial control mechanisms.

Because federally authorized motor carriers operate under uniform FMCSA regulation and haul freight in interstate commerce, payment for completed transportation services is already governed by existing federal safety, insurance, and financial-responsibility frameworks. In 2026, the insertion of private factoring intermediaries that delay, condition, or tax carrier compensation

219

serves no regulatory or safety purpose recognized by the FMCSA, but instead interferes with the free flow of interstate commerce by imposing artificial financial barriers on carriers' ability to operate lawfully

Private payment intermediaries that obstruct or condition carrier compensation undermine FMCSA-regulated interstate commerce without serving any recognized safety or regulatory function.

**Remedy as to**

**John Doe Factoring Partners**

(Rent Extraction, Payday-Lending Conduct, Disgorgement, and Special Master Oversight)

Plaintiff alleges that the John Doe Factoring Partners operate not as neutral financiers, but as rent-extracting intermediaries that functionally resemble payday lenders within the freight industry—profiting from carriers' cash-flow dependence by inserting themselves between completed performance and earned payment. Through Notices of Assignment, UCC-1 sweeping Liens, reserves, holdbacks, fee stacking, and payment interception, these entities convert routine carrier compensation into a high-cost debt product imposed after performance, untethered from legitimate credit risk.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

In 2025–2026, when direct ACH and real-time payment systems are widely available, such factoring arrangements serve no operational necessity and exist solely to extract rent from carriers who have already performed federally regulated interstate transportation services. This conduct constitutes unjust enrichment, breach of contract, breach of the duty of good faith and fair dealing, and knowing participation in an enterprise that restrains carrier compensation through coercive financial leverage.

Plaintiff seeks equitable relief requiring full disgorgement of all rents, fees, interest, spreads, reserves, and retained funds derived from this payday-lending model, together with an accounting identifying every load affected, every NOA enforced, and every downstream beneficiary of intercepted payments.

Any John Doe Factoring Partner that continues to engage in this rent-extraction model after notice of this action—by enforcing NOAs, intercepting carrier payments, or coordinating with broker or platform defendants—shall disgorge not less than $300 per load, trebled to $900 per load, for each affected load, until such entity affirmatively disengages and certifies cessation of enterprise participation. Continued operation after notice constitutes knowing, willful exploitation of carrier dependency and warrants enhanced disgorgement.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

For any non-compliant factoring entity, Plaintiff further seeks appointment of a Special Master, under the same conditions applicable to the John Doe Broker Defendants, to audit receivables control, NOA enforcement, and payment interception. All costs and fees of the Special Master shall be borne solely by the at-fault factoring entity, and no carrier shall bear any expense. To ensure neutrality and jurisdictional competence, the Special Master shall conduct audits and administer disgorgement through two adjoining attorneys, one licensed in the factoring entity's principal place of business or operational jurisdiction and one licensed in the State of Ohio, to receive, review, and disburse funds under court supervision.

Plaintiff does not seek to reform or preserve this payday-lending business model, but seeks relief sufficient to strip it of economic incentive, dismantle its role in the enterprise, and restore direct, timely payment to carriers without rent-seeking intermediaries.

---

Factoring entities that profit by delaying payment for completed freight function as payday lenders with no opt out, not financiers, not banks, not FDIC insured and must disgorge the rents extracted from carrier dependency.

---

222

Defendant #6

Motive Technologies, gomotive.com

f/k/a Keep Truckin Inc

## A. Identity, Nature, and Non-Regulatory Status

Defendant Motive Technologies, Inc. ("Motive"), formerly known as KeepTruckin, Inc., is a privately held, for-profit technology company that originated as a software platform and electronic logging device ("ELD") provider. Keep Truckin Inc. was originally a **CARRIER FACING PLATFORM**, Feature Creeped into becoming **Motive** and Motive is not a regulator, not a governmental agency, and not delegated statutory authority to govern motor carriers, drivers, or freight markets. It is a commercial platform whose authority derives exclusively from private contracts, technological dependency, and market penetration—not from law.

Despite this, Motive designs, markets, and operates systems that closely resemble federal and state regulatory infrastructure, including compliance dashboards, inspection-style scoring, behavioral monitoring, risk flags, and enforcement-like alerts. These systems are presented to carriers, drivers, brokers, insurers, and third-party platforms in a manner that mimics official oversight, while remaining wholly private, opaque, and unaccountable.

Motive maintains significant operational and engineering ties outside the United States, including Pakistan, while exerting real-time influence over U.S. interstate commerce, federally regulated carriers, and U.S. drivers—without being subject to the transparency, due process, or statutory limits imposed on actual regulators.

223

## B. Core Business Model: Data Capture First, Services Second

Motive's primary asset is data, not hardware.

From inception, Motive pursued a strategy of large-scale data collection through the provision of low-cost or free carrier-facing tools—initially ELD software, later expanded to include dash cameras, GPS tracking, fleet management systems, and AI-enabled driver monitoring. These tools are embedded directly into the daily operations of motor carriers and drivers and function continuously.

Through these systems, Motive obtains and retains access to:

- Real-time and historical vehicle location data
- Driver identity and contact information
- CDL and compliance records
- Hours-of-service data
- Driving behavior, speed, braking, and route selection
- In-cab real time video and audio data
- Shipment metadata, including bills of lading, commodities, and timing
- Performance, safety, and exception flags

This data is not episodic. It is persistent, longitudinal, and behavioral, allowing Motive to construct detailed profiles of carriers, trucks, and drivers over time.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## C. Regulatory Dependency as an Entry Vector (ELD Mandate)

Motive's expansion was accelerated by the federal ELD mandate, which compelled carriers to adopt electronic logging technology to remain legally operable. Motive capitalized on this regulatory requirement by positioning itself as an accessible compliance solution, nearly the only one at the time, thereby embedding itself deeply into the operational nervous system of the trucking industry and it's 3,5 million carriers. Mostly are small carriers with 6 trucks or less or single owner operators.

As a result, carriers did not merely "choose" Motive as a vendor; many were effectively forced into dependency by regulatory pressure, cost constraints, and network effects and FMCSA compliance. Once embedded, Motive gained continuous visibility into carrier operations that carriers themselves could not realistically replicate or exit without severe disruption.

## D. Brokerage Incubation and Market Intelligence Extraction

Motive did not confine itself to compliance tools. It deliberately expanded into freight brokerage through the acquisition and operation of One Point Logistics ("OPL"). Public statements and contemporaneous reporting establish that Motive operated OPL not as a long-term brokerage competitor, but as a learning and training intelligence-gathering mechanism.

Through OPL, Motive:

- Observed how freight is priced, matched, and moved
- Studied broker-carrier negotiation dynamics

225

- Tested freight-matching models

- Fed freight into early marketplace systems

- Combined brokerage workflows with ELD-derived data

The brokerage was fully staffed with experienced professionals across operations, pricing, compliance, sales, and data functions, confirming that it was a functional, operational brokerage, not a superficial experiment.

After extracting the operational knowledge and data necessary to build freight-matching and marketplace technology, Motive shut down  OPL February 2020, while retaining the underlying intelligence, systems, and models.

**Motive (Formerly KeepTruckin) as the Scale Engine and Test Bed for Industrialized Freight Exploitation**

Plaintiff alleges that Motive Technologies, Inc., formerly known as KeepTruckin, was the first company to bring mandatory ELD-based fleet surveillance technology to national scale, rapidly embedding itself at the operational core of U.S. trucking. As a result of this privileged position, Motive obtained unavoidable, real-time access to carrier identities, driver credentials, vehicle locations, routes, timing, and load activity across the interstate freight network.

Plaintiff further alleges that Motive's internal engineering and platform decisions enabled an unprecedented acceleration of broker-facing and dispatch-adjacent activity. Former freight-technology engineers have publicly testified and described how the brokerage operation

226

leveraging Motive-adjacent data access scaled from approximately zero revenue to roughly $77 million within nine months, before being abruptly shuttered in or around February 2020. Plaintiff alleges that this rapid rise and sudden closure did not dismantle the trained workforce of 1,500 people in Pakistan and the operational knowledge that had already been created, but instead released a highly skilled offshore labor pool into the broader freight ecosystem, who then began it's own operations into the new dispatching services who piggyback off of carriers who can not otherwise get freight access without them.

According to industry testimony and observed market behavior, Plaintiff alleges that approximately 1,500 offshore brokers and dispatch operators—many based in Pakistan—continued operating at scale after the shutdown, applying the same techniques, workflows, and data-driven tactics across multiple freight platforms. Plaintiff alleges that these actors did not disappear; rather, they diffused into the market, carrying with them institutional knowledge of how to mine freight-tech systems, reuse carrier identities, and exploit verification gaps.

Plaintiff alleges that this offshore activity constitutes an industrialized double-brokering model, not sporadic fraud. In this model, MC numbers and carrier profiles are repeatedly reused or impersonated, loads are reassigned without disclosure, and payment paths are intentionally fragmented. Legitimate owner-operators are induced to physically transport freight under false pretenses, only to later discover that compensation has been diverted or extinguished. When disputes arise, responsibility is shifted to unrelated carriers or shell entities that never directly engaged with the broker or dispatcher who controlled the transaction.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Plaintiff further alleges that this system depends on signal-level intelligence, not traditional contractual relationships. Offshore operators do not require full administrative access; they require visibility into availability, timing, location, and identity—signals that are generated upstream by mandatory ELD and telematics systems. Plaintiff alleges that Motive's expansion beyond compliance into analytics, surveillance, and third-party interfacing created a foreseeable signal layer that could be exploited at scale by actors outside U.S. regulatory reach.

Plaintiff does not allege that Motive directly committed cargo theft or operated offshore brokerage schemes. Rather, Plaintiff alleges that Motive's architecture functioned as a test bed, demonstrating how mandatory compliance data could be converted into commercial intelligence and redistributed without effective containment. Once this model was proven viable and profitable, it became replicable across the industry, even after specific operations were formally closed.

Plaintiff further alleges that the downstream consequences of this architecture include systemic cargo diversion and laundering, whereby freight obtained through double-brokering schemes is routed through informal or opaque distribution channels. Industry reports and enforcement actions have documented patterns in which facilities purporting to serve charitable or emergency purposes are alleged to function as temporary holding points for misappropriated goods, which are then reintroduced into retail, convenience, and secondary markets. Plaintiff alleges that these patterns reflect economic exploitation enabled by upstream data misuse, not isolated theft events.

228

Plaintiff alleges that the persistence and scale of these practices—despite years of public warnings, enforcement actions, and carrier harm—demonstrate that incremental safeguards are insufficient. The harm arises from design choices that privileged scale and distribution over containment, and from the conversion of federally mandated compliance into a private intelligence asset.

Accordingly, Plaintiff alleges that structural relief is required. Because Motive's privileged access to mandatory ELD data made it uniquely capable of seeding and scaling this ecosystem, the only adequate remedy is to defrock Motive of all third-party distribution and downstream interfacing, and to require that all compliance, telemetry, camera, and derived data be broadcast exclusively to the carrier. Carrier-only broadcast preserves safety and compliance while eliminating the signal leakage that enables offshore scale, identity reuse, blame shifting, and uncompensated freight movement and widespread freight theft.

---

### E. Transition to "Neutral Platform" While Retaining Control

Following the shutdown of its brokerage arm, Motive repositioned itself as a "neutral" marketplace infrastructure provider, inviting third-party brokers and logistics companies to participate. This repositioning was framed as removing conflicts of interest.

Motive did not relinquish control. It retained:

- Full access to carrier and driver data

229

- The ability to rank, filter, prioritize, and score carriers

- Control over matching logic and visibility

- Influence over which carriers appear "acceptable" or "risky"

- Technical integration pathways with broker-facing platforms

Thus, Motive ceased being a visible market participant while continuing to act as a market architect and gatekeeper.

---

## F. Ongoing Conflict of Interest

Motive's conflict of interest is ongoing and structural.

It simultaneously:

- Collects and controls sensitive carrier and driver data

- Sells services to carriers under compliance pretexts

- Supplies data, insights, or integrations to broker-facing platforms

- Shapes freight access, visibility, and eligibility outcomes

Motive has 100% access to almost all trucks, drivers, compliance records, and behavioral data of carriers using its systems, while carriers have no reciprocal visibility into how that data is used, shared, scored, or weaponized.

This imbalance allows Motive to influence economic outcomes—who gets freight, who is excluded, who is flagged—without issuing formal decisions, notices, or explanations.

230

## G. Alter-Ego Cycling and Identity Shifts

Motive has habitually altered its corporate identity, branding, and outward posture while preserving the same underlying data infrastructure and control mechanisms. The transition from KeepTruckin to Motive is emblematic of a broader pattern: rebranding without relinquishing power.

These shifts obscure continuity, frustrate accountability, and complicate carrier efforts to understand who controls their data, how decisions are made, and where responsibility lies.

## H. Mimicry of Government Systems Without Safeguards

Motive's systems replicate the look, language, and function of government compliance and enforcement tools, yet operate entirely outside constitutional, statutory, or administrative safeguards.

There is:

- No due process

- No neutral adjudicator

- No transparent scoring criteria

- No right to confront or correct data

- No meaningful opt-out once embedded

231

Carriers experience Motive's outputs as de facto regulatory judgments, even though they are generated by a private platform acting in its own economic interest.

---

## I. Enterprise Intent and Design

Taken together, Motive's conduct reflects a coherent enterprise design:

1. Leverage regulatory mandates to seed adoption

2. Capture continuous operational and behavioral data

3. Operate a brokerage to extract market intelligence

4. Build proprietary matching and marketplace technology

5. Withdraw from visible participation while retaining control

6. Monetize and leverage data asymmetry across the ecosystem

This was not accidental, reactive, or incidental. It was architected.

---

## J. Plaintiff's Contemporaneous Recognition and Field Validation

Plaintiff recognized this trajectory as early as 2017, identifying that ELD platforms would evolve into economic control points, not mere compliance tools. Although unable to compete financially with platform-scale actors, Plaintiff continued structured research, in-field participation, and data collection, combining firsthand carrier experience with analytical work alongside an engineer and owner operators/agency organizers.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

That field experience—spanning regulatory adoption, brokerage incubation, and platform consolidation—corroborates the enterprise design now visible in Motive's conduct and former employees and their public admissions.

---

## K. Harm and Relevance to Enterprise Claims

Motive's role is central to the enterprise because it supplies the data backbone that enables coercive control, blacklisting, retaliation, and market foreclosure without direct contractual privity or overt enforcement actions.

By designing and operating the surveillance and data architecture upon which other defendants rely, Motive knowingly facilitates and benefits from enterprise-wide misconduct affecting carriers, drivers, and interstate commerce.

## L. Progressive Insurance and API ELD interface and Ai Cameras with Video/Audio, in Cab

Motive publicly positions its relationship with Progressive as a telematics-based insurance integration, framed as:

- helping insurers "better understand risk,"

- enabling usage-based insurance (UBI), and

- allowing fleets to "earn better premiums" through data sharing.

233

On paper, Motive says it provides vehicle and driver telemetry (speed, braking, mileage, location patterns, safety events) that insurers like Progressive can use to price policies more accurately.

---

**What this means in practice (mechanically)**

**1.Data source**

Motive collects:

- ELD compliance data (mandatory),

- GPS location and routes,

- driving behavior (hard braking, speeding, idling),

- camera-derived events (AI-triggered incidents),

- driver identity and vehicle association.

This data exists continuously, regardless of insurance participation.

---

**2. Insurance-facing interface**

Through APIs or data feeds, Motive allows Progressive to:

- ingest summarized or event-based telemetry,

- associate driving behavior with insured vehicles or fleets,

- adjust underwriting, pricing, or eligibility models.

234

This is not a one-time snapshot — it is ongoing behavioral data.

---

## 3. Asymmetry

Progressive receives risk intelligence.

Carriers and drivers do not receive:

- the insurer's internal scoring,

- how specific Motive events are weighted,

- whether data affects renewal, cancellation, or premium increases,

- or how long data is retained.

This creates a one-way transparency problem.

---

## Why this matters legally (and structurally)

The Motive–Progressive linkage shows how:

- federally mandated compliance data (ELD)

  becomes

- commercial surveillance data,

235

which becomes

- insurance underwriting leverage.

The carrier cannot realistically opt out of:

- ELD data collection (required by law), or

- insurer reliance on that data (condition of coverage).

That combination converts compliance into economic compulsion.

---

**The deeper issue**

Motive sits in the middle of three roles:

1. Mandatory compliance infrastructure (ELD)

2. Commercial analytics platform

3. Data supplier to insurers

Progressive is not alleged to be unlawful by existing — but the pipeline is the issue.

Once:

- insurance eligibility,

- premiums,

- renewals,

- or cancellations

236

are influenced by continuous third-party surveillance, the carrier's "choice" is no longer voluntary.

---

The same data stream flows to:

- insurers (Progressive),

- brokers (via Highway, RMIS),

- platforms (risk scores),

- and enforcement tools (eligibility / exclusion).

That shows horizontal reuse of the same surveillance data across markets — insurance, brokerage, compliance — without carrier parity or due process, consent or a way to opt out.

**Remedies Sought as to Defendant**

**Motive Technologies, Inc.**

**A. Purpose of Relief and Remedy**

The relief sought against Motive is structural and prospective, not punitive. Plaintiff does not seek to bar Motive from providing lawful compliance or fleet-management services to carriers. Rather, Plaintiff seeks to limit Motive to its originally intended and represented function as a **carrier-facing compliance platform** only and to prohibit its use of surveillance-derived data to influence freight markets, broker decisions, or carrier eligibility outside of that role.

237

This relief is necessary to prevent continued conflicts of interest, ongoing market distortion, and irreparable harm to carriers operating in interstate commerce of which there is no remedy at law, absent adjudication.

---

**Injunctive Relief Limiting Motive to Carrier-Facing Functions**

Plaintiff seeks injunctive relief requiring that Motive:

1. Operate solely as a carrier-facing platform, providing compliance, safety, and fleet-management tools directly to motor carriers and drivers, and not as a broker-facing, market-shaping, or eligibility-determining infrastructure.

2. Cease using, monetizing, or repurposing carrier and driver data—including location, behavioral, compliance, video, audio, or performance data—for:

   o freight matching,

   o carrier ranking or prioritization,

   o broker screening or exclusion decisions,

   o marketplace design, or

   o indirect economic pressure on carriers

   o blacklisting

   o interfacing with the new "level VIII" Dot Inspection. This is crossing into dangerous territory to allow the government inside the cab with video/audio and an invasion of privacy. Truck Drivers live inside the cab, sleep and reside there.

238

3. Prohibit downstream sharing, licensing, or integration of carrier surveillance data with broker-facing platforms, risk-rating services, load boards, or third-party eligibility systems, except where expressly authorized by the carrier for a defined, carrier-benefiting purpose.

## C. Separation of Compliance Data from Market Functions

Plaintiff seeks an order requiring Motive to:

- Segregate compliance and safety data collected for regulatory or carrier-management purposes from any system capable of influencing freight access, pricing, or carrier participation.
- Maintain clear technical and operational firewalls preventing the use of compliance-derived data in marketplace or broker-oriented tools.
- Disclose, in plain language, the categories of data collected, how long such data is retained, and all categories of third parties with access.

## D. Prohibition on Quasi-Regulatory Conduct

Plaintiff seeks injunctive relief barring Motive from:

239

- Presenting private scores, flags, alerts, or risk indicators in a manner that mimics governmental enforcement or regulatory determinations when used outside a carrier's internal management.
- Functioning as a de facto regulator of carriers by influencing eligibility, access, or reputation without statutory authority, due process, or transparency.
- Disconnect from Progressive Insurance or other insurance agencies

Motive shall not act as an enforcement proxy, gatekeeper, or silent decision-maker for brokers or other market participants.

---

## E. Opt-Out, Portability, and Non-Retaliation Protections

Plaintiff seeks relief requiring Motive to:

- Provide carriers with a meaningful opt-out from any non-compliance, non-safety data uses without loss of service.
- Ensure data portability, allowing carriers to retrieve their own operational data in usable form.
- Prohibit retaliation, degradation of service, or adverse treatment against carriers who decline data sharing beyond compliance purposes.

---

## F. Independent Oversight and Compliance Certification

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

To ensure effectiveness, Plaintiff seeks:

- Appointment of an independent monitor or special master, limited in scope, to:
  - verify data segregation,
  - audit integrations,
  - certify compliance with the carrier-facing limitation.
- Periodic compliance reporting to the Court for a defined term.

---

## G. Declaratory Relief

Plaintiff seeks a declaration that:

- Motive is a private for profit platform, not a regulator;
- It possesses no authority to govern carrier eligibility, freight access, or economic participation beyond voluntary, carrier-initiated services; and
- Any use of compliance-derived surveillance data to influence markets constitutes an impermissible conflict of interest.

---

## H. Equity and Public Interest

The requested relief serves the public interest by:

- Preserving lawful compliance tools,
- Restoring balance and transparency to freight markets,

241

- Preventing private surveillance platforms from exercising unchecked economic control over federally authorized carriers,

- Protecting interstate commerce from opaque, non-regulatory gatekeeping.

**Alignment of Motive Remedies With Sherman Act and RICO Equitable Relief**

**A. Statutory Basis for Equitable Relief**

The relief sought against Motive Technologies, Inc. is authorized and appropriate under:

- Sherman Act §16 (15 U.S.C. § 26), which permits injunctive relief to prevent and restrain ongoing or threatened antitrust violations; and

- RICO §1964(a) (18 U.S.C. § 1964(a)), which empowers courts to impose equitable remedies to prevent and restrain future racketeering activity, including restrictions on enterprise conduct, structural separation, and oversight.

Plaintiff seeks prospective, structural relief narrowly tailored to prevent recurrence of the unlawful conduct.

---

**B. Sherman Act Alignment: Restraint of Trade and Market Foreclosure**

Under the Sherman Act, the Court may enjoin conduct that unreasonably restrains trade or threatens future anticompetitive effects.

The remedies limiting Motive to a carrier-facing role only directly address the mechanisms by which Motive's conduct restrains trade, including:

242

- Information asymmetry created by exclusive access to real-time carrier and driver data;
- Vertical foreclosure, where carriers are excluded or disadvantaged through opaque platform-derived signals rather than open competition;
- Market manipulation through private ranking, filtering, or eligibility systems that influence broker behavior without transparency or due process.

By prohibiting Motive from using compliance-derived data to influence freight access, pricing, or eligibility, the requested relief restores competitive neutrality, prevents future exclusionary conduct, and aligns with the Sherman Act's purpose of preserving open and fair markets.

---

## C. RICO Alignment: Preventing Continuity of Enterprise Misconduct

Under RICO, courts are empowered to prevent and restrain future violations by addressing the structure and operation of the enterprise itself, even where unlawful acts are ongoing or threatened rather than completed.

The requested remedies are specifically designed to disrupt:

- Enterprise continuity, by removing Motive's ability to act as a hidden data-control node;
- Common purpose, by eliminating the economic incentive to repurpose surveillance data for market control;
- Relatedness, by severing technical and operational linkages between compliance systems and broker-facing market tools.

243

Limiting Motive to carrier-facing compliance functions prevents it from continuing to supply the data backbone that enables coordinated blacklisting, coercive control, and retaliation by other enterprise participants.

---

## D. Structural and Conduct Remedies Permitted Under RICO

The relief sought falls squarely within the scope of remedies authorized by RICO, including:

- Restrictions on future activities of an enterprise participant;

- Prohibitions on engaging in specified lines of business or conduct;

- Structural separation of lawful functions from unlawful ones;

- Appointment of oversight to ensure compliance.

Here, the requested limitation does not dismantle Motive's business. It redefines and confines it to the role Motive publicly represents—carrier-facing compliance—while preventing misuse of surveillance-derived data as an enterprise enforcement mechanism.

---

## E. Irreparable Harm and Prospective Necessity

Both Sherman Act and RICO jurisprudence recognize that data-driven market control, once entrenched, causes irreparable harm not easily remedied by damages alone.

Absent injunctive relief:

244

- Carriers remain subject to invisible exclusion without notice or recourse;

- Market power continues to be exercised through private platforms rather than competition;

- The enterprise retains the ability to rebrand, reconfigure, and continue misconduct under altered identities.

The requested relief is therefore necessary to prevent future violations, not merely to address past harm.

---

## F. Public Interest and Equitable Balance

The remedies serve the public interest by:

- Preserving legitimate compliance and safety tools;

- Preventing private platforms from exercising quasi-regulatory power over interstate commerce;

- Protecting federally authorized carriers from opaque economic exclusion;

- Reinforcing the distinction between lawful regulation and private surveillance-based control.

The balance of equities favors relief that restores transparency and competition while allowing Motive to continue lawful, carrier-benefiting operations

## Structural Remedy (the only adequate relief)

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Plaintiff seeks equitable relief defrocking Motive of all third-party data distribution, interfacing, and downstream visibility, and limiting Motive's operations solely to carrier-facing compliance services.

Specifically, Motive shall:

1. Broadcast data only to the carrier

   o All ELD, telemetry, camera, audio, video, and derived analytics shall be visible exclusively to the carrier that owns the equipment and employs the driver.

   o No data, signals, scores, or summaries may be transmitted to brokers, insurers, verification platforms, load boards, or third parties.

2. Terminate all third-party integrations

   o Motive shall disable and permanently cease:

      ▪ API connections,

      ▪ data feeds,

      ▪ shared dashboards,

      ▪ insurer integrations,

      ▪ broker-facing analytics,

      ▪ eligibility or risk scoring outputs.

   o No "opt-in," "value-add," or "consent-based" exceptions apply where the underlying data stream originates from federally mandated ELD compliance.

3. Prohibit downstream use of compliance data

   o Data collected to satisfy federal compliance may not be repurposed for:

246

- underwriting,

- pricing,

- eligibility determinations,

- surveillance-based enforcement,

- or market access decisions.

4. Restore parity and control to carriers

   o Carriers shall retain:

     - sole access to their data,

     - sole discretion to export it,

     - and sole authority to decide whether, when, and to whom it is shared.

---

**Why this remedy is necessary (and narrow)**

- Motive cannot be both:

  o mandatory compliance infrastructure, and

  o a commercial surveillance distributor.

- The harm arises from architecture.

- Disclosure controls, consent screens, or audits cannot cure the coercion created by mandatory data capture.

- Reversion to carrier-only broadcasting:

  o preserves ELD compliance,

  o preserves safety,

  o preserves Motive's core product,

247

o while eliminating unlawful leverage.

This remedy is prospective, structural,  and is the least intrusive means of restoring lawful market conditions.

A company entrusted with mandatory compliance data may serve the carrier—or the market—but not both.

# Defendant: 7

# Highway.com Highway app,

# Highway load board

## 1. Highway expressly distinguishes "Carriers" from "Customers"

This is not accidental language.

Throughout the policy:

- "Customers" are the entities to whom information is disclosed and for whom services are optimized.
- "Carriers" are the subjects of data collection, verification, monitoring, and eligibility assessment.

This distinction matters because it establishes:

248

- Two classes of users

- Asymmetric rights and power

- A principal–subject relationship, not a peer marketplace

Carriers are not Highway's customers in the meaningful sense.

They are the evaluated population.

---

## 2. Data flows primarily from Carriers → Customers

Highway states that it discloses carrier information to:

- Customers (brokers / shippers),

- Vendors,

- Advertising partners,

- Integration partners,

- Affiliates,

- Professional advisors,

- Legal authorities.

Carriers, by contrast:

- Do not receive reciprocal visibility,

- Do not control downstream use,

249

- Do not know which customers accessed or relied on their data,

- Cannot meaningfully audit or contest outcomes.

This is one-way transparency.

---

## 3. Eligibility is explicitly conditioned on surveillance

Highway admits that:

- Carriers may stop precise geolocation collection,

- But customers may require visibility to remain eligible to service contracts.

That sentence alone establishes:

- Surveillance as a condition of market access

- Consent as coerced, not voluntary

- A functional penalty for exercising privacy rights

This directly contradicts the stated "non-discrimination" assurance elsewhere in the policy.

---

## 4. Precise geolocation is tied to ELD integrations

Highway expressly identifies:

- Precise geolocation information (ELD) as a category of personal information,

250

- Shared with vendors and customers.

This confirms:

- Continuous operational telemetry ingestion,

- Use beyond shipment-level tracking,

- Broker-side visibility into carrier movement and behavior.

This is not passive compliance data.

It is live operational intelligence.

---

## 5. Audio information is collected and disclosed

Highway lists audio information as a category of personal information,

shared with vendors.

Combined with:

- identity verification,

- eligibility determinations,

- dispute investigation,

- fraud analysis,

251

This creates a reasonable belief of monitoring, which is sufficient to establish a chilling effect—regardless of how often recordings are accessed.

---

## 6. Biometric data is required for identity verification

Highway requires:

- facial imagery,

- government-issued ID,

- biometric identifiers processed by verification vendors.

Although Highway claims biometric data is not shared downstream, it:

- is retained for years,

- is a gatekeeping prerequisite,

- and is required to access the marketplace at all.

This places identity custody with Highway and its vendors, not with the carrier.

---

## 7. Publicly available information" carve-out limits carrier rights

Highway asserts that some information it collects is "publicly available" and therefore:

- not subject to access,

- not subject to deletion,

252

- not subject to correction.

This allows Highway to:

- ingest government records,

- repackage them,

- enrich them with analytics,

- and distribute them to customers,

while denying carriers the ability to challenge accuracy or context.

That is data laundering, not neutral use of public records.

---

## 8. Advertising and analytics confirm monetization of carrier data

Highway admits it:

- shares identifiers and activity data with advertising partners,

- uses analytics to expand reach and effectiveness,

- may engage in "sharing" or "selling" under California law.

This confirms:

- Carrier data is an asset,

- Brokers are the paying audience,

- Highway's revenue model depends on carrier-derived intelligence.

253

From Highway's own policy:

Customers are the decision-makers.

Carriers are the data source.

Highway is the intermediary that transforms surveillance into eligibility.

That is not a neutral platform.

It is a private regulatory layer operating:

- without statutory authority,

- without due process,

- without appeal,

- and without reciprocal rights.

Highway's own privacy disclosures establish a two-tier system in which carriers are continuously surveilled, profiled, and conditioned for eligibility, while customers receive actionable intelligence without accountability.

Highway operates a two-tier system in which brokers are treated as "customers" and carriers are treated as a surveilled population whose continued market access is conditioned on submission to identity capture, biometric verification, continuous ELD-based geolocation, audio monitoring, and data enrichment. Highway aggregates carrier data from public records, ELD integrations, analytics vendors, and direct surveillance, repackages it into eligibility signals, and distributes

254

those signals to brokers while denying carriers reciprocal access, transparency, or meaningful correction. This structure enables concerted refusals to deal and market foreclosure by centralizing broker decision-making around Highway's outputs (antitrust), imposes economic exclusion without notice or process (due process), coerces consent through surveillance-based eligibility conditioning (coercion), and constitutes a continuing enterprise that monetizes carrier data and exclusionary effects through interstate systems and third-party integrations (RICO). Highway operates a two-tier system in which brokers are treated as "customers" and carriers are treated as a surveilled population whose continued market access is conditioned on submission to identity capture, biometric verification, continuous ELD-based geolocation, audio monitoring, and data enrichment. Highway aggregates carrier data from public records, ELD integrations, analytics vendors, and direct surveillance, repackages it into eligibility signals, and distributes those signals to brokers while denying carriers reciprocal access, transparency, or meaningful correction. This structure enables concerted refusals to deal and market foreclosure by centralizing broker decision-making around Highway's outputs (antitrust), imposes economic exclusion without notice or process (due process), coerces consent through surveillance-based eligibility conditioning (coercion), and constitutes a continuing enterprise that monetizes carrier data and exclusionary effects through interstate systems and third-party integrations (RICO).A

## A. Identity, Represented Purpose, and Non-Regulatory Status

Defendant Highway is a privately owned, for-profit technology platform that presents itself as a "carrier identity," "trust," and "fraud prevention" system for the freight industry. Highway is not a governmental entity, not a regulator, not a law-enforcement body, and not delegated authority

by the Federal Motor Carrier Safety Administration ("FMCSA"), the Department of Transportation, or any state agency.

Highway nevertheless holds itself out as an authoritative source of carrier legitimacy, risk assessment, and eligibility—providing brokers with simplified, binary signals that effectively determine whether a federally authorized motor carrier may access freight.

Highway's authority is entirely private, contractual, and technological. It derives its power not from statute or rulemaking, but from broker dependence, data aggregation, and market concentration.

---

## B. False Neutrality and Platform Posture

Highway publicly characterizes itself as a neutral identity and verification layer—distinct from brokers, load boards,(yet has a load board built into the platform) or enforcement bodies. In practice, Highway operates as a broker-facing gatekeeper, supplying eligibility signals that brokers rely upon to accept or reject carriers without direct investigation, explanation, or recourse.

Although Highway claims to merely "verify," it actively shapes market outcomes by determining which carriers are visible, trusted, or excluded. This function is not passive. It is determinative.

Highway's neutrality is further undermined by its ongoing platform expansion, including features that increasingly resemble load-board functionality, carrier discovery, and transactional facilitation—while simultaneously asserting control over carrier identity and access.

256

## C. De Facto Regulatory Function Without Safeguards

Highway's systems replicate core attributes of government regulation while operating entirely outside public accountability. These include:

- centralized carrier identity records,

- risk or fraud flags,

- approval or denial states,

- opaque criteria,

- absence of notice,

- absence of appeal,

- absence of due process.

Carriers experience Highway's outputs as de facto enforcement decisions, even though Highway lacks statutory authority and is not bound by administrative law, constitutional safeguards, or transparency obligations.

## D. Integration Into the Enterprise Architecture

Highway functions as a downstream enforcement and amplification node within the broader freight-tech enterprise.

257

Where upstream platforms collect real-time operational, behavioral, and compliance data, Highway converts that information—directly or indirectly—into simplified eligibility signals consumed by brokers. In doing so, Highway transforms raw surveillance data into economic exclusion, without issuing formal decisions or assuming regulatory responsibility.

This design allows the enterprise to discipline carriers without notice, explanation, or traceable accountability.

---

### E. Plaintiff's Direct Experience Demonstrating Non-Neutrality and Fraud Enablement

Plaintiff's experience illustrates Highway's operational reality.

When Plaintiff was invited by 5 Star Trucking to onboard for the very first load as All Directions Trucking, Plaintiff was prevented from proceeding because Highway reported that Plaintiff's federally authorized motor carrier profile was already in use by another party. Plaintiff can produce evidence of this.

Plaintiff had not authorized any third party to create, control, or use her motor carrier identity. Despite this, Highway's system treated the fraudulent user as authoritative, blocking Plaintiff from accessing freight under her own new MC number.

An offshore dispatching service had already assumed—without Plaintiff's consent—that it would control Plaintiff's access to loads through Highway, demonstrating how Highway's system facilitates identity appropriation and unauthorized third-party control, rather than preventing it.

258

It took approximately ninety (90) days for Highway to decommission the fraudulent user and allow Plaintiff to reclaim and adopt her own motor carrier identity—during which time Plaintiff was effectively excluded from freight opportunities.

---

## F. Fraud Prevention in Name, Fraud Facilitation in Practice

Highway markets itself as a fraud-prevention platform. In operation, it enables fraud by:

- allowing unauthorized third parties to assume control over carrier identities,

- treating fraudulent profiles as authoritative,

- blocking the rightful carrier from accessing freight,

- placing the burden of correction on the victimized carrier,

- delaying remediation while economic harm accrues.

This inversion—where the rightful carrier is locked out and the fraudulent user is initially empowered—demonstrates that Highway's system prioritizes broker convenience and platform control over accuracy, carrier rights, or lawful authority.

---

## G. Intent and Enterprise Consistency

Highway's conduct is not accidental. It reflects a consistent enterprise pattern:

259

- claim neutrality,

- centralize identity,

- control visibility,

- expand platform scope,

- deny regulatory responsibility,

- externalize harm to carriers.

There is, in every sense, a "motive" embedded in Highway's design: to convert data and identity into leverage over freight access, while avoiding the obligations that accompany true regulatory authority.

---

**Defendant:**

**Highway**

**#2 — Data Sources, Ingest, and Information Asymmetry**

**A. Multi-Source Data Ingest Without Carrier Control**

Highway's power does not arise from carrier contracts alone, but from its ability to aggregate, synthesize, and operationalize data originating outside the carrier's direct control. Highway ingests information from multiple upstream and lateral sources, including but not limited to:

- broker-submitted records and assessments,

- carrier onboarding artifacts and identity credentials,

260

- third-party compliance and monitoring platforms,

- historical activity and behavioral indicators, and

- platform-to-platform integrations that transmit carrier status, flags, or reputational signals.

This architecture allows Highway to construct a centralized carrier identity profile that carriers cannot fully see, audit, or correct in real time, yet which brokers treat as authoritative.

---

## B. Upstream Surveillance Dependency and Downstream Translation

Highway operates as a translation layer within the enterprise.

Upstream platforms collect continuous operational, compliance, and behavioral data about carriers, trucks, and drivers. Highway then converts that complex data environment into simplified eligibility signals—trusted/untrusted, verified/unverified, acceptable/rejected—that brokers rely on to make freight decisions.

This translation strips context, eliminates nuance, and obscures provenance, while preserving the economic effect of the data: exclusion or access.

Carriers are never informed which upstream data source, platform input, or third-party assertion triggered an adverse outcome.

---

## C. Broker-Driven Inputs Masquerading as Objective Identity

261

Highway allows brokers to submit or influence carrier identity determinations while presenting the resulting profile as neutral and objective.

This design enables:

- broker-originated allegations to be embedded as platform "truth,"
- reputational signals to propagate across unrelated brokers, and
- private commercial preferences to masquerade as fraud prevention.

Highway does not function as an independent verifier. It functions as an amplifier—transforming broker suspicion, third-party assertions, or upstream data into durable exclusion signals.

---

## D. Identity Control Without Title or Consent

Highway asserts functional control over motor carrier identities—including MC numbers and associated operational profiles—without requiring proof of rightful authority from the carrier.

As demonstrated by Plaintiff's experience, Highway's system permitted an unauthorized third party to assume control over Plaintiff's carrier identity, blocking Plaintiff from onboarding with a legitimate broker while treating the fraudulent user as the authoritative account holder.

During this period:

- the rightful carrier was excluded,
- the fraudulent user remained active,
- and Highway required prolonged remediation efforts before restoring control.

262

This structure reveals that Highway's data model prioritizes platform continuity over lawful identity ownership.

---

## E. Asymmetry by Design

Highway's data architecture is intentionally asymmetric:

- Highway sees everything: aggregated inputs, historical signals, broker feedback, and third-party data.
- Brokers see conclusions: simplified trust or risk indicators.
- Carriers see almost nothing: no full record, no source attribution, no timeline, no explanation.

This asymmetry ensures that Highway can deny responsibility for outcomes while still causing those outcomes.

---

## F. Lack of Verification, Audit, or Timely Correction

Highway provides no meaningful mechanism for carriers to:

- verify who created or controls their profile,
- immediately reclaim identity from unauthorized users,

263

- contest false or outdated information,

- identify which data source caused an exclusion,

- or obtain timely correction before economic harm accrues.

Instead, carriers are subjected to delay-based exclusion, where access to freight is denied while the platform investigates itself.

---

## G. Enterprise Intent Reflected in Data Design

Highway's data ingest and synthesis model reflects enterprise intent:

- centralize identity,

- externalize data risk onto carriers,

- preserve broker confidence,

- deny regulatory responsibility,

- and maintain leverage without accountability.

This is not accidental engineering. It is control architecture.

**Defendant: 7**

**Highway**

**#3 — Market Role: Broker-Facing Gatekeeper and Eligibility Enforcement**

264

## A. Highway as the Functional Decision-Maker

Highway does not merely provide information to brokers; it functions as the decision-maker that determines whether a carrier may participate in the freight market at all. Brokers rely on Highway's outputs as a prerequisite to onboarding, tendering loads, or continuing relationships with carriers.

In practice, a carrier's ability to obtain freight is conditioned on Highway's approval status—regardless of the carrier's federal authority, safety record, insurance, or past performance. This places Highway in the position of a private gatekeeper controlling access to interstate commerce.

---

## B. Binary Signals With Determinative Economic Effect

Highway reduces complex, disputed, and often unverifiable data into binary eligibility signals (e.g., approved / not approved; trusted / untrusted; verified / unverified). These signals are treated by brokers as dispositive.

Once a negative signal is issued:

- brokers decline to tender loads,

- onboarding halts or is reversed,

- carriers are excluded without explanation,

- and the exclusion propagates across unrelated brokers using the same platform.

265

This occurs without contractual privity, without notice, and without an opportunity to be heard.

---

## C. Delegated Enforcement Without Accountability

Brokers rely on Highway to outsource risk, diligence, and responsibility. By deferring to Highway's determinations, brokers avoid making independent judgments while retaining plausible deniability for exclusionary conduct.

Highway, in turn, disclaims responsibility by asserting that it merely provides information.

This circular delegation results in enforcement without an enforcer:

- carriers are excluded,
- no party claims decision-making authority,
- and no avenue for redress exists.

---

## D. Replacement of FMCSA Transparency With Private Control

Federal motor carrier authority is issued by the FMCSA and is intended to be public, transparent, and uniform. Highway supplants this system by inserting private eligibility criteria that are:

- undisclosed,
- non-uniform,
- non-reviewable,

266

- and subject to platform discretion.

As a result, carriers who are fully authorized under federal law are nevertheless functionally barred from the market by a private platform operating outside statutory limits.

---

## E. Retaliation and Cascading Exclusion

Highway's gatekeeping role enables retaliation and cascading exclusion.

A carrier flagged once may experience:

- immediate denial by one broker,

- followed by rejection across multiple brokers,

- based solely on shared reliance on Highway's signals.

Because Highway's determinations are opaque, carriers cannot identify whether the exclusion is based on:

- fraud allegations,

- data errors,

- broker complaints,

- third-party assertions,

- or retaliatory conduct.

The result is market-wide exclusion without a charge, finding, or remedy.

267

## F. Expansion Into Load Board and Transactional Functions

Highway has expanded beyond identity verification into features that resemble carrier discovery, load visibility, and transactional facilitation, blurring the line between verification platform and marketplace participant.

This expansion intensifies the conflict of interest:

- Highway controls identity and eligibility,
- while simultaneously expanding into functions that benefit from controlling who is visible and selectable.

This mirrors the same enterprise pattern previously employed by other platform defendants: claim neutrality while consolidating control.

## G. Economic Coercion Through Silence

Highway enforces compliance not through overt sanctions, but through silence:

- no notice,
- no explanation,
- no timeline,
- no appeal.

268

Carriers are left to infer exclusion through repeated rejection and loss of income. This silence is itself a mechanism of coercion, forcing carriers to submit to platform demands, third-party intermediaries, or unauthorized dispatchers to regain access.

---

## H. Enterprise Function and Intent

Within the enterprise, Highway serves as the enforcement layer that converts upstream data and private assertions into downstream economic harm.

It allows the enterprise to:

- exclude carriers without overt action,

- discipline dissenting or independent operators,

- maintain control while avoiding regulatory scrutiny,

- and perpetuate a system of private governance over public commerce.

This role is intentional, profitable, and ongoing.

**Defendant:**

**Highway**

**#4 — Enterprise Integration: Upstream Surveillance, Downstream Enforcement, and Closed-Loop Control**

269

## A. Highway's Position Within the Enterprise Architecture

Highway does not operate in isolation. It occupies a critical middle position within the enterprise architecture—receiving data, signals, and assumptions from upstream surveillance and compliance platforms, and transmitting simplified enforcement outcomes downstream to brokers and market participants.

This position allows Highway to function as the conversion point where raw data and private assertions are transformed into actionable economic consequences for carriers.

---

## B. Upstream Coordination: Surveillance-to-Identity Pipeline

Upstream platforms collect continuous, real-time information about carriers, trucks, and drivers, including operational behavior, compliance activity, location data, and performance metrics. Highway ingests or relies upon outputs derived from these systems—whether through direct integrations, shared data environments, broker inputs informed by those platforms, or third-party services that themselves depend on upstream surveillance.

Highway does not independently verify this upstream information. Instead, it inherits and operationalizes it, embedding upstream assumptions into c into carrier identity profiles that are treated as authoritative by brokers.

270

In this way, surveillance becomes identity, and identity becomes eligibility.

---

## C. Downstream Coordination: Broker Reliance and Market Enforcement

Downstream, brokers rely on Highway as a single source of truth for carrier legitimacy and risk. Brokers are encouraged—explicitly or implicitly—to trust Highway's determinations rather than conduct individualized assessments.

This reliance creates uniform enforcement across otherwise independent brokers. A carrier excluded through Highway is not merely rejected by one broker, but by many, because the same eligibility signal is reused across the market.

The enterprise thus achieves horizontal coordination through vertical dependence, without brokers needing to communicate with one another.

---

## D. Closed-Loop Design and Self-Reinforcement

Highway's architecture creates a closed feedback loop:

1. Upstream platforms generate data or behavioral signals.

2. Highway converts those signals into identity or risk determinations.

3. Brokers act on those determinations by excluding carriers.

4. Broker actions are treated as validation of the original signals.

5. The exclusion is reinforced and normalized across the market.

271

At no point does the carrier receive a clear explanation, an opportunity to contest the underlying premise, or a mechanism to break the loop.

---

## E. Plausible Deniability by Design

Each enterprise participant disclaims responsibility:

- Upstream platforms claim neutrality as data collectors.
- Highway claims it only provides information.
- Brokers claim reliance on third-party verification.

Yet the combined effect is deliberate and foreseeable: exclusion, coercion, and economic harm to carriers.

This structure allows the enterprise to act collectively while avoiding accountability individually.

---

## F. Replacement of Public Governance With Private Coordination

Federal motor carrier regulation is intended to be centralized, transparent, and subject to oversight. The enterprise replaces this system with private coordination, where eligibility is determined by platforms that are unregulated, opaque, and economically conflicted.

272

Highway is the mechanism through which this replacement becomes operational—substituting platform trust scores for public authority, and private data flows for statutory process.

---

## G. Intentional Design, Not Accidental Interoperability

The interoperability between Highway and upstream and downstream actors is not accidental. It reflects intentional design choices:

- standardized eligibility outputs,

- simplified broker interfaces,

- opaque carrier dashboards,

- and frictionless propagation of exclusion signals

These features are optimized for speed, scale, and control, not fairness, accuracy, or due process.

---

## H. Enterprise Role Summary

Within the enterprise, Highway serves as:

- the identity arbiter for carriers,

- the enforcement proxy for brokers, and

- the shield that prevents accountability from attaching to any single actor.

273

This role is essential to the enterprise's ability to restrain trade, suppress competition, and discipline carriers without overt enforcement action.

**Defendant:**

**Highway**

**#5 — Feature Creep, Load-Board Convergence, and the Commodity Model**

**A. From "Verification Tool" to Market Controller**

Highway originally held itself out as a fraud-prevention and identity verification tool for brokers. Its stated purpose was narrow: confirm that a carrier is who it claims to be.

Through feature creep, Highway expanded far beyond that role.

Over time, Highway added features and functions that now allow it to:

- control who may onboard with brokers,

- determine whether a carrier is "acceptable,"

- block carriers from freight opportunities,

- retain and control carrier identities,

- and influence market visibility across multiple brokers at once.

Highway did not announce a transition into market control. It simply added features until the outcome was unavoidable.

---

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## B. Broker as the Customer, Carrier as the Commodity

Highway's true business model becomes clear when viewed economically.

- The broker is the customer.

  Brokers pay, integrate, and rely on Highway's outputs.

- The carrier is the commodity.

  Carriers are not the audience being served; they are the subject being evaluated, filtered, and traded on.

- Data is the asset.

  Carrier identity, behavior, compliance history, location, and activity are collected, aggregated, and monetized.

In this model, carriers are not clients. They are inputs.

Highway's platform exists to package carrier data into simplified signals that brokers can consume quickly, cheaply, and at scale.

---

## C. Continuous Data Dependency Through ELD Integration

Carriers do not interact with Highway once. They are continuously interfaced with the data ecosystem that feeds Highway.

275

Because carriers are required by federal mandate to use Electronic Logging Devices (ELDs), their trucks and drivers generate continuous streams of operational and compliance data. This data does not stop when the truck stops.

That continuous data flow means:

- carrier behavior is always being recorded,

- compliance status is always being evaluated,

- historical data never expires,

- and past signals follow the carrier indefinitely.

Highway benefits from this always-on data environment, even when carriers have no direct relationship with Highway and no meaningful way to disengage.

---

## D. Feature Creep Into Load-Board and Market Functions

Highway has expanded beyond identity verification into features that resemble:

- carrier discovery,

- market visibility,

- broker-carrier matching,

- and transactional facilitation.

276

These are functions traditionally associated with load boards and marketplaces.

This convergence matters because:

- Highway controls identity and visibility,

- eligibility and discovery,

- verification and access.

When one platform controls all three, it is no longer neutral. It is structural control.

---

## E. Why This Is Dangerous (In Simple Terms)

When one private company:

- sees the data,

- decides what it means,

- and controls who gets access,

then a carrier can be locked out of work without ever being accused of anything, without being told why, and without being able to fix it.

That is exactly what happened to Plaintiff:

- her identity was already "in use,"

- a fraudulent party was treated as legitimate,

- she was excluded from onboarding,

277

- and it took months to correct—during which income was lost.

This is not fraud prevention.

This is fraud enablement through design.

---

## F. Enterprise Intent Reflected in Feature Expansion

Feature creep is not accidental growth. It is how platforms:

- avoid early scrutiny,

- build dependency,

- then consolidate power quietly.

Highway's expansion follows the same enterprise playbook seen elsewhere:

1. claim neutrality,

2. centralize data,

3. simplify outputs for powerful customers,

4. deny regulatory responsibility,

5. externalize harm to carriers.

Each feature added increased Highway's leverage while reducing carrier visibility and control.

---

## G. Enterprise Function

278

Within the enterprise, Highway's feature creep transformed it from a verification tool into a market enforcement mechanism.

It now:

- converts continuous data into exclusion,

- replaces public authority with private signals,

- and allows brokers to rely on platform decisions instead of law or transparency.

That transformation is central to the enterprise's ability to restrain trade, suppress competition, and control access to interstate commerce.

**Defendant:**

**Highway**

**#6 — Harm, Causation, and the Chilling Effect on Carriers and Drivers**

**A. Continuous Telemetry and Market Exposure**

Motor carriers are required by federal mandate to operate with Electronic Logging Devices ("ELDs"), which generate continuous telemetry—including location, movement, time, and compliance data—whenever a truck is in service. This telemetry does not exist in isolation. Through integrations and platform-to-platform interfaces, it is broadcast, shared, or made available to downstream systems relied upon by brokers and broker-facing platforms.

279

As a result, carrier operations are continuously exposed to private market actors who are not regulators and are not bound by due process. Highway operates within this environment as the identity and eligibility layer that converts continuous telemetry into market consequences.

## B. Access to In-Cab AI Camera Video and Audio

Through its position in the enterprise ecosystem and integrations with upstream surveillance platforms, Highway enables brokers and other market participants to benefit from access to in-cab AI camera outputs, including video and audio streams or derived behavioral signals.

This includes inward-facing monitoring that captures:

- driver behavior,
- cabin activity,
- speech and interactions,
- and conduct unrelated to safety or compliance.

Even where live access is mediated or indirect, the reasonable belief of access—that brokers and platforms can see, hear, or infer in-cab activity—fundamentally alters driver and carrier behavior.

## C. The Chilling Effect on Speech, Negotiation, and Lawful Conduct

280

Knowing that:

- telemetry is continuous,

- identity profiles are persistent,

- eligibility signals are opaque,

- and adverse outcomes propagate instantly across brokers,

carriers and drivers experience a chilling effect.

Drivers and owner-operators refrain from:

- negotiating rates,

- disputing broker conduct,

- raising safety or payment concerns,

- engaging in candid communications,

- or asserting contractual rights,

out of fear that any expression—spoken, behavioral, or inferred—may trigger:

- negative platform flags,

- FreightGuard reports,

- identity downgrades,

- or market-wide blacklisting.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

This chilling effect is not speculative. It is a rational response to a system where speech and behavior can be surveilled, interpreted, and economically punished without notice.

---

## D. FreightGuard and Blacklisting as Retaliatory Outcomes

Highway's eligibility signals and identity determinations operate in tandem with reputation and reporting systems used by brokers. Once a carrier is flagged or downgraded:

- brokers decline loads without explanation,
- onboarding is halted or reversed,
- negative reports appear without adjudication,
- and the exclusion spreads across the market.

Carriers understand—through experience and industry knowledge—that challenging brokers or platforms increases the risk of FreightGuard reports and blacklisting. The result is coerced silence.

---

## E. Causation: From Data to Economic Harm

The causal chain is direct and foreseeable:

1. Continuous ELD telemetry and in-cab monitoring generate data.
2. That data, or signals derived from it, flows into platform ecosystems.
3. Highway converts those inputs into identity and eligibility determinations.

282

4. Brokers rely on those determinations to deny access to freight.

5. Carriers suffer immediate and ongoing economic harm.

At no point does the carrier receive notice of the alleged issue, an opportunity to contest it, or a neutral forum for review.

## F. Disproportionate Impact on Owner-Operators and Small Carriers

The harm falls most heavily on:

- owner-operators,

- small carriers,

- women-owned and independent businesses,

- and drivers without bargaining power.

Unlike large fleets, these carriers cannot absorb weeks or months of exclusion, cannot negotiate special access, and cannot operate without platform approval. The system effectively forces compliance through economic pressure, not law.

## G. Interstate Commerce Impact

Highway's conduct restrains and disrupts interstate commerce by:

- removing federally authorized carriers from the market,

283

- suppressing rate negotiation,

- discouraging lawful competition,

- and concentrating freight access among compliant or platform-favored actors.

This harm is ongoing, structural, and not remediable through damages alone.

---

## H. Enterprise-Level Consequences

By enabling surveillance-driven retaliation and blacklisting, Highway provides the enforcement mechanism that allows the enterprise to function without overt coordination or formal sanctions.

The chilling of speech, suppression of negotiation, and fear of retaliation are features, not side effects, of the system's design.

### Section #6 — Conclusion: RICO, Sherman Act, and Hobbs Act Implications

### A. RICO: Enterprise Conduct, Continuity, and Coercive Control

The conduct described above establishes that Highway knowingly participates in an enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

Highway does not merely supply software. It performs an essential enterprise function by converting continuous surveillance data—originating from ELD telemetry, in-cab AI camera systems, broker inputs, and third-party assertions—into economic exclusion and coercive pressure against federally authorized carriers.

284

This conduct satisfies RICO's requirements:

- Enterprise: A structured association-in-fact among surveillance platforms, identity systems, brokers, and reputation mechanisms.
- Common purpose: Control of freight access and market discipline of carriers.
- Relationships: Interoperability and mutual reliance between platforms and brokers.
- Continuity: Ongoing, repeated exclusionary acts affecting interstate commerce.

Highway's role as the enforcement and amplification layer gives effect to the enterprise's objectives while allowing upstream and downstream actors to disclaim responsibility.

---

## B. Hobbs Act: Extortion Through Fear of Economic Harm

Highway's conduct also constitutes extortion under color of the Hobbs Act (18 U.S.C. § 1951).

Carriers are compelled to surrender property interests—including labor, economic opportunity, rate negotiation rights, and control over their own business operations—through the wrongful use of fear of economic harm.

That fear is real, reasonable, and induced by:

- continuous monitoring of trucks and drivers,
- the reasonable belief that in-cab video and audio may be accessed or inferred by brokers,
- opaque identity and eligibility determinations,

285

- the threat of FreightGuard reports and blacklisting,

- and the knowledge that exclusion propagates instantly across the market.

Carriers and drivers are coerced into silence, non-negotiation, and submission—not by overt threats, but by a system designed to punish dissent invisibly. This is extortion by design, not accident.

---

## C. Sherman Act: Restraint of Trade and Market Foreclosure

Highway's conduct further violates Section 1 of the Sherman Act by facilitating unreasonable restraints of trade and market foreclosure.

By acting as a centralized gatekeeper relied upon by multiple brokers, Highway enables:

- concerted refusals to deal,

- horizontal exclusion through vertical dependence,

- suppression of price negotiation, and

- removal of lawful competitors without process.

Carriers who possess valid federal authority are nevertheless barred from participating in the market based on private, undisclosed criteria. This substitutes platform control for competition and private governance for public regulation.

The restraint is not ancillary or incidental—it is the core function of the system.

---

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## D. Interstate Commerce Nexus

The conduct described directly affects interstate commerce by:

- preventing carriers from hauling freight across state lines,

- suppressing lawful competition,

- distorting freight pricing,

- and concentrating market access in the hands of platform-favored actors.

Because carriers are required to operate ELDs continuously, the effects are constant, not episodic.

---

## E. Summary

In sum:

- RICO is satisfied because Highway knowingly operates as part of a continuing enterprise that uses surveillance and identity control to discipline carriers.

- The Hobbs Act is satisfied because carriers are coerced through fear of economic harm into surrendering rights and opportunities.

- The Sherman Act is satisfied because Highway enables coordinated market exclusion and suppresses competition without lawful justification.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Highway's conduct is not neutral, not accidental, and not protective. It is structural, intentional, and ongoing, and it is central to the enterprise's ability to restrain trade and extort compliance from carriers operating in interstate commerce.

**Remedies Sought as to Defendant**

**Highway**

**A. Purpose and Scope of Relief**

Plaintiff seeks forward-looking equitable relief to prevent ongoing and future harm. The relief is does not seek to dismantle lawful fraud-prevention tools. It is designed to restore market transparency, carrier autonomy, and due process, and to confine Highway to a non-coercive, non-gatekeeping role consistent with its representations.

This relief is authorized under Sherman Act §16 and RICO §1964(a) to prevent and restrain continued unlawful conduct affecting interstate commerce.

---

**B. Injunctive Relief Prohibiting Gatekeeping and De Facto Regulation**

Plaintiff seeks an injunction requiring that Highway:

1. Cease acting as a broker-facing gatekeeper whose outputs determine whether carriers may access freight, onboard, or continue relationships with brokers.

288

2. Prohibit binary eligibility determinations (approved/denied; trusted/untrusted; verified/unverified) that have determinative economic effect on carriers absent notice, explanation, and a meaningful opportunity to contest.

3. Refrain from any conduct that mimics regulatory enforcement, including private "risk," "trust," or "fraud" labels presented as authoritative substitutes for FMCSA determinations.

---

## C. Separation of Identity Verification From Market Access

Plaintiff seeks an order requiring Highway to:

- Separate identity verification from market access, such that any identity confirmation provided to brokers is informational only and may not be used to deny freight, onboarding, or participation without independent broker diligence.
- Implement technical and operational firewalls preventing identity data from being repurposed for eligibility enforcement, market exclusion, or retaliatory signaling.

---

## D. Prohibition on Surveillance-Derived Economic Enforcement

Plaintiff seeks injunctive relief barring Highway from:

- Using or benefiting from ELD telemetry, in-cab AI camera video or audio, or derived behavioral signals to influence carrier eligibility, broker decisions, or market access.

289

- Participating in, integrating with, or operationalizing any system that creates a reasonable belief that carrier or driver speech, behavior, or negotiations may be surveilled and economically punished.

This prohibition is necessary to eliminate the chilling effect on lawful speech, negotiation, and carrier independence.

---

## E. Identity Ownership, Consent, and Immediate Remediation

Plaintiff seeks relief requiring Highway to:

1. Recognize the carrier as the rightful owner of its MC identity, absent written authorization to the contrary.
2. Prevent unauthorized third-party control of carrier profiles and prohibit assumptions of authority by dispatchers or intermediaries without explicit carrier consent.
3. Provide immediate decommissioning of fraudulent or unauthorized users upon credible notice by the carrier, with expedited timelines measured in days—not months.
4. Maintain a clear audit trail showing who created, modified, or controlled a carrier identity profile and when.

---

## F. Transparency, Notice, and Due Process Protections

Plaintiff seeks an order requiring Highway to:

290

- Provide carriers with plain-language notice of any adverse identity signal that could affect market access.
- Disclose the source category (broker input, third-party assertion, upstream data signal) that triggered the adverse outcome.
- Offer a meaningful, timely appeal process with human review and a defined resolution window before exclusion takes effect.

---

## G. Prohibition on Retaliation and Reputation Weaponization

Plaintiff seeks injunctive relief prohibiting Highway from:

- Facilitating, amplifying, or normalizing retaliatory conduct, including cascading exclusions linked to FreightGuard or similar reputation systems.
- Treating broker complaints, disputes, or carrier negotiations as fraud indicators absent objective, verifiable evidence.

---

## H. Independent Oversight and Compliance Certification

To ensure effectiveness, Plaintiff seeks:

- Appointment of special master to audit:
  - data segregation,
  - identity control procedures,

291

- o  remediation timelines,

- o  and compliance with non-gatekeeping requirements.

- Periodic compliance certifications to the Court for a defined term.

---

## I. Declaratory Relief

Plaintiff seeks a declaration that:

- Highway is a private platform, not a regulator;

- It possesses no authority to determine carrier eligibility or market participation;

- Any system that converts surveillance-derived data into economic exclusion constitutes an impermissible restraint of trade and coercive control.

---

## J. Public Interest and Equitable Balance

The requested relief serves the public interest by:

- Preserving legitimate fraud-prevention tools while eliminating coercive gatekeeping;

- Protecting federally authorized carriers from opaque, private exclusion;

- Restoring competition, negotiation, and transparency in interstate commerce;

- Preventing extortion through fear of economic harm.

292

The balance of equities favors relief that limits Highway to non-coercive functions while allowing lawful operations to continue.

**Clarification of Permitted Conduct and Purpose of Relief**

(As to Defendant Highway)

**A. The Relief Does Not Eliminate Highway's Lawful Utility**

The relief sought does not render Highway obsolete, nor does it prohibit legitimate fraud-prevention or identity-verification services. To the contrary, the relief preserves Highway's lawful utility while prohibiting only those functions that convert a private platform into an unauthorized regulator and coercive gatekeeper.

Under the requested remedies, Highway remains free to operate as an informational tool, not an enforcement authority.

---

**B. Functions Highway May Continue to Perform (Lawful and Useful)**

Under the injunction, Highway may continue to:

1. Verify basic, objective identity facts, including:

   o confirming that a motor carrier's MC number exists,

   o confirming current authority status,

   o confirming insurance filings on record,

   o confirming consistency of contact information.

293

These functions constitute legitimate fraud prevention grounded in objective, verifiable facts.

2.  Flag objective anomalies on an informational basis only, such as:

   o   noting that a carrier's insurance was canceled on a specific date,

   o   identifying the age of an MC number,

   o   identifying factual overlaps (e.g., a phone number appearing on multiple MCs).

These disclosures are facts, not judgments, and do not carry punitive or exclusionary effect.

3.  Provide tools and information to brokers without deciding outcomes, meaning Highway may state:

   "Here is what we see."

Highway may not state, imply, or enforce:

"This carrier is effectively banned."

Brokers remain free to make their own decisions—but they must own those decisions, rather than outsourcing them to an opaque platform that disclaims responsibility.

This distinction is legally dispositive.

---

## C. Functions the Remedies Intentionally Prohibit (and Why)

294

The remedies prohibit only those functions that convert Highway from a tool into a private adjudicator.

1. Silent Gatekeeping

   o Prohibiting "approved / denied" or equivalent status labels that determine a carrier's economic survival.

   o Prohibiting invisible exclusion without notice, explanation, or recourse.

Such conduct constitutes regulation without authority.

2. Surveillance-Based Punishment

   o Prohibiting use of ELD telemetry,

   o prohibiting use of in-cab video or audio,

   o prohibiting any system that chills speech, negotiation, or lawful carrier conduct through fear of monitoring.

Such conduct crosses from fraud prevention into coercion and extortionary pressure.

3. Identity Capture and Prolonged Lockout

   o Prohibiting unauthorized third-party control of a carrier's MC identity,

   o prohibiting prolonged remediation delays while fraudulent users remain active,

   o requiring immediate restoration of control to the lawful carrier.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Allowing identity capture facilitates fraud rather than preventing it.

---

## D. The Critical Legal Distinction

The remedies draw a bright, lawful line:

- Highway as a tool → lawful and useful
- Highway as a judge → unlawful and coercive

The injunction does not ban Highway's platform.

It bans Highway from acting as judge, jury, and executioner over federally authorized carriers.

---

## E. Addressing the "Crippling" Argument Directly

Platforms frequently argue that limiting their ability to decide outcomes would make them "unable to function."

Courts reject this argument where the platform's claimed "function" depends on:

- coercion,
- silence,
- fear,
- or exclusion without process.

296

Such an argument is effectively an admission that:

"Our business model depends on controlling people."

That is not a protected interest under equity, antitrust law, RICO, or the Hobbs Act.

Equitable relief exists precisely to restrain business models that rely on unchecked control rather than lawful competition.

---

## F. How This Relief Is Read by the Court

A court does not read this relief as:

"Shut Highway down."

A court reads this relief as:

"Stop acting like a regulator without authority."

That is why the remedies are:

- narrow (targeting only coercive conduct),

- prospective (preventing future harm),

- structural (addressing the mechanism of abuse),

- defensible (preserving legitimate utility).

297

### G. Summary

If Highway cannot function without coercion, then coercion was the product.

The law does not protect business models that depend on:

- fear,

- silence,

- surveillance,

- or economic exclusion without due process.

The relief sought restores Highway to a lawful role while protecting carriers, competition, and interstate commerce.

### Anticipated Defense and Rebuttal

Highway may contend that limiting its ability to issue binding eligibility determinations or to rely on surveillance-derived data would "cripple" its operations or render its platform impracticable. That argument fails as a matter of law and fact. The requested relief does not prohibit Highway from verifying objective identity facts, flagging factual anomalies, or providing informational tools to brokers; it prohibits only Highway's assumption of de facto regulatory authority through silent gatekeeping, surveillance-based punishment, and identity capture without due process. A private platform has no protected interest in a business model that depends on coercive control, fear of economic exclusion, or the substitution of opaque platform judgments for lawful regulatory processes. If Highway's profitability or utility depends on

298

deciding outcomes rather than supplying information, that dependency confirms—rather than defeats—the necessity of equitable relief under Sherman Act §16 and RICO §1964(a). The injunction preserves lawful fraud-prevention functions while restraining only those practices that improperly regulate market access, restrain trade, and extort compliance through fear of economic harm.

**Irreparable Harm and Public Interest (TRO / Preliminary Injunction)**

Absent immediate injunctive relief, Plaintiff and similarly situated carriers face ongoing irreparable harm that cannot be remedied by damages alone, including loss of access to interstate commerce, cascading exclusion across brokers, suppression of lawful negotiation, and coerced silence caused by fear of opaque platform retaliation. Because carriers are required to operate with continuous ELD telemetry and are subject to persistent identity profiling, each day of continued gatekeeping compounds the harm and threatens business survival. The public interest strongly favors an injunction that preserves legitimate fraud-prevention and informational services while restraining Highway from acting as an unauthorized regulator through silent exclusion and surveillance-based coercion. Restoring transparency, due process, and competition protects federally authorized carriers, promotes fair markets, and prevents private platforms from exercising quasi-governmental control over interstate commerce without accountability.

**#2 — Data Sources, Ingest, and Information Asymmetry**

**A. Multi-Source Data Ingest Without Carrier Control**

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Highway's power does not arise from carrier contracts alone, but from its ability to aggregate, synthesize, and operationalize data originating outside the carrier's direct control. Highway ingests information from multiple upstream and lateral sources, including but not limited to:

- broker-submitted records and assessments,

- carrier onboarding artifacts and identity credentials,

- third-party compliance and monitoring platforms,

- historical activity and behavioral indicators, and

- platform-to-platform integrations that transmit carrier status, flags, or reputational signals.

This architecture allows Highway to construct a centralized carrier identity profile that carriers cannot fully see, audit, or correct in real time, yet which brokers treat as authoritative.

---

## B. Upstream Surveillance Dependency and Downstream Translation

Highway operates as a translation layer within the enterprise.

Upstream platforms collect continuous operational, compliance, and behavioral data about carriers, trucks, and drivers. Highway then converts that complex data environment into simplified eligibility signals—trusted/untrusted, verified/unverified, acceptable/rejected—that brokers rely on to make freight decisions.

300

This translation strips context, eliminates nuance, and obscures provenance, while preserving the economic effect of the data: exclusion or access.

Carriers are never informed which upstream data source, platform input, or third-party assertion triggered an adverse outcome.

---

## C. Broker-Driven Inputs Masquerading as Objective Identity

Highway allows brokers to submit or influence carrier identity determinations while presenting the resulting profile as neutral and objective.

This design enables:

- broker-originated allegations to be embedded as platform "truth,"
- reputational signals to propagate across unrelated brokers, and
- private commercial preferences to masquerade as fraud prevention.

Highway does not function as an independent verifier. It functions as an amplifier—transforming broker suspicion, third-party assertions, or upstream data into durable exclusion signals.

---

## D. Identity Control Without Title or Consent

Highway asserts functional control over motor carrier identities—including MC numbers and associated operational profiles—without requiring proof of rightful authority from the carrier.

301

As demonstrated by Plaintiff's experience, Highway's system permitted an unauthorized third party to assume control over Plaintiff's carrier identity, blocking Plaintiff from onboarding with a legitimate broker while treating the fraudulent user as the authoritative account holder.

During this period:

- the rightful carrier was excluded,

- the fraudulent user remained active,

- and Highway required prolonged remediation efforts before restoring control.

This structure reveals that Highway's data model prioritizes platform continuity over lawful identity ownership.

---

## E. Asymmetry by Design

Highway's data architecture is intentionally asymmetric:

- Highway sees everything: aggregated inputs, historical signals, broker feedback, and third-party data.

- Brokers see conclusions: simplified trust or risk indicators.

- Carriers see almost nothing: no full record, no source attribution, no timeline, no explanation.

302

This asymmetry ensures that Highway can deny responsibility for outcomes while still causing those outcomes.

---

## F. Lack of Verification, Audit, or Timely Correction

Highway provides no meaningful mechanism for carriers to:

- verify who created or controls their profile,

- immediately reclaim identity from unauthorized users,

- contest false or outdated information,

- identify which data source caused an exclusion,

- or obtain timely correction before economic harm accrues.

Instead, carriers are subjected to delay-based exclusion, where access to freight is denied while the platform investigates itself.

---

## G. Enterprise Intent Reflected in Data Design

Highway's data ingest and synthesis model reflects enterprise intent:

- centralize identity,

- externalize data risk onto carriers,

- preserve broker confidence,

- deny regulatory responsibility,

- and maintain leverage without accountability.

This is not accidental engineering. It is control architecture.

**Defendant: 7**

**Highway**

**#3 — Market Role: Broker-Facing Gatekeeper and Eligibility Enforcement**

**A. Highway as the Functional Decision-Maker**

Highway does not merely provide information to brokers; it functions as the decision-maker that determines whether a carrier may participate in the freight market at all. Brokers rely on Highway's outputs as a prerequisite to onboarding, tendering loads, or continuing relationships with carriers.

In practice, a carrier's ability to obtain freight is conditioned on Highway's approval status—regardless of the carrier's federal authority, safety record, insurance, or past performance. This places Highway in the position of a private gatekeeper controlling access to interstate commerce.

---

**B. Binary Signals With Determinative Economic Effect**

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Highway reduces complex, disputed, and often unverifiable data into binary eligibility signals (e.g., approved / not approved; trusted / untrusted; verified / unverified). These signals are treated by brokers as dispositive.

Once a negative signal is issued:

- brokers decline to tender loads,

- onboarding halts or is reversed,

- carriers are excluded without explanation,

- and the exclusion propagates across unrelated brokers using the same platform.

This occurs without contractual privity, without notice, and without an opportunity to be heard.

---

## C. Delegated Enforcement Without Accountability

Brokers rely on Highway to outsource risk, diligence, and responsibility. By deferring to Highway's determinations, brokers avoid making independent judgments while retaining plausible deniability for exclusionary conduct.

Highway, in turn, disclaims responsibility by asserting that it merely provides information.

This circular delegation results in enforcement without an enforcer:

- carriers are excluded,

- no party claims decision-making authority,

- and no avenue for redress exists.

305

## D. Replacement of FMCSA Transparency With Private Control

Federal motor carrier authority is issued by the FMCSA and is intended to be public, transparent, and uniform. Highway supplants this system by inserting private eligibility criteria that are:

- undisclosed,

- non-uniform,

- non-reviewable,

- and subject to platform discretion.

As a result, carriers who are fully authorized under federal law are nevertheless functionally barred from the market by a private platform operating outside statutory limits.

## E. Retaliation and Cascading Exclusion

Highway's gatekeeping role enables retaliation and cascading exclusion.

A carrier flagged once may experience:

- immediate denial by one broker,

- followed by rejection across multiple brokers,

- based solely on shared reliance on Highway's signals.

306

Because Highway's determinations are opaque, carriers cannot identify whether the exclusion is based on:

- fraud allegations,

- data errors,

- broker complaints,

- third-party assertions,

- or retaliatory conduct.

The result is market-wide exclusion without a charge, finding, or remedy.

---

## F. Expansion Into Load Board and Transactional Functions

Highway has expanded beyond identity verification into features that resemble carrier discovery, load visibility, and transactional facilitation, blurring the line between verification platform and marketplace participant.

This expansion intensifies the conflict of interest:

- Highway controls identity and eligibility,

- while simultaneously expanding into functions that benefit from controlling who is visible and selectable.

307

This mirrors the same enterprise pattern previously employed by other platform defendants: claim neutrality while consolidating control.

---

## G. Economic Coercion Through Silence

Highway enforces compliance not through overt sanctions, but through silence:

- no notice,

- no explanation,

- no timeline,

- no appeal.

Carriers are left to infer exclusion through repeated rejection and loss of income. This silence is itself a mechanism of coercion, forcing carriers to submit to platform demands, third-party intermediaries, or unauthorized dispatchers to regain access.

---

## H. Enterprise Function and Intent

Within the enterprise, Highway serves as the enforcement layer that converts upstream data and private assertions into downstream economic harm.

It allows the enterprise to:

- exclude carriers without overt action,

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

- discipline dissenting or independent operators,

- maintain control while avoiding regulatory scrutiny,

- and perpetuate a system of private governance over public commerce.

This role is intentional, profitable, and ongoing.

**Defendant:**

**Highway**

**#4 — Enterprise Integration: Upstream Surveillance, Downstream Enforcement, and Closed-Loop Control**

**A. Highway's Position Within the Enterprise Architecture**

Highway does not operate in isolation. It occupies a critical middle position within the enterprise architecture—receiving data, signals, and assumptions from upstream surveillance and compliance platforms, and transmitting simplified enforcement outcomes downstream to brokers and market participants.

This position allows Highway to function as the conversion point where raw data and private assertions are transformed into actionable economic consequences for carriers.

---

**B. Upstream Coordination: Surveillance-to-Identity Pipeline**

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Upstream platforms collect continuous, real-time information about carriers, trucks, and drivers, including operational behavior, compliance activity, location data, and performance metrics. Highway ingests or relies upon outputs derived from these systems—whether through direct integrations, shared data environments, broker inputs informed by those platforms, or third-party services that themselves depend on upstream surveillance.

Highway does not independently verify this upstream information. Instead, it inherits and operationalizes it, embedding upstream assumptions into carrier identity profiles that are treated as authoritative by brokers.

In this way, surveillance becomes identity, and identity becomes eligibility.

---

## C. Downstream Coordination: Broker Reliance and Market Enforcement

Downstream, brokers rely on Highway as a single source of truth for carrier legitimacy and risk. Brokers are encouraged—explicitly or implicitly—to trust Highway's determinations rather than conduct individualized assessments.

This reliance creates uniform enforcement across otherwise independent brokers. A carrier excluded through Highway is not merely rejected by one broker, but by many, because the same eligibility signal is reused across the market.

The enterprise thus achieves horizontal coordination through vertical dependence, without brokers needing to communicate with one another.

---

## D. Closed-Loop Design and Self-Reinforcement

Highway's architecture creates a closed feedback loop:

6. Upstream platforms generate data or behavioral signals.

7. Highway converts those signals into identity or risk determinations.

8. Brokers act on those determinations by excluding carriers.

9. Broker actions are treated as validation of the original signals.

10. The exclusion is reinforced and normalized across the market.

At no point does the carrier receive a clear explanation, an opportunity to contest the underlying premise, or a mechanism to break the loop.

---

## E. Plausible Deniability by Design

Each enterprise participant disclaims responsibility:

- Upstream platforms claim neutrality as data collectors.

- Highway claims it only provides information.

- Brokers claim reliance on third-party verification.

311

Yet the combined effect is deliberate and foreseeable: exclusion, coercion, and economic harm to carriers.

This structure allows the enterprise to act collectively while avoiding accountability individually.

---

## F. Replacement of Public Governance With Private Coordination

Federal motor carrier regulation is intended to be centralized, transparent, and subject to oversight. The enterprise replaces this system with private coordination, where eligibility is determined by platforms that are unregulated, opaque, and economically conflicted.

Highway is the mechanism through which this replacement becomes operational—substituting platform trust scores for public authority, and private data flows for statutory process.

---

## G. Intentional Design, Not Accidental Interoperability

The interoperability between Highway and upstream and downstream actors is not accidental. It reflects intentional design choices:

- standardized eligibility outputs,

- simplified broker interfaces,

- opaque carrier dashboards,

312

- and frictionless propagation of exclusion signals.

These features are optimized for speed, scale, and control, not fairness, accuracy, or due process.

---

## H. Enterprise Role Summary

Within the enterprise, Highway serves as:

- the identity arbiter for carriers,

- the enforcement proxy for brokers, and

- the shield that prevents accountability from attaching to any single actor.

This role is essential to the enterprise's ability to restrain trade, suppress competition, and discipline carriers without overt enforcement action.

**Defendant:**

**Highway**

## #5 — Feature Creep, Load-Board Convergence, and the Commodity Model

## A. From "Verification Tool" to Market Controller

Highway originally held itself out as a fraud-prevention and identity verification tool for brokers. Its stated purpose was narrow: confirm that a carrier is who it claims to be.

Through feature creep, Highway expanded far beyond that role.

313

Over time, Highway added features and functions that now allow it to:

- control who may onboard with brokers,

- determine whether a carrier is "acceptable,"

- block carriers from freight opportunities,

- retain and control carrier identities,

- and influence market visibility across multiple brokers at once.

Highway did not announce a transition into market control. It simply added features until the outcome was unavoidable.

---

## B. Broker as the Customer, Carrier as the Commodity

Highway's true business model becomes clear when viewed economically.

- The broker is the customer.

  Brokers pay, integrate, and rely on Highway's outputs.

- The carrier is the commodity.

  Carriers are not the audience being served; they are the subject being evaluated, filtered, and traded on.

- Data is the asset.

314

Carrier identity, behavior, compliance history, location, and activity are collected, aggregated, and monetized.

In this model, carriers are not clients. They are inputs.

Highway's platform exists to package carrier data into simplified signals that brokers can consume quickly, cheaply, and at scale.

---

## C. Continuous Data Dependency Through ELD Integration

Carriers do not interact with Highway once. They are continuously interfaced with the data ecosystem that feeds Highway.

Because carriers are required by federal mandate to use Electronic Logging Devices (ELDs), their trucks and drivers generate continuous streams of operational and compliance data. This data does not stop when the truck stops.

That continuous data flow means:

- carrier behavior is always being recorded,

- compliance status is always being evaluated,

- historical data never expires,

- and past signals follow the carrier indefinitely.

315

Highway benefits from this always-on data environment, even when carriers have no direct relationship with Highway and no meaningful way to disengage.

---

## D. Feature Creep Into Load-Board and Market Functions

Highway has expanded beyond identity verification into features that resemble:

- carrier discovery,

- market visibility,

- broker-carrier matching,

- and transactional facilitation.

These are functions traditionally associated with load boards and marketplaces.

This convergence matters because:

- Highway controls identity and visibility,

- eligibility and discovery,

- verification and access.

When one platform controls all three, it is no longer neutral. It is structural control.

---

## E. Why This Is Dangerous (In Simple Terms)

When one private company:

316

- sees the data,

- decides what it means,

- and controls who gets access,

then a carrier can be locked out of work without ever being accused of anything, without being told why, and without being able to fix it.

That is exactly what happened to Plaintiff:

- her identity was already "in use,"

- a fraudulent party was treated as legitimate,

- she was excluded from onboarding,

- and it took months to correct—during which income was lost.

This is not fraud prevention.

This is fraud enablement through design.

---

## F. Enterprise Intent Reflected in Feature Expansion

Feature creep is not accidental growth. It is how platforms:

- avoid early scrutiny,

- build dependency,

- then consolidate power quietly.

317

Highway's expansion follows the same enterprise playbook seen elsewhere:

6.  claim neutrality,

7.  centralize data,

8.  simplify outputs for powerful customers,

9.  deny regulatory responsibility,

10. externalize harm to carriers.

Each feature added increased Highway's leverage while reducing carrier visibility and control.

---

## G. Enterprise Function

Within the enterprise, Highway's feature creep transformed it from a verification tool into a market enforcement mechanism.

It now:

- converts continuous data into exclusion,

- replaces public authority with private signals,

- and allows brokers to rely on platform decisions instead of law or transparency.

That transformation is central to the enterprise's ability to restrain trade, suppress competition, and control access to interstate commerce.

318

**Defendant:**

**Highway**

**#6 — Harm, Causation, and the Chilling Effect on Carriers and Drivers**

**A. Continuous Telemetry and Market Exposure**

Motor carriers are required by federal mandate to operate with Electronic Logging Devices ("ELDs"), which generate continuous telemetry—including location, movement, time, and compliance data—whenever a truck is in service. This telemetry does not exist in isolation. Through integrations and platform-to-platform interfaces, it is broadcast, shared, or made available to downstream systems relied upon by brokers and broker-facing platforms.

As a result, carrier operations are continuously exposed to private market actors who are not regulators and are not bound by due process. Highway operates within this environment as the identity and eligibility layer that converts continuous telemetry into market consequences.

---

**B. Access to In-Cab AI Camera Video and Audio**

Through its position in the enterprise ecosystem and integrations with upstream surveillance platforms, Highway enables brokers and other market participants to benefit from access to in-cab AI camera outputs, including video and audio streams or derived behavioral signals.

319

This includes inward-facing monitoring that captures:

- driver behavior,

- cabin activity,

- speech and interactions,

- and conduct unrelated to safety or compliance.

Even where live access is mediated or indirect, the reasonable belief of access—that brokers and platforms can see, hear, or infer in-cab activity—fundamentally alters driver and carrier behavior.

---

## C. The Chilling Effect on Speech, Negotiation, and Lawful Conduct

Knowing that:

- telemetry is continuous,

- identity profiles are persistent,

- eligibility signals are opaque,

- and adverse outcomes propagate instantly across brokers,

carriers and drivers experience a chilling effect.

Drivers and owner-operators refrain from:

- negotiating rates,

- disputing broker conduct,

320

- raising safety or payment concerns,

- engaging in candid communications,

- or asserting contractual rights,

out of fear that any expression—spoken, behavioral, or inferred—may trigger:

- negative platform flags,

- FreightGuard reports,

- identity downgrades,

- or market-wide blacklisting.

This chilling effect is not speculative. It is a rational response to a system where speech and behavior can be surveilled, interpreted, and economically punished without notice.

---

## D. FreightGuard and Blacklisting as Retaliatory Outcomes

Highway's eligibility signals and identity determinations operate in tandem with reputation and reporting systems used by brokers. Once a carrier is flagged or downgraded:

- brokers decline loads without explanation,

- onboarding is halted or reversed,

- negative reports appear without adjudication,

- and the exclusion spreads across the market.

321

Carriers understand—through experience and industry knowledge—that challenging brokers or platforms increases the risk of FreightGuard reports and blacklisting. The result is coerced silence.

---

## E. Causation: From Data to Economic Harm

The causal chain is direct and foreseeable:

6. Continuous ELD telemetry and in-cab monitoring generate data.

7. That data, or signals derived from it, flows into platform ecosystems.

8. Highway converts those inputs into identity and eligibility determinations.

9. Brokers rely on those determinations to deny access to freight.

10. Carriers suffer immediate and ongoing economic harm.

At no point does the carrier receive notice of the alleged issue, an opportunity to contest it, or a neutral forum for review.

---

## F. Disproportionate Impact on Owner-Operators and Small Carrier

The harm falls most heavily on:

- owner-operators,

- small carriers,

- women-owned and independent businesses,

- and drivers without bargaining power.

Unlike large fleets, these carriers cannot absorb weeks or months of exclusion, cannot negotiate special access, and cannot operate without platform approval. The system effectively forces compliance through economic pressure, not law.

---

## G. Interstate Commerce Impact

Highway's conduct restrains interstate commerce by:

- removing federally authorized carriers from the market,

- suppressing rate negotiation,

- discouraging lawful competition,

- and concentrating freight access among compliant or platform-favored actors.

This harm is ongoing, structural, and not remediable through damages alone.

---

## H. Enterprise-Level Consequences

By enabling surveillance-driven retaliation and blacklisting, Highway provides the enforcement mechanism that allows the enterprise to function without overt coordination or formal sanctions.

The chilling of speech, suppression of negotiation, and fear of retaliation are features, not side effects, of the system's design.

323

**Section #6 — Conclusion: RICO, Sherman Act, and Hobbs Act Implications**

**A. RICO: Enterprise Conduct, Continuity, and Coercive Control**

The conduct described above establishes that Highway knowingly participates in an enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

Highway does not merely supply software. It performs an essential enterprise function by converting continuous surveillance data—originating from ELD telemetry, in-cab AI camera systems, broker inputs, and third-party assertions—into economic exclusion and coercive pressure against federally authorized carriers.

This conduct satisfies RICO's requirements:

- Enterprise: A structured association-in-fact among surveillance platforms, identity systems, brokers, and reputation mechanisms.
- Common purpose: Control of freight access and market discipline of carriers.
- Relationships: Interoperability and mutual reliance between platforms and brokers.
- Continuity: Ongoing, repeated exclusionary acts affecting interstate commerce.

Highway's role as the enforcement and amplification layer gives effect to the enterprise's objectives while allowing upstream and downstream actors to disclaim responsibility.

---

**B. Hobbs Act: Extortion Through Fear of Economic Harm**

324

Highway's conduct also constitutes extortion under color of the Hobbs Act (18 U.S.C. § 1951).

Carriers are compelled to surrender property interests—including labor, economic opportunity, rate negotiation rights, and control over their own business operations—through the wrongful use of fear of economic harm.

That fear is real, reasonable, and induced by:

- continuous monitoring of trucks and drivers,

- the reasonable belief that in-cab video and audio may be accessed or inferred by brokers,

- opaque identity and eligibility determinations,

- the threat of FreightGuard reports and blacklisting,

- and the knowledge that exclusion propagates instantly across the market.

Carriers and drivers are coerced into silence, non-negotiation, and submission—not by overt threats, but by a system designed to punish dissent invisibly. This is extortion by design, not accident.

---

## C. Sherman Act: Restraint of Trade and Market Foreclosure

Highway's conduct further violates Section 1 of the Sherman Act by facilitating unreasonable restraints of trade and market foreclosure.

By acting as a centralized gatekeeper relied upon by multiple brokers, Highway enables:

- concerted refusals to deal,

325

- horizontal exclusion through vertical dependence,

- suppression of price negotiation, and

- removal of lawful competitors without process.

Carriers who possess valid federal authority are nevertheless barred from participating in the market based on private, undisclosed criteria. This substitutes platform control for competition and private governance for public regulation.

The restraint is not ancillary or incidental—it is the core function of the system.

---

## D. Interstate Commerce Nexus

The conduct described directly affects interstate commerce by:

- preventing carriers from hauling freight across state lines,

- suppressing lawful competition,

- distorting freight pricing,

- and concentrating market access in the hands of platform-favored actors.

Because carriers are required to operate ELDs continuously, the effects are constant, not episodic.

---

## E. Summary

326

In sum:

- RICO is satisfied because Highway knowingly operates as part of a continuing enterprise that uses surveillance and identity control to discipline carriers.
- The Hobbs Act is satisfied because carriers are coerced through fear of economic harm into surrendering rights and opportunities.
- The Sherman Act is satisfied because Highway enables coordinated market exclusion and suppresses competition without lawful justification.

Highway's conduct is not neutral, not accidental, and not protective. It is structural, intentional, and ongoing, and it is central to the enterprise's ability to restrain trade and extort compliance from carriers operating in interstate commerce.

**Remedies Sought as to Defendant**

**Highway**

**A. Purpose and Scope of Relief**

Plaintiff seeks forward-looking equitable relief to prevent ongoing and future harm. The relief is not punitive and does not seek to dismantle lawful fraud-prevention tools. It is designed to restore market transparency, carrier autonomy, and due process, and to confine Highway to a non-coercive, non-gatekeeping role consistent with its representations.

327

This relief is authorized under Sherman Act §16 and RICO §1964(a) to prevent and restrain continued unlawful conduct affecting interstate commerce.

---

## B. Injunctive Relief Prohibiting Gatekeeping and De Facto Regulation

Plaintiff seeks an injunction requiring that Highway:

4. Cease acting as a broker-facing gatekeeper whose outputs determine whether carriers may access freight, onboard, or continue relationships with brokers.

5. Prohibit binary eligibility determinations (approved/denied; trusted/untrusted; verified/unverified) that have determinative economic effect on carriers absent notice, explanation, and a meaningful opportunity to contest.

6. Refrain from any conduct that mimics regulatory enforcement, including private "risk," "trust," or "fraud" labels presented as authoritative substitutes for FMCSA determinations.

---

## C. Separation of Identity Verification From Market Access

Plaintiff seeks an order requiring Highway to:

- Separate identity verification from market access, such that any identity confirmation provided to brokers is informational only and may not be used to deny freight, onboarding, or participation without independent broker diligence.

328

- Implement technical and operational firewalls preventing identity data from being repurposed for eligibility enforcement, market exclusion, or retaliatory signaling.

---

## D. Prohibition on Surveillance-Derived Economic Enforcement

Plaintiff seeks injunctive relief barring Highway from:

- Using or benefiting from ELD telemetry, in-cab AI camera video or audio, or derived behavioral signals to influence carrier eligibility, broker decisions, or market access.
- Participating in, integrating with, or operationalizing any system that creates a reasonable belief that carrier or driver speech, behavior, or negotiations may be surveilled and economically punished.

This prohibition is necessary to eliminate the chilling effect on lawful speech, negotiation, and carrier independence.

---

## E. Identity Ownership, Consent, and Immediate Remediation

Plaintiff seeks relief requiring Highway to:

5. Recognize the carrier as the rightful owner of its MC identity, absent written authorization to the contrary.
6. Prevent unauthorized third-party control of carrier profiles and prohibit assumptions of authority by dispatchers or intermediaries without explicit carrier consent.

329

7. Provide immediate decommissioning of fraudulent or unauthorized users upon credible notice by the carrier, with expedited timelines measured in days—not months.

8. Maintain a clear audit trail showing who created, modified, or controlled a carrier identity profile and when.

---

## F. Transparency, Notice, and Due Process Protections

Plaintiff seeks an order requiring Highway to:

- Provide carriers with plain-language notice of any adverse identity signal that could affect market access.
- Disclose the source category (broker input, third-party assertion, upstream data signal) that triggered the adverse outcome.
- Offer a meaningful, timely appeal process with human review and a defined resolution window before exclusion takes effect.

---

## G. Prohibition on Retaliation and Reputation Weaponization

Plaintiff seeks injunctive relief prohibiting Highway from:

- Facilitating, amplifying, or normalizing retaliatory conduct, including cascading exclusions linked to FreightGuard or similar reputation systems.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

- Treating broker complaints, disputes, or carrier negotiations as fraud indicators absent objective, verifiable evidence.

---

## H. Independent Oversight and Compliance Certification

To ensure effectiveness, Plaintiff seeks:

- Appointment of a limited-scope independent monitor or special master to audit:
  - data segregation,
  - identity control procedures,
  - remediation timelines,
  - and compliance with non-gatekeeping requirements.
- Periodic compliance certifications to the Court for a defined term.

---

## I. Declaratory Relief

Plaintiff seeks a declaration that:

- Highway is a private platform, not a regulator;
- It possesses no authority to determine carrier eligibility or market participation;
- Any system that converts surveillance-derived data into economic exclusion constitutes an impermissible restraint of trade and coercive control.

---

331

## J. Public Interest and Equitable Balance

The requested relief serves the public interest by:

- Preserving legitimate fraud-prevention tools while eliminating coercive gatekeeping;

- Protecting federally authorized carriers from opaque, private exclusion;

- Restoring competition, negotiation, and transparency in interstate commerce;

- Preventing extortion through fear of economic harm.

The balance of equities favors relief that limits Highway to non-coercive functions while allowing lawful operations to continue.

## Clarification of Permitted Conduct and Purpose of Relief

(As to Defendant Highway)

## A. The Relief Does Not Eliminate Highway's Lawful Utility

The relief sought does not render Highway obsolete, nor does it prohibit legitimate fraud-prevention or identity-verification services. To the contrary, the relief preserves Highway's lawful utility while prohibiting only those functions that convert a private platform into an unauthorized regulator and coercive gatekeeper.

Under the requested remedies, Highway remains free to operate as an informational tool, not an enforcement authority.

---

332

**B. Functions Highway May Continue to Perform (Lawful and Useful)**

Under the injunction, Highway may continue to:

2. Verify basic, objective identity facts, including:

   o confirming that a motor carrier's MC number exists,

   o confirming current authority status,

   o confirming insurance filings on record,

   o confirming consistency of contact information.

These functions constitute legitimate fraud prevention grounded in objective, verifiable facts.

3. Flag objective anomalies on an informational basis only, such as:

   o noting that a carrier's insurance was canceled on a specific date,

   o identifying the age of an MC number,

   o identifying factual overlaps (e.g., a phone number appearing on multiple MCs).

These disclosures are facts, not judgments, and do not carry punitive or exclusionary effect.

4. Provide tools and information to brokers without deciding outcomes, meaning Highway may state:

   "Here is what we see."

Highway may not state, imply, or enforce:

333

"This carrier is effectively banned."

Brokers remain free to make their own decisions—but they must own those decisions, rather than outsourcing them to an opaque platform that disclaims responsibility.

This distinction is legally dispositive.

---

## C. Functions the Remedies Intentionally Prohibit (and Why)

The remedies prohibit only those functions that convert Highway from a tool into a private adjudicator.

2. Silent Gatekeeping

   o  Prohibiting "approved / denied" or equivalent status labels that determine a carrier's economic survival.

   o  Prohibiting invisible exclusion without notice, explanation, or recourse.

Such conduct constitutes regulation without authority.

3. Surveillance-Based Punishment

   o  Prohibiting use of ELD telemetry,

   o  prohibiting use of in-cab video or audio,

   o  prohibiting any system that chills speech, negotiation, or lawful carrier conduct through fear of monitoring.

334

Such conduct crosses from fraud prevention into coercion and extortionary pressure.

4. Identity Capture and Prolonged Lockout

- o Prohibiting unauthorized third-party control of a carrier's MC identity,

- o prohibiting prolonged remediation delays while fraudulent users remain active,

- o requiring immediate restoration of control to the lawful carrier.

Allowing identity capture facilitates fraud rather than preventing it.

---

**D. The Critical Legal Distinction**

The remedies draw a bright, lawful line:

- Highway as a tool → lawful and useful

- Highway as a judge → unlawful and coercive

The injunction does not ban Highway's platform.

It bans Highway from acting as judge, jury, and executioner over federally authorized carriers.

---

**E. Addressing the "Crippling" Argument Directly**

Platforms frequently argue that limiting their ability to decide outcomes would make them "unable to function."

335

Courts reject this argument where the platform's claimed "function" depends on:

- coercion,

- silence,

- fear,

- or exclusion without process.

Such an argument is effectively an admission that:

"Our business model depends on controlling people."

That is not a protected interest under equity, antitrust law, RICO, or the Hobbs Act.

Equitable relief exists precisely to restrain business models that rely on unchecked control rather than lawful competition.

---

## F. How This Relief Is Read by the Court

A court does not read this relief as:

"Shut Highway down."

A court reads this relief as:

336

"Stop acting like a regulator without authority."

That is why the remedies are:

- narrow (targeting only coercive conduct),

- prospective (preventing future harm),

- structural (addressing the mechanism of abuse),

- defensible (preserving legitimate utility).

---

## G. Summary

If Highway cannot function without coercion, then coercion was the product.

The law does not protect business models that depend on:

- fear,

- silence,

- surveillance,

- or economic exclusion without due process.

The relief sought restores Highway to a lawful role while protecting carriers, competition, and interstate commerce.

## Anticipated Defense and Rebuttal

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Highway may contend that limiting its ability to issue binding eligibility determinations or to rely on surveillance-derived data would "cripple" its operations or render its platform impracticable. That argument fails as a matter of law and fact. The requested relief does not prohibit Highway from verifying objective identity facts, flagging factual anomalies, or providing informational tools to brokers; it prohibits only Highway's assumption of de facto regulatory authority through silent gatekeeping, surveillance-based punishment, and identity capture without due process. A private platform has no protected interest in a business model that depends on coercive control, fear of economic exclusion, or the substitution of opaque platform judgments for lawful regulatory processes. If Highway's profitability or utility depends on deciding outcomes rather than supplying information, that dependency confirms—rather than defeats—the necessity of equitable relief under Sherman Act §16 and RICO §1964(a). The injunction preserves lawful fraud-prevention functions while restraining only those practices that improperly regulate market access, restrain trade, and extort compliance through fear of economic harm.

## Irreparable Harm and Public Interest (TRO / Preliminary Injunction)

Absent immediate injunctive relief, Plaintiff and similarly situated carriers face ongoing irreparable harm that cannot be remedied by damages alone, including loss of access to interstate commerce, cascading exclusion across brokers, suppression of lawful negotiation, and coerced silence caused by fear of opaque platform retaliation. Because carriers are required to operate with continuous ELD telemetry and are subject to persistent identity profiling, each day of continued gatekeeping compounds the harm and threatens business survival. The public interest strongly favors an injunction that preserves legitimate fraud-prevention and informational

338

services while restraining Highway from acting as an unauthorized regulator through silent

exclusion and surveillance-based coercion. Restoring transparency, due process, and competition

protects federally authorized carriers, promotes fair markets, and prevents private platforms from

exercising quasi-governmental control over interstate commerce without accountability.

# Defendant: 8

# Carrier411

### #1 — Identity, Represented Purpose, and Non-Regulatory Status

Carrier411 is a privately owned, for-profit online platform that presents itself as a carrier

monitoring, reporting, and risk-assessment service used primarily by freight brokers. Carrier411

is not a governmental entity, not a regulator, not affiliated with the FMCSA or DOT, and not

vested with any statutory authority to discipline, suspend, or penalize federally authorized motor

carriers

Despite this lack of authority, Carrier411 functions in practice as a private enforcement and

reputational adjudication system that materially determines whether a carrier may access freight

in interstate commerce.

---

### A. Represented Function vs. Actual Operation

339

Carrier411 represents itself as an informational repository that allows brokers to "share experiences" or "flag risks" associated with carriers. In reality, Carrier411 operates as a blacklisting mechanism whose outputs are treated by brokers as dispositive.

Once a carrier is flagged or reported within Carrier411:

- brokers decline to tender loads,

- onboarding halts across unrelated brokers,

- carriers are excluded without notice,

- and exclusion propagates industry-wide.

Carrier411's reports function as economic death sentences for small carriers, despite being:

- unverified,

- one-sided,

- non-adjudicated,

- and immune from meaningful challenge.

---

## B. Private Adjudication Without Due Process

Carrier411 permits brokers to submit FreightGuard reports or equivalent negative entries that are published and disseminated to other brokers without:

- sworn statements,

340

- evidentiary standards,

- neutral review,

- carrier participation,

- or a right to confront accusations.

Carriers are not afforded notice before publication, nor a meaningful opportunity to contest allegations before market-wide consequences attach.

This structure mirrors judicial punishment without a court, and regulatory enforcement without law.

---

## C. De Facto Regulatory Power Over Federally Authorized Carriers

Although FMCSA authority is public, uniform, and federally governed, Carrier411 substitutes a private reputational regime for lawful regulation.

A carrier may:

- hold valid federal authority,

- maintain insurance,

- pass inspections,

- and operate lawfully,

yet still be functionally barred from the market solely due to Carrier411 entries.

341

Carrier411 thus supplants federal transparency with opaque private governance, creating a parallel system of control over interstate commerce.

---

## D. Broker-Facing Orientation and Economic Incentives

Carrier411's true customer is the broker, not the carrier.

- Brokers pay for access.

- Brokers generate the content.

- Brokers benefit from risk externalization.

Carriers, by contrast, are the subject of the data, not the beneficiary. Their identities, reputations, and livelihoods are commodified and traded without consent.

This misalignment of incentives encourages:

- over-reporting,

- retaliatory reporting,

- leverage extraction,

- and suppression of negotiation.

---

## E. Enterprise Consistency With Other Defendants

342

Carrier411 occupies a complementary role within the broader enterprise:

- Upstream platforms collect surveillance and behavioral data.

- Carrier411 converts disputes into reputational punishment.

- Downstream brokers rely on Carrier411 to justify refusals to deal.

- No participant claims responsibility for the outcome.

Carrier411 supplies the reputation weapon that enables the enterprise to discipline carriers without formal enforcement.

---

## F. Intent and Design

Carrier411's system is not neutral, accidental, or self-correcting.

It is designed to:

- publish allegations first,

- correct later (if ever),

- favor paying broker customers,

- and externalize harm onto carriers.

The platform's architecture ensures that once a carrier is flagged, the damage occurs immediately, while remediation—if allowed at all—is slow, costly, and uncertain.

---

343

## G. Role in Market Control

Carrier411's role is not to inform—it is to exclude.

By providing a centralized, broker-controlled blacklist that substitutes rumor and dispute for adjudication, Carrier411 restrains trade, suppresses competition, and coerces carrier compliance through fear of reputational destruction.

## Carrier411

## #1 — Identity, Declared Purpose, and Assumption of Enforcement Authority

Carrier411 is a privately owned, for-profit data platform that openly holds itself out as an "industry-standard", "essential service" for freight brokers, shippers, and factoring companies. It is not a governmental entity, not a regulator, not affiliated with the FMCSA or DOT, and not vested with any statutory authority to discipline, restrict, or penalize federally authorized motor carriers.

Despite this, Carrier411 explicitly markets itself as a carrier selection and exclusion system, designed not merely to inform brokers, but to decide who should and should not be allowed to participate in the freight market.

---

## A. Express Broker-Only Orientation and Exclusion of Carriers

344

Carrier411 affirmatively excludes motor carriers from its platform. By its own statements:

- Carrier411 is "not a service for trucking companies."

- It "will not talk to carriers about anything."

- Trucking companies, dispatch services, attorneys, consultants, compliance services, and authority services are explicitly barred from access.

- Attempts by carriers to create accounts result in blocking, and even carrier phone calls are surfaced to Carrier411's broker customers.

This is not neutral data publication. It is intentional structural exclusion, ensuring that:

- only brokers control the narrative,

- only brokers submit reports,

- only brokers see the data,

- and carriers are denied any participatory or corrective role.

---

## B. Public Claim of Market Control and Essentiality

Carrier411 repeatedly describes itself as:

- an "essential service" for brokers and shippers,

- a platform relied upon by thousands of brokers daily,

- a system monitoring over a million companies,

- and a tool used to "avoid choosing the wrong carriers."

345

Carrier411 does not merely suggest brokers may consider its information. It markets itself as a gatekeeping necessity, framing carrier exclusion as a form of protection for the logistics industry.

This language reflects an assumed enforcement role, not an informational one.

---

## C. Self-Declared Authority to "Catch" and "Stop" Carriers

Carrier411 explicitly states that it:

- tracks all new MC numbers issued by the FMCSA,

- identifies so-called "chameleon carriers,"

- and "catches them dead in their tracks."

This is not passive observation. It is active interdiction language, used by a private platform that lacks regulatory authority and due process obligations.

Carrier411 thus positions itself as a parallel enforcement regime, operating alongside — and effectively supplanting — federal oversight.

---

## D. Proprietary Data + Public Data = Enforcement Leverage

Carrier411 states it aggregates:

346

- at least 18 FMCSA datasets,

- historical FMCSA data dating back decades,

- and proprietary, non-public data unavailable elsewhere.

This combination allows Carrier411 to:

- blend verified public records with unverified private allegations,

- obscure the source of adverse signals,

- and present composite "risk" conclusions that appear authoritative but are not auditable.

The result is a black-box enforcement tool that brokers treat as dispositive.

---

**E. FreightGuard Reports as a Core Feature, Not an Ancillary Tool**

Carrier411 openly advertises the existence of hundreds of thousands of FreightGuard reports, submitted by its broker customers and made instantly available to other brokers.

These reports:

- are not sworn,

- are not adjudicated,

- are not reviewed neutrally,

- are not subject to evidentiary standards,

- and are published without carrier participation.

347

Yet they are marketed as a central value proposition of the platform.

This confirms that reputational punishment is a product feature, not an incidental byproduct.

---

## F. Artificial Intelligence as a Justification Layer

Carrier411 promotes the use of:

- artificial intelligence,

- machine learning,

- analytics,

- and automated detection systems

to "detect things that should be considered when vetting carriers."

This language positions algorithmic outputs as decision substitutes, not advisory inputs — further distancing the platform from transparency, accountability, or due process.

---

## G. Intentional Power Asymmetry by Design

Carrier411's system is intentionally structured so that:

- brokers are the paying customers,

- brokers are the sole contributors,

- brokers receive the benefit of exclusionary signals,

348

- carriers are the subjects of the data,

- and carriers are denied access, voice, or remedy.

This is not accidental bias. It is designed power asymmetry.

---

## H. Role Within the Enterprise

Within the broader enterprise alleged in this action:

- surveillance platforms collect behavioral and operational data,

- identity platforms translate that data into eligibility signals,

- Carrier411 supplies the reputation weapon,

- and brokers execute refusals to deal while disavowing responsibility.

Carrier411's function is to convert disputes, allegations, and data into market-wide exclusion, without the visibility or accountability required of lawful regulators.

---

## I. Summary

Carrier411 does not operate as a neutral data service. It operates as:

- a broker-only enforcement platform,

- a private blacklist,

- and a de facto regulator of carrier participation in interstate commerce.

349

By design, Carrier411 wields reputational and economic power over carriers who are denied access to the very system that determines their survival.

**Defendant: 6**

**Carrier411**

**#2 — FreightGuard Reports, Pay-to-Remove Dynamics, and Extortionary Leverage**

Carrier411's most consequential feature is its FreightGuard reporting system, which functions as a broker-controlled reputational punishment mechanism rather than a neutral safety or compliance tool.

---

**A. FreightGuard Reports as Immediate Market Sanctions**

FreightGuard reports are published to Carrier411's broker-only audience and take effect immediately upon posting. Once a negative report appears:

- brokers decline to tender freight,

- carrier onboarding halts across unrelated companies,

- factoring relationships are jeopardized,

- and market exclusion cascades without explanation.

350

No prior notice is given to the carrier. No neutral review occurs before publication. The punishment precedes any opportunity to respond.

---

## B. One-Sided Allegations Without Due Process

FreightGuard reports are:

- unsworn,

- unverified,

- broker-submitted,

- narrative-based,

- and immune from evidentiary standards.

Carriers are not permitted to:

- participate before posting,

- confront the reporting party,

- compel correction,

- or meaningfully appeal within a reasonable timeframe.

Carrier411 nonetheless markets these reports as authoritative indicators of "risk," knowing brokers treat them as dispositive.

---

## C. Economic Coercion and Leverage Extraction

351

Because Carrier411 advertises itself as an "essential service" relied upon by thousands of brokers, a FreightGuard report functions as economic leverage over carriers.

Carriers understand that:

- disputing a broker,

- demanding payment,

- negotiating rates,

- or asserting contractual rights

may result in retaliatory reporting that effectively removes them from the market.

The choice presented is implicit but unmistakable: submit or be excluded.

---

## D. Pay-to-Remove and Monetized Reputation Control

Carrier411's structure creates a dynamic in which carriers are pressured to:

- pay third-party "removal" services,

- settle disputed claims irrespective of merit,

- or accede to broker demands

as the only realistic path to restoring access to freight.

352

This monetization of reputational harm converts FreightGuard reports from informational content into economic weapons, functioning as a form of private toll imposed on carriers seeking to reenter the market.

---

## E. Retaliation Shielded by Platform Design

Carrier411's refusal to communicate with carriers, combined with its broker-only access rules, ensures that:

- reporting brokers face no accountability,

- retaliatory motives remain hidden,

- and false or exaggerated allegations persist unchecked.

The platform's design insulates bad-faith reporting while amplifying its market impact.

---

## F. Enterprise Alignment

Within the broader enterprise:

- upstream surveillance and identity systems generate data,

- Carrier411 converts disputes into reputational punishment,

- brokers rely on FreightGuard to justify refusals to deal,

- and no participant claims responsibility for the exclusion.

353

Carrier411 thus supplies the coercive enforcement layer that allows the enterprise to discipline carriers without overt coordination.

---

## G. Summary

FreightGuard reports are not safety notices. They are private sanctions imposed without law, process, or accountability, and enforced through fear of economic ruin.

By monetizing reputational harm and enabling retaliatory exclusion, Carrier411 engages in conduct consistent with extortionary leverage, restraint of trade, and enterprise-wide coercive control.

**Defendant: 8**

**Carrier411**

## #3 — FreightGuard Reports as an Instrument of Blackmail, Retaliation, and Personal Enrichment

Carrier411's FreightGuard system is widely understood within the trucking industry to function not merely as a reputational database, but as a tool of economic coercion routinely exploited by individual brokers and brokerage agents for leverage, retaliation, and personal enrichment.

---

354

## A. Widespread Industry Knowledge and Open Practice

It is common knowledge among carriers that brokers and brokerage agents use the threat of a FreightGuard report—often without confirming whether any report exists—to extract concessions from carriers.

This practice is so normalized that carriers reasonably believe:

- a FreightGuard can be created at any time,
- by any broker with access,
- without oversight,
- and without accountability.

The fear alone is sufficient to coerce payment or compliance.

---

## B. A-La-Carte Blackmail by Individual Brokerage Agents

Brokers and brokerage agents are widely known to go off script, acting outside formal company channels to demand payment directly from carriers in exchange for "making the problem go away."

These demands frequently involve:

- Cash App transfers,
- Zelle payments,
- Venmo,

355

- or other personal payment platforms,

made to the individual agent, not the brokerage, and often without documentation or confirmation that a FreightGuard report was ever filed.

In many cases, carriers pay simply to avoid the risk of market exclusion—whether or not a report exists.

---

## C. Coercion Without Verification or Process

Carrier411's platform design enables this abuse by ensuring that:

- carriers cannot see whether a FreightGuard exists,

- carriers cannot verify who submitted it,

- carriers cannot confirm whether removal occurred,

- and carriers have no direct access to the platform to check their own status.

This opacity creates the perfect conditions for coercion: power without transparency.

---

## D. Retaliation for Lawful Conduct

Carriers understand that asserting basic rights—such as:

- demanding payment,

- disputing deductions,

356

- refusing unsafe or underpriced loads,

- negotiating rates,

- or declining unlawful requests—

can trigger retaliatory threats involving FreightGuard reports.

Carrier411's system therefore suppresses lawful conduct by substituting fear-based compliance for voluntary agreement.

---

## E. Monetization of Reputational Harm

The FreightGuard system converts reputational harm into a currency, traded informally by brokers and agents and formally by third-party "removal" services.

The market message to carriers is unmistakable:

Your ability to operate depends on your willingness to pay.

This is not fraud prevention. It is economic leverage extraction.

---

## F. Carrier411's Knowledge and Facilitation

Carrier411 publicly markets FreightGuard reports as authoritative, relies on broker submissions without verification, refuses communication with carriers, and enforces broker-only access while knowing that:

357

- FreightGuard reports trigger immediate refusals to deal,

- carriers cannot independently verify or contest allegations,

- and the threat of reporting is routinely used as leverage.

By designing and maintaining this system, Carrier411 facilitates and profits from the coercive use of reputational power, while disclaiming responsibility for its consequences.

---

## G. Enterprise Function

Within the broader enterprise architecture:

- surveillance and compliance platforms generate carrier exposure,

- brokers weaponize that exposure through FreightGuard threats,

- Carrier411 provides the enforcement mechanism,

- and economic exclusion occurs without any single actor appearing to decide it.

Carrier411 thus supplies the blackmail-ready enforcement layer that allows coercion to occur informally, deniably, and at scale.

---

## H. Summary

FreightGuard reports function not as safety notices, but as unregulated economic weapons, routinely used by brokers and agents to extract money, silence disputes, and punish resistance.

358

Carrier411's system enables this conduct by design, and its continued operation sustains a marketplace where fear—not merit—determines access to interstate commerce.

**Carrier411**

**#4 — Blacklisting, Market Foreclosure, and Concerted Refusals to Deal**

Carrier411 operates as a centralized blacklisting hub that enables and enforces market-wide exclusion of motor carriers through concerted refusals to deal, resulting in unlawful foreclosure from interstate commerce.

---

**A. Blacklisting by Design, Not Accident**

Carrier411's system is structured so that a single negative marker—whether a FreightGuard report, internal risk flag, or adverse narrative—triggers immediate and widespread refusal to transact across thousands of brokers simultaneously.

Because Carrier411 markets itself as an "essential service" relied upon daily for carrier selection, brokers treat its outputs not as informational inputs, but as final determinations of whether a carrier may participate in the market.

359

This transforms Carrier411 from a data provider into a de facto gatekeeper.

---

## B. Market-Wide Effects Without Direct Coordination

Although brokers do not explicitly communicate with one another, Carrier411 supplies a shared decision-making infrastructure that produces uniform outcomes:

- carriers are declined across unrelated brokerages,
- onboarding portals suddenly fail or stall,
- rate confirmations are withdrawn,
- and carriers are told they are "not approved" with no explanation.

This is a classic hub-and-spoke restraint, where Carrier411 functions as the hub and brokers as parallel spokes, producing concerted refusals to deal without overt agreement.

---

## C. No Meaningful Alternative Channels

Because Carrier411 is relied upon by:

- major national brokerages,
- factoring companies,
- insurers,
- and compliance vendors,

360

a carrier subject to adverse Carrier411 status cannot reasonably avoid its effects.

The result is practical market foreclosure, not limited to one broker or transaction, but extending across the carrier's entire addressable market.

---

## D. Absence of Due Process and Opportunity to Cure

Carriers subjected to blacklisting:

- receive no advance notice,

- are given no specific allegations,

- cannot confront accusers,

- cannot verify what triggered the exclusion,

- and are denied access to the platform itself.

There is no neutral review, no evidentiary standard, and no timely path to restoration.

The exclusion is indefinite, opaque, and absolute.

---

## E. Suppression of Competition and Price Discipline

361

The threat of blacklisting suppresses:

- rate negotiation,

- payment disputes,

- lawful refusal of uneconomic loads,

- and carrier mobility between brokers.

Carriers learn that asserting basic commercial rights risks total exclusion, while brokers face no reciprocal risk.

This distorts pricing, entrenches broker power, and restrains trade by removing independent carriers from competitive participation.

**REMEDY**

**As to**

**Carrier411, LLC**

(Preventing Civilian Replication of the Carrier411 Model)

---

**A. Nature and Purpose of Relief**

362

Plaintiff seeks prospective declaratory and injunctive relief narrowly tailored to prevent Carrier411's broker-only, pay-to-observe, opaque blacklisting model from being replicated, adapted, licensed, or extended into civilian contexts.

This remedy is not punitive. It is preventive, recognizing Carrier411 as a proven test bed whose architecture—if unchecked—poses an imminent risk to civilians when combined with modern surveillance infrastructure.

---

## B. Declaration of Carrier411's Structural Risk

Plaintiff seeks a declaration that:

1. Carrier411 operates as a one-way reputational enforcement system in which access to adverse information is sold exclusively to institutional users while subjects are denied notice, transparency, or meaningful recourse.

2. Such a system, when combined with surveillance-derived data, constitutes a two-tier access-control regime incompatible with civilian due-process norms.

3. The Carrier411 model is lawful, if at all, only within a narrow, regulated commercial context, and is not suitable for expansion into general civilian life.

363

### C. Prohibition on Civilian Expansion and Repurposing

Plaintiff seeks an injunction prohibiting Carrier411 from:

1. Licensing, marketing, adapting, or repurposing its platform, architecture, or reporting model for use in:

   o housing,

   o employment screening,

   o neighborhood surveillance,

   o insurance risk assessment,

   o consumer reputation systems, or

   o any civilian eligibility or permissioning context.

2. Partnering with or integrating into civilian surveillance platforms, including but not limited to:

   o license-plate recognition systems,

   o neighborhood or HOA camera networks,

   o consumer doorbell or residential surveillance platforms.

3. Accepting or ingesting surveillance-derived civilian data for the purpose of reputation scoring, flagging, or access

### CARRIER411-SPECIFIC REMEDY

**Preventing Replication of Surveillance-Based Blacklisting Into Civilian Life**

**A. Declaratory Relief as to Carrier411**

Plaintiff seeks a declaration that Carrier411, LLC operates a broker-only, pay-to-access reputational system that conditions access to work on undisclosed reports, opaque criteria, and silent exclusion, without notice, explanation, or meaningful opportunity to respond.

Plaintiff further seeks a declaration that such a system, if replicated outside the trucking industry, would function as an unregulated civilian blacklisting mechanism incompatible with due process, fair competition, and basic civil liberties.

---

**B. Injunction Prohibiting One-Way Visibility and Pay-to-Judge Access**

Plaintiff seeks an injunction prohibiting Carrier411 from operating any system in which:

- adverse reports, flags, or designations are visible only to paying institutional users;

365

- affected individuals are denied access to view, understand, or challenge the information used against them; and
- reputational harm is imposed silently through denial of opportunity rather than through notice and process.

Such one-way visibility shall be declared unlawful where it results in exclusion from work or commerce.

---

## C. Mandatory Notice, Transparency, and Right to Respond

Plaintiff seeks injunctive relief requiring Carrier411 to implement, at minimum:

- Notice to any carrier when an adverse report or designation is posted;
- Disclosure of the substance, source category (without doxxing), and basis of the report;
- Opportunity to respond within a reasonable time before reports are relied upon for exclusion; and
- Clear expiration or review periods to prevent permanent reputational punishment.

Silent, indefinite blacklisting shall be prohibited.

366

## D. Prohibition on Expansion Beyond Regulated Freight Contexts

Plaintiff seeks an injunction expressly prohibiting Carrier411 from:

- licensing, adapting, or exporting its reputational-scoring or reporting model into civilian domains, including housing, employment, insurance, neighborhood surveillance, or public-safety platforms;
- integrating with civilian surveillance systems or camera networks for purposes of reputational judgment; or
- marketing its platform or methodology as a general-purpose "risk," "trust," or "safety" scoring tool outside the trucking industry.

## E. Guardrails Against Civilian Replication

Plaintiff seeks an order requiring that any reputational system operated by Carrier411:

- remain strictly confined to the regulated freight brokerage context;
- be subject to carrier-facing transparency equivalent to credit-reporting standards; and
- be prohibited from serving as a template, pilot, or proof-of-concept for civilian surveillance-based access control.

367

**F. Public Interest Finding**

Plaintiff seeks a finding that preventing the civilian replication of Carrier411's model serves the public interest by:

- stopping the creation of a pay-to-judge society,

- preventing blacklisting without law or process, and

- ensuring that technology tested on economically captive workers is not silently redeployed against the general public.

Carrier411 shows how easily surveillance becomes control when only one side is allowed to see. In trucking, brokers pay to access reports that drivers cannot see, cannot challenge, and cannot escape—yet those reports determine who may work and who may not. That system succeeded because truck drivers were economically captive. If this same model is allowed to spread beyond trucking, it becomes a civilian blacklisting system where landlords, employers, insurers, or private communities can quietly deny opportunity based on unseen data. The Court need not speculate about the danger. Carrier411 already proves the model works. The only question is whether it will be confined—or allowed to expand into everyday life.

368

## F. Predictable and Intended Effects

Carrier411 is aware—or must be aware—that:

- its outputs are treated as dispositive,

- its reports cause immediate refusals to deal,

- and its platform produces cascading exclusion.

These effects are not incidental. They are the commercial value proposition sold to subscribers: the ability to exclude carriers efficiently, quietly, and at scale.

## G. Enterprise Integration

Within the broader enterprise:

- upstream platforms collect carrier data,

- Carrier411 converts disputes into exclusion,

- brokers rely on Carrier411 to justify refusals,

- and responsibility is diffused across systems.

Carrier411 thus supplies the market-foreclosure mechanism that allows coordinated exclusion to occur without accountability.

369

## H. Summary

Carrier411 enables and enforces blacklisting that results in concerted refusals to deal and unlawful market foreclosure.

By centralizing reputational control, denying carriers access or process, and selling exclusion as a service, Carrier411 restrains trade and removes federally authorized motor carriers from interstate commerce without lawful authority.

**Defendant:**

**Carrier411**

## #5 — Misrepresentation of Authority, Quasi-Regulatory Conduct, and False Claims of Industry Protection

Carrier411 affirmatively holds itself out as an industry protector and essential service, while simultaneously exercising powers that mirror regulation—without statutory authority, due process, or public accountability.

## A. Self-Appointment as Industry Arbiter

Carrier411 publicly claims to:

- "protect the logistics industry,"

370

- "monitor carriers,"

- "identify problem carriers,"

- and prevent fraud on a market-wide basis.

These representations convey to brokers, shippers, and intermediaries that Carrier411 performs a gatekeeping and safety function analogous to that of a regulator, despite being a private, for-profit platform with no delegated authority.

---

## B. Conduct That Mimics Government Functions

Carrier411's actual conduct goes beyond data aggregation and into quasi-regulatory control, including:

- determining which carriers are effectively eligible to haul freight,

- enabling market-wide exclusion without notice,

- imposing indefinite reputational penalties,

- and conditioning participation in interstate commerce on opaque internal criteria.

These are regulatory outcomes, achieved without rulemaking, standards, hearings, or appeal.

---

## C. False Framing of Exclusion as "Protection"

Carrier411 frames blacklisting and FreightGuard reports as necessary to "protect" brokers and shippers, while concealing that:

371

- reports are unverified and one-sided,

- exclusions occur without process,

- and retaliatory or bad-faith submissions are foreseeable and routine.

Labeling coercive exclusion as "protection" misrepresents the nature of the service and masks its anticompetitive effects.

---

## D. Broker-Only Access as Structural Bias

Carrier411 expressly excludes:

- trucking companies,

- dispatch services,

- attorneys,

- compliance providers,

- and consultants

from accessing the platform or even communicating about their own status.

This broker-only architecture ensures that:

- decision-makers hear only one side,

- carriers are denied transparency,

- and adverse actions are insulated from scrutiny.

Such asymmetry is inconsistent with any legitimate claim of neutrality or safety oversight.

372

## E. Discretion Without Standards

Carrier411 reserves absolute discretion to:

- approve or deny accounts,

- block access,

- geo-restrict users,

- and enforce terms,

without publishing objective standards or providing explanations to affected carriers.

This unfettered discretion further demonstrates that Carrier411 is not a neutral data service, but an unchecked private authority controlling market access.

## F. Reliance by Market Participants

Carrier411 knows that brokers rely on its outputs as authoritative determinations, not optional inputs. By encouraging that reliance while denying carriers any voice, Carrier411 entrenches its role as a private regulator whose decisions carry market-ending consequences.

## G. Enterprise Role

373

Within the enterprise framework:

- Carrier411 supplies the narrative justification ("risk," "protection"),

- brokers execute refusals to deal,

- and upstream platforms provide data inputs,

allowing exclusionary outcomes to occur while no single actor claims responsibility.

---

## H. Summary

Carrier411 falsely presents itself as an industry protector while exercising regulatory-like power it does not lawfully possess. Its practices substitute private discretion for public regulation, impose sanctions without process, and mislead market participants into treating its determinations as authoritative.

This conduct supports claims of misrepresentation, restraint of trade, and enterprise-wide coercive control.

**Defendant: 8**

**Carrier411**

**— Antitrust Injury, Interstate Commerce Effects, and Causatio**

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Carrier411's conduct causes antitrust injury of the type the Sherman Act was designed to prevent and directly affects interstate commerce.

---

## A. Unreasonable Restraints of Trade

Carrier411 facilitates and enforces unreasonable restraints of trade by enabling brokers to engage in concerted refusals to deal through a shared, broker-only platform that produces uniform exclusionary outcomes.

By centralizing reputational control and disseminating negative determinations as authoritative, Carrier411 substitutes platform discretion for competitive decision-making. Independent broker judgment is displaced by reliance on Carrier411's outputs, resulting in parallel exclusion of carriers across the market.

---

## B. Market Foreclosure and Exclusion of Lawful Competitors

Carriers subject to adverse Carrier411 status are effectively foreclosed from the market, regardless of valid federal authority, insurance, or safety record. Because Carrier411 is widely relied upon by major brokerages and intermediaries, affected carriers cannot reasonably bypass its effects.

This foreclosure:

- removes independent carriers from competition,

375

- reduces carrier choice available to shippers,

- and entrenches broker power.

---

## C. Suppression of Price Competition and Output

The threat and use of FreightGuard reports suppress:

- rate negotiation,

- payment disputes,

- and lawful refusal of uneconomic or unsafe loads.

Carriers, fearing market-wide exclusion, accept lower rates and unfavorable terms, resulting in suppressed prices, reduced output, and diminished service quality—classic anticompetitive effects.

---

## D. Antitrust Injury to Plaintiff and Similarly Situated Carriers

Plaintiff and similarly situated carriers suffer direct antitrust injury, including:

- loss of access to freight,

- loss of customers and revenue,

- forced acceptance of below-market rates,

376

- reputational harm that persists across transactions,

- and loss of the ability to compete on merit.

These injuries flow directly from the challenged conduct and are not speculative or incidental.

---

## E. Causation and Proximate Cause

The causal chain is direct and foreseeable:

1. Carrier411 publishes or threatens adverse reputational signals.

2. Brokers rely on those signals as dispositive.

3. Brokers refuse to deal with affected carriers.

4. Market access is foreclosed across multiple brokerages.

5. Carriers suffer economic harm and exit or curtail operations.

Carrier411 is aware that its platform produces these effects and markets the service on that basis.

---

## F. Effect on Interstate Commerce

Carrier411's conduct substantially affects interstate commerce by:

- preventing federally authorized carriers from hauling freight across state lines,

- distorting pricing and competition nationwide,

- and concentrating market power through private coordination.

377

Because trucking is inherently interstate and Carrier411's platform operates nationwide, the anticompetitive effects are widespread and ongoing.

---

## G. Lack of Procompetitive Justification

Any asserted justification based on "fraud prevention" fails because:

- the system relies on unverified allegations,

- excludes carriers without process,

- and enables retaliation and personal enrichment.

Less restrictive alternatives—such as factual disclosures without exclusionary effect—are readily available and were not adopted.

---

## H. Summary

Carrier411's practices restrain trade, foreclose competition, suppress prices, and harm interstate commerce. The injuries suffered by Plaintiff and others are the direct, intended, and foreseeable result of Carrier411's conduct.

This section supports claims for injunctive relief under Sherman Act §16 and establishes Carrier411's role as a material participant in the enterprise's anticompetitive scheme.

378

**Defendant: 8**

**Carrier411**

**#7 — RICO Enterprise Conduct, Pattern of Racketeering, and Participation**

Carrier411 knowingly conducts and participates in the conduct of an enterprise affecting interstate commerce through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), and conspires to do so in violation of § 1962(d).

---

## A. The Enterprise

The enterprise consists of an association-in-fact among broker-facing platforms, surveillance and data aggregation systems, reputation and identity services, and participating brokers and agents, including but not limited to Carrier411.

The enterprise has:

- a common purpose: controlling access to freight and disciplining carriers outside lawful regulatory processes;
- relationships: interoperability, reliance, and shared use of reputational and data tools;
- longevity: continuous operation over years, affecting thousands of carriers nationwide.

---

379

## B. Carrier411's Role in the Enterprise

Carrier411 performs a central enforcement function within the enterprise by:

- converting broker disputes and allegations into reputational sanctions;

- enabling market-wide exclusion through FreightGuard reports;

- supplying a broker-only blacklist relied upon as authoritative;

- and insulating brokers and agents from accountability for retaliatory conduct.

Carrier411 is not a passive bystander. It is the mechanism through which exclusion is operationalized.

---

## C. Predicate Acts — Extortion (Hobbs Act)

Carrier411's FreightGuard system facilitates extortion in violation of the Hobbs Act (18 U.S.C. § 1951) by enabling the wrongful use of fear of economic harm to obtain property.

Carriers are coerced into:

- paying disputed charges,

- accepting reduced compensation,

- foregoing lawful claims,

- or making direct payments to brokers or agents,

380

to avoid the threat or continuation of FreightGuard-based blacklisting.

The fear is real, reasonable, and intentionally induced by the system's design.

---

## D. Predicate Acts — Wire Fraud

Carrier411 further engages in wire fraud (18 U.S.C. § 1343) by:

- transmitting unverified and misleading reputational information via interstate communications;
- representing FreightGuard reports as reliable indicators of "risk" or "protection" while concealing their unverified, retaliatory nature;
- inducing brokers to rely on false premises to justify refusals to deal.

These misrepresentations are material and made in furtherance of the enterprise's scheme.

---

## E. Pattern, Relatedness, and Continuity

The racketeering acts are:

- related: all further the objective of controlling carrier behavior through reputational coercion;
- continuous: repeated across carriers, brokers, and time;
- open-ended: posing an ongoing threat to competition and interstate commerce.

381

Carrier411's system ensures repetition by design, not chance.

---

## F. Interstate Commerce Nexus

Carrier411's conduct affects interstate commerce by:

- removing carriers from interstate hauling,

- suppressing competition nationwide,

- and enabling uniform exclusion across state lines through electronic systems.

The enterprise's activities are inherently interstate.

---

## G. Conspiracy

Carrier411 knowingly agrees and conspires with brokers and other enterprise participants to conduct and participate in the enterprise's affairs through racketeering activity, sharing a common understanding that FreightGuard reports and reputational threats will be used to discipline carriers.

---

## H. Proximate Cause and Injury

382

Plaintiff's injuries—including loss of freight, revenue, reputation, and the ability to compete—were proximately caused by Carrier411's racketeering conduct and were the intended consequence of the enterprise's methods.

---

## I. Summary

Carrier411 is a knowing participant in an enterprise that uses reputational blacklisting, fear of economic harm, and deceptive communications to coerce carriers and restrain trade.

Its conduct satisfies RICO's enterprise, pattern, predicate acts, and causation requirements, and warrants injunctive relief and other remedies under 18 U.S.C. § 1964.

**REVISED — Carrier411 Stand-Alone Remedies**

(Impossible Triangle / Structural Removal Remedy)

**Remedies Sought as to Defendant**

**Carrier411**

**A. Findings Necessitating Structural Relief**

Plaintiff seeks structural equitable relief based on the finding that Carrier411's business model is inherently incompatible with lawful competition and due process, and that its continued

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

operation—regardless of incremental safeguards—poses an ongoing threat to interstate commerce.

Carrier411 has operated for approximately two decades as a broker-controlled, carrier-excluded blacklisting system, producing:

- unilateral reputational punishment,

- market-wide exclusion without adjudication,

- extortionary leverage through fear of FreightGuard reports,

- and irreversible harm to tens of thousands of carriers.

The harm is cumulative, irreversible, and ongoing.

---

## B. Permanent Prohibition on Reputational Enforcement Functions

Plaintiff seeks an injunction permanently prohibiting Carrier411 from:

1. Publishing, hosting, maintaining, or disseminating any reputational, evaluative, or punitive content about motor carriers, including but not limited to FreightGuard reports or equivalent systems.

2. Operating or licensing any system that results in carrier exclusion, refusal to deal, or market access restriction, whether directly or indirectly.

3. Providing broker-only access to carrier-specific adverse information.

This prohibition is necessary because Carrier411's core product is exclusion, not information.

## C. Mandatory Dissolution or Divestiture of Blacklisting Assets

Plaintiff seeks an order requiring:

- Dissolution, decommissioning, or permanent divestiture of Carrier411's FreightGuard database and any derivative reputational datasets;
- Prohibition on sale, transfer, licensing, or migration of such datasets to any successor entity, affiliate, or third party.

Twenty years of unverified, one-sided allegations cannot be laundered into a new platform.

## D. Permanent Removal From the Enterprise

Plaintiff seeks an order barring Carrier411 from:

- Participating in any enterprise involving:
  - carrier eligibility,
  - broker vetting,
  - identity verification,
  - fraud prevention,
  - or market access control;
- Integrating with load boards, brokers, factoring companies, insurers, or surveillance platforms for carrier-disciplining purposes.

385

Carrier411 must be structurally severed from the freight-tech ecosystem.

---

## E. Declaratory Relief (Irreparable Taint)

Plaintiff seeks a declaration that:

- Carrier411's reputation systems are irreparably tainted by historic abuse;

- No remedial labeling, transparency, or appeal mechanism can cure the coercive effects;

- Continued operation constitutes an ongoing restraint of trade and RICO enterprise facilitation.

---

## F. Preservation, Audit, and Wind-Down Oversight

Plaintiff seeks appointment of a special master to:

- Preserve all Carrier411 records for evidentiary purposes;

- Audit historical usage, report creation, removals, and payments;

- Supervise the orderly wind-down and destruction of blacklisting systems;

- Prevent spoliation or data migration.

---

## G. Public Interest and Equitable Necessity

The public interest overwhelmingly favors complete removal, not reform.

386

Allowing Carrier411 to persist—even in modified form—would:

- perpetuate fear-based compliance,

- chill lawful carrier conduct,

- entrench broker dominance,

- and validate private punishment without law.

Equity does not protect business models that depend on permanent reputational harm.

---

## H. Summary (Impossible Triangle Doctrine)

Carrier411 cannot simultaneously:

- exist as a broker-only platform,

- traffic in punitive reputation,

- and operate lawfully in interstate commerce

Due Process (5th & 14th Amendments)

A private actor may:

Collect information

387

Advise others

But may not impose livelihood ending consequences without notice, standards or appeal.

**The triangle cannot be reconciled**.

Carrier411 is exercising governmental powers without constitutional constraints.

The only equitable remedy is removal.

---

**Judicial Justification for Structural Relief as to**

**Carrier411**

The Court is presented not with a defendant whose conduct can be cured by incremental safeguards, but with a platform whose core design, history, and function are inseparable from the harm alleged. Where the product itself is the mechanism of exclusion, coercion, and market foreclosure, equitable relief must be structural, not behavioral.

Carrier411 has operated for approximately two decades as a broker-only reputational enforcement system that excludes federally authorized motor carriers from interstate commerce without notice, adjudication, or lawful authority. Its defining features—one-sided access, unverified allegations, immediate market-wide effect, and permanent reputational stigma—are not incidental defects. They are the commercial value proposition.

The record reflects that Carrier411 simultaneously performs three incompatible roles:

388

(1) it adjudicates disputes without process;

(2) it enforces outcomes through cascading refusals to deal; and

(3) it profits from the fear and exclusion it creates.

This "impossible triangle" cannot be reconciled through transparency labels, appeals, or policy adjustments. Any attempt to preserve Carrier411 while limiting its conduct would leave intact the very leverage—fear of irreversible reputational harm—that drives coercion and anticompetitive effects.

Critically, the harm here is cumulative and irreversible. Twenty years of unverified, broker-submitted allegations have produced enduring reputational damage that follows carriers indefinitely, suppressing competition, chilling lawful conduct, and distorting pricing and output across the market. No forward-looking disclaimer can unwind that history, and no procedural retrofit can neutralize a system whose past use defines its present power.

Equity is concerned not with punishment, but with prevention. Where a defendant's continued operation poses a substantial likelihood of future violations, courts are expressly empowered to order relief that removes the source of the harm. Allowing Carrier411 to remain embedded in the freight-tech ecosystem—even in modified form—would perpetuate fear-based compliance, validate private punishment without law, and undermine public regulatory frameworks governing interstate commerce.

Nor does structural relief eliminate legitimate functions. Objective, public, carrier-visible information already exists through lawful government systems and neutral data sources. What

389

Carrier411 adds is not transparency, but private enforcement without accountability. Equity does not protect business models that depend on permanent reputational injury and exclusion as a service.

Accordingly, the only remedy capable of preventing future harm, restoring competitive conditions, and serving the public interest is complete removal of Carrier411's reputational enforcement functions from the market, including dissolution or permanent divestiture of its blacklisting assets and severance from enterprise integrations. Anything less would leave the coercive mechanism intact and invite recurrence.

## Disgorgement and Restitution as to

## Carrier411

## A. Equitable Basis for Disgorgement

Plaintiff seeks disgorgement of revenues and benefits unjustly obtained by Carrier411 through its operation of a broker-controlled blacklisting and reputational enforcement system.

Carrier411's revenues are not derived from neutral information services. They are derived from:

- broker subscriptions purchased for the purpose of excluding carriers,
- the monetization of FreightGuard reports and reputational fear,
- and the market power created by coordinated refusals to deal.

Where profits are inextricably linked to unlawful conduct, equity requires forfeiture.

---

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## B. Causal Nexus to Plaintiff's Injury

Plaintiff was directly harmed by the very mechanisms that generated Carrier411's revenues, including:

- reputational exclusion,

- inability to access freight,

- loss of bargaining power,

- and forced exit from competitive opportunities.

Plaintiff's exclusion was not incidental — it was a necessary condition for the system's value to brokers. Without carrier harm, the platform has no coercive leverage and no market power.

Thus, Carrier411's unjust enrichment is directly traceable to Plaintiff's injury.

---

## C. Scope of Disgorgement

Plaintiff seeks disgorgement of:

- subscription revenues attributable to FreightGuard and carrier-monitoring services,

- revenues derived from blacklisting, exclusion, and reputational enforcement,

- any payments, fees, or economic benefits tied to removal, mitigation, or threat of FreightGuard reports,

- and profits traceable to enterprise integrations that amplified carrier exclusion.

391

Exact calculation is a matter for accounting and discovery, not pleading.

---

## D. Restitution to Plaintiff

Plaintiff seeks that disgorged funds be paid directly to Plaintiff as restitution, because:

- Plaintiff is a direct victim of the scheme,

- Plaintiff's exclusion enabled Carrier411's continued operation,

- and restitution restores, in part, the competitive position unlawfully taken.

This relief is remedial, not punitive, and is necessary to prevent Carrier411 from retaining the fruits of unlawful conduct.

---

## E. Disgorgement Is Necessary to Prevent Recurrence

Absent disgorgement, Carrier411 would:

- retain profits earned through coercive exclusion,

- exit the market enriched by unlawful conduct,

- and signal to similarly situated platforms that blacklisting is profitable even if later enjoined.

Equity does not permit a defendant to "keep the money and stop the conduct."

---

392

## F. Relationship to Structural Relief

Disgorgement is complementary to structural removal.

Structural relief prevents future harm.

Disgorgement remedies past unjust enrichment.

Together, they:

- restore competitive balance,
- deter recurrence,
- and compensate the injured party.

---

**Targeted Discovery Roadmap — Carrier411**

(Disgorgement, Restitution, and Structural Relief)

## I. Core Objective of Discovery

Discovery is narrowly tailored to:

1. Identify ill-gotten gains derived from blacklisting, FreightGuard leverage, and exclusionary conduct;

2. Trace a causal nexus between Carrier411's revenues and Plaintiff's injury;

393

3. Preserve and audit reputational enforcement systems to prevent spoliation; and

4. Support equitable relief, including disgorgement, restitution to Plaintiff, and permanent structural removal.

This discovery does not seek speculative damages or unrelated business data.

---

## II. Financial Discovery (Disgorgement Backbone)

### A. Revenue Streams (Last 6–10 Years)

Request production of:

- Broker subscription revenue, broken down by:
    - FreightGuard access,
    - carrier monitoring features,
    - risk / alert / blacklist functionality.
- Revenue attributable to:
    - report creation,
    - report access,
    - report visibility tiers,
    - historical database access.
- Any revenues tied to:
    - "risk," "do not use," or equivalent exclusionary indicators.

394

Purpose: establish that Carrier411's profits are inseparable from reputational enforcement.

---

## B. Payments Related to Removal or Mitigation

Request:

- Records of any fees, payments, or consideration related to:
    - report removal,
    - report modification,
    - expedited review,
    - mitigation services,
    - third-party "removal" vendors.
- Communications referencing:
    - Cash App,
    - Zelle,
    - Venmo,
    - personal payments,
    - or "making a FreightGuard go away."

Purpose: prove monetization of fear and extortionary leverage.

---

## III. FreightGuard System Evidence (Product = Harm)

## A. FreightGuard Database

Request:

- Full FreightGuard database (metadata + content), including:
    - date created,
    - broker submitting,
    - edits,
    - removals,
    - views,
    - duration active.
- Policies governing:
    - submission standards,
    - review (if any),
    - removal criteria.

Purpose: demonstrate systemic one-sidedness and permanence of harm.

---

## B. Abuse, Retaliation, and False Reporting

Request:

- Internal complaints about false, retaliatory, or abusive reports;
- Broker accounts flagged or warned for misuse;
- Internal discussions acknowledging abuse or coercion.

Purpose: establish knowledge and facilitation.

---

## IV. Broker Conduct & Off-Script Behavior

### A. Broker Communications

Request:

- Communications between Carrier411 and brokers discussing:
    - use of FreightGuard as leverage,
    - carrier "discipline,"
    - "teaching carriers a lesson,"
    - threats or deterrence.
- Training materials instructing brokers how to use reports.

Purpose: prove concerted refusal dynamics and intent.

---

### B. Broker Account Audit Logs

Request:

- Logs showing which brokers:
    - created reports,

397

- o  repeatedly targeted the same carriers,

- o  used reports shortly after payment disputes.

Purpose: show pattern, not isolated misuse.

---

## V. Carrier Impact Evidence (Restitution Nexus)

## A. Carrier Exclusion Metrics

Request:

- Analytics showing:

  - o  how often carriers are excluded after FreightGuard reports,

  - o  average duration of exclusion,

  - o  broker refusal rates following reports.

Purpose: connect reports directly to loss of market access.

---

## B. Plaintiff-Specific Records

Request all records relating to Plaintiff, including:

- Any FreightGuard reports (published or threatened),

- Broker communications referencing Plaintiff,

- Internal notes or flags,

- Views of Plaintiff's profile by brokers,

- Any attempted or completed removal actions.

Purpose: establish direct causation and individualized harm for restitution.

---

## VI. Enterprise Integration Discovery

Request documents showing integration with:

- load boards,

- broker onboarding systems,

- factoring companies,

- insurance vetting,

- compliance platforms.

Purpose: show Carrier411's role as an enterprise enforcement node.

---

## VII. Preservation & Anti-Spoliation Measures

Immediately request:

- Litigation hold on:

    o FreightGuard databases,

    o financial records,

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

- o broker communications,

- o audit logs.

- Prohibition on:

  - o data migration,

  - o deletion,

  - o "sunsetting" systems,

  - o transfer to affiliates.

Purpose: protect evidence before structural relief.

---

## VIII. Why This Discovery Is Proportionate

This discovery is:

- limited to Carrier411,

- limited to exclusionary functions,

- limited to revenues tied to harm,

- essential to equitable relief.

It avoids speculative damages and focuses on unjust enrichment + prevention.

### Targeted Discovery Roadmap — Carrier411

(Disgorgement, Restitution, and Structural Relief)

## I. Core Objective of Discovery

400

Discovery is narrowly tailored to:

1. Identify ill-gotten gains derived from blacklisting, FreightGuard leverage, and exclusionary conduct;

2. Trace a causal nexus between Carrier411's revenues and Plaintiff's injury;

3. Preserve and audit reputational enforcement systems to prevent spoliation; and

4. Support equitable relief, including disgorgement, restitution to Plaintiff, and permanent structural removal.

This discovery does not seek speculative damages or unrelated business data.

---

## II. Financial Discovery (Disgorgement Backbone)

### A. Revenue Streams (Last 6–10 Years)

Request production of:

- Broker subscription revenue, broken down by:
  - FreightGuard access,
  - carrier monitoring features,
  - risk / alert / blacklist functionality.
- Revenue attributable to:
  - report creation,
  - report access,
  - report visibility tiers,

401

- historical database access.

- Any revenues tied to:

  - "risk," "do not use," or equivalent exclusionary indicators.

Purpose: establish that Carrier411's profits are inseparable from reputational enforcement.

---

## B. Payments Related to Removal or Mitigation

Request:

- Records of any fees, payments, or consideration related to:

  - report removal,

  - report modification,

  - expedited review,

  - mitigation services,

  - third-party "removal" vendors.

- Communications referencing:

  - Cash App,

  - Zelle,

  - Venmo,

  - personal payments,

  - or "making a FreightGuard go away."

402

Purpose: prove monetization of fear and extortionary leverage.

---

## III. FreightGuard System Evidence (Product = Harm)

## A. FreightGuard Database

Request:

- Full FreightGuard database (metadata + content), including:
    - date created,
    - broker submitting,
    - edits,
    - removals,
    - views,
    - duration active.
- Policies governing:
    - submission standards,
    - review (if any),
    - removal criteria.

Purpose: demonstrate systemic one-sidedness and permanence of harm.

---

403

## B. Abuse, Retaliation, and False Reporting

Request:

- Internal complaints about false, retaliatory, or abusive reports;

- Broker accounts flagged or warned for misuse;

- Internal discussions acknowledging abuse or coercion.

Purpose: establish knowledge and facilitation.

---

## IV. Broker Conduct & Off-Script Behavior

## A. Broker Communications

Request:

- Communications between Carrier411 and brokers discussing:
    - use of FreightGuard as leverage,
    - carrier "discipline,"
    - "teaching carriers a lesson,"
    - threats or deterrence.
- Training materials instructing brokers how to use reports.

Purpose: prove concerted refusal dynamics and intent.

---

404

## B. Broker Account Audit Logs

Request:

- Logs showing which brokers:

    o   created reports,

    o   repeatedly targeted the same carriers,

    o   used reports shortly after payment disputes.

Purpose: show pattern, not isolated misuse.

---

## V. Carrier Impact Evidence (Restitution Nexus)

## A. Carrier Exclusion Metrics

Request:

- Analytics showing:

    o   how often carriers are excluded after FreightGuard reports,

    o   average duration of exclusion,

    o   broker refusal rates following reports.

Purpose: connect reports directly to loss of market access.

---

## B. Plaintiff-Specific Records

405

Request all records relating to Plaintiff, including:

- Any FreightGuard reports (published or threatened),

- Broker communications referencing Plaintiff,

- Internal notes or flags,

- Views of Plaintiff's profile by brokers,

- Any attempted or completed removal actions.

Purpose: establish direct causation and individualized harm for restitution.

---

## VI. Enterprise Integration Discovery

Request documents showing integration with:

- load boards,

- broker onboarding systems,

- factoring companies,

- insurance vetting,

- compliance platforms.

Purpose: show Carrier411's role as an enterprise enforcement node.

---

## VII. Preservation & Anti-Spoliation Measures

406

Immediately request:

- Litigation hold on:
    - FreightGuard databases,
    - financial records,
    - broker communications,
    - audit logs.
- Prohibition on:
    - data migration,
    - deletion,
    - "sunsetting" systems,
    - transfer to affiliates.

Purpose: protect evidence before structural relief.

---

## VIII. Why This Discovery Is Proportionate

This discovery is:

- limited to Carrier411,
- limited to exclusionary functions,
- limited to revenues tied to harm,
- essential to equitable relief.

It avoids speculative damages and focuses on unjust enrichment + prevention.

407

## PLAINTIFF'S MOTION TO COMPEL TARGETED DISCOVERY AND FOR APPOINTMENT OF A SPECIAL MASTER

(Carrier411 — Disgorgement, Restitution, and Structural Relief)

Plaintiff moves this Court for an Order (1) compelling Defendant Carrier411 to produce narrowly tailored discovery necessary to adjudicate equitable relief, including disgorgement and restitution, and (2) appointing a limited-scope Special Master to supervise preservation, production, and audit of Carrier411's reputational enforcement systems.

This motion is grounded in the Court's inherent equitable powers, RICO §1964(a), Sherman Act §16, and Rule 26's proportionality principles.

## I. INTRODUCTION AND RELIEF SOUGHT

Plaintiff does not seek speculative damages or generalized business discovery. Plaintiff seeks targeted, proportional discovery to identify ill-gotten gains, establish a causal nexus to Plaintiff's injury, and prevent spoliation of systems that are the very instruments of the alleged misconduct.

Because Carrier411's core product is reputational enforcement with immediate market-wide effect, ordinary discovery mechanisms are insufficient to ensure preservation, transparency, and accountability. Limited Special Master oversight is necessary.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## II. LEGAL STANDARD

Courts may compel discovery and appoint a Special Master where:

- the information sought is central to equitable relief;

- the evidence is complex, technical, or uniquely controlled by a defendant;

- there is a risk of spoliation or continued harm absent supervision; and

- discovery must be structured to avoid overbreadth while ensuring completeness.

Each condition is satisfied here.

## III. GOOD CAUSE FOR TARGETED DISCOVERY

### A. Discovery Is Essential to Disgorgement and Restitution

Plaintiff seeks disgorgement of revenues unjustly obtained through blacklisting, FreightGuard leverage, and exclusionary conduct, and restitution paid to Plaintiff as a directly injured carrier.

That relief turns on:

1. What revenues were derived from reputational enforcement;

2. How those revenues were generated;

3. Whether Plaintiff's exclusion was integral to the scheme's operation.

Carrier411 exclusively controls this evidence.

409

**B. Discovery Is Narrow and Proportionate**

Plaintiff seeks only the following categories, verbatim and limited to the exclusionary product:

## IV. REQUESTED DISCOVERY (ORDER COMPELLING PRODUCTION)

### 1. Financial Discovery (Last 6–10 Years)

Produce records sufficient to show:

- Broker subscription revenues attributable to:
    - FreightGuard access,
    - carrier monitoring,
    - risk/alert/blacklist functionality.
- Revenues tied to:
    - report creation,
    - report visibility,
    - historical database access.
- Any payments, fees, or consideration related to:
    - report removal or mitigation,
    - expedited review,
    - third-party "removal" vendors.

410

## 2. FreightGuard System Evidence

Produce:

- The complete FreightGuard database (content + metadata), including:

    o creation dates,

    o submitting broker,

    o edits,

    o removals,

    o views,

    o duration active.

- All policies governing submission, review, and removal.

## 3. Abuse, Retaliation, and Knowledge

Produce:

- Internal complaints or acknowledgments of false, retaliatory, or abusive reporting;

- Broker accounts flagged, warned, or discussed for misuse;

- Internal communications discussing coercion, leverage, or fear-based compliance.

## 4. Broker Conduct and Off-Script Use

411

Produce:

- Communications with brokers concerning:

  - leverage,

  - "discipline" of carriers,

  - threats of reporting,

  - use of FreightGuard to resolve disputes.

- Training or guidance materials provided to brokers.

---

## 5. Carrier Impact Metrics

Produce analytics showing:

- refusal-to-deal rates following reports,

- average duration of exclusion,

- effects on onboarding, factoring, or broker access.

---

## 6. Plaintiff-Specific Records

Produce all records relating to Plaintiff, including:

- any FreightGuard reports (published or threatened),

412

- broker communications referencing Plaintiff,

- internal notes or flags,

- views of Plaintiff's profile,

- any attempted or completed removal actions.

---

## 7. Enterprise Integrations

Produce documents showing integrations with:

- load boards,

- broker onboarding systems,

- factoring companies,

- insurance or compliance platforms.

---

## V. PRESERVATION AND ANTI-SPOLIATION ORDER

Plaintiff requests an immediate Order requiring Carrier411 to:

- preserve all FreightGuard databases, audit logs, communications, and financial records;

- suspend deletion, migration, or "sunsetting" of systems;

- preserve affiliate and third-party hosted copies;

- certify compliance under oath.

Given the structural relief sought, risk of spoliation is substantial.

413

## VI. APPOINTMENT OF A LIMITED-SCOPE SPECIAL MASTER

### A. Necessity

A Special Master is necessary to:

- oversee preservation of complex reputational databases;

- audit financial linkages to exclusionary conduct;

- ensure accurate, non-selective production;

- supervise an orderly wind-down if structural relief is ordered.

### B. Scope (Narrow)

The Special Master's duties shall be limited to:

- supervising production of the above categories;

- auditing FreightGuard usage, removals, and payments;

- reporting compliance to the Court;

- preventing spoliation or data laundering.

The Special Master shall not adjudicate liability.

## VII. BALANCE OF EQUITIES

This motion:

414

- imposes minimal burden relative to Carrier411's control of the evidence;

- avoids speculative damages discovery;

- protects the public interest in transparent markets;

- ensures the Court can fashion effective equitable relief.

Absent this relief, Carrier411 could retain the proceeds of alleged misconduct while obscuring the evidentiary trail.

---

## VIII. CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court:

1. Compel production of the targeted discovery listed above;

2. Enter a preservation and anti-spoliation order;

3. Appoint a limited-scope Special Master to supervise compliance; and

4. Grant such other equitable relief as justice requires.

**Disgorgement as an Evidentiary and Remedial Mechanism**

Plaintiff seeks disgorgement not only to prevent unjust enrichment, but to expose and unwind the mechanics of the FreightGuard reporting system itself, which operates as the central instrument of harm.

Because FreightGuard reports are:

- broker-submitted,

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

- unverified,

- shielded from carrier access,

- and economically outcome-determinative,

disgorgement necessarily requires full accounting and disclosure of how the system operates in practice.

## A. Revealing What FreightGuard Reporting Is in Fact

Disgorgement discovery must reveal:

- how FreightGuard reports are created, categorized, scored, weighted, and displayed;

- whether reports are treated as advisory or outcome-determinative;

- how long reports persist and how removal decisions are made;

- what internal labels, flags, or severity indicators exist beyond what is shown to brokers.

This information is essential because the product itself is the harm, and Carrier411's revenues are inseparable from the use of FreightGuard as a blacklisting mechanism.

## B. Identifying Broker Inputs and Reliance

Disgorgement must further reveal:

- which brokers and brokerage agents submitted FreightGuard reports;

416

- how frequently specific brokers relied on FreightGuard outputs to refuse to deal;

- patterns of repeat reporting, retaliatory reporting, or dispute-linked reporting;

- whether FreightGuard entries followed payment disputes, rate negotiations, or carrier complaints.

This is necessary to establish:

- who input the data,

- who relied on it, and

- how exclusion propagated across the market.

Disgorgement without this transparency would allow Carrier411 to retain profits while obscuring the very conduct that generated them.

## C. Identifying the Universe of Harmed Carriers

Plaintiff further seeks disgorgement discovery to identify:

- the number of carriers affected by FreightGuard reports;

- the duration and scope of their exclusion;

- the correlation between reports and market refusal rates;

- whether carriers exited the market following reports.

This information is required to:

- demonstrate the scale and foreseeability of harm,

417

- confirm that Plaintiff's injury is representative, not isolated,

- and ensure equitable relief addresses the full impact of the system.

---

## D. Why Disgorgement Is the Proper Vehicle

Carrier411 cannot be permitted to:

- retain revenues derived from FreightGuard,

- while simultaneously concealing how FreightGuard functions,

- who used it,

- and who was harmed.

Equity requires disgorgement with illumination.

Where profits derive from a black-box enforcement system, courts routinely order accounting and disclosure as part of equitable relief to ensure the defendant does not benefit from opacity.

---

## E. Relationship to Restitution

Once the scope of FreightGuard-based harm is revealed, the Court may:

- order disgorgement of revenues traceable to the system;

- direct restitution to Plaintiff as a directly injured carrier;

- and fashion additional equitable relief as necessary to restore competitive conditions.

418

Disgorgement is therefore not ancillary—it is foundational.

## DEFENDANT #9   — MAGELLAN TRANSPORT LOGISTICS

(Broker Defendant — Contractual Tracking Compliance Met; Compensation Unlawfully Withheld)

### Defendant

Magellan Transport Logistics ("Magellan") is a freight brokerage company engaged in interstate commerce. At all relevant times, Magellan issued written rate confirmations, tendered loads, mandated GPS tracking through MacroPoint, and controlled payment to motor carriers, including Plaintiff.

Magellan transacts business nationwide and exercised direct control over the terms, conditions, and compensation of the loads at issue.

### Contractual Rate Confirmation and Tracking Terms

Magellan issued a written Rate / Route Confirmation to Plaintiff for an interstate shipment in the total amount of $1,300.00, expressly itemized as follows:

- Linehaul: $1,000.00

- GPS Load Tracking: $300.00

419

The rate confirmation explicitly required:

- GPS tracking through FourKites or MacroPoint;

- Tracking to remain active for the entirety of the shipment;

- Drivers to keep the tracking application open at all times;

- Mobile data and GPS/location services to remain enabled;

- A stated $300 deduction for failure to accept or comply with GPS tracking.

Magellan therefore:

1. Required MacroPoint tracking, and

2. Charged and incorporated a $300 GPS tracking component into the agreed rate.

---

**Full Performance and Documented Compliance**

Plaintiff hauled two separate loads for Magellan under substantially identical terms.

For both loads:

- Plaintiff personally served as the driver;

- MacroPoint tracking was accepted, activated, and maintained;

- Plaintiff screenshot and preserved every MacroPoint location entry captured during transit;

- Freight was delivered as required, without cargo damage or service failure.

At no time did Magellan notify Plaintiff of:

420

- Any alleged tracking failure,

- Any late delivery,

- Any breach of contract during transit.

---

**Short Payment Despite Tracking Compliance**

Notwithstanding full contractual performance and documented GPS tracking compliance, Magellan short-paid Plaintiff by exactly $300 on each of the two loads, totaling $600 withheld.

The short payments:

- Match the exact dollar amount of the GPS tracking line item;

- Were imposed despite tracking being accepted and completed;

- Were not supported by any written amendment, notice, or proof of non-compliance;

- Were imposed after delivery, when Plaintiff no longer had leverage to dispute payment.

The repetition of the identical $300 deduction across two separate loads establishes that the conduct was not accidental, but rather the result of a standardized internal practice.

---

**MacroPoint as the Enforcement Mechanism**

Magellan required and relied upon MacroPoint, a phone-based real-time driver tracking platform, as part of its load compliance regime.

MacroPoint tracking is inherently dependent on:

- Cellular coverage,

- Mobile device battery life,

- GPS signal availability.

Even where tracking data is continuously captured—as it was here—Magellan retained unilateral discretion to deem compliance insufficient and withhold compensation.

Magellan's use of MacroPoint therefore functioned not merely as visibility, but as a post-performance enforcement and compensation-reduction tool.

---

**Unlawful Compensation Suppression**

Magellan's conduct constitutes:

- Breach of contract, by failing to pay the agreed rate despite full performance;

- Unlawful withholding of earned compensation, particularly the $300 GPS component already built into the rate;

- Unfair and deceptive trade practices, by charging for GPS tracking while simultaneously using tracking as a basis to deny payment;

- Participation in the Enterprise's surveillance-based compensation suppression scheme.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Magellan benefited financially by retaining the withheld amounts while shifting all compliance risk onto the carrier.

---

## Damages (Magellan)

Plaintiff suffered direct, concrete, and measurable damages, including:

1. $300 short payment on Load One

2. $300 short payment on Load Two

Total direct damages: $600, exclusive of interest, costs, consequential damages, and statutory remedies.

The damages are corroborated by:

- The rate confirmation itself,

- MacroPoint tracking screenshots,

- Payment records reflecting the short pays.

---

## Legal Significance

Magellan Transport Logistics is properly named as a defendant because it:

- Directly contracted with Plaintiff;

- Mandated MacroPoint tracking and monetized it as a line item;

423

- Received full performance and tracking compliance;

- Withheld compensation without lawful justification;

- Repeated the same deduction across multiple loads, evidencing policy rather than mistake.



- As to Defendant Magellan, Plaintiff seeks equitable disgorgement of all funds withheld, deducted, or clawed back after delivery of contracted freight, together with an accounting identifying each post-performance adjustment and the data or enterprise tools relied upon to justify such action. Plaintiff further seeks declaratory relief that retroactive financial penalties imposed outside the rate confirmation or through third-party reputational or compliance platforms constitute unlawful interference with carrier compensation. Plaintiff does not seek structural injunctive relief as to Magellan, but seeks restoration of earned compensation and elimination of unlawful post-delivery enforcement practices.

- As to Defendants Magellan and Total Quality Logistics, Plaintiff seeks equitable disgorgement of all funds withheld, deducted, or clawed back after completion of contracted transportation services. Plaintiff further seeks an accounting identifying each post-delivery adjustment, the asserted justification, and any reliance on third-party reputational, compliance, or eligibility platforms. Plaintiff seeks declaratory relief that post-performance penalties imposed outside the rate confirmation constitute unlawful interference with earned carrier compensation. Plaintiff does not seek structural injunctive relief as to these broker defendants. Relief is limited to restoration of earned payments and elimination of retroactive financial enforcement practices.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

**DEFENDANT: DAT FREIGHT & ANALYTICS, LLC**

(d/b/a DAT Load Board; DAT Solutions, LLC)

**A. Nature, History, and Market Position**

Defendant DAT Freight & Analytics, LLC ("DAT") operates one of the most widely used freight load boards and market-information platforms in the United States. DAT's origins predate modern freight surveillance and enforcement systems, evolving from early "dial-a-truck" from the 1970's and 1980's. DAT evolved into an electronic load-matching tool developed to connect available carriers with posted freight opportunities posted by freight brokers.

DAT is not a regulator, not a broker, not a factoring company, and not a compliance authority. Its historical role was to provide freight visibility and market information, not to adjudicate eligibility, enforce discipline, or control payment. Plaintiff does not allege that DAT was

425

originally designed to coerce carriers, nor does Plaintiff seek to dismantle DAT as a freight-matching tool.

However, DAT's scale and centrality have transformed it into a de facto gateway to interstate freight access, such that participation in the modern freight market is functionally impossible for carriers without exposure to DAT's platform.

DAT is the Host for all of the freight brokers, while DAT freight and Analytics host's the brokered freight it is still broker facing. One broker and his agents can post thousands of loads in one day while the carrier picks one load and then operates the truck. Of those thousand loads, the *broker* is an ambiguous party who could be masquerading as a real broker.

Both the Carrier and the Broker are paying customers for load access and load posting.

DAT at all times is the host for the parties to connect and engage. DAT therefore, has a duty to require that every one of it customers are vetted, verified and have legitimate MC#'s not spoofed, not spam, not offshore dispatching services using VoIP, WhatsApp, Telegram (Russian app) or free Gmail accounts and Google voice callers, posters.

---

**B. DAT's Role in the Enterprise: Permissive but Material**

426

Plaintiff alleges that DAT's participation in the Integrated Freight Data-Control Conglomerate Enterprise is narrower and more passive than enforcement-oriented defendants, but nevertheless material.

DAT provides the load-access layer upon which other enterprise actors depend. Its systems host, normalize, and facilitate broker and dispatcher communications and postings that—when combined with verification platforms, surveillance systems, payment controls, and blacklisting mechanisms operated by others—enable coercive outcomes downstream.

Specifically, DAT:

- allows brokers and dispatchers to communicate through Gmail, VOIP numbers, WhatsApp, Telegram, and similar channels;

- permits dispatching services and third-party actors to operate within or alongside its ecosystem;

- allows third- and fourth-party intermediaries to piggyback into freight communications with only surface-level identity verification; and

- maintains plausible deniability by positioning itself as a neutral marketplace.

- DAT is a neutral marketplace yet it had widely become the go to tool to facilitate industrialized double brokering from non domestic bad actors who picked up the ball and ran with it.

- DAT knew or should know have known that bad actors have flooded the platform and

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

- Bad actors are placed in front of legitimate carriers who are then used as straw men to haul freight, for free, while loads are being re-reouted to the wrong destinations.

Nobody but a broker could ever be a double broker. Carriers do not post freight anywhere, they haul the freight and have no other access to the DAT loadboard to perform these activities. Yet there is industrialized  double brokering that harms the carriers and the carriers get the blame for stolen freight when they obtain the load from the DAT loadboard.

---

## C. Offshore Dispatching, Anonymity, and Double-Brokering Enablement

Plaintiff alleges that DAT's permissive platform environment has, over time, normalized anonymized and offshore participation, including dispatching networks operating outside the United States.

In the USA there is high value cargo that needs to keep moving every single day to feed and provide for 330 million or more people. There are a dwindling population of 3.5 million truck drivers that sacrifice time from their lives and the dynamic of no compensation and blame shifting by double brokered freight is not sustainable. Without repair the ongoing freight recession that has already seen 113,000 Carriers collapse in the last 3 years. This should be alarming to every American.

428

More, offshore dispatching services are getting government contracts and Plaintiff alleges there is a possibility to double broker military freight.

DAT does not itself originate offshore fraud. DAT can technically detect certain offshore behavioral signals and analytics. However, Plaintiff alleges that DAT does not consistently prevent offshore dispatching networks from operating through intermediaries, virtual identities, and layered communications.

This permissive architecture has contributed to the systemic rise of:

- double brokering,
- identity reuse,
- straw-man hauling arrangements, and
- payment diversion schemes,

particularly when DAT's load-access layer is paired with weak broker verification, opaque compliance portals, and punitive reputation systems operated by other defendants.

---

**D. Structural Distinction From Enforcement Defendants**

429

DAT's role is structurally distinct from defendants such as Carrier411, Highway, factoring entities, and surveillance platforms.

DAT does not:

- issue fraud labels or risk scores,
- blacklist carriers,
- control payment routing,
- file liens or enforce Notices of Assignment,
- mandate ELD integrations,
- or impose surveillance-based eligibility requirements.

DAT's influence arises from market centrality, not direct coercion. Plaintiff does not allege that DAT is the architect of the enterprise's enforcement mechanisms, but alleges that its platform became the table upon which those mechanisms were applied.

**E. Broker-Centric Design and Lack of Carrier Protections**

430

Plaintiff nevertheless alleges that DAT's platform is broker-centric by design, offering limited reciprocal protections for carriers. If any at all.

Specifically, DAT:

- does not meaningfully verify brokers despite brokers' control over rates, payment, and load representation;
- permits brokers to require compliance with external enterprise platforms as a condition of freight access;
- normalizes opaque and non-transparent communication channels; and
- provides carriers with limited recourse when loads are misrepresented, payments are delayed, or disputes arise.
- DAT has the analytic ability to use firewalls to remove bad actors but it doesn't

As a result, carriers bear disproportionate risk while brokers retain leverage, anonymity, and exit options.

---

**F. Coordination Effects Within the Enterprise**

431

Plaintiff alleges that DAT operated within a coordinated enterprise environment alongside Truckstop, RMIS, Risk Factors, Highway, and Truckstop Payments, such that:

- adverse compliance or risk signals generated elsewhere were reflected in broker selection behavior on DAT;
- carriers subject to payment holds, liens, or verification flags were effectively sidelined;
- brokers used DAT's load visibility as leverage to impose enterprise-mandated conditions; and
- carriers had no practical alternative to regain market access outside the enterprise.

This coordination transformed DAT from a neutral marketplace into a multiplier of enterprise-wide control, even absent direct enforcement by DAT itself.

## G. Causation and Harm to Plaintiff

Plaintiff purchased access to the DAT load board in good faith, relying on its historical role as a neutral freight-matching tool. Shortly thereafter, Plaintiff experienced effective exclusion and inability to secure freight—not because of DAT enforcement alone, but because enterprise-level signaling rendered DAT access functionally useless.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Plaintiff alleges that she:

- paid for DAT access,

- was unable to meaningfully secure any freight,

- suffered economic loss and business interruption,

- and experienced diminished bargaining power and suppressed opportunities.

These harms were foreseeable consequences of embedding a neutral access tool within a coercive enterprise architecture.

---

## H. No Disgorgement Sought; Corrective Relief Only

Plaintiff expressly does not seek disgorgement, forfeiture, or punitive remedies against DAT.

The relief sought as to DAT is industry correction and safety, not destruction. Plaintiff seeks:

- structural clarity as to DAT's role,

- guardrails against misuse,

- and removal of coercive enterprise overlays that distort DAT's original purpose.

433

DAT is uniquely positioned to participate in corrective measures without being dismantled, given its historical role and technical capability.

---

## I. Summary as to DAT

DAT is best understood as a legacy market tool operating within a modern enterprise environment it did not fully design, but whose permissive architecture has been exploited by more coercive actors.

Plaintiff seeks judicially guided correction—not punishment—to restore DAT's function as a market-access tool rather than an enterprise enforcement multiplier.

---

**One-Sentence Judicial Framing**

DAT is not accused of being the hammer—only of being the table upon which others swung it.

**DAT-Specific Corrective Remedies**

434

(Analytics Platform Safeguards, Identity Firewalls, and Offshore Access Controls)

As to Defendant DAT Freight & Analytics, LLC, Plaintiff seeks corrective and prospective relief recognizing that DAT operates both as (i) an analytics and load-posting platform for brokers and (ii) a market-access tool for carriers, with both sides paying customers. The relief sought is designed to preserve DAT's legitimate function while preventing continued misuse of its platform as an access point for double-brokering, identity cloaking, and payment diversion.

## A. Broker Analytics With Reciprocal Accountability

Plaintiff seeks relief requiring DAT to maintain its broker-facing analytics and load-posting functions only where accompanied by reciprocal identity accountability, including:

- verified broker identity tied to a real, accountable U.S. business entity;

- prohibition on anonymous or proxy posting through layered third parties;

- disclosure to carriers of the true controlling party behind a posted load.

DAT may continue to provide analytics and posting tools, but not in a manner that allows brokers to externalize risk onto carriers through anonymity.

435

## B. Anti-Piggybacking and Identity Cloaking Prohibitions

Plaintiff seeks relief requiring DAT to eliminate piggybacking, account sharing, and identity cloaking practices, including:

- prohibition on the use of shared, resold, or sub-leased broker or dispatcher accounts;
- controls preventing multiple unrelated actors from operating under a single broker profile;
- enforcement against the use of virtual identities to mask the true origin or control of load postings and reposting
- Verify all real identification of MC#'s of Brokers and begin registering IP Addresses for the brokers to present to carriers actual FMCSA qualified parties ONLY
- That any dispatching services be attached to those IP-addresses, it's endorsement by and through the Broker who is qualified and identified as a legitimate freight broker.

## C. Firewall Against Offshore Control and Dispatch Substitution

Plaintiff seeks relief requiring DAT to implement a hard firewall against offshore control of load postings and dispatch activity, including:

436

- prohibition on load postings or dispatch control where the controlling operator is located outside the United States or not subject to U.S. jurisdiction;
- technical detection and blocking of access patterns consistent with offshore proxy use, VPN tunneling, or remote credential relay;
- mandatory disclosure to carriers where any portion of broker or dispatcher operations is conducted offshore.

This relief is jurisdictional and control-based, not nationality-based, and is necessary to prevent evasion of U.S. regulatory oversight.

A Carrier cannot redress or remedy when forced to engage in business with a ghost identity when USA has no jurisdiction over and there is no name or address to serve.

---

## D. Communications Channel Integrity

Plaintiff seeks relief requiring DAT to prohibit or restrict the use of identity-masking communications channels in connection with load postings and dispatch, including:

- Gmail, Google Voice, VOIP numbers, Telegram, WhatsApp, VPN or similar services used to obscure broker or dispatcher identity;

- requirement that primary transactional communications be tied to verifiable, accountable business contact methods;
- flagging and restriction of postings that rely exclusively on anonymizing communication tools.

These measures are necessary to prevent brokers and double brokers from cloaking their identity while shifting risk to carriers.

---

## E. Prevention of Double-Broker Access and Control

Plaintiff seeks relief requiring DAT to adopt measures that affirmatively prevent known double-brokering patterns, including:

- blocking access by entities that control loads without contractual authority;
- detection of repetitive MC number reuse and load reassignment patterns;
- refusal to host postings where payment responsibility is obscured or fragmented.

---

## F. Purpose and Limitation of Relief

438

Plaintiff does not seek to convert DAT into a regulator, nor to punish legitimate brokers or dispatchers. The relief sought is intended solely to:

- prevent DAT's analytics platform from being exploited by offshore double-brokering networks;
- restore transparency and accountability to load postings;
- and ensure that carriers are not induced to haul freight under false pretenses by actors beyond U.S. legal reach.

---

439

**DEFENDANT: Flock Safety, Inc.**

(d/b/a Flock Safety Cameras; Flock Camera System; Flock Group)

---

## I. Role of Flock Safety in the Enterprise

Flock Safety is not merely a camera vendor. It is a surveillance platform operator whose business model depends on persistent data capture, centralized aggregation, interoperability, and shared access across users and jurisdictions. Flock Safety designs, deploys, hosts, and controls large-scale camera networks that continuously capture vehicle location, movement patterns, and contextual imagery in everyday civilian environments.

Flock Safety's platform is marketed as "public safety" technology, but functionally operates as infrastructure for behavior-based monitoring and downstream decision-making. The value of the platform increases not from any single camera, but from network effects: more cameras, more

440

data, longer retention, broader sharing, and wider access. This architecture mirrors—almost exactly—the surveillance systems first normalized within the trucking industry.

Flock Safety occupies the expansion layer of the enterprise. Where other defendants proved that continuous surveillance and opaque data use could control a captive workforce (truck drivers), Flock Safety scales that same model outward into neighborhoods, roadways, workplaces, schools, and public life.

---

## II. Enterprise Mechanism of Harm (Shared Across All Defendants)

Across all defendants, the enterprise operates through the same repeating mechanism:

1. Continuous Surveillance Capability

   Technology capable of constant monitoring (visual, location-based, behavioral, and in some contexts audio-capable), whether or not monitoring is active at every moment.

2. Opaque Aggregation and Retention

   Data is centrally stored, searchable, and retained beyond the immediate context in which it was captured, without meaningful transparency to the subject.

3. Third-Party Access and Interoperability

441

Data is shared horizontally and vertically—across platforms, users, agencies, or partners—outside the subject's control or awareness.

4. Interpretation, Inference, and Scoring

Raw surveillance data is transformed into judgments: risk, suspicion, trustworthiness, eligibility, or "safety" determinations.

5. Permissioning and Silent Exclusion

Those judgments affect access—to work, payment, movement, or freedom from scrutiny—without notice, explanation, or appeal.

The harm does not require proof that every recording was watched or every data point reviewed. The harm arises because people change their behavior when they reasonably believe they are being watched, scored, or judged, and because defendants knowingly design systems that exploit that reality.

---

## III. Unified Enterprise Narrative: Real or Imaginary In-Cab Audio and Camera Surveillance

## A. Truck Drivers as the Test Population

442

Truck drivers were the first population subjected to this enterprise model at scale because they were uniquely vulnerable:

- economically captive,

- unable to opt out without losing livelihood,

- isolated inside a workspace that also functions as a home, and

- dependent on platform-controlled access to work and payment.

Through ELDs, AI-enabled inward-facing cameras, telemetry, and audio-capable systems, drivers were placed into an environment where they could not know when they were being watched or listened to.

Drivers were never clearly told:

- whether audio was enabled,

- when recording occurred,

- who could access recordings,

- whether feeds were live or retrospective, or

- how long data was retained or shared.

443

As a result, drivers reasonably believed that someone could be watching or listening at any time. Whether audio monitoring was actually active in a given moment became irrelevant. The belief alone was enough.

This produced a chilling effect:

- conversations were shortened or avoided,

- phone calls to family were muted,

- complaints were withheld,

- legal advice was delayed,

- silence became safer than speech.

The enterprise did not need to listen constantly. It only needed drivers to believe that it could.

## B. Conversion of Surveillance Into Control

That belief tied directly to access. Through broker-facing platforms and coordinated reliance on shared data systems, drivers believed—correctly—that what was seen or heard, or believed to be seen or heard, fed into risk profiles, eligibility decisions, and silent blacklisting.

444

Loads disappeared. Access was denied. Income stopped. No explanation was given. Every participant deflected responsibility by pointing to "the system."

The system worked.

---

## IV. Expansion Beyond Trucking: From Cabs to Civilian Life

Flock Safety represents the civilian expansion of this same architecture.

Instead of the truck cab, the monitored space becomes:

- neighborhood streets,
- residential entrances,
- parking lots,
- schools,
- workplaces,
- churches,
- and public roads.

445

Instead of inward-facing cab cameras, the tools become:

- automated license plate recognition,

- wide-angle roadway cameras,

- vehicle movement tracking,

- searchable location histories.

Instead of drivers, the subjects become everyone.

Civilians, like drivers, are not meaningfully informed:

- when they are being recorded,

- how long their movement data is retained,

- who can access it,

- how it is shared,

- or how it may be used later.

There is no civilian opt-out once cameras are installed. A person cannot meaningfully avoid being recorded while living, working, or traveling in modern society.

446

## V. Connection to Ring Doorbells and Private Surveillance Normalization

Flock Safety's model does not exist in isolation. It operates alongside and reinforces the normalization of private surveillance through systems such as Ring doorbells and similar consumer devices.

Together, these systems create:

- overlapping camera coverage,
- shared footage ecosystems,
- informal data sharing with law enforcement,
- and normalized expectation of constant observation.

What began as "security" becomes ambient monitoring. Movement itself becomes data. Presence becomes a record.

Just as drivers came to believe that anything said in the cab could be overheard, civilians come to believe that:

- every drive is tracked,
- every visit is logged,
- every stop creates a record,
- every pattern may be interpreted.

447

## VI. Social Scoring, Behavior Modification, and Chilling of Free Speech

The enterprise does not require an explicit "social credit score" to function as one.

When surveillance data is:

- aggregated,

- searchable,

- inferential,

- and shared,

it becomes behavioral reputation infrastructure.

People alter behavior not because they have done anything wrong, but because they do not know how data might later be interpreted.

This chills:

- free speech,

- free association,

- lawful protest,

- whistleblowing,

- and ordinary social interaction.

The chilling effect is the same in trucking and civilian life. The only difference is scale.

448

## VII. Side-by-Side Comparison for the Court

| Enterprise Element | Truck Drivers | Civilians (Flock / Ring / Public Cameras) |
|---|---|---|
| Monitored Space | Truck cab (work + home) | Streets, neighborhoods, entrances, public space |
| Surveillance Tools | AI cameras, telemetry, audio-capable systems | ALPR, roadway cameras, doorbells |
| Opt-Out | None without losing job | None without leaving society |
| Disclosure | Opaque or buried | Minimal or nonexistent |
| Data Aggregation | Centralized platforms | Centralized platforms |
| Third-Party Access | Brokers, platforms, insurers | Law enforcement, municipalities, HOAs |
| Scoring / Inference | Risk flags, eligibility | Suspicion, targeting, scrutiny |
| Notice of Adverse Use | None | None |
| Right to Challenge | None | None |
| Behavioral Effect | Silence, compliance | Self-monitoring, fear |
| Enterprise Outcome | Control through surveillance | Control through surveillance |

449

## VIII. Why This Matters to the Court

Truck drivers were not an edge case. They were the proof of concept.

The enterprise demonstrated that:

- surveillance without transparency works,

- fear of being watched changes behavior,

- opaque systems silence resistance,

- and access control can be enforced without process.

Flock Safety exists because that model succeeded.

Plaintiff was injured where the system was first deployed. That injury establishes standing to challenge the enterprise as a whole—including its predictable and ongoing expansion into civilian life.

---

This case is not about cameras. It is about an enterprise that converts surveillance—real or reasonably perceived—into control over who may speak, move, work, or participate economically, without notice, explanation, or due process. Truck drivers were the first population forced to live inside this system. Flock Safety represents its expansion into everyday civilian life.

450

## IX. The "Haves vs. Have-Nots" Divide Created by Surveillance Platforms

A critical and underexamined harm of the enterprise is the economic stratification of surveillance power.

Platforms such as Flock Safety, Inc. do not merely observe public space; they allocate the power to observe. That power is not distributed equally. It is sold.

Those with financial resources—municipalities with budgets, private communities with dues, corporations with capital, and individuals embedded in institutions—are granted privileged access to real-time and historical surveillance data. Those without such resources are rendered data subjects only, visible but powerless.

This creates a two-tier society:

- a class that can see, search, monitor, and analyze, and
- a class that can only be seen, tracked, and inferred about.

The enterprise thus transforms surveillance from a purported safety tool into a pay-to-watch regime, where economic status determines who holds observational power over whom.

---

## X. Real-Time Access and the Risk of Civilian Stalking and Abuse

The danger is not abstract. Platforms that provide near-real-time access to location and movement data create conditions ripe for abuse.

451

When surveillance access is granted to:

- private homeowners associations,

- property managers,

- private security entities,

- non-sworn personnel, or

- loosely supervised users,

the line between "safety" and stalking collapses.

Real-time or near-real-time access enables:

- tracking an individual's movements across neighborhoods,

- identifying routines and patterns,

- monitoring arrivals and departures,

- following a person from one location to another, and

- correlating presence with associations or relationships.

For individuals without resources, there is no counterbalance. They cannot see who is watching them. They cannot audit access. They cannot challenge misuse. They cannot opt out.

The enterprise thus enables asymmetric visibility: one side watches in real time; the other never knows.

---

## XI. Disproportionate Impact on Poor and Marginalized Populations

452

The harms of this system fall most heavily on those with the least power.

Lower-income populations are:

- more likely to live in surveilled neighborhoods,

- more likely to traverse public spaces subject to monitoring,

- less able to relocate to "privacy-protected" environments,

- less able to pay for access to surveillance tools themselves, and

- least able to challenge misuse through legal or political means.

Affluent communities can choose surveillance as a service. Poor communities experience surveillance as a condition.

This mirrors the trucking context, where drivers—economically captive—were forced into surveillance systems they could not refuse. In both cases, lack of economic power equals lack of consent.

---

## XII. Surveillance Power Without Jurisdictional Boundaries

Traditional law enforcement surveillance is constrained—at least in theory—by:

- jurisdictional limits,

- statutory authority,

- probable cause standards,

- warrant requirements, and

- oversight mechanisms.

The enterprise bypasses these constraints.

Platforms like Flock Safety enable:

- cross-jurisdictional searches,

- data sharing across cities, counties, and states,

- access by users who are not bound by the same constitutional duties as police,

- searches untethered to a specific investigation, and

- long-term retention untethered to any case.

A user in one jurisdiction can observe movement in another.

A private entity can access data originally justified as "public safety."

No single sovereign meaningfully controls the scope of access.

The result is nationwide surveillance without nationwide accountability.

---

## XIII. If Surveillance Is Everywhere, It Functions as a Public Utility

When a system is:

- omnipresent,

454

- unavoidable,

- embedded in public infrastructure, and

- determinative of safety, access, and suspicion,

it ceases to function as a private luxury good.

It functions as infrastructure.

And infrastructure—when it governs public life—demands public rules.

Plaintiff alleges that if surveillance systems are to exist everywhere, capturing everyone's movement by default, then it is fundamentally inequitable for:

- access to be sold only to those who can pay,

- visibility to be monopolized by institutions,

- and accountability to be absent for those being observed.

A system that observes the public as a whole cannot legitimately be governed as a private club.

---

## XIV. The Public-Utility Principle Applied to Surveillance

The remedy flows from the problem.

If surveillance platforms are allowed to operate ubiquitously, then at minimum they must be governed by principles analogous to public utilities:

- Equal access rules — no privileged observational class based solely on wealth

455

- Transparency — individuals must know what is collected and who can see it

- Auditability — access must be logged and reviewable

- Due process — adverse uses must carry notice and the right to challenge

- Jurisdictional limits — access must be constrained to lawful authority

Absent such constraints, the system produces a society where the wealthy watch the poor, institutions watch individuals, and no one is accountable.

---

## XV. Chilling Effect on Free Speech, Movement, and Association

When people know—or reasonably believe—that:

- their movements are tracked,

- their presence is recorded,

- their patterns are searchable, and

- their behavior may later be interpreted,

they do not act freely.

They self-censor.

They avoid gatherings.

They change routes.

456

They limit associations.

They choose silence over expression.

This chilling effect is not speculative. It is the same effect observed in truck drivers subjected to in-cab surveillance. The difference is scale.

What began in a regulated industry now reaches into everyday civilian life.

---

## XVI. Enterprise-Wide Consequence

The enterprise thus creates a world where:

- surveillance power is concentrated among those who can pay,

- observation is decoupled from accountability,

- jurisdictional limits are erased,

- behavior is modified through fear rather than law, and

- fundamental freedoms are chilled without a single overt command.

Plaintiff alleges that this outcome is not accidental. It is the foreseeable result of deploying surveillance-based access-control systems without transparency, due process, or equitable governance.

---

457

**J**

**COUNT [X]**

**UNIFIED ENTERPRISE — SURVEILLANCE-BASED ACCESS CONTROL**

(Declaratory and Injunctive Relief)

---

## A. The Enterprise

Defendants, including Motive Technologies, Inc. (formerly KeepTruckin), Highway, and Flock Safety, Inc., together with unnamed co-conspirators and participants, constitute an associated-in-fact enterprise within the meaning of applicable federal and state law.

The enterprise has a common purpose, relationships among members, and longevity sufficient to pursue its objectives.

The common purpose of the enterprise is to monitor, aggregate, interpret, and weaponize surveillance data to control access to work, movement, and economic participation, while avoiding the transparency, due-process protections, and jurisdictional limits traditionally required by law.

---

## B. Enterprise Architecture and Functional Roles

458

The enterprise operates through a layered but unified architecture.

At the data-capture layer, platforms such as Motive deploy ELDs, AI-enabled inward-facing cameras, telemetry, and audio-capable systems inside commercial truck cabs. These systems normalize continuous monitoring of drivers who lack meaningful ability to opt out without losing their livelihood.

At the aggregation and permissioning layer, platforms such as Highway ingest surveillance-derived data and third-party inputs, convert them into risk flags, scores, or eligibility determinations, and operationalize those determinations across multiple brokers simultaneously—silently granting or denying access to freight and payment.

At the expansion and normalization layer, platforms such as Flock Safety extend the same surveillance-based access-control model beyond trucking into everyday civilian life through networked license-plate-reading cameras, neighborhood surveillance systems, and interoperable data platforms used by municipalities, private entities, and residential communities.

Each defendant occupies a distinct but complementary role, and the enterprise functions regardless of whether any single defendant directly interacts with Plaintiff.

---

## C. Enterprise Mechanism of Harm

Across all defendants, the enterprise operates through the same repeating mechanism:

459

1. Continuous Surveillance Capability

   Defendants deploy technologies capable of constant monitoring—visual, locational, behavioral, and in some contexts audio-capable—creating environments where individuals cannot know when they are being watched or listened to.

2. Reasonable Belief of Monitoring

   Due to opaque disclosures and the existence of surveillance capabilities, individuals reasonably believe they may be monitored at any time. Whether monitoring is actually active in a given moment becomes irrelevant.

3. Opaque Aggregation and Sharing

   Surveillance data is centrally stored, searchable, retained, and shared across platforms, users, and jurisdictions without meaningful notice to the subject.

4. Inference, Scoring, and Interpretation

   Raw data is transformed into judgments—risk, suspicion, trustworthiness, or eligibility—without transparency or explanation.

5. Permissioning and Silent Exclusion

   Those judgments control access to work, payment, movement, or freedom from scrutiny, without notice, explanation, or opportunity to challenge adverse outcomes.

460

The enterprise does not rely on overt commands. It enforces compliance through fear of exclusion, made effective by silence and opacity.

---

## D. Truck Drivers as the Initial Test Population

Truck drivers were the first population subjected to this enterprise at scale because they were uniquely vulnerable:

- economically captive,

- dependent on platform-controlled access to work and payment,

- operating inside spaces that function as both workplace and home, and

- unable to meaningfully opt out of surveillance systems.

Through ELDs, AI cameras, telemetry, and audio-capable systems, drivers were placed into environments where they could not determine whether their speech or conduct was being recorded or reviewed.

Drivers were not clearly told when audio was active, who could access recordings, how data was shared, or how long it was retained. As a result, drivers behaved as if they were always being watched and listened to.

This produced a chilling effect on speech, association, complaints, and resistance. The system succeeded. Access was controlled. Behavior was modified. Silence was enforced.

461

**E. Expansion Beyond Trucking Into Civilian Life**

Having proven effective in trucking, the enterprise expanded outward.

Flock Safety exemplifies this expansion by deploying networked camera systems that capture vehicle movement and location data across neighborhoods, roadways, parking lots, schools, workplaces, and public space.

Like drivers, civilians are not meaningfully informed when surveillance occurs, who has access, how data is shared, or how it may later be used. There is no practical opt-out once such systems are installed.

Surveillance becomes ambient. Movement becomes data. Presence becomes a record.

The same architecture—continuous capture, opaque aggregation, third-party access, inference, and downstream decision-making—now governs civilian life.

**F. Haves vs. Have-Nots and Concentration of Surveillance Power**

The enterprise creates a profound economic stratification of surveillance power.

Access to surveillance platforms is sold to those with money: municipalities with budgets, private communities with dues, corporations with capital, and institutional users. Those without

462

resources—particularly poor and marginalized populations—are rendered data subjects only, visible but powerless.

This creates a two-tier system:

- one class that can watch, search, and analyze in real time; and
- another class that can only be watched.

Surveillance thus becomes a pay-to-observe regime, where wealth determines who holds power over whom.

---

## G. Real-Time Access, Stalking Risk, and Abuse

By providing real-time or near-real-time access to movement data, the enterprise enables stalking-like behavior by those granted access, including non-sworn or lightly supervised users.

Such access allows tracking routines, following individuals across locations, identifying associations, and monitoring presence without the subject's knowledge.

Those without resources have no ability to see who is watching them, audit access, or challenge misuse.

---

463

## H. Jurisdictional Overreach and Absence of Legal Constraints

Traditional law-enforcement surveillance is theoretically constrained by jurisdiction, warrants, and oversight.

The enterprise bypasses these limits.

Data is searchable across cities, counties, and states. Access is granted to users not bound by constitutional duties. Searches need not be tied to investigations. Retention need not be tied to cases.

The result is nationwide surveillance without nationwide accountability.

---

## I. Chilling Effect on Speech, Movement, and Association

The foreseeable consequence of this system is a chilling effect on fundamental freedoms.

When individuals reasonably believe their movements, associations, and behavior are tracked, searchable, and inferable, they self-censor. They avoid gatherings. They change routes. They choose silence.

This effect was proven in trucking. It is now normalized in civilian life.

The enterprise governs behavior not through law, but through fear of being watched and silently judged.

464

## J. Plaintiff's Injury and Standing

Plaintiff was directly injured by this enterprise within the trucking industry, where surveillance-derived scoring and exclusion deprived her of work, income, and participation in interstate commerce.

That injury establishes standing to challenge the enterprise as a whole, including its foreseeable expansion into broader civilian contexts.

Plaintiff need not allege that each defendant directly surveilled her. The harm arose from a unified system that functions regardless of which defendant performs which role.

## K. Declaratory and Injunctive Relief

Plaintiff seeks declaratory and injunctive relief sufficient to:

- prohibit surveillance-derived access decisions without notice and appeal,
- require transparency regarding data collection, sharing, and use,
- enjoin coordinated exclusion and blacklisting practices,
- impose jurisdictional limits and accountability, and

465

- prevent further expansion of the enterprise absent lawful safeguards.

---

## SHERMAN ACT & RICO — UNIFIED ENTERPRISE

## ELEMENTS SATISFIED THROUGH A SINGLE SURVEILLANCE-BASED SYSTEM

---

### I. The Core Unifying Fact (Applies to All Counts)

Plaintiff is not situated solely as a truck driver, nor solely as a civilian. Plaintiff is both.

Plaintiff was injured first as a truck driver and motor carrier subjected to continuous surveillance, opaque scoring, and silent exclusion from work and commerce. Plaintiff is also a civilian whose daily movement, speech, and association are increasingly governed by the same surveillance-based architecture as it expands into public and residential life.

The enterprise alleged herein is not industry-specific. Trucking served as the initial test environment because drivers were economically captive and unable to opt out. Having proven effective, the same system is now deployed against civilians generally.

Plaintiff's standing arises from direct injury at one layer and foreseeable, ongoing injury at another, caused by the same unified enterprise.

---

466

## II. Associated-in-Fact Enterprise (RICO § 1962(c))

Element: Existence of an Enterprise

(Common purpose, relationships, longevity)

This element is satisfied.

Defendants, including Motive Technologies, Inc., Highway, and Flock Safety, Inc., together with unnamed participants, form an associated-in-fact enterprise.

- Common purpose:

  To control access to work, movement, and economic participation through surveillance-derived data, opaque aggregation, and permissioning, while avoiding transparency and due process obligations.

- Relationships:

  Each defendant occupies a complementary role:

    o  Motive captures and normalizes continuous surveillance.

    o  Highway converts surveillance and third-party inputs into eligibility decisions.

    o  Flock Safety scales the same model into civilian life through networked cameras and shared access platforms.

- Longevity:

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

The enterprise has operated continuously for years and continues to expand geographically and functionally.

No single defendant needs to perform every function. The enterprise operates as a system.

---

## III. Conduct or Participation (RICO § 1962(c))

Element: Conduct or participation in the affairs of the enterprise

This element is satisfied.

Each defendant knowingly performs a necessary operational role in the enterprise:

- Motive operates the data-capture layer, imposing real or reasonably perceived audio/video monitoring on truck drivers who cannot opt out.
- Highway operates the scoring and gatekeeping layer, translating surveillance and reports into silent inclusion or exclusion from freight and payment.
- Flock Safety operates the expansion layer, applying the same architecture to civilians through ubiquitous camera networks that capture movement and association.

Direct contact with Plaintiff by every defendant is not required. Liability arises from knowing participation in a system whose predictable output is exclusion and control.

---

## IV. Pattern of Racketeering Activity (RICO)

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Element: At least two predicate acts; continuity

This element is satisfied.

## A. Wire Fraud (18 U.S.C. § 1343)

Defendants market surveillance systems as "safety," "compliance," or "community protection," while materially omitting:

- the extent of data sharing,

- the use of data for access control and exclusion,

- the absence of notice or appeal,

- and the conversion of surveillance into economic and social permissioning.

Plaintiff, brokers, carriers, and civilians rely on these misrepresentations and omissions.

## B. Hobbs Act Extortion (18 U.S.C. § 1951)

The enterprise obtains compliance, silence, and economic submission through fear of exclusion:

- truck drivers fear loss of work and income,

- civilians fear scrutiny, targeting, or misinterpretation of movement.

The coercion is enforced through "the system," not overt threats, which is sufficient under the statute.

## C. Continuity

469

The enterprise demonstrates open-ended continuity:

- ongoing surveillance,

- repeated exclusion,

- expanding deployment into civilian environments,

- no natural endpoint absent court intervention.

---

## V. Sherman Act § 1 — Concerted Restraint of Trade

### Element: Contract, combination, or conspiracy

This element is satisfied.

Defendants coordinate not through explicit agreements, but through shared reliance on common surveillance and permissioning infrastructure.

- Brokers rely on Highway.

- Highway relies on surveillance-derived inputs.

- Surveillance platforms normalize data capture.

- All actors deflect responsibility to "the system."

Courts recognize this as hub-and-spoke coordination through shared platforms.

---

### Element: Unreasonable restraint of trade

470

This element is satisfied.

The enterprise restrains trade by:

- conditioning access to work on opaque surveillance-derived signals,

- enforcing group boycotts without performance-based justification,

- replacing market competition with permissioning.

Plaintiff was excluded not for poor performance, but due to silent scoring and enterprise signaling.

---

**Element: Effect on interstate commerce**

This element is satisfied.

Plaintiff is a federally authorized motor carrier engaged in interstate commerce. Exclusion from freight, payment, and access directly burdens interstate trade.

---

**Element: Antitrust injury**

This element is satisfied.

471

Plaintiff suffered the precise harm antitrust law forbids:

- exclusion from the market,

- inability to compete on the merits,

- suppression through coordinated refusal to deal.

---

## VI. Sherman Act § 2 — Monopolization / Exclusionary Conduct

### Element: Monopoly power or dangerous probability

This element is satisfied.

The enterprise collectively controls access to freight markets and surveillance-based movement data, creating de facto essential facilities.

Neither truck drivers nor civilians can reasonably avoid these systems once deployed at scale.

---

### Element: Exclusionary conduct

This element is satisfied.

The enterprise maintains power through:

- surveillance-based exclusion,

472

- opaque scoring,

- denial of access without due process,

- chilling of resistance through fear of monitoring.

This is exclusion by architecture, not competition.

---

## VII. Plaintiff's Dual Standing: Truck Driver and Civilian

Plaintiff was directly injured as a truck driver subjected to in-cab surveillance, scoring, and exclusion from work.

Plaintiff is also a civilian subjected to the same architecture as it expands into neighborhoods, roadways, and public space through camera networks such as those operated by Flock Safety.

The enterprise does not change between these contexts. Only the population changes.

Plaintiff's injury is therefore not isolated or speculative. It is proof of concept.

---

## VIII. Proximate Cause

Element: Causation

473

This element is satisfied.

Plaintiff's economic and liberty injuries flow directly from the enterprise's surveillance-based access-control mechanism. The same mechanism now governs civilian life.

---

Plaintiff is not asking the Court to imagine future harm. Plaintiff lived inside this system when it was first deployed against truck drivers. The same system now governs civilians. The defendants are tied together not by coincidence, but by architecture.

**REMEDY**

**Enterprise-Wide Declaratory and Injunctive Relief**

---

**I. Nature of Relief Sought**

Plaintiff seeks prospective declaratory and injunctive relief only against Defendants, including Motive Technologies, Inc., Highway, and Flock Safety, Inc., sufficient to terminate the Unified Enterprise's surveillance-based access-control mechanisms and to prevent their continued expansion.

Plaintiff does not seek punitive damages against all Defendants equally. The relief requested is structural, corrective, and forward-looking, tailored to the role each Defendant plays in the enterprise.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

## II. Declaratory Relief (Enterprise-Wide)

Plaintiff seeks a declaration that:

1. Defendants operate a unified system that conditions access to work, movement, and economic participation on surveillance-derived data, opaque aggregation, and permissioning decisions.

2. The use of surveillance—real or reasonably perceived—combined with opaque scoring and silent exclusion constitutes a restraint of trade, coercive conduct, and enterprise activity when deployed without notice, explanation, or appeal.

3. Systems that govern access to livelihood or public movement may not lawfully operate as unregulated "shadow credit or eligibility systems" outside due-process safeguards.

4. Plaintiff was injured both as:

   o a truck driver subjected to in-cab surveillance and exclusion; and

   o a civilian subjected to the same architecture as it expands into everyday life.

## III. Injunctive Relief — Core Enterprise Constraints

Plaintiff seeks injunctive relief prohibiting Defendants from:

1. Conditioning access to work, freight, payment, movement, or participation on surveillance-derived scores, flags, or inferences without notice and an opportunity to challenge.

475

2.  Enforcing or participating in silent exclusion, blacklisting, or denial of access through shared platforms where responsibility is obscured by reference to "the system."

3.  Using real-time or near-real-time surveillance access to monitor individuals without:

    o   role-based access limits,

    o   jurisdictional constraints, and

    o   auditable access logs.

---

## IV. Due-Process and Transparency Safeguards

Plaintiff seeks injunctive relief requiring Defendants to implement minimum due-process protections, including:

1.  Notice

    Clear notice to affected individuals when surveillance data is used in any manner that affects access to work, payment, movement, or scrutiny.

2.  Explanation

    Disclosure of:

    o   what data was used,

    o   how it was interpreted,

    o   and what decision resulted.

3.  Right to Challenge

476

A meaningful opportunity to contest accuracy, context, or misuse before adverse consequences are imposed.

4. Correction Mechanisms

Procedures to correct, delete, or limit data that is inaccurate, stale, or misused.

---

## V. Surveillance Limits and Jurisdictional Boundaries

Plaintiff seeks injunctive relief requiring that:

1. Surveillance access be strictly limited by jurisdiction, such that:
   - municipal or neighborhood surveillance cannot be searched nationwide by default;
   - private entities cannot exercise surveillance power equivalent to law enforcement.
2. Cross-jurisdictional data sharing be prohibited absent lawful authority, defined purpose, and documented justification.
3. Retention of surveillance data be limited to defined periods tied to legitimate purposes, not indefinite accumulation.

---

## VI. Prohibition on Surveillance-Derived Social Scoring

Plaintiff seeks injunctive relief prohibiting Defendants from:

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

1. Using surveillance-derived data to construct de facto social, behavioral, or trustworthiness scores without statutory authorization and regulation.

2. Inferring character, intent, or risk from:

   o movement patterns,

   o proximity,

   o association,

   o or behavior absent individualized suspicion.

3. Converting surveillance into economic or social permissioning without transparent standards.

---

## VII. Haves-vs-Have-Nots Correction (Equity Remedy)

Plaintiff seeks relief addressing the economic stratification of surveillance power, including:

1. Prohibiting pay-to-watch regimes where:

   o affluent entities gain real-time surveillance access;

   o poor and marginalized populations are surveilled but lack visibility or recourse.

2. Requiring that any surveillance system deployed ubiquitously in public life be governed by public-utility-like principles, including:

   o equal access rules,

   o nondiscriminatory use,

   o transparency,

478

     o  and accountability.

3. Declaring that surveillance infrastructure that is everywhere and unavoidable cannot be governed as a private luxury good.

---

## VIII. Defendant-Specific Structural Relief

Without limiting enterprise-wide relief, Plaintiff seeks tailored constraints:

- As to surveillance capture platforms (e.g., Motive):

  prohibition on audio-capable or inward-facing surveillance without explicit, informed, voluntary consent and opt-out.

- As to scoring and gatekeeping platforms (e.g., Highway):

  prohibition on eligibility determinations without notice, explanation, and appeal.

- As to civilian surveillance platforms (e.g., Flock Safety):

  prohibition on real-time civilian tracking, unrestricted sharing, and cross-jurisdictional searches without lawful process.

---

## IX. Prevention of Further Expansion

479

Plaintiff seeks injunctive relief barring Defendants from expanding surveillance-based access-control systems into new domains absent:

- statutory authorization,

- due-process safeguards,

- jurisdictional limits,

- and equitable access protections.

---

## X. Public Interest Finding

Plaintiff seeks a finding that the requested relief serves the public interest by:

- restoring fair competition,

- protecting free speech and association,

- preventing coercive surveillance,

- and ensuring that technology does not silently replace law.

- Surveillance that governs access to work and movement must be constrained by law, not fear. A system that watches everyone but is controlled only by those who can pay is not safety—it is power without accountability.

---

480

**DEFENDANT: C.H. Robinson Worldwide, Inc.**

("CH Robinson")

## A. Broker Role and Enterprise Function

1. CH Robinson is a federally regulated freight broker with nationwide market reach whose decisions materially determine whether motor carriers may access freight and earn income in interstate commerce.

2. CH Robinson does not operate independently when determining carrier eligibility. Instead, it relies on the same broker-facing verification, risk-scoring, and eligibility platforms used by other large brokers, including Total Quality Logistics, LLC ("TQL") and Magellan Logistics ("Magellan").

3. Through this shared reliance, CH Robinson functions as a participating enforcement node within the Unified Surveillance-Based Access-Control Enterprise.

---

## B. Delegation of Eligibility and Silent Exclusion (Uniform Broker Conduct)

1. CH Robinson conditions access to freight on carrier participation in opaque third-party systems over which carriers have no meaningful control and no transparent insight.

2. When a carrier is flagged, restricted, or adversely designated within those systems, CH Robinson enforces the outcome by:

   o refusing to offer loads,

   o ceasing communications, or

481

   o  asserting that eligibility is dictated by "the system," not by broker discretion.

3. CH Robinson provides no meaningful notice, explanation, or appeal to carriers subjected to such exclusion.

4. This conduct mirrors the practices of TQL and Magellan, which likewise:

   o  rely on the same platforms,

   o  apply the same adverse signals,

   o  and deny carriers access without individualized explanation.

5. The result is market-wide exclusion enforced uniformly across competing brokers, rather than independent, performance-based decision-making.

---

## C. Sherman Act §1 — Concerted Restraint of Trade (Mirrored Across Brokers)

1. CH Robinson participates in a concerted restraint of trade by relying on the same eligibility and exclusion infrastructure as its direct competitors.

2. TQL, Magellan, and CH Robinson collectively enforce carrier exclusion through shared platforms, producing:

   o  simultaneous refusals to deal,

   o  suppressed competition among carriers, and

   o  foreclosure of market access unrelated to carrier performance.

3. The coordination occurs through shared technological infrastructure, satisfying the requirements of a hub-and-spoke conspiracy even in the absence of explicit broker-to-broker agreements.

482

## D. Sherman Act §2 — Exclusionary Conduct and Market Power

1. CH Robinson's scale and market position amplify the exclusionary effect of its refusal to deal.

2. When CH Robinson enforces enterprise-level exclusion, affected carriers cannot reasonably mitigate the harm by seeking alternative brokers, because TQL and Magellan apply the same restrictions through the same systems.

3. This substitutes opaque permissioning for competitive markets and constitutes exclusionary conduct under the Sherman Act.

## E. RICO — Conduct or Participation in the Enterprise

1. CH Robinson knowingly conducts and participates in the affairs of the enterprise by operationalizing surveillance-derived scoring and exclusion.

2. CH Robinson benefits from this participation through:

    o reduced carrier bargaining power,

    o downward pressure on rates, and

    o removal of carriers who question or resist the system.

3. This conduct is continuous, not isolated, and mirrors the conduct of TQL and Magellan as co-participants.

483

**F. Plaintiff's Injury and Causation (Unified Broker Pattern)**

1. Plaintiff is a federally authorized motor carrier engaged in interstate commerce.

2. Plaintiff was denied access to freight not because of performance deficiencies, but because of enterprise-level signals enforced uniformly by brokers including CH Robinson, TQL, and Magellan.

3. Each broker's refusal reinforced the others, producing total market exclusion.

4. Plaintiff's economic injury was the foreseeable and intended result of this coordinated architecture.

---

**G. Relief Sought as to CH Robinson (Consistent With TQL and Magellan)**

1. Plaintiff seeks declaratory and injunctive relief prohibiting CH Robinson from:

   o enforcing carrier exclusion based on opaque third-party systems,

   o participating in coordinated refusals to deal, and

   o delegating eligibility decisions without notice and due process.

2. Plaintiff seeks an order requiring CH Robinson—consistent with relief sought against TQL and Magellan—to:

   o restore independent broker judgment,

   o provide explanation for adverse decisions, and

   o cease participation in enterprise-wide exclusionary practices.

---

484

**REMEDY**

**As to Participating Broker Defendants**

(C.H. Robinson Worldwide, Inc., Total Quality Logistics, LLC, and Magellan Logistics)

---

## A. Nature of Relief Sought

Plaintiff seeks prospective declaratory and injunctive relief against the Participating Broker Defendants sufficient to terminate their participation in the Unified Surveillance-Based Access-Control Enterprise and to restore lawful, competitive, performance-based access to freight.

Plaintiff does not seek punitive damages uniquely against these defendants. The relief sought is structural, corrective, and forward-looking, tailored to the brokers' role as market gatekeepers and enforcement nodes.

---

## B. Prohibition on Delegated and Opaque Exclusion

Plaintiff seeks an injunction prohibiting Participating Broker Defendants from:

1. Denying, restricting, or conditioning carrier access to freight based on opaque third-party scores, flags, or eligibility signals over which the carrier has no visibility or control.

2. Enforcing enterprise-level exclusion while disclaiming responsibility by asserting that eligibility decisions are dictated by "the system," a platform, or an external vendor.

485

3. Participating in or effectuating concerted refusals to deal through shared reliance on common verification, surveillance, or risk-scoring infrastructure.

---

## C. Requirement of Independent Broker Judgment

Plaintiff seeks injunctive relief requiring Participating Broker Defendants to exercise independent, good-faith broker judgment when determining carrier eligibility, rather than deferring automatically to shared enterprise platforms.

Such relief shall require that any adverse decision be:

- based on articulated, performance-related criteria;
- attributable to the broker making the decision; and
- subject to internal review rather than automatic enforcement of third-party determinations.

---

## D. Notice, Explanation, and Opportunity to Respond

Plaintiff seeks injunctive relief requiring Participating Broker Defendants to provide carriers with:

1. Notice when access to freight is denied, restricted, or terminated.
2. Explanation identifying the basis for the decision, including whether any third-party information was relied upon.

486

3. Opportunity to Respond, including the ability to contest inaccuracies, stale data, or misapplied signals before exclusion is enforced.

Silent exclusion shall be prohibited.

---

## E. Prohibition on Coordinated Market Foreclosure

Plaintiff seeks injunctive relief prohibiting Participating Broker Defendants from engaging in coordinated conduct that results in market-wide foreclosure of carriers, including:

- uniform exclusion across competing brokers,
- reciprocal reliance on shared disqualification signals, and
- de facto blacklisting enforced through common platforms.

Such conduct shall be declared an unlawful restraint of trade when it substitutes permissioning for competition.

---

## F. Transparency and Auditability

Plaintiff seeks injunctive relief requiring Participating Broker Defendants to maintain auditable records of:

- carrier eligibility decisions,
- reliance on third-party platforms,

487

- reasons for adverse determinations, and

- communications affecting access to freight.

These records shall be sufficient to permit judicial and regulatory review of compliance.

---

## G. Sherman Act–Specific Relief

Plaintiff seeks an order declaring that Participating Broker Defendants' coordinated reliance on shared exclusion infrastructure constitutes an unreasonable restraint of trade when it results in group boycotts or concerted refusals to deal.

Plaintiff further seeks an injunction restoring competitive conditions by requiring brokers to compete for carriers based on rates, service, and performance—not exclusionary signaling.

---

## H. RICO-Related Equitable Relief

Plaintiff seeks equitable relief under RICO sufficient to:

- bar Participating Broker Defendants from further participation in enterprise conduct that uses surveillance-derived data to coerce, exclude, or silence carriers; and

- prevent the continued use of fear of exclusion as a means of economic control.

---

## I. Public Interest Finding

488

Plaintiff seeks a finding that the requested relief serves the public interest by:

- restoring fair competition in interstate freight markets,

- protecting lawful motor carriers from silent exclusion,

- preventing the privatization of market access through opaque technology systems, and

- ensuring that brokers cannot outsource coercive decision-making while avoiding accountability.

- Brokers may compete on service and price. They may not compete by sharing a blacklist.

---

**DEFENDANT: MacroPoint, LLC**

("MacroPoint")

---

**A. Identity and Core Function**

1. Defendant MacroPoint, LLC is a freight-tracking and location-intelligence company that provides real-time and continuous shipment-visibility services to brokers, shippers, and logistics intermediaries.

489

2. MacroPoint's platform captures, aggregates, and transmits carrier and driver location data during freight movements, often through mobile devices, integrations, and automated prompts.

3. MacroPoint markets its services as shipment visibility and fraud prevention, but functionally operates as a real-time surveillance and data-distribution layer within the freight market.

---

## B. Role in the Unified Enterprise

1. MacroPoint is not a passive technology vendor. It is a core data-intermediation node within the Unified Surveillance-Based Access-Control Enterprise.

2. MacroPoint supplies continuous or near-continuous location data that is relied upon by brokers to:

   o   monitor carrier movements,

   o   detect deviations or delays,

   o   infer risk or trustworthiness, and

   o   justify denial of payment, refusal of future loads, or exclusion from market access.

3. MacroPoint's data feeds and integrations operate downstream into broker decision-making systems, including eligibility, payment release, and continued access to freight.

---

## C. Surveillance Without Meaningful Consent or Limitation

490

1. Carriers and drivers are routinely required to activate MacroPoint tracking as a condition of hauling freight, without meaningful ability to negotiate terms or refuse participation.

2. Consent, if referenced, is typically implied, time-pressured, or bundled into load acceptance, rather than informed, voluntary, and revocable.

3. Once activated, MacroPoint enables:

    o continuous location tracking,

    o retention of movement history,

    o sharing of data beyond the immediate shipment context, and

    o use of tracking data for purposes unrelated to shipment completion.

4. Drivers and carriers are not meaningfully informed:

    o how long tracking data is retained,

    o who can access it,

    o whether it is shared across platforms,

    o or how it may later be used against them.

---

## D. Conversion of Tracking Into Control and Exclusion

1. MacroPoint tracking data is routinely used not merely for shipment visibility, but to:

    o question carrier conduct,

    o allege deviations or noncompliance,

    o delay or withhold payment,

    o and justify refusal to offer future freight.

491

2. Brokers relying on MacroPoint data often assert that adverse outcomes are dictated by "tracking issues" or "system requirements," disclaiming independent judgment.

3. This converts surveillance into permissioning—where access to payment and future work is conditioned on uninterrupted, unquestioned tracking compliance.

---

## E. Sherman Act §1 — Concerted Restraint of Trade

1. MacroPoint facilitates concerted restraint of trade by supplying a standardized surveillance feed relied upon uniformly by competing brokers.

2. When multiple brokers rely on MacroPoint tracking data to enforce the same exclusionary outcomes, the result is:

   o  coordinated refusal to deal,

   o  suppression of carrier competition,

   o  and market foreclosure unrelated to performance.

3. The coordination occurs through shared infrastructure rather than express agreement, satisfying hub-and-spoke conspiracy principles.

---

## F. Sherman Act §2 — Exclusionary Conduct

1. MacroPoint contributes to exclusionary conduct by embedding itself as a de facto required tracking system for market participation.

492

2. Carriers cannot reasonably compete without submitting to continuous tracking, rendering MacroPoint an essential surveillance facility within the enterprise.

3. The use of tracking data to justify exclusion, payment interference, or denial of future access constitutes exclusionary conduct when untethered from transparent standards or due process.

---

## G. RICO — Conduct or Participation in the Enterprise

1. MacroPoint knowingly conducts and participates in the affairs of the enterprise by providing the surveillance data upon which exclusionary and coercive decisions are made.

2. MacroPoint benefits economically from:

   o  normalization of continuous tracking,

   o  increased reliance by brokers,

   o  and expanded use of surveillance as a condition of market access.

3. MacroPoint's participation is continuous and integral to the enterprise's operation, not incidental.

---

## H. Plaintiff's Injury and Causation

1. Plaintiff was required to submit to tracking as a condition of hauling freight.

493

2. Plaintiff experienced adverse treatment, exclusion, and loss of opportunity tied to surveillance-derived monitoring and broker reliance on tracking data.

3. Plaintiff's injury was the foreseeable result of an enterprise architecture that converts real-time tracking into leverage over payment, access, and livelihood.

---

## I. Civilian Parallel and Expansion

1. The same logic used by MacroPoint—continuous tracking justified as "visibility"—mirrors surveillance expansion in civilian life through location tracking, vehicle monitoring, and movement analytics.

2. As with civilian surveillance platforms, MacroPoint's tracking systems:

   o normalize constant observation,

   o deny subjects meaningful control over their data,

   o and convert movement into judgment.

3. MacroPoint thus reinforces the enterprise's broader surveillance-based access-control model beyond trucking.

---

## J. Relief Sought as to MacroPoint

1. Plaintiff seeks declaratory and injunctive relief prohibiting MacroPoint from:

   o facilitating continuous tracking as a condition of market access without meaningful consent,

494

      o   enabling use of tracking data for exclusionary or punitive purposes, and

      o   participating in coordinated surveillance-based exclusion.

2. Plaintiff seeks an order requiring MacroPoint to:

      o   limit tracking to shipment-specific purposes,

      o   prohibit downstream misuse for eligibility or payment control,

      o   provide transparency regarding data sharing and retention, and

      o   allow revocation of tracking without retaliation.

**SURVEILLANCE INFRASTRUCTURE DEFENDANTS**

**(MacroPoint + ELD / AI Camera Systems + Flock Safety)**

---

**A. Surveillance Infrastructure as a Unified Enterprise Layer**

1. Defendants Motive Technologies, Inc. (formerly KeepTruckin), MacroPoint, LLC, and Flock Safety, Inc. operate collectively as the Surveillance Infrastructure layer of the Unified Enterprise.

2. Although marketed as distinct products—compliance tools, shipment visibility, and public safety cameras—these systems function together as a continuous, end-to-end surveillance architecture that captures, aggregates, and distributes movement and behavior data.

495

3.  This infrastructure supplies the raw surveillance inputs upon which downstream permissioning, scoring, exclusion, and coercive control are based.

---

**B. Continuous Data Capture Across All Domains**

1.  At the vehicle and driver level, Motive deploys ELDs, AI-enabled inward-facing cameras, telemetry, and audio-capable systems inside truck cabs, capturing:

     o   location,

     o   driving behavior,

     o   visual recordings of the driver,

     o   and, in some configurations, audio from the cab environment.

2.  At the shipment and route level, MacroPoint captures real-time and continuous location data through mobile devices and integrations, tracking:

     o   movement during loads,

     o   deviations,

     o   stops,

     o   and dwell time.

3.  At the civilian and public-space level, Flock Safety deploys networked camera systems that capture:

     o   vehicle movement,

     o   license-plate data,

     o   time-stamped location histories,

     o   and searchable travel patterns across neighborhoods and jurisdictions.

496

4. Together, these systems create near-continuous coverage from the interior of the truck cab, to the route taken, to the public spaces traveled—without meaningful gaps.

---

## C. Lack of Meaningful Consent, Notice, or Opt-Out

1. Subjects of this surveillance—truck drivers, carriers, and civilians—are not provided meaningful notice regarding:

   - when monitoring occurs,
   - who may access the data,
   - how long it is retained,
   - or how it may be shared or repurposed.

2. Truck drivers and carriers cannot realistically opt out of ELDs or tracking systems without losing work.

3. Civilians cannot opt out of roadway, neighborhood, or municipal camera networks once installed.

4. Consent, where referenced at all, is implied, bundled, coerced by economic necessity, or buried in terms—not informed, voluntary, or revocable.

---

## D. Conversion of Surveillance Into Control

1. The Surveillance Infrastructure Defendants do not merely observe. Their systems enable downstream control by supplying surveillance data used to:

497

- o justify denial of freight,

- o withhold or delay payment,

- o exclude carriers from future work,

- o flag individuals as "risky" or "suspicious," or

- o subject civilians to heightened scrutiny.

2. Surveillance thus becomes permissioning infrastructure, where uninterrupted compliance with monitoring is required to maintain access to livelihood or freedom from suspicion.

3. Responsibility for adverse outcomes is obscured by reference to "the system," allowing each participant to disclaim accountability while enforcing the same result.

---

## E. Reasonable Belief of Monitoring and Chilling Effect

1. Due to the existence of pervasive surveillance capabilities and opaque disclosures, individuals reasonably believe they may be watched or tracked at any time.

2. This belief—regardless of whether monitoring is active in a given moment—produces a chilling effect:

- o drivers self-censor speech inside the cab,

- o carriers avoid questioning brokers or platforms,

- o civilians alter routes, associations, and behavior.

3. The enterprise relies on this chilling effect as a control mechanism. The system does not need to monitor constantly; it only needs subjects to believe that it can.

---

498

**F. Integration With Downstream Scoring and Exclusion**

1. Surveillance data captured by Motive, MacroPoint, and Flock Safety is designed to be:

   o searchable,

   o retainable,

   o interoperable,

   o and shareable across platforms and users.

2. This data feeds directly or indirectly into downstream systems that:

   o score risk,

   o determine eligibility,

   o authorize or deny access,

   o and enforce exclusion without notice or appeal.

3. The Surveillance Infrastructure layer is therefore indispensable to the enterprise's operation and cannot be separated from its coercive effects.

---

**G. Jurisdictional Overreach and Pay-to-Watch Power**

1. Surveillance access is granted primarily to those who can pay: corporations, brokers, municipalities, private communities, and institutional users.

2. Those without resources—drivers, carriers, and civilians—are surveilled but denied access to visibility, audit, or recourse.

3. Surveillance data is searchable across jurisdictions, unconstrained by traditional geographic or legal limits, enabling monitoring without clear sovereign accountability.

499

4. This creates a haves-vs-have-nots surveillance regime, where observational power is sold while exposure is imposed.

---

## H. Enterprise Significance

1. The Surveillance Infrastructure Defendants form the foundation of the Unified Enterprise.
2. Without continuous data capture, the downstream scoring, exclusion, and market control could not function.
3. Truck drivers were the first population subjected to this architecture because they were economically captive. The same system now governs civilian life.

---

## I. Relief Implications

1. Because these defendants supply the surveillance backbone of the enterprise, injunctive relief must:
   - limit continuous monitoring,
   - prohibit use of surveillance data for access control absent due process,
   - impose jurisdictional and role-based access limits, and
   - prevent pay-to-watch power imbalances.
2. Absent such relief, the enterprise will continue to expand surveillance-based control across both commerce and civilian life.

500

These defendants do not merely observe movement. They supply the infrastructure that converts movement into control.

**DEFENDANT: Carrier411, LLC**

**The Test Bed for a Two-Tier Surveillance Economy**

**A. Carrier411 as the Proof-of-Concept "Haves vs. Have-Nots" System**

Carrier411 operates as a forecast model for how surveillance-based access control functions when power is concentrated in one class and denied to another.

In the Carrier411 system, brokers are the haves. They pay for access. They see flags, reports, and adverse information. They communicate with one another through the platform. They can impose consequences.

501

Drivers and carriers are the have-nots. They do not see what is written about them. They cannot view reports without paying. They are often denied access entirely. They receive no notice before harm occurs and no meaningful explanation afterward.

Carrier411 thus functions as a one-way mirror:

- brokers can see and judge carriers;
- carriers cannot see, challenge, or confront their accusers.

This is not incidental. It is the product being sold.

---

## B. Carrier411 as a Controlled Test Bed

Carrier411 is alarming not only because of what it does, but because of where it does it first.

Truck drivers and small carriers were the ideal test population because they:

- are economically captive,
- depend on brokers for survival,

502

- lack bargaining power,

- operate in isolation,

- and cannot easily organize or resist.

Within Carrier411, the enterprise proved that:

- silent reporting works,

- lack of transparency suppresses resistance,

- fear of blacklisting enforces compliance,

- and access to work can be controlled without law or process.

Once carriers learned that a single invisible report could end their livelihood nationwide, behavior changed. Silence replaced challenge. Compliance replaced protest.

The system succeeded.

---

## C. Integration With Surveillance Infrastructure

Carrier411 does not operate alone. It sits downstream from surveillance infrastructure.

503

Data captured by:

- ELDs and AI cameras,

- shipment tracking systems,

- and movement surveillance

feeds the narrative layer—reports, flags, and "risk" designations—used by brokers on Carrier411.

Carrier411 converts surveillance-derived suspicion into reputational punishment, which brokers then enforce collectively by refusing loads, delaying payment, or severing relationships.

This is how surveillance becomes economic control.

---

**D. Why This Is a Forecast for Civilian Life**

Carrier411 demonstrates what happens when:

504

- surveillance exists,

- data is aggregated,

- access to interpretation is sold,

- and the subject is denied transparency.

Now remove "truck driver" and substitute civilian.

Replace:

- broker → HOA, landlord, employer, insurer, municipality

- Carrier411 → civilian surveillance platform

- freight access → housing, employment, insurance, movement

The architecture does not change.

The same two-tier system emerges:

- those who can pay to see and judge, and

- those who can only be seen and judged.

505

Carrier411 is therefore not just a trucking platform. It is a functional prototype for how surveillance power will be distributed in civilian society.

---

## E. From Blacklisting to Social Permissioning

Carrier411 shows how easily surveillance becomes social permissioning.

A carrier is not told:

- who reported them,
- what data was relied upon,
- whether the report is accurate,
- or how long it will follow them.

The result is not correction. It is exile.

This same mechanism, when applied to civilians, becomes:

- denial of housing,

506

- denial of employment,

- increased scrutiny,

- exclusion from opportunity,

- or targeting without explanation.

No arrest.

No charge.

No notice.

Just loss of access.

---

## F. Why Civilians Should Be Alarmed

Carrier411 proves three dangerous facts:

1. Surveillance power concentrates upward

   Those with money and institutional standing gain visibility and control.

2. Subjects are denied recourse

507

The people most affected are the least informed and least able to respond.

3. Fear enforces compliance better than law

The mere possibility of being flagged changes behavior.

When this model expands beyond trucking—through neighborhood cameras, movement tracking, and shared civilian data platforms—it does not become safer. It becomes quieter, harder to detect, and harder to challenge.

Carrier411 is what the system looks like before it reaches civilians.

---

## G. Enterprise Significance

Carrier411 completes the enterprise loop:

- Surveillance captures behavior.

- Platforms interpret it.

- Access is sold to the powerful.

- Consequences are imposed on the powerless.

- Responsibility is denied by everyone involved.

508

Truck drivers were the first population subjected to this architecture at scale. They could not opt out. They could not see the data. They could not fight back.

The enterprise learned that it works.

That is why its expansion into civilian life is not speculative. It is already underway.

---

Carrier411 demonstrates how surveillance becomes control when only one side is allowed to see. Truck drivers were the test population. Civilians are next. This is of great public interest.

509

**WHEREFORE, PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Sandra Worthing Alves, d/b/a All Directions Trucking, respectfully prays that this Honorable Court, the Cuyahoga County Court of Common Pleas, enter judgment in her favor and against all Defendants, jointly and severally, and grant the following relief:

A. COMPENSATORY DAMAGES

1. An award of compensatory damages in the amount of Eighty Thousand United States Dollars (US $80,000.00) and tolling representing:

  a. Lost loads and lost revenue.

Currently, BLACKLISTED BY 99% OF THE INDUSTRY  while still a federally active carrier

No restrictions

  b. Wrongfully delayed, diverted, or withheld freight payments.

  c. One-cent ("penny") deposits and fabricated short-pay practices;

  d. Fuel deprivation, inability to purchase food, and inability to maintain insurance.

  e. Operational shutdowns, onboarding denials, and exclusion from freight markets.

  f. Credit impairment and business harm caused by fraudulent UCC filings.

  g. Reputational injury within the trucking industry;

  h. Emotional distress, humiliation, fear, and physical danger while stranded over 1,200 miles from home.

510

2. An order trebling all compensatory damages pursuant to:

  a. Ohio Revised Code § 2923.34(E) (Ohio Civil RICO);

  b. 18 U.S.C. § 1964(c) (Federal Civil RICO);

  c. 15 U.S.C. § 15 (Sherman Act), as applicable.

## B. PUNITIVE DAMAGES

3. An award of punitive damages in the amount of Fifty Million United States Dollars (US $50,000,000.00) against Defendants, jointly and severally, to punish and deter Defendants' willful, malicious, reckless, and enterprise-driven misconduct, including:

  a. Filing and maintaining fraudulent blanket UCC liens;

  b. Weaponizing payment delays and penny deposits to exert economic coercion.

  c. Endangering Plaintiff's physical safety by withholding funds necessary for fuel, heat, and food.

  d. Facilitating offshore fraud networks and double-brokering schemes.

  e. Monetizing surveillance, identity exploitation, and carrier data harvesting.

  f. Participating in an integrated scheme that has contributed to the collapse of over 113,000 American motor carriers.

## C. DECLARATORY RELIEF

511

4. A declaration that UCC-1 Financing Statement No. OH00290660927 is unauthorized, fraudulent, void, and of no legal effect.

5. A declaration that Plaintiff never granted, signed, or authorized any security interest, assignment of receivables, lien, or collateral pledge to any Defendant.

6. A declaration that Defendants possess no lawful ownership, lien, encumbrance, or security interest in Plaintiff's assets, receivables, bank accounts, equipment, or business operations.

## D. INJUNCTIVE AND EQUITABLE RELIEF

7. A Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction prohibiting Defendants from:

a. Enforcing or maintaining the fraudulent UCC lien.

b. Issuing or circulating any Notice of Assignment affecting Plaintiff.

c. Intercepting, delaying, diverting, or withholding payments owed to Plaintiff.

d. Blocking or restricting Plaintiff's access to freight marketplaces.

e. Imposing surveillance-based ELD API requirements as a condition of hauling freight.

f. Sharing, monetizing, or transmitting Plaintiff's data to offshore or third-party actors.

8. Structural injunctive relief requiring Defendants, at their sole cost and expense, to:

a. Submit to ongoing oversight by a Court-appointed Special Master.

b. Undergo full forensic audits of financial systems, factoring practices, and payment-routing mechanisms.

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

c. Eliminate offshore access to carrier identity, onboarding, and payment systems through analytics-based domain enforcement.

d. Prohibit the use of VOIP numbers, Google Voice, Gmail-only identities, Telegram, WhatsApp, and similar anonymizing tools for broker or dispatcher access.

e. Implement a verified domestic broker registry with metadata validation.

f. Implement a court-supervised Enterprise Electronic Logging Device ("E-ELD") mirror system that captures and archives enterprise-level surveillance, payment, identity, and routing metadata for government and judicial review.

## E. DISGORGEMENT AND RESTITUTION

9. Disgorgement of all profits wrongfully obtained by Defendants from:

a. Fraudulent factoring practices./ Blacklisting Plaintiff

b. Payment float and delayed disbursements.

c. Unauthorized data harvesting and monetization.

d. Surveillance-based revenue models.

e. Offshore dispatch facilitation.

10. Full restitution of all funds wrongfully withheld, diverted, or seized from Plaintiff.

## F. COSTS, FEES, AND INTEREST

11. An award of all costs of suit, including filing fees, service fees, investigative costs, and expert costs.

8.  Pre-judgment and post-judgment interest at the maximum rate permitted by Ohio law.

513

## G. OTHER RELIEF

9. Establish escrowed money of $100. dollars to $50 million dollars for appointment of software engineer Special Masters and two 2 court approved appointed attorneys for each Special Master,, one for Cuyahoga County and another Attorney in the jurisdiction of the defendant for Judicial oversight and scaled in the amount of Special Masters and Funds to reflect and calibrate how many will be needed per defendant. Such other and further legal, equitable, statutory, and injunctive relief as this Court deems just, proper, and necessary to remedy the full scope of harm to Plaintiff and to protect the integrity of interstate commerce and the American supply chain.

### Evidence & Exhibit Index (No Exhibits Attached)

Plaintiff provides the following Evidence and Exhibit Index to identify materials supporting the allegations in this First Amended Complaint. Plaintiff expressly reserves the right to supplement, amend, and produce these materials during discovery. No exhibits are attached at this stage.

EXHIBIT CATEGORY A — RECORDED CALLS & AUDIO EVIDENCE

A-1. Recorded telephone interviews with offshore dispatchers and brokers (2022–2025), including individuals located in Pakistan and other foreign jurisdictions, describing:

• control of multiple U.S. MC numbers,

• commission structures (approximately five percent (5%) per truckload),

• data retention practices (ACH, MC, W-9, insurance, ELD access),

• double-brokering methods and straw-man carrier usage.

514

A-2. Recorded calls with factoring representatives regarding:

- "no obligation" representations,

- unexplained short payments,

- one-cent deposits,

- refusal to release funds or Notices of Assignment.

## EXHIBIT CATEGORY B — ELECTRONIC COMMUNICATIONS

B-1. Telegram message threads documenting:

- ELD manipulation and hours-of-service falsification,

- offshore dispatch coordination,

- instructions to operate beyond lawful driving limits.

B-2. WhatsApp and VOIP communications used by offshore brokers and dispatchers to:

- impersonate carriers,

- negotiate freight,

- substitute unauthorized drivers.

B-3. Screenshots of Google Voice and non-domestic contact numbers associated with broker and dispatcher communications facilitated through DAT and related platforms.

## EXHIBIT CATEGORY C — ELD & TELEMATICS EVIDENCE

C-1. Screenshots and documentation showing backend ELD edits and log manipulation.

C-2. Comparative evidence showing lawful Garmin ELD use versus API-integrated surveillance ELD systems favored by brokers.

C-3. Industry documentation and technical references regarding remote-disable and API telemetry capabilities.

EXHIBIT CATEGORY D — PLATFORM RECORDS & DIGITAL FLAGS

D-1. Highway App records showing unauthorized "claimed" authority and delayed decommission.

D-2. RMIS onboarding records reflecting automatic access shutdowns.

D-3. Carrier411 records evidencing reputational coercion and blacklist threat mechanisms.

EXHIBIT CATEGORY E — FINANCIAL & LIEN DOCUMENTATION

E-1. UCC-1 Financing Statement No. OH00290660927.

E-2. Notices of Assignment circulated to brokers.

E-3. Payment statements reflecting penny deposits, unexplained holds, and shortages.

E-4. Broker confirmations of full payment contradicting factoring statements.

EXHIBIT CATEGORY F — SOCIAL MEDIA & PUBLIC ADMISSIONS

F-1. TikTok and social media videos of offshore dispatchers boasting of:

   • dispatching fifty (50) or more trucks per dispatcher,

   • commission-based revenue,

   • overseas operations managing U.S. freight.

EXHIBIT CATEGORY G — GOVERNMENT & INDUSTRY MATERIALS

G-1. FMCSA authority records for Plaintiff.

G-2. Industry reports and warnings regarding:

   • double brokering,

   • cargo theft,

   • offshore dispatching fraud,

   • ELD manipulation.

516

Plaintiff states that these materials are within her possession, custody, or control, or will be obtained through discovery, subpoenas, and court-supervised forensic review under the requested structural relief and Special Master oversight.

517

**Instructions for Certified Service of Process**

**Cuyahoga County Court of Common Pleas**

Plaintiff respectfully requests that the Clerk of Court issue service of process by Certified Mail, Return Receipt Requested, pursuant to Ohio Civ.R. 4.1(A)(1), upon the following Defendants at the addresses listed below. Plaintiff is proceeding pro se. Plaintiff understands that service will be completed by the Clerk and docketed accordingly. This is the second Amended Complaint and first service on many.

Defendant 1.
**Internet Truckstop Payments, LLC**
**Dba- Denim,Truckstop Load board,**
**RMIS, SaferWatch,**
**RiskFactor**
**Registered Agent**
1505 Corporation
(d/b/a CSC – Lawyers Incorporating Service)
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833

Defendant 2.
**Denim, Inc.**
c/o Registered Agent
1444 South Entertainment Avenue, Suite 110
Boise, Idaho 83709

Defendant 3
**Total Quality Logistics, LLC (TQL)**
c/o Registered Agent
4289 Ivy Pointe Boulevard
Cincinnati, Ohio 45245

Electronically Filed 01/14/2026 10:27 / COMPLAINT / CV 25 129498 / Confirmation Nbr. 3728084 / CLTXT

Defendant 4.
**John Doe Freight Brokers1-29,061**
To be identified


Defendant 5.
**John Doe Factoring Partners 1–100**
To be identified



Defendant 6.
**Motive Technologies, gomotive.com**
 **f/k/a Keep Trucking**
1505 Corporation Incorporating Services LTD
Registered Agent
7801 Folsom BLVD # 202
Sacramento, CA 95826



Defendant 7
**Highway App, Inc.**
c/o Registered Agent
440 North Wolfe Road
Sunnyvale, California 94085



Defendant 8
**Carrier411 Services, Carrier411.com**
**Registered Agent**
50 North Laura Sreet
Suite 2600
Jacksonville, FL 32202


Defendant 9.
**Magellan Transport Logistics, Inc.**
Registered Agent
8505 Baycenter Road
Jacksonville, Florida 32256

519

Defendant 10.
**DAT Freight & Analytics, LLC**
c/o Registered Agent
8405 SW Nimbus Avenue
Beaverton, Oregon 97008

Defendant 11.
**Flock Safety, Flock Group Inc, Flock Cameras**
c/o Registered Agent
300 Colonial Center Pkwy, STE 100N
Roswell, GA 30076

Defendant 12.
**C.H. Robinson Worldwide, Inc.**
c/o Registered Agent
14701 Charlson Road
Eden Prairie, Minnesota 55347

Defendant #13
**MacroPoint, Inc.**
c/o Registered Agent
3350 Riverwood Parkway, Suite 1900
Atlanta, Georgia 30339

**John Doe Defendants**

John Doe Brokers 1–29,061 and John Doe Factoring Partners 1–100 are named as placeholder

defendants whose identities are presently unknown to Plaintiff.

520

Plaintiff respectfully requests that service upon John Doe Defendants be deferred until such time as their identities are discovered through investigation, discovery, subpoena, or court order. Upon identification, Plaintiff will promptly move to amend the complaint and request issuance of service.

Plaintiff requests that proof of service be entered upon the docket upon completion.

Respectfully submitted,

Sandra Worthing Alves-

All Directions Trucking

521

522