# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

SANDRA WORTHING ALVES,
d/b/a All Directions Trucking,
Plaintiff,

v.

INTERNET TRUCKSTOP
PAYMENTS, LLC, et al.,
Defendants.

) Case No.: 1:26-CV-00150
)
) The Honorable
) Dan Aaron Polster
)
) RENEWED MOTION FOR TEMPORARY
) RESTRAINING ORDER & Memorandum
)

**FILED**

**JAN 2 9 2026**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

**RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER**

**PRELIMINARY INJUNCTION and this MEMORANDUM as follows here;**

(Incorporating Prior TRO Record and Clarifying Authority Issues)

Plaintiff Sandra Worthing Alves respectfully moves this Court for entry of a Temporary

Restraining Order and Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil

Procedure. This renewed motion incorporates by reference Plaintiff's previously filed TRO

record and supporting evidence and is submitted to preserve the status quo for All Directions

Trucking and prevent ongoing irreparable harm pending a notified hearing.

Plaintiff submits this memorandum and its accompanying exhibits without waiving any rights,

arguments, claims, or allegations previously asserted. Plaintiff expressly incorporates and adopts

all factual allegations, legal theories, exhibits, and arguments set forth in the Second Amended

Complaint and all prior filings in this action as if fully restated herein, except to the extent

expressly supplemented or clarified by the present filing.

1

**PRELIMINARY STATEMENT**

Plaintiff Sandra Worthing Alves is a federally authorized motor carrier engaged in interstate commerce with current active federal authority. Plaintiff holds valid operating authority issued by the Federal Motor Carrier Safety Administration ("FMCSA"), Motor Carrier Number (MC#)1710778, and has lawfully participated in the interstate freight market as an owner-operator hauling general freight with a combination vehicle 80,000lbs. Plaintiff has a decade of experience as a Class A CDL holder and a truck driver. This action arises from Plaintiff's alleged ongoing exclusion from freight opportunities and disruption of her carrier operations based not on any loss of federal authority, safety violation, or regulatory action, but on determinations made and enforced through private, broker-facing technology platforms relied upon by Defendants. Plaintiff seeks narrowly tailored emergency relief to preserve the status quo and prevent irreparable harm and requests for hearing.


Under federal law, the Federal Motor Carrier Safety Administration (FMCSA) is the sole authority empowered to license and regulate interstate commerce.

Only carriers holding FMCSA motor carrier authority may lawfully transport freight in interstate commerce, and only entities holding FMCSA broker authority may lawfully arrange such transportation. Plaintiff remains federally authorized as a carrier. None of the Defendants possess authority to suspend, revoke, or otherwise override a carrier's federal operating status. Nevertheless, Plaintiff alleges that Defendants collectively rely on private, non-governmental, and unregulated broker-facing platforms to determine which federally authorized carriers may access freight, at what rates, and under what economic conditions.

2

**Absence of Statutory Authorization or Regulatory Oversight**

Federal law permits coordination among competitors in limited circumstances only when Congress has expressly authorized such coordination and subjected it to federal oversight. For example, under statutes such as the Reed and Bullwinkle Act, certain transportation entities may engage in coordinated conduct only if agreements are disclosed and approved by a federal regulator. Outside such narrow statutory frameworks, collective action that affects market access, rates, or exclusion remains subject to the antitrust laws.

Plaintiff alleges that Defendants' conduct operates outside any such statutory authorization. Freight brokers and carriers are federally regulated by the Federal Motor Carrier Safety Administration ("FMCSA"), which alone licenses and governs participation in interstate motor carriage. Defendants alleged collective reliance on private, broker-facing technology platforms to determine carrier eligibility, access to freight, rates, and payment practices is not disclosed to, reviewed by, or approved by FMCSA or any other federal regulator.

As alleged, these private platforms function as shared enforcement mechanisms across multiple market participants, determining which federally authorized carriers may access interstate commerce and under what economic terms. Plaintiff alleges that this coordinated reliance occurs without federal supervision, without statutory immunity, and without procedural safeguards, resulting in ongoing exclusion and economic harm to Plaintiff and similarly situated owner-operators.

At this stage, Plaintiff does not ask the Court to adjudicate the ultimate legality of Defendants' conduct under the antitrust laws. Rather, Plaintiff submits that the absence of regulatory authorization or oversight underscores the urgency of interim relief, as the alleged conduct

3

continues to disrupt interstate commerce and impose irreparable harm through private coordination pending adjudication on a full record.

This Court has not previously adjudicated the merits of Plaintiff's request for emergency relief. Plaintiff initially sought a temporary restraining order in state court due to the immediacy of the alleged harm. The state court did not reach the merits of that request and instead scheduled a hearing. Before any adjudication occurred, the matter was removed to this Court. Plaintiff now re-presents the emergency request to the proper forum, incorporating the previously submitted sworn declarations and exhibits and clarifying the authority and gatekeeping issues that give rise to ongoing and compounding harm.

Plaintiff does not challenge the existence of broker discretion, the lawful role of brokers under FMCSA authority, or the use of technology for administrative efficiency. Rather, Plaintiff alleges a factual system in which brokers, factoring companies, and related intermediaries collectively rely on the same private, broker-facing technology platforms to monitor, surveil, and evaluate carriers in real time. As alleged, these platforms ingest and distribute live data streams—including location data, shipment status, telematics, and in cab audio and video camera facing observation to determine carrier "eligibility," risk status, and access to freight. Adverse determinations result in immediate denial of loads to carriers who hold valid FMCSA authority.

Plaintiff further alleges that these same determinations are used not only to deny access to freight, but to anchor rates, suppress compensation, and justify slow pay, short pay, or non-payment to carriers—particularly owner-operators. As alleged, these practices are enforced

4

economically through coordinated broker reliance and factoring arrangements and NOA'S, rather than through any federal regulatory process. Factoring companies operating within this ecosystem are not neutral intermediaries; Plaintiff alleges they rely on the same eligibility determinations and participate in the same information-sharing framework, including publication and dissemination of adverse carrier status through Carrier411.com, resulting in compounding market exclusion. Carrier411.com is a blacklisting company that's sole purpose is to target Carriers to arbitrarily put them out of business with no opportunity to know what is within this private blacklisting platform. No due process and no opportunity to cure.

**Carrier411's Functional Role and Its Market Effects**

Carrier411 is not a government regulator, nor is it a neutral publisher of raw federal data. In practice, it operates as a broker-facing risk adjudication and market-access control system, ingesting publicly available FMCSA data, applying proprietary interpretive overlays, and redistributing qualitative judgments to brokers, factors, and logistics intermediaries who rely on those judgments to determine whether a federally authorized carrier may participate in the marketplace.

Carrier411 does not merely display FMCSA records. It reprocesses federal data through proprietary algorithms, assigns qualitative labels such as "alerts," "risk indicators," or "authority concerns," and presents those conclusions in a format designed to prompt exclusionary decisions. These labels are not issued by FMCSA, are not accompanied by any federal enforcement action, and are not subject to notice, hearing, or appeal by the affected carrier.

Critically, carriers themselves are denied access to the Carrier411 platform and to the evaluative criteria applied to them, while brokers and other non-carrier intermediaries, factoring companies and shippers retain continuous access to those same assessments. As a result, carriers are scored, characterized, and excluded based on private judgments they cannot see, challenge, or correct.

**Role-Based Access Disparity and Surveillance Asymmetry**

Carrier411 enforces access based on market role, not identity or safety. Individuals operating as brokers retain platform access even when those same individuals are denied access in their capacity as asset-based carriers. In at least one instance, a broker who became asset-based and obtained federal carrier authority was barred from Carrier411 access as a carrier, yet continued unknown access to the platform in a broker role—despite being the same human operator, using retained credentials and network identifiers.

This demonstrates that Carrier411's access restrictions are not safety-driven and not identity-driven, but rather structurally aligned to preserve broker visibility and leverage while denying carriers reciprocal transparency. The effect is a one-way surveillance architecture: brokers observe, evaluate, and act upon carrier data, while carriers remain blind to the evaluative process governing their own eligibility.

**Practical Consequences for Interstate Commerce**

The practical effect of this system is immediate and severe. Brokers, factors, and shippers treat Carrier411's private labels as final, even where FMCSA has taken no adverse action and the carrier's authority remains active and lawful. Once a negative designation appears, carriers

6

experience instant loss of load access, payment disruptions, factoring refusals, and reputational harm without any underlying safety event, violation, or enforcement finding.

These consequences extend beyond ordinary commercial freight. Carrier411 assessments are relied upon in contexts involving U.S. Mail, federal freight, hazardous materials, and other sensitive cargo, meaning that private, opaque exclusion decisions can affect government-linked logistics and public interests without federal oversight.

**Conclusion**

Exhibit F-002 is submitted to demonstrate the immediate and non-quantifiable harm arising from Carrier411's operation as a broker-facing information-sharing platform through which participating brokers exchange carrier assessments, status indicators, and access-relevant opinions outside any governmental or FMCSA adjudicatory process. As reflected in the exhibit, Carrier411 aggregates broker-submitted reports, internal risk classifications, and algorithmic flags that are relied upon by subscribing brokers in real time when determining whether a carrier will be offered freight. Because these determinations occur privately, without notice, hearing, or opportunity to contest, the resulting loss of market access is not readily traceable to a single transaction and cannot be fully remedied through monetary damages alone.

This evidence supports Plaintiff's likelihood of success by demonstrating that market exclusion may occur through coordinated private reliance on shared broker opinions, rather than through individualized, independent decision-making or lawful regulatory process.

In substance, Carrier411 functions as a private regulatory surrogate: interpreting federal data, issuing qualitative judgments, and triggering market exclusion—while lacking statutory authority, procedural safeguards, or accountability mechanisms required of actual

regulators. By combining interpretive scoring, asymmetric access, and broker-exclusive visibility, Carrier411 exercises de facto gatekeeping power over federally authorized carriers, reshaping access to interstate commerce without notice, due process, or lawful delegation.

This is not passive information sharing. It is active market control, implemented through data asymmetry and role-based surveillance, with immediate and irreparable effects on carriers' ability to operate.

The harm alleged extends beyond Plaintiff individually. Owner-operators are the backbone of the United States supply chain, representing a substantial portion of the nation's approximately 3.5 million truck drivers. Plaintiff alleges that when private platforms collectively determine winners and losers in the freight market outside the FMCSA framework and the result is disruption of interstate commerce, concentration of power in unregulated intermediaries, and exclusion of federally authorized carriers without notice, hearing, or appeal.

The harm alleged is ongoing and irreparable. Plaintiff alleges that denial of freight opportunities, reputational damage, rate suppression, and payment interference are occurring now and continue to compound daily. Loss of access to interstate commerce and broker relationships cannot be fully remedied by money damages alone. Each day of exclusion further erodes Plaintiff's ability to operate, maintain insurance, meet financial obligations, and remain a viable carrier. Once lost, these opportunities cannot be readily restored through post-hoc relief.

**Expansion of Harm, U.S. Mail, Federal, Military, and Hazardous Freight Access**

The harms described above are not limited to access to justgeneral freight but also the United States Mail. The same broker-mandated intermediation and platform-based gatekeeping mechanisms now control access to a far broader category of federally connected freight, including military logistics, government-contracted freight, hazardous materials, and loads

8

involving sensitive routing, facility access, or classified operational details with no Federal oversight.

Owner-operators holding valid FMCSA authority are functionally excluded from these lanes unless they submit to private, broker-controlled platforms that are neither required by federal law nor subject to public oversight. At the same time, those platforms confer access upon actors whose qualifications, identities, affiliations, or data-handling practices are opaque, undisclosed, or outside traditional regulatory safeguards or outside United States jurisdiction.

This creates a dual and dangerous outcome. First, lawful carriers are excluded from critical freight markets for refusing to submit to private surveillance and eligibility systems that exceed statutory authority. Second, access to federal, military, and hazardous freight is concentrated in the hands of intermediaries whose internal controls, data governance, and subcontracting practices are shielded from scrutiny, despite their exposure to sensitive cargo, locations, and operational intelligence.

The risk is not theoretical. Broker-controlled platforms routinely aggregate and disseminate real-time information concerning freight contents, routes, schedules, driver identities, vehicle telemetry, and facility access. When such systems operate without transparency, due process, or statutory authorization, they create vulnerabilities that extend beyond market harm to implicate public safety, national security, and the integrity of federal contracting systems.

Plaintiff does not seek to interfere with legitimate federal security or compliance requirements. Rather, Plaintiff seeks to prevent private actors from exploiting those requirements to erect exclusive chokepoints, excluding lawful carriers while simultaneously granting access to sensitive freight through opaque and unaccountable private regimes. Once embedded, these

systems cannot be easily unwound, and the resulting loss of competition, transparency, and control constitutes irreparable harm warranting immediate injunctive relief.

Plaintiff seeks only limited, temporary relief directed to preserving the status quo pending a noticed hearing. Plaintiff does not ask the Court to adjudicate liability, resolve disputed facts, or determine the legality of Defendants' business models at this stage. Plaintiff seeks interim relief solely to prevent further exclusion and economic harm for All Directions Trucking based on private platform determinations while the Court considers the matter on a full record.

This renewed motion incorporates by reference the factual record previously submitted in support of Plaintiff's emergency request, including sworn declarations and documentary exhibits. Those materials remain accurate and describe conditions that are ongoing and unchanged. Plaintiff submits this motion promptly upon removal to ensure that the emergency request is presented to the Court with jurisdiction to grant relief and to prevent any misunderstanding that the prior request was resolved on the merits, it wasn't, but instead a hearing was scheduled for January 29, 2026 and all parties were required to be present when C.H. Robinson Worldwide removed the case to Federal Court.

Plaintiff is proceeding pro se and currently lacks electronic filing access. Due to the time-sensitive nature of the relief requested and the ongoing harm alleged, Plaintiff files this motion in person or by US mail to ensure prompt docketing and review. Plaintiff respectfully requests expedited consideration and a noticed hearing at the Court's earliest availability. This is a time sensitive matter and Plaintiff has no access to Pacer or electronic filing currently and in person access/US Mail is the only available options to access the Court records or docket and put the Plaintiff at a procedural handicap.

In sum, this case presents a narrow but urgent question appropriate for interim relief: whether federally authorized carriers may continue to be excluded from interstate commerce, subjected to rate suppression, and deprived of payment based on collective reliance on private, unregulated, broker-facing platforms pending adjudication of the underlying claims. Plaintiff respectfully submits that preserving the status quo is necessary to prevent irreparable harm and to allow this matter to be heard on the merits.

**Statement Regarding Counsel and the Broader Public Interest**

Plaintiff makes clear that she does not ascribe intent, motive, or culpability to defense counsel individually. Counsel are advocates retained to represent their clients' interests within the bounds of the law, and Plaintiff respects that role. This action is not directed at counsel, nor does it seek to impugn counsel's professionalism or judgment.

At the same time, Plaintiff believes it is important to distinguish routine adversarial advocacy from conduct that risks obscuring or prolonging a systemic issue with real-world consequences. The allegations in this case do not concern a private commercial dispute in isolation. They concern practices that affect the availability of federally authorized carriers, the flow of freight, and the functioning of the interstate supply chain. Prolonged procedural maneuvering or strategic delay does not merely burden the parties; it risks compounding market disruption that extends well beyond this litigation.

Plaintiff alleges that Defendants' business practices including consolidation, platform-driven gatekeeping, and coordinated reliance on private systems have coincided with a rapid reduction in the number of active, independent motor carriers and owner-operators. Whether by acquisition, aggregation of motor carrier authorities, or exclusionary platform determinations, the effect alleged is a large diminished volume of available trucks and increased concentration of

control. Plaintiff submits that these allegations warrant prompt, transparent examination rather than extended procedural skirmishing.

This case presents an opportunity for counsel and the Court to address these issues efficiently and on a full factual record. Plaintiff does not seek to "game" the litigation process, nor does she benefit from delay. To the contrary, Plaintiff seeks an orderly and timely resolution that clarifies the rules governing participation in interstate commerce and avoids further disruption to a supply chain that depends on lawful, independent carriers to continue operating at scale.

Plaintiff respectfully submits that early engagement with the merits and targeted discovery will serve the interests of all parties, reduce litigation risk, and mitigate broader economic harm. The alternative, allowing unresolved questions about authority, access, and coordination to persist poses risks that extend beyond this case and are not aligned with the long-term interests of the industry or the public, it's suppliers and also safety to the motoring public on our roadways as well.

**What the "Great Freight Recession" means**

The Great Freight Recession is an industry term used to describe the multi-year contraction in U.S. trucking and freight markets that began in 2022 and continued through 2025, marked by collapsing spot rates, excess capacity followed by rapid carrier exits, and severe financial stress on carriers—especially owner-operators and small fleets.

It is not a single event. It is a systemic unwinding do to the unregulated broker facing platforms that are de facto regulators who keep moving the goal post, anchor the rates too low to remain viable for carriers, are punitive while scoring carriers by desperation while being fuel dependent and surveilled, trapped inside trucks as over the road truck drivers, financial deprivation by NOA's a factoring companies that decide when or who gets paid.

12

By 2022:

Spot rates fell sharply.

Operating costs (fuel, insurance, equipment, financing) stayed high.

This created a margin collapse: revenue fell faster than costs.

**The contraction (2023–2025: the recession)**

As rates stayed low:

More than 113,00 of carriers exited averaging 1,500 per week

Owner operators were hit hardest due to thin margins and dependence on spot markets.

Payment delays, short-pay, and access restrictions intensified financial stress.

Capacity shrank, but market power and control of carriers concentrated among large
intermediaries.

This is why many describe it as "great" not because of size alone, but because of duration,
breadth, and structural impact and this is ongoing. 340 million people rely on the supply chain
and everything comes from a truck. Trucks are constantly deteriorating and need high dollar
ongoing maintenance to maintain safe operations. The average price per mile is anchored at
around $1.50 per mile while operating costs to run a semi-truck before any profit is $2.40 per
mile. These anchored rates are not sustainable. Owner Operators make up majority of the
industry, approximately 91.5%  and as high as 96% are Trucking Companies with 10 trucks or
less. Owner Operators and are aging out or opting out over the strain of coerced capitulation and
constant surveillance while operating at a loss.

**Why this wasn't a "normal cycle"**

Freight has cycles. This one was different because:

1. Technology-driven gatekeeping expanded during the downturn, defendant
   Highway.com broker facing platform was invented in 2022 and it forced coupling with the
   trucks ELD's and outward and inward facing cameras.

   Broker-facing platforms, surveillance, and vetting systems became more central just as
   carriers were weakest.

2. Financial intermediaries gained leverage

   Factoring, payment controls, and data publication amplified exclusion and cash-flow
   pressure.

3. Exits became self-reinforcing

   Fewer carriers, more dependence on platforms, greater leverage, more exits.

4. Regulatory gaps mattered

   Deregulation removed rate and entry controls but did not create oversight for modern tech
   platform coordination, payment enforcement, or surveillance-driven exclusion.

**The supply-chain consequence**

The Great Freight Recession:

Reduced the number of independent, federally authorized carriers.

Increased concentration and dependence on intermediaries.

Made the supply chain more fragile, not more efficient.

Shifted risk downward to owner-operators who form the backbone of over 3.5 million drivers.

In other words: capacity didn't just shrink it consolidated under private control.

Plaintiff files this Emergency Motion based on the currently operative Second Amended Complaint and expressly reserves the right to amend the pleadings to add newly discovered defendants and post-filing conduct without waiving any relief sought herein.

## EXHIBIT LIST

### Exhibit F-001

Plaintiff's Original Motion for Temporary Restraining Order Filed in State Court (with Incorporated Exhibits) CV-25-129498 Cuyahoga County CommonPleas

This exhibit consists of Plaintiff's complete original Motion for Temporary Restraining Order as filed in state court, including all exhibits submitted in support thereof, incorporated herein for reference and continuity of the record.

### Exhibit F-002

Carrier411 Report and Access Record Relating to Plaintiff 1/12 PAGES

This exhibit consists of Carrier411 platform pages reflecting broker-facing reports, status indicators, risk classifications, and related carrier access information pertaining to Plaintiff.

### Exhibit F-003

FMCSA Correspondence Regarding Insurance Status and Investigation

This exhibit consists of correspondence from the Federal Motor Carrier Safety Administration notifying Plaintiff of an investigation relating to an alleged lapse or issue in insurance coverage.

### Exhibit F-004

FMCSA DECISION, DISCONTINUANCE OF REVOCATION PROCEEDING

**EXHIBIT F-005**

FMCSA ATTACHED NOTICE FOR PENALTY FOR PRIVATE U

All exhibits designated "F-###" are filed for purposes of the federal record and are intended to distinguish these materials from exhibits previously filed in state court proceedings.

## REQUESTED RELIEF

Plaintiff respectfully requests that the Court enter a Temporary Restraining Order, and set the matter for a prompt notified hearing on a Preliminary Injunction, providing the following limited and temporary relief:

1. Prohibition on Enforcement of Adverse Determinations Against Plaintiff also known as blacklisting.

   Defendants, and those acting in concert with them, are temporarily restrained from enforcing, publishing, relying upon, or disseminating adverse carrier eligibility determinations, risk flags, access restrictions, or similar platform-based determinations against Plaintiff that result in denial of freight, refusal to tender loads, or exclusion from broker networks, pending further order of the Court.

2. Maintenance of Status Quo Pending Hearing and

   Defendants are temporarily restrained from taking new or additional actions that further restrict Plaintiff's access to freight opportunities, broker relationships,

payment processing, or carrier standing based on private platform determinations during the pendency of this motion.

3. Payment and Non-Interference and

Defendants are temporarily restrained from using platform-based determinations or shared eligibility data as a basis to delay payment, short-pay, withhold payment, or otherwise interfere with compensation owed to Plaintiff for freight lawfully hauled, pending further order of the Court.

4. No Merits Adjudication

Plaintiff seeks this relief solely to preserve the status quo and prevent irreparable harm. Entry of a temporary restraining order would not require the Court to adjudicate liability, determine the legality of Defendants' business models, or resolve disputed facts.

5. Duration

Plaintiff requests that the temporary restraining order remain in effect only until the Court can conduct a prompt notified hearing on Plaintiff's request for a preliminary injunction.

6. Further Relief

Plaintiff requests such other and further relief as the Court deems just and equitable to prevent irreparable harm pending adjudication of the merits.

**CERTIFICATE OF SERVICE**

Pursuant to Rule 5 of the Federal Rules of Civil Procedure

I hereby certify that on this 26 day of January, 2026, I served a true and correct copy of the foregoing Renewed Emergency Motion for Temporary Restraining Order and Preliminary Injunction, including all incorporated exhibits, by depositing the same in the United States mail, first-class postage prepaid, addressed as follows:

• Via CM/ECF upon counsel of record for Defendants that have appeared, including CH Robinson, DAT Freight & Analytics, LLC, and Magellan Transport Logistics, Inc.; and

• Via U.S. Mail upon Defendants that have not yet appeared, including Total Quality Logistics, LLC, and all other non-appearing Defendants, at their registered agent or last known business address.

(Additional parties served are listed on the attached service list.)

Service was made pursuant to Rule 5 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ *Sandra Worthing Alves*

Sandra Worthing Alves
d/b/a All Directions Trucking
25540 Byron Dr
North Olmsted, OH 44070

Email: adt@alldirections247.com
Phone: 440-591-0354
MC #: 1710778

Date: 01/26/2026

**ATTORNEYS OF RECORD (in the order of appearance)**

**Defendant #10  Counsel for DAT Freight & Analytics, LLC**

Kristin L. Bryan, Esq.
James M. Brennan, Esq.
1120 Avenue of the Americas
New York, New York 10036
Defendant #**12Counsel for C.H. Robinson Worldwide, Inc.**

Eric Larson Zalud, Esq.
Clara R. Tait, Esq.
Brian R. Cowman, Esq.
200 Public Square, Suite 2300
Cleveland, Ohio 44114

**Defendant # 9 Counsel for Magellan Transport Logistics, Inc.**

Markus E. Apelis, Esq.
Abigail R. Jones, Esq.
Gallagher Sharp LLP
1215 Superior Avenue, 7th Floor
Cleveland, Ohio 44114

Defendant 1
**Internet Truckstop Payments, LLC**
Registered Agent: 1505 Corporation (d/b/a CSC – Lawyers Incorporating Service)
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833

Defendant 2

**Denim, Inc.**
Registered Agent: 1505 Corporation (d/b/a CSC – Lawyers Incorporating Service)
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833

Defendant 3
**Total Quality Logistics, LLC**
Registered Agent: Taft Service Solutions Corp.
301 East Fourth Street, Suite 2800
Cincinnati, Ohio 45202

**Defendants 4&5 to be identified**

Defendant 6
**Motive Technologies, Inc.**
**f/k/a Keep Truckin**
Registered Agent: 1505 Corporation (Incorporating Services), Ltd.
7801 Folsom Boulevard, Suite 202
Sacramento, California 95826

Defendant 7
**Highway App, Inc**.
Registered Agent
440 North Wolfe Road
Sunnyvale, California 94085

Defendant 8
**Carrier411 Services, Inc.**
Registered Agent
50 North Laura Street, Suite 2600

Jacksonville, Florida 32202

Defendant 11
**Flock Group, Inc.**
Registered Agent
300 Colonial Center Parkway, Suite 100N
Roswell, Georgia 30076

Defendant 13
**MacroPoint, Inc.**
Registered Agent
3350 Riverwood Parkway, Suite 1900
Atlanta, Georgia 30339