

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

FILED

MAR 0 5 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | |
|---|---|
| SANDRA WORTHING ALVES, | ) Case No.: 1:26-CV-00150 |
| d/b/a All Directions Trucking, | ) |
| Plaintiff, | ) |
| | ) JUDGE |
| | ) DAN AARON POLSTER |
| v. | ) |
| INTERNET TRUCKSTOP | ) **AMENDED COMPLAINT FOR DAMAGES,** |
| PAYMENTS, LLC, et al., | ) **DECLARATORY & INJUNCTIVE RELIEF** |
| Defendants. | ) **DEMAND FOR JURY TRIAL** |

NOW COMES Plaintiff, Sandra Worthing Alves, d/b/a All Directions Trucking,

proceeding pro se, and for her Amended Complaint against Defendants states as follows:

1.     This is a civil action seeking compensatory damages, treble damages as provided by

statute, declaratory relief, injunctive and such other relief as the Court deems appropriate.

2.     Plaintiff files this Amended Complaint in compliance with the Court's Memorandum of

Opinion and Order dated February 10, 2026, and to present a short and plain statement of her

claims in accordance with the Federal Rules of Civil Procedure.

3.     Plaintiff further clarifies that her previously filed Motion for Temporary Restraining

Order was not adjudicated on the merits and is now moot considering subsequent developments

and the filing of this Amended Complaint.

## JURISDICTION AND VENUE

4.      Plaintiff is an individual residing in Cuyahoga County, Ohio and is the owner and federally authorized motor carrier operating under the name All Directions Trucking, MC No. 1710778.

5.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under laws of the United States, specifically the Sherman Act, 15 U.S.C. §§ 1–2, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

6.      This action further arises within the federal regulatory framework governing interstate motor carrier transportation. Plaintiff operates as a federally authorized motor carrier under operating authority issued by the Federal Motor Carrier Safety Administration (MC #1710778), and the conduct alleged herein directly affects Plaintiff's ability to transport freight in interstate commerce subject to federal jurisdiction under 49 U.S.C. § 13501.

7.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and §§1337 and §§1367 because this action arises under federal statutes regulating commerce and protecting trade and commerce against restraints and monopolies, and because Defendants' conduct was directed at and substantially affects interstate commerce, including Plaintiff's operation as a federally authorized motor carrier transporting property in and through the State of Ohio. At all relevant times, Plaintiff operated as a federally authorized commercial motor carrier engaged in the transportation of property in interstate commerce, and Defendant's business activities were directed toward and had a substantial effect on interstate commerce, including in the State of Ohio.

8.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred in this District, where Plaintiff operates in interstate commerce and where Defendants' conduct was directed and caused injury.

## PARTIES

9.      Plaintiff Sandra Worthing Alves, doing business as All Directions Trucking, is a federally authorized motor carrier engaged in the interstate transportation of property under FMCSA Motor Carrier Number MC-1710778.

10.     Defendant 1: Internet Truckstop Payments, LLC,(Truckstop) d/b/a RMIS, d/b/a Truckstop, and d/b/a Denim and other subsidiaries  is a private, for-profit, non-governmental company that operates multiple interconnected broker facing technology platforms including a digital freight load board, broker carrier onboarding and compliance services, and freight-payment and factoring products in interstate commerce. RMIS integrates telematics on trucks for broadcasting and real time surveillance on drivers and trucks to freight brokers, insurance and factors. Truckstop and Truckstop groups are not a federally licensed freight broker or motor carrier.

11.     Defendant 2: Highway App, Inc. (Highway) is a private, for-profit, technology platform, it is a non-governmental company that provides a broker-facing carrier-onboarding, carrier identity-verification, and compliance-review platform that integrates with telematics on trucks for broadcasting real time  data to freight brokers, insurance and factors and other operational data used in the selection and surveillance of motor carriers for interstate freight transportation. It is not a federally licensed freight broker or motor carrier.

12.     Defendant 3:  Carrier411 CarrierGuard LLC (Carrier411) is a private, for-profit, non-governmental technology platform company that provides broker-and factoring-facing carrier-

monitoring, reporting, and scoring and freight guard reporting and broadcasting services used in the evaluation and selection of motor carriers for interstate freight transportation. It is not a federally licensed freight broker or motor carrier.

13.     Defendant 4:  DAT Freight & Analytics, LLC ("DAT") is a private, for-profit, nongovernmental broker-facing digital load-board platform operating in interstate commerce through which freight brokers post available loads for motor carriers to locate and respond to. DAT does not transport freight and is not a federally licensed property broker, but its system functions as a primary electronic publication and communication channel by which brokers advertise freight opportunities to the carrier market and receive broker identity and contact information for response.

14.     Defendant 5: Total Quality Logistics, LLC is a private, for-profit, federally licensed freight broker that arranges for the transportation of property in interstate commerce, including transactions involving Ohio motor carriers.

15.     Defendant 6: C.H. Robinson Worldwide, Inc. is a public, for-profit, federally licensed freight broker that arranges for the transportation of property in interstate commerce, including transactions involving Ohio motor carriers.

16.     Defendant 7: Magellan Transport Logistics, Inc. is a private, for-profit, federally licensed freight broker that arranges for the transportation of property in interstate commerce, including transactions involving Ohio motor carriers.

17.      Defendant 8: Motive Technologies, Inc. f/k/a KeepTruckin, Inc. is a private, for-profit, non-governmental company it is a technology platform, phone application and ELD device and AI camera (in cab facing and forward facing) provider to carriers for fleet-management systems, trucks and drivers data, hours of service and carrier-compliance and operational-data services

used in interstate motor-carrier transportation and interfaces and also broadcasts real time truck intelligence to Highway, RMIS, insurance companies, brokers and factors. It is not a federally licensed freight broker or motor carrier.

18.    Defendant 9: GenLogs, Inc. is a private, for-profit, non-governmental platform company that provides factor and broker-facing freight-intelligence, shipment-visibility, and motor-carrier monitoring data derived from real-time and historical transportation activity and used by freight brokers and other market participants in the selection and management of interstate shipments. It is not a federally licensed freight broker or motor carrier.

## NATURE OF THE ACTION

19.    This civil action arises from the operation of broker-facing freight technology platforms used by freight brokers to evaluate, monitor, and select federally authorized motor carriers operating in interstate commerce. Plaintiff, is a federally authorized motor carrier holding operating authority issued by the Federal Motor Carrier Safety Administration (MC #1710778) and alleges that Defendants operate and participate in an ongoing interconnected system of surveillance and compliance verification, tracking, payment, and reputational reporting platforms that influence broker freight-selection decisions and restrict Plaintiff's ability to fairly compete for loads in the interstate trucking market

20.    Plaintiff alone holds the federal motor-carrier operating authority under which her business lawfully functions in interstate commerce. That authority includes the exclusive right to decide how her company operates, what freight it transports, the terms on which it contracts, and how the revenue it earns is received and used.

21.    No Defendant is a governmental regulator, and no one has lawful power to grant, deny, suspend, or condition Plaintiff's right to operate.

22.     Plaintiff, not the Defendants, has dominion and control over her company, her labor, equipment, contracts, and transportation receivables. By repeatedly and continuously and collectively conditioning load access, carrier approval, and the release of earned freight revenue on constant and repeated document uploads and submission to their private broker-facing systems, Defendants deprived Plaintiff of the practical ability to exercise that federal authority and substituted their control for her independent business judgment. In doing so, Defendants reduced a federally authorized carrier to a revocable platform status and excluded her from the market despite her full legal qualification to operate.

23.     These systems are interconnected technology platforms and brokers now have a collective technological and operational dependency on shared onboarding of semi-trucks, commercial drivers, and their commercial carriers. It is for the convenience of brokers for faster expediting for checking compliance, insurance-verification, payment, and shipment-tracking functions, including application-programming-interface (API) integrations that permit the real-time exchange and use of carrier identity, operational, truck and driver location, information and intelligence of financial data for the selection and management and control of motor carriers, its drivers and for the brokers operations connected to interstate freight transportation.

24.     Plaintiff is a federally authorized motor carrier who personally owns a small woman owned business with semi-trucks and other equipment, she is also a truck driver that operates a tractor-trailer transporting up to 80,000 pounds of freight in interstate commerce over public highways and through shipper and receiver facilities, and the transportation she performs is an indispensable physical step in the continuous flow of goods throughout the national economy.

25.     Federal law places on every motor carrier of record the responsibility for safety and compliance, insurance, equipment, and the lawful movement of each shipment, and performing

that transportation requires the assumption of substantial operational and financial risk for each load undertaken.

26.     Beginning in approximately 2022 and continuing through the present, the trucking industry entered what has been widely described as the "Great Freight Recession," a prolonged downturn characterized by depressed spot market rates, excess carrier capacity, and rising operating costs for fuel, insurance, and equipment. During this period many small and independent motor carriers experienced significant financial pressure and market instability. The industry saw and exit of  upwards of 113,000 carriers across the nation during this period.

27.     Against this backdrop, broker-facing digital platform systems and compliance technologies became increasingly central to how freight opportunities were distributed, how carriers were evaluated, and how payments were processed within the interstate freight marketplace.

28.      In 2012 Congress enacted the Moving Ahead for Progress in the 21st Century Act ("MAP-21"), a federal transportation statute that, among other provisions, required the widespread use of electronic logging devices ("ELDs") to digitally record commercial truck drivers' hours of service. The ELD mandate, which became fully enforceable in December 2017, required federally regulated motor carriers to install electronic devices in their trucks that automatically record driving time and operational data. The ELD was a tool for carriers to replace paper log book recording.

29.     Following implementation of the ELD mandate, broker-facing digital platform systems and compliance technologies rapidly emerged and expanded within the trucking industry, increasingly determining how freight brokers verify carriers and complete onboarding.

30.     As these conditions developed, independent motor carriers were increasingly compelled to participate in broker-facing digital platforms and compliance systems to access freight opportunities, complete broker onboarding requirements, and receive payment for completed transportation services.

31.     During this same period, electronic logging device ("ELD") systems originally introduced as a carrier compliance tool for recording regulatory hours-of-service requirements gradually expanded in scope and functionality, incorporating operational monitoring, data analytics, and platform connectivity features not present in the original regulatory framework. ELD providers, including systems such as Motive (formerly KeepTruckin), increasingly integrated with broker-facing verification and compliance platforms, further tying motor carriers' day-to-day operations to the same digital ecosystem through which freight access, compliance verification, and payment processing were controlled, a structure that concentrated informational and operational leverage within broker-facing platform systems.

32.   In this structure, freight brokers are the primary customers of the technology platforms, motor carriers are now the "principled commodity" compelled to participate in these platforms to obtain freight, and carrier operational and financial data is the principal asset used to evaluate, select, and manage and control carriers and drivers.

33.   Through these coordinated and interdependent activities, Defendants operate and participate in a coordinated enterprise, and the activities of which affect, interstate commerce within the meaning of 18 U.S.C. § 1962 and restrain trade and competition in violation of 15 U.S.C. §§ 1 and 2.

34.   Additionally, telematics and electronic logging device systems, including Motive (formerly KeepTruckin), collect operational and location data from motor carriers that is integrated with or

shared through broker-facing compliance and verification platforms such as Highway and RMIS, further linking carrier operations to the same ecosystem through which freight access, monitoring, and payment are controlled.

35.     Defendant Motive Technologies, Inc. originally marketed and deployed its system as a fleet-compliance and electronic logging device platform intended to satisfy federal hours-of-service recording requirements. In practice, however, the platform operates as a broader telematics and data-integration system capable of transmitting operational and shipment-related information beyond the limited scope of regulatory compliance.

36.     Through application interfaces and platform integrations, Motive's system can transmit real-time vehicle location, shipment visibility data, and information accessible through the driver-facing application and in cab cameras to connected third-party logistics platforms and insurance. Motor carriers and drivers were not informed that these integrations function as continuous data transmissions across multiple participating platforms; instead, carriers were led to believe such connections were limited, transaction-specific tracking events associated with freight movements.

37.     As implemented, the system enables the distribution of shipment visibility information, including data visible within the driver application such as bill of ladings, load documentation and proprietary operational communications associated with a shipment, to external platforms without clear disclosure or informed consent from the carrier regarding the scope of such data dissemination. In practice, several of these broker-facing systems operate as interconnected components of the same commercial platform network.

38.     Defendant Internet Truckstop Payments, LLC operates or is affiliated with the Truckstop digital freight load board, the RMIS carrier-onboarding and compliance platform, and Denim

freight-payment and factoring services. These systems function in a mutually reinforcing manner

in which motor carriers seeking to obtain freight, complete broker onboarding, and receive

payment are routed through related platform services controlled by the same corporate network,

making participation in the Truckstop ecosystem a practical prerequisite for many federally

authorized motor  carriers seeking to obtain freight and receive payment in interstate commerce.

39.     Brokers operating within this marketspace also rely on shared reporting systems such as

Carrier 411 through which participating brokers submit and review reports concerning motor

carriers and evaluate carriers eligibility for future freight opportunities.

40.     The conditions described herein are not unique to Plaintiff and reflect operational

requirements and platform dependencies commonly encountered by independent motor carriers

seeking to obtain freight through broker-facing marketplace and compliance systems.

## FACTUAL ALLEGATIONS

41.     Defendants operate broker-facing platforms within a broader freight-technology

ecosystem that integrates tracking, surveillance, and compliance verification tools used by

brokers to monitor and evaluate motor carriers in real time. These systems include freight-

tracking services such as Macro Point and vehicle-location and license-plate capture networks

such as Flock Safety, which collect and aggregate location, vehicle, and operational data from

trucks operating in interstate commerce. While such systems are not presently named as

defendants, their data and services are routinely integrated into broker-facing platforms used by

Defendants and contribute to the continuous monitoring, scoring, and restriction of federally

authorized motor carriers

42.     Through this integrated system, brokers and broker-facing platforms are able to observe,

track, and evaluate carriers such as Plaintiff in real time, while motor carriers themselves lack

equivalent access to the aggregated data used to assess them and influence freight-allocation decisions. Defendant Carrier411 CarrierGuard LLC operates the Carrier411 platform and its Freight Guard reporting system as a structured broker-facing carrier monitoring and evaluation system rather than a neutral forum for third-party commentary. The platform collects, aggregates, organizes, and distributes carrier-specific reports submitted by industry participants and incorporates those reports into a centralized database used by subscribing users when researching and selecting motor carriers for freight transportation.

43.     Through the Freight Guard reporting system, Carrier411 aggregates and republishes reports concerning federally authorized motor carriers and distributes automated alerts and monitoring notifications to subscribing users when new reports are submitted or existing reports are updated. Users of the platform are able to add carriers to monitoring lists, after which the system generates alerts and updates concerning those carriers, including the appearance of new Freight Guard reports and other carrier-related changes.

44.     Carrier411 further maintains and distributes structured carrier-information records within the platform, including carrier contact information and historical changes to such information, which are aggregated from regulatory and industry data sources and organized by the platform for its subscribing users. These carrier-information monitoring features are marketed and implemented as tools that assist industry participants in evaluating motor carriers and identifying perceived risks when engaging carriers in freight transactions.

45.     Access to the Carrier411 platform is not limited to freight brokers alone. The system is also accessible to other industry participants, including shippers, factoring companies, and financial service providers that participate in freight transactions and carrier payment systems.

These entities are permitted to access carrier-related information distributed within the platform as part of their evaluation of motor carriers operating within the interstate freight marketplace.

46.     Motor carriers themselves, however, are not permitted to obtain accounts on the Carrier411 platform and therefore cannot access, monitor, or respond to the information distributed within the system in the same manner as subscribing brokers, shippers, and other participating industry users. As implemented, the platform functions as a broker-side and industry-side carrier evaluation and monitoring network designed to collect, structure, and disseminate carrier-related information across a community of subscribing users who rely on the system when making freight-related and payment-related decisions.

47.     By designing and operating the Freight Guard reporting system, structuring and organizing carrier-specific reports, distributing automated alerts regarding those reports and carrier-status changes, maintaining structured carrier-information monitoring records, and disseminating that information across its subscriber network of brokers, shippers, and other industry participants, Carrier411 actively participates in the creation, development, organization, publication, and distribution of carrier-related information within the interstate freight marketplace rather than functioning as a passive host of third-party statements.

48.     The Freight Guard reporting system therefore operates as a broker-facing and industry-facing monitoring, reporting, and publishing mechanism designed to propagate carrier-related information throughout the freight brokerage and shipping ecosystem and influence decision-making regarding federally authorized motor carriers. As implemented, the system directly affects motor carriers' access to freight transactions occurring in interstate commerce and forms part of the enterprise's coordinated pattern of conduct impacting interstate freight transportation.

49.     Plaintiff obtained federal motor-carrier operating authority on May 30, 2025, from the Federal Motor Carrier Safety Administration under MC No. 1710778 and began operations on July 27,2025 as a for-hire motor carrier in interstate commerce.

50.     Upon obtaining federal motor carrier authority, Plaintiff encountered a broker-facing compliance and marketplace environment in which participation in the Truckstop platform ecosystem became operationally necessary to access freight and receive payment.

51.     Brokers utilizing onboarding systems such as RMIS and Highway required carriers to maintain active profiles within those systems before loads could be booked. Plaintiff experienced repeated instances in which cancelling her paid Truckstop load board subscription resulted in loss of functional access to associated onboarding or payment processes, including the inability to access RMIS- related workflows and delays in receiving payment for completed freight services.

52.     When Plaintiff reinstated the Truckstop load board subscription, those access barriers were removed and operational functionality resumed. This sequence occurred more than once and effectively required continued participation in the Truckstop platform ecosystem in order for Plaintiff to obtain freight opportunities and receive payment for services performed.

53.     As a newly authorized motor carrier, Plaintiff was required to use digital load boards and broker administered carrier-onboarding systems to obtain access to freight from federally licensed freight brokers.

54.     Plaintiff maintained paid subscriptions to both the DAT load board and the Truckstop load board at a combined cost of approximately $400 per month to locate and communicate with brokers regarding available interstate shipments.

55.     Access to loads was conditioned on Plaintiff's successful completion of broker-specific onboarding and approval processes administered through RMIS, Highway, and related carrier selection platforms.

56.     Plaintiff was invited by the brokers to register with the RMIS carrier onboarding system and sought approval through the Highway carrier onboarding platform because multiple brokers required approval through those systems before dispatching freight.

57.     Each onboarding attempt for every load required a new invitation for Plaintiff to re-enter extensive compliance, identity, equipment registrations, vehicle inspections reports, insurance, tax, and banking routing and account information line by line, including information that had previously been stored in the system, and to locate and upload supporting documents that were not always readily available while operating on the road.

58.     The insurance-verification process required Plaintiff to contact her insurance agent to generate and transmit ACORD and related documentation through the proper chain of authorization, a process dependent on third-party availability and not capable of immediate completion.

59.     These repeated submissions did not result in dispatch approval and frequently triggered system lockouts and profile resets that prevented Plaintiff from booking freight for periods of approximately twenty-four to forty-eight hours after each rejection from the system. Minor updating cascaded to the Truckstop paid for load board which restricted any access to reach other brokers and stalled operations for the time-out period.

60.     During these lockout periods Plaintiff's equipment and services were ready and available for dispatch, but she was required to perform prolonged administrative work instead of transporting revenue-producing freight.

61.    On multiple occasions within a two-day period Plaintiff attempted to complete RMIS onboarding for specific loads for which brokers represented that freight would be tendered upon approval, but no approval was issued and no load was provided.

62.    As a result of these onboarding failures and approval delays, Plaintiff was unable to obtain consistent freight despite maintaining paid access to multiple load boards and actively seeking dispatch.

63.    Payment for completed transportation was subject to extended net-payment terms 30, 60 or 90 days if ever, unless Plaintiff agreed to additional payment-processing, payday lenders and factoring platforms or from the brokers quick-pay all for incurring fees and charges that reduced the amount received for the load.

64.    Plaintiff depended on prompt payment for completed transportation in order to purchase fuel, maintain required insurance, and truck maintenance to continue operating in interstate commerce.

65.    After transporting interstate loads delivered on February 11, February 16, and February 23, 2026, Plaintiff did not receive timely payment through either the brokers or the factoring arrangement despite full performance.

66.    Because payment for those loads was not received, Plaintiff  lacked the working capital necessary to purchase fuel and was unable to accept future loads that were otherwise available for interstate shipments.

67.    Plaintiff remained idle at truck stops for extended periods awaiting payment and load approval, including multiple consecutive days in which she was ready, willing, and able to transport freight but could not obtain a broker to tender a load.

68. During this period Plaintiff was forced to borrow money from family and friends in order to purchase diesel fuel and meet basic operating and survival expenses.

69. After approximately six days of remaining in her truck awaiting payment and load approval without any revenue generating work, Plaintiff was forced to cease operations temporarily.

70. Plaintiff was forced to deadhead 1,200 miles to her domicile without revenue.

71. In practical effect, Plaintiff was effectively required to subsidize the brokers' transportation transactions by advancing the cost of performance and operating as the de-facto source of capital for transportation for which payment had not been made, while the brokers received the benefit of these completed services without bearing any ordinary costs of obtaining them. All while payment for completed work remains outstanding.

72. Plaintiff had been continuously on the road from February 10 through March 1, 2026, during which time she experienced repeated unpaid or delayed loads and extended idle periods through no fault of her own.

73. The limited funds ultimately received from one broker during this period were used to maintain insurance coverage, repay borrowed fuel money, and pay necessary communications expenses and did not restore Plaintiff's operating capital.

74. When Plaintiff attempted to resume normal operations and booked additional loads, the same onboarding delays, approval holds, payment delays, and platform restrictions continued.

75. Within the industry these cascading denials of load access, approval holds, payment delays, and carrier-status conflicts are commonly understood as forms of blacklisting that prevent a motor carrier from obtaining freight despite being federally authorized and qualified.

76. The repeated denial of load access, the withholding and delay of payment for completed transportation, the platform-based suspension of carrier approval, and the resulting forced idle time and uncompensated deadhead miles caused Plaintiff to lose weeks of income and deprived her of the working capital required to continue operating.

77. These conditions are economically unsustainable for a small motor carrier and would prevent similarly situated carriers from maintaining insurance, purchasing fuel, paying ordinary living expenses, and remaining in business.

78. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of business income, loss of access to freight, increased operating costs, impaired cash flow, and damage to her ability to compete in the interstate motor-carrier market.

79. During this period Plaintiff was forced to borrow money from family and friends to purchase diesel fuel and meet basic operating expenses.

## COUNT I – Violation of 18 U.S.C. § 1962(c) (RICO)

Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 79 as though fully set forth herein.

80. The Defendants, through their coordinated operation and use of broker-facing freight technology platforms, including the Freight Guard reporting system operated by Carrier411 CarrierGuard LLC, participated in an association-in-fact enterprise affecting interstate commerce.

81. At all relevant times, Defendants and their co-conspirators constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), engaged in, and the activities of which affected and disrupted interstate commerce.

82.     The enterprise consisted of freight brokers, broker-facing technology platforms, payment processing and factoring entities, and related data and monitoring services that operated together for the common purpose of controlling motor-carrier selection, load access, payment timing, and the flow of transportation revenue in the interstate motor-carrier market.

83.     The association-in-fact enterprise is a structure separate and distinct from each Defendant, and each Defendant is a RICO "person" that conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity alleged herein.

84.     Defendants conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c). In doing so, each Defendant participated in the operation and management of the enterprise by making and enforcing the carrier-approval, load-access, tracking, reputational, and payment-control decisions that governed the enterprise's functioning.

85.     Through the coordinated use of carrier-approval systems, payment-control mechanisms, factoring and Notice-of-Assignment issuing, load-board access, and real-time operational data, Defendants controlled whether Plaintiff could obtain freight, receive payment for completed transportation, and continue operating in interstate commerce.

86.     This conduct was related, it is continuous and poses a threat of ongoing racketeering activity in that it affected multiple transactions, multiple shipments, multiple carriers and continuing in the ongoing operation of Plaintiff's federally authorized motor-carrier trucking business.

87.     This pattern of racketeering activity constitutes both closed-ended continuity, through repeated conduct over a substantial period, and open-ended continuity, because the enterprise's

standardized platform-based control of load access, payment, and carrier status poses a continuing threat to Plaintiff and to her business and to other similarly situated motor carriers.

88.  Plaintiff's injuries were the direct and foreseeable result of Defendants' control of load access, payment routing, and carrier approval through the enterprise's racketeering acts, and would not have occurred but for Defendants coordinated conduct.

89.  As a direct and proximate result of Defendants' conduct, Plaintiff suffered injury to her business and property, including but not limited to lost transportation revenue, loss of working capital, inability to accept additional loads, and exclusion from the interstate motor-carrier market.

90.  At all relevant times, Defendants and their co-conspirators operated as an association-in-fact enterprise within the meaning of 18 U.S.C. §1961(4), and through a pattern of racketeering activity conducted and participated in the affairs of that enterprise in a manner that affected and disrupted interstate commerce. 18 U.S.C. § 1961 and 18 U.S.C. § 1962

91.  Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) and is separate and distinct from the association-in-fact enterprise through which the Defendants conducted their activities.

92.  In conducting the affairs of the enterprise, Defendants used interstate wires and electronic platforms to implement standardized and normalized the broker-facing and factoring company facing practices that controlled carrier approval, reputational scoring, load access, and conditioned payments and the timing and release of payments for completed interstate transportation.

93.  These communications included electronic load offers, onboarding and monitoring transmissions, invoice and document submissions, payment-status communications, credit

determinations, and other electronically transmitted instructions governing whether Plaintiff would be paid and permitted to continue operating.

94.     The foregoing conduct constitutes a pattern of racketeering activity consisting of multiple related predicate acts indictable under 18 U.S.C. §§ 1343 and 1951.

95.     Defendants used interstate wires and electronic platforms to obtain and exercise control over Plaintiff's transportation receivables and to knowingly withhold and redirect earned freight revenue.

96.      Plaintiff's consent to these arrangements was induced by the use of economic fear, including the inability to obtain fuel and operating capital needed to continue transporting freight in interstate commerce.

97.     Through these acts, Defendants acquired and maintained control over Plaintiffs business revenue and operations thereby affecting interstate commerce.

98.     The pattern of racketeering activity consisted of related predicate acts carried out through interstate load boards, onboarding systems, telematics integrations, surveillance platforms, freight-intelligence data systems, and payment processing and factoring mechanisms.

99.     These coordinated systems operated together as a common method of control over motor carrier identity, eligibility for load access, real time operational visibility, ownership and release of receivables compensation for completed shipments and reputational standing within the interstate motor carrier market.

## PREDICATE ACTS (18 U.S.C. §§ 1343 and 1951)

100.    Interstate electronic filing of a blanket five-year UCC-1 lien against Plaintiff's receivables to obtain control of freight revenue. (Internet Truckstop Payments, LLC d/b/a Denim and Truckstop.)

101.    Interstate transmission of Notices of Assignment redirecting broker payment away from Plaintiff and completing the diversion of earned transportation revenue. (Internet Truckstop Payments, LLC d/b/a Denim and Truckstop; platform Defendants.)

102.    Interstate transmission of settlement statements reflecting opaque penny deposits, unexplained reserves, and undisclosed chargebacks that concealed the status of collected receivables. (Internet Truckstop Payments, LLC d/b/a Denim and Truckstop.)

103.    Interstate refusal to release payment after confirmed delivery while the receivable remained under the control of the factoring system. (Internet Truckstop Payments, LLC d/b/a Denim and Truckstop.)

104.    Interstate electronic onboarding denials and status holds that blocked dispatch for periods of approximately twenty-four to forty-eight hours following RMIS status updates, restricting Plaintiff's access to freight. (RMIS; Highway App, Inc.; platform Defendants.)

105.    Interstate conditioning of dispatch by TQL on RMIS approval that was electronically connected to ELD and telematics data. (TQL; RMIS)

106.    Interstate maintenance of an unauthorized carrier identity association in the Highway system that prevented onboarding and load access for approximately ninety days despite active FMCSA authority. (Highway App, Inc.)

107.    Interstate generation of platform-based compliance and fraud-risk determinations that superseded Plaintiff's active FMCSA operating authority and were used by platform Defendants as the controlling eligibility decision for access to interstate freight.

108.    Thereby restricting Plaintiff's ability to obtain loads and receive compensation for completed transportation services. (Highway App, Inc.; RMIS; platform Defendants.)

109.    Brokers interstate conditioning of dispatch and payment require continuous tracking through an electronic logging device physically connected to the truck's engine control module and computer, which transmitted mapped real-time location together with inward-facing camera video and audio to platform-facing systems. (Motive Technologies, Inc.; Highway App, Inc.; RMIS; GenLogs; platform Defendants.)

110.    Interstate use of the DAT load-board platform to publish freight opportunities and to electronically transmit motor-carrier identity and contact information between brokers and prospective carriers, thereby exposing Plaintiff's federally authorized operating authority within the broker-facing platform network. (DAT Freight & Analytics, LLC; platform Defendants.)

111.    Interstate transmission of unsolicited communications from individuals representing themselves as dispatchers who demanded Plaintiff's motor-carrier credentials and email access asserted authority to control load booking on her behalf without authorization.

112.    Interstate maintenance of an unauthorized dispatching-entity association within the Highway system connected to Plaintiff's carrier profile without her knowledge or consent. (Highway App, Inc.; platform Defendants.)

113.    Interstate designation of Plaintiff within RMIS as a broker rather than a motor carrier despite active FMCSA operating authority, impairing onboarding and restricting access to interstate freight opportunities. (RMIS; platform Defendants.)

Interstate refusal by TQL to pay Plaintiff directly based solely on transmitted Notices of Assignment, completing the receivable-control loop. (TQL.)

114.    Interstate post-delivery reduction of agreed compensation by Magellan Transport Logistics, Inc. on multiple occasions, including a deduction of approximately three hundred

dollars for each delivered load based on an alleged loss of non-defendant (Macro Point) tracking failure after full performance.

115.    Interstate failure by TQL to pay TONU, detention, layover, and other accessorial compensation and blocking the carrier portal for Plaintiff to obtain 1099 for taxes (remains outstanding as of this filing) in breach of the transportation contract, together with post-delivery deductions without disclosed cause or transparent accounting and unwillingness to pay directly and requiring an NOA to redirect payment to a third-party factoring.

116.    Interstate dissemination of carrier-monitoring and platform communications resulted in Plaintiff being excluded from freight opportunities after a successful delivery and left stranded 824 miles from home, known as blacklisting from TQL, cascading to other brokers large and small thus largely eliminating carrier access to the interstate freight market through unknown reasons. December 30, 2025

(Carrier411, Inc.; RMIS; TQL; and platform Defendants.)

117.    On a previous occasion, the interstate use of real-time truck location data enabled TQL to position preferred carriers for next day pickup, TQL told Plaintiff to drive her empty trailer Jacksonville Florida after posting a ghost load on the load board in Sarasota Florida. Plaintiff called on the posted ghost load and TQL compelled the Plaintiff to deadhead 250 miles *today* for pick up in Jacksonville for the next days market competition. This denying Plaintiff comparable opportunities to haul any loads nearby *today*, instead the verbal commitment was understood if  Plaintiff doesn't want to be blacklisted Plaintiff should comply with TQL's demand and the Plaintiff did stage in Jacksonville for the brokers benefit.

118.   Positioning trucks to a preferred location anchors and reduces rates levels through that surveillance visibility of Plaintiffs truck and similarly situated trucks bid on the same load get in a  bidding race to the bottom for the benefit of the brokers,

119.   Interstate operation of a freight-intelligence surveillance system that aggregates roadside camera captures, vehicle identifiers, ELD-derived telematics, broker transaction data, and factoring-sourced records to map carrier operations, lane activity, and pricing behavior across the market. (GenLogs, Inc., use data sources that include non-defendant Flock Safety systems and telematics integrations.)

120.   Interstate marketing and provision of that aggregated intelligence to large broker customers, including C.H. Robinson Worldwide, Inc. And to large-carrier beneficiaries, including non-defendant Werner Enterprises, Inc., for the purpose and effect of identifying capacity, predicting carrier behavior, intervening in rate formation, and undercutting competing federally authorized carriers.

121.   Interstate use of the foregoing surveillance and financial-data aggregation to shift load opportunities and rate levels toward preferred large brokers and large carriers while reducing compensation and load access for smaller federally authorized carriers, including Plaintiff. (GenLogs, Inc.; platform Defendants.)

122.   Interstate withholding of earned freight revenue to compel continued submission to the factoring and platform structure through economic fear of fuel deprivation and the resulting loss of heat in winter and cooling in summer, rendering the driver effectively homeless without fuel required for both transportation and basic survival. (Internet Truckstop Payments, LLC d/b/a Denim and Truckstop; platform Defendants.)

123.   Retention and enforcement of the receivables lien to block alternative financing and direct payment and to maintain Defendants' control over Plaintiff's revenue stream. (Internet Truckstop Payments, LLC d/b/a Denim and Truckstop.)

124.   These predicate acts formed a closed operational loop in which load visibility, carrier identity, real-time surveillance, tracking compliance, payment routing, compensation level, and reputational standing were controlled through the same integrated systems and were repeated across multiple loads and payment cycles as Defendants' regular way of conducting business.

125.   These coordinated acts allowed Defendants to obtain and control Plaintiff's earned freight revenue through the wrongful use of economic fear, to exclude Plaintiff from interstate freight while stranded without the fuel required for transportation and basic survival, and to maintain their dominance over compensation, capacity allocation, and market entry in the interstate motor carrier market.

126.   Through the coordinated use of these systems, Defendants established a normalized, market wide requirement that motor carriers submit to continuous evaluation and scoring as a condition of obtaining freight and receiving payment for completed shipments. Carrier411 operates a broker-facing carrier-monitoring and reporting platform used by thousands of broker subscribers in daily freight-award decisions. As publicly reported in October 2024, Carrier411 modified its Freight Guard system so that broker-filed reports may be removed without trace only within seventy-two hours of posting. After seventy-two hours, even if a broker attempts deletion, the report remains listed on the carrier's profile and is reclassified as "deleted," but continues to appear as part of the carrier's reporting history.

127.   Motor carriers are not permitted to maintain accounts on the Carrier411 platform and cannot view broker-facing profiles, monitor the existence of Freight Guard entries, or post visible responses to broker subscribers.

128.   Although a carrier might receive notice of a report by email and may communicate privately with the reporting broker, any rebuttal is not displayed within the broker-facing system relied upon in load-award decisions. This architecture creates a structural asymmetry in which broker-originated allegations may be disseminated market-wide without procedural parity or carrier visibility.

129.   Because Freight Guard entries are visible to a nationwide subscriber base of brokers and are relied upon in routine carrier selection decisions, the existence or potential existence of a negative report carries material economic consequences.

130.   Even a single published entry, once permanent under the seventy-two-hour policy, may impair a carrier's ability to secure freight, negotiate rates, or contest disputed charges. The platform's scale amplifies the effect of each report beyond the originating transaction.

131.   Plaintiff lacks any mechanism to determine whether a Freight Guard report exists concerning her company and must operate in a market in which broker-facing reputational determinations are made in a system she cannot access or audit.

132.   In an environment where load access and payment timing are already conditioned on platform approval and reputational standing, the design of the Carrier411 system contributes to the economic leverage exercised by broker participants over federally authorized carriers.

133.   Broker-facing monitoring and reporting systems, including Carrier411, distributed adverse information among brokers and factoring entities and created market-wide reputational consequences.

134.   These systems deterred carriers from contesting nonpayment, chargebacks or unfair practices by conditioning continued access to freight and timely payment on maintaining approval status within the network, thereby leveraging the threat of exclusion to enforce compliance.

135.   These practices were related in purpose, participants, methods, and results, were carried out across multiple shipments and payment transactions, and constituted the regular way in which Defendants conducted business in the interstate motor-carrier market.

136.   By controlling payment for completed transportation, restricting load access, and enforcing reputational consequences across a coordinated broker-facing system, Defendants disrupted the free flow of transportation services in interstate commerce at scale and directly and proximately caused Plaintiff's loss of transportation revenue, loss of working capital, inability to accept additional loads, and exclusion from the market.

137.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages, the costs of this action, reasonable attorney's fees, and appropriate equitable and injunctive relief.

### COUNT II – Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

138.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 137  as though fully set forth herein.

139.   Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies in restraint of trade or commerce among several States.

140.   Some Defendants compete as freight brokers, others compete as broker-facing platforms, but all of them connect to the same shared systems for carrier approval, monitoring, tracking and payment thus creating an overlapping, vertically and horizontally integrated enterprise that controls market access and cash flow across all interstate commerce.

141.   The relevant market includes the interstate brokerages and the broker facing platforms that function as the gatekeepers for carrier access to brokered loads and payment timing in interstate commerce.

142.   Defendants' agreement was implemented through their collective use of Carrier411 as a shared broker-facing clearinghouse for carrier reputational information, where adverse reports were distributed to multiple competing brokers and uniformly enforced as a condition of load access and compensation.

143.   By relying on the same Carrier411-distributed determinations and opinions, Defendants replaced independent carrier selection with a uniform, platform-driven exclusion standard that displaced competition and created a coordinated, market-wide barrier to carrier participation.

144.   These coordinated practices suppressed competition among carriers, excluded small and independent carriers from fair access to freight, and shifted pricing leverage to Defendants by controlling when and how transportation revenue was paid.

145.   The restraint was unreasonable because it transformed market access itself into a product controlled by Defendants, foreclosing Plaintiff and similarly situated carriers from interstate freight unless they operated on Defendants' collectively enforced platform terms. Plaintiff alone has lawful dominion and authority over her federally authorized motor carrier business, but Defendants' collectively enforced platform-approval and payment-control system displaced that authority, withheld earned freight revenue, and prevented her from competing in the market on the merits.

146.   The concerted use of these systems was not the result of independent business judgment but of a coordinated and normalized structure that extracted Plaintiff's earned freight revenue through the wrongful use of economic fear, leveraged the market-wide dissemination of carrier

reputational information to enforce compliance at scale, and conditioned Plaintiff's continued ability to operate in interstate commerce on submission to Defendants' control, causing concrete financial collapse, loss of load access, and the strandings and survival conditions described herein.

147.    These practices operate in an industry in which small federally authorized motor carriers can be immobilized within forty-eight hours by the withholding of a single payment, cut off from freight through reputational dissemination across the broker-facing network, and forced into survival conditions, including loss of fuel for heat in winter and cooling in summer and the resulting functional homelessness in their trucks, while Defendants reduce that lawful authority and livelihood to a revocable platform status that can be restricted or eliminated on a whim and without consequence.

148.    Defendants coordinated use of these systems replaced arm's length, load-by-load contracting with a market-wide control structure in which carrier eligibility, compensation, payment timing, and access to future freight were determined collectively through shared platforms rather than through independent competitive decision-making.

149.    This coordinated structure had the purpose and effect of suppressing competition by standardizing the conditions under which small carriers could obtain freight and be paid, eliminating the ability to negotiate terms in an open market and shifting control over rate, timing of compensation, and market access to the Defendants shared systems.

150.    As a direct and proximate result of this coordinated restraint, Plaintiff suffered antitrust injury, including loss of time and being stranded in a truck away from home, loss of transportation revenue for completed shipments, loss of working capital, denial of access to available freight, and exclusion from fair participation in the interstate motor carrier market.

151.  Plaintiff's injury flows from the Defendants' suppression of competition among motor carriers and the foreclosure of independent access to brokered freight, which reduced output, eliminated price competition, it shifted market-wide bargaining power from the independent motor carrier to the broker-controlled platform systems described herein.

152.  Defendants shared platform structure and leverage that enabled the use of  scripted and anchored low freight rates.

153.  Defendants conduct substantially affected interstate commerce because it governed the selection, performance, and payment of interstate freight shipments on a market-wide basis.

154.  Plaintiff is entitled to recover damages, costs of suit, and reasonable attorney's fees, if necessary and pursuant to 15 U.S.C. § 15 and to obtain appropriate injunctive and equitable relief pursuant to 15 U.S.C. § 26.

### COUNT III – Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

155.  Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 154  as though fully set forth herein.

156.  Section 2 of the Sherman Act prohibits monopolization, attempted monopolization, and conspiracies to monopolize any part of trade or commerce among several States.

157.  The relevant markets include the interstate brokerage of truckload freight and the market for access by federally authorized motor carriers to brokered loads in interstate commerce.

158.  Defendants, individually and collectively, possessed and exercised market power in these markets through control of the broker-facing platforms and systems that determined carrier approval, load access, monitoring, reputational status, and the timing and release of transportation payments.

159.    This power arises from Defendants' collective control over the dominant broker-facing load boards, carrier-onboarding and approval systems, reputational clearinghouses, and payment-routing infrastructure that motor carriers must use to obtain freight and receive compensation in interstate commerce.

160.    Plaintiff and Plaintiff alone has lawful dominion and authority over her federally authorized motor carrier business.

161.    Defendants collective control of the broker-facing platforms that govern load access and payment displaced that authority and excluded her from the market, demonstrating the exercise of monopoly power in violation of Section 2 of the Sherman Act.

162.    Through the coordinated use of these systems, Defendants acquired and maintained that power by excluding small and independent motor carriers from fair access to freight and by conditioning market participation on compliance with Defendants integrated approval, scoring, and payment structure.

163.    Defendants conduct constituted exclusionary and anticompetitive acts because it replaced open competition with standardized, platform-based control over which carriers could obtain freight and then be paid for completed transportation.

164.    Defendants had a specific intent to monopolize the relevant markets, as demonstrated by the market-wide adoption of uniform carrier-approval requirements, shared monitoring and reporting systems, and coordinated payment-control practices.

165.    There exists a dangerous probability that Defendants will achieve monopoly power in the relevant markets unless restrained.

166. The Defendants systems through which carriers must submit to gain access, the carriers reputation, and payment are controlled have all become normalized and unavoidable for participation in interstate freight transportation.

167. As a direct and proximate result of Defendants' monopolization, attempted monopolization, and conspiracy to monopolize, Plaintiff suffered antitrust injury, including loss of revenue, loss of working capital, loss of access to freight, and exclusion from the interstate motor-carrier market.

168. Defendants conduct substantially affected and disrupted interstate commerce.

169. Plaintiff is entitled to recover damages, costs of suit, and reasonable attorney's fees, if necessary, pursuant to 15 U.S.C. § 15 and to obtain appropriate injunctive and equitable relief pursuant to 15 U.S.C. § 26.

### COUNT IV – Tortious Interference with Business Relationships (Ohio Law)

170. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 169 as though fully set forth herein.

171. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 because it arises from the same common nucleus of operative facts as Plaintiffs Federal claims.

172. At all relevant times, Plaintiff had valid and ongoing business relationships and prospective business relationships with freight brokers and other participants in the interstate motor-carrier market.

173. Defendants had knowledge of these relationships and of Plaintiff's expectation of obtaining and performing transportation for compensation.

174. Defendants intentionally and improperly interfered with those relationships by implementing and using coordinated carrier-approval systems, reputational scoring, monitoring

platforms, and payment-control practices that prevented Plaintiff from obtaining freight, receiving payment for completed transportation, and continuing to operate.

175. Defendants interference was not justified by legitimate business reasons and was carried out through a standardized and coordinated structure that restricted Plaintiff's market access and ability to be paid for services performed.

176. The interference was accomplished through wrongful and improper means, including coordinated reputational dissemination, platform-based exclusion from load access, and the withholding and redirection of earned transportation revenue.

177. As a direct and proximate result of Defendants' interference, Plaintiff suffered damages, including loss of business income, loss of access to prospective contractual relationships, loss of working capital, and other injury to her business.

178. Defendants acted with actual malice and conscious disregard for Plaintiff's rights and the rights of similarly situated motor carriers.

179. Plaintiff is entitled to recover compensatory damages, treble damages and punitive damages, attorney's fees, if necessary, as permitted by Ohio law, and such other relief as the Court deems it appropriate.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and grant the following relief:


180. Award Plaintiff compensatory damages, jointly and severally against Defendants, in an amount to be determined at trial exceeding $150,000 for injury to her business and property,

including lost transportation revenue, loss of working capital, and loss of access to the interstate motor-carrier market and waste.

181. Treble damages pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 15.

182. Award punitive damages jointly and severally on Count IV for tortious interference with business relationships under Ohio law, in an amount to be determined at trial.

183. Enter declaratory relief that the coordinated carrier approval, reputational scoring, monitoring, reporting, and payment-control practices described in this Complaint violate federal law and form an unlawful pattern of racketeering activity and constitute unlawful restraint of interstate commerce.

184. Enter preliminary and permanent injunctive relief, including a cease-and-desist order, prohibiting Defendants from: (a) engaging in blacklisting or the dissemination of adverse carrier reports without fair, transparent, and nondiscriminatory procedures; (b) imposing coordinated carrier-approval or reputational restrictions that cascade across multiple brokers, platforms, or payment systems; and (c) conditioning access to freight or payment for completed transportation on participation in such systems. Such injunctive relief is authorized by 18 U.S.C. § 1964(a) and 15 U.S.C. § 26 and is necessary to prevent and restrain Defendants' ongoing violations of federal law.

185. Enter equitable relief sufficient to eliminate the anticompetitive and racketeering effects of Defendants conduct and restore Plaintiff's ability to operate under her own federal motor carrier authority, free from the collectively enforced platform-approval requirements, payment control practices, and reputational restrictions that currently prevent her from working and being paid in the ordinary course of interstate commerce.

186. Appoint a special master, at Defendants' expense, to conduct and oversee a full accounting and reconciliation of all transportation receivables, factoring records, payment-processing records, reserves, chargebacks, credits, debits, and other financial transactions relating to Plaintiff's shipments, together with such professionals as are necessary to perform that accounting and to report the findings to the Court.

187. Order a complete accounting and disgorgement of all amounts wrongfully withheld or obtained through the practices described herein.

188. Enter equitable relief designed to prevent the continued use of the unlawful systems and practices described herein as applied to Plaintiff and to other similarly situated federally authorized motor carriers participating in interstate commerce.

189. Find that Plaintiff has no adequate remedy at law for the ongoing loss of market access, reputational harm, and exclusion from the interstate freight market and that injunctive relief is necessary to prevent continuing and irreparable harm.

190. Award Plaintiff the costs of this action and reasonable attorney's fees to the extent permitted by law, including in the event Plaintiff retains counsel.

191. Award pre-judgment and post-judgment interest as allowed by law.

192. Order phased sequencing and bifurcated proceedings, as the Court deems it appropriate, including: (a) a bench determination of liability and entitlement to declaratory and injunctive relief, disgorgement, accounting, and appointment of a special master; and (b) a jury determination, if necessary, of compensatory and punitive damages, with no waiver of Plaintiff's right to trial by jury on such issues.

193. Grant such other and further legal relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by Jury on all issues so triable, if necessary , no waivers.

Respectfully submitted,

/s/Sandra Worthing Alves
Sandra Worthing Alves~ pro se
 d/b/a All Directions Trucking
25540 Byron Dr
North Olmsted, OH 44070
Email: adt@alldirections247.com
Phone: 440-591-0354
MC #: 1710778
Date: 03/04/2026