FILED

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO**

APR 0 9 2026

CLERK, US DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | |
|---|---|
| SANDRA WORTHING ALVES, Plaintiff, | ) Case No. 1:26-cv-00150 |
| | ) Judge Dan Aaron Polster |
| | ) |
| v. | ) |
| | ) |
| | ) <u>PLAINTIFFS CONSOLIDATED RESPONSE REBUTTALS AND OBJECTIONS TO MOTIONS TO DISMISS</u> |
| INTERNET TRUCKSTOP PAYMENTS, LLC, et al., Defendants. | |
| | ) |
| | ) <u>WITH EXHIBITS</u> |

Now Comes Sandra Worthing Alves, d/b/a All Directions Trucking, a federally authorized Motor Carrier #1710778 and brings forth this Consolidated Response, Rebuttal and Objections to each and every Defendant and each and every Motion to Dismiss in this action, and states the opposition pursuant to Fed.R.Civ.P.12(b)(6) All rights, arguments, and objections are expressly preserved. No waivers.

1

## TABLE OF CONTENTS

**I. Preliminary Statement: Preservation of All Rights**

**II. Introduction: The Conductor and the Orchestra**

**III. Motive Technologies: The Anchor Defendant**

**IV. Defendant-Specific Responses**

    A. Motive Technologies, Inc.

    B. Internet Truckstop Payments LLC

    C. Highway App, Inc.

    D. C.H. Robinson Worldwide, Inc.

    E. Total Quality Logistics, LLC

    F. Magellan Transport Logistics, Inc.

**V. Preemptive Response**: Plaintiff's Commercial Destruction Was Caused by Defendants'

Conduct, Not Plaintiff's Performance

**VI. Conclusion**

Appendix – Exhibits A through AA

## TABLE OF AUTHORITIES

**CASES:**

Air Products & Controls, Inc. v. Safetech Int'l, Inc., 503 F.3d 544 (6th Cir. 2007)

Ashcroft v. Iqbal, 556 U.S. 662 (2009)

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

Boyle v. United States, 556 U.S. 938 (2009)

DirecTV, Inc. v. Treesh, 487 F.3d 471 (6th Cir. 2007)

Eskridge v. HMD Trucking Inc., No. 1:24-cv-12437 (N.D. Ill. 2025)

Gerber v. Riordan, 649 F.3d 514 (6th Cir. 2011)

Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393 (6th Cir. 2012)

Keys v. Humana, Inc., 684 F.3d 605 (6th Cir. 2012)

King v. Taylor, 694 F.3d 650 (6th Cir. 2012)

Lewis v. Lytx, Inc., No. 3:22-cv-00046-NJR (S.D. Ill. 2025)

Moon v. Harrison Piping Supply, 465 F.3d 719 (6th Cir. 2006)

Nicsand, Inc. v. 3M Co., 507 F.3d 442 (6th Cir. 2007)

Ouwinga v. Benistar 419 Plan Servs., Inc., 694 F.3d 783 (6th Cir. 2012)

Southern Machine Co. v. Mohasco Industries, Inc., 401 F.2d 374 (6th Cir. 1968)

U.S. ex rel. SNAPP, Inc. v. Ford Motor Co., 532 F.3d 496 (6th Cir. 2008)   Wong v. PartyGaming Ltd., 589 F.3d 821 (6th Cir. 2009)

**STATUTES AND REGULATIONS**

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.§1961 et seq.

18 U.S.C. § 1962(c) (Conducting Enterprise Through Pattern of Racketeering)

18 U.S.C. § 1962(d) (RICO Conspiracy)

28 U.S.C. § 1331,

18 U.S.C. § 1964(c)

Wire Fraud, 18 U.S.C.§1343

Sherman Antitrust Act, 15 U.S.C.§1 et seq.

Illinois Biometric Information Privacy Act, 740 ILCS 14 et seq.

49 C.F.R. Part 371 (Freight Brokers)

49 C.F.R. § 371.3

3

49 C.F.R. § 371.7

49 C.F.R. § 390.6

49 C.F.R. Part 395 (Hours of Service of Drivers)

49 U.S.C. § 13905 (Suspension, Amendment, Repeal, Revocation of Operating Authority)49

U.S.C. § 14701(a) (General Authority of the FMCSA)

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 5

Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 12(b)(4), 12(b)(5), 12(b)(6)

Fed. R. Civ. P. 12(h)(1)

Fed. R. Civ. P. 15(a)(1)

Fed. R. Civ. P. 55(a)

Fed. R. Civ. P. 56

## OTHER AUTHORITIES

Motive Technologies, Inc., Form S-1 Registration Statement, SEC EDGAR, filed December

23, 2025

### AVAILABLE:

https://www.sec.gov/Archives/edgar/data/0001646681/000162828025058773/motive-sx1.htm

FreightWaves, KeepTruckin Shutters One Point Logistics, Brings Smart Load Board to

Market,  February 20, 2020

4

## I. PRELIMINARY STATEMENT : PRESERVATION OF ALL RIGHTS

1.     Plaintiff Sandra Worthing Alves, d/b/a All Directions Trucking, submits this consolidated response to Defendants' motions to dismiss without waiving any right, objection, or argument.   All rights are expressly preserved.

2.     Under Fed. R. Civ. P. 12(a)(1)(A)(i), Defendants' answers were due March 26, 2026. Defendants elected to file motions under Rule 12 in lieu of answering. Plaintiff preserves all arguments arising from that election, including those relating to default under Fed. R. Civ. P. 55(a).

3.     The operative pleading is the Amended Complaint, Doc. 32, filed March 5, 2026. Plaintiff does not concede Defendants' repeated characterization of that pleading as a "Third Amended Complaint." That characterization is incorrect. The complaints filed in state court before removal do not alter the identity of the operative federal pleading presently before this Court.

4.     At no point prior to the filing of Plaintiff's Amended Complaint had any Defendant filed an answer. Under Fed. R. Civ. P. 15(a)(1), Plaintiff was entitled to amend as a matter of course.   The present Amended Complaint was filed in compliance with the Order of the Honorable Dan Aaron Polster. The operative pleading is properly before this Court.

5.     Plaintiff effected service on the registered agent of record for each Defendant as reflected in applicable Secretary of State filings. Proofs of service have been filed on the docket.

6.     Defendant Highway App, Inc. waived any objection to service under Fed. R. Civ. P. 12(b)(4) and 12(b)(5) by filing a Notice of Appearance and participating in this action before

5

asserting such defenses. Under Fed. R. Civ. P. 12(h)(1), those defenses are waived. A defendant cannot appear before a court and simultaneously deny its authority.

7.     Defendant Internet Truckstop Payments LLC and its affiliated entities were properly served as reflected in the docket. Four separate docket entries confirm service, each with corresponding return receipts. Internet Truckstop Payments LLC, Truckstop, RMIS, and Denim share the same registered agent at the same address. Plaintiff served that agent. The entities were served through their own designated agent of record across multiple entity names. Defendant cannot claim improper service when its affiliated entities share the same registered agent and that agent was served. Defendant's participation in this action, its coordination with co-defendants, and its filing of substantive motions to dismiss through counsel independently confirms actual notice. It is axiomatic that a defendant who appears through counsel, coordinates with co-defendants, and files substantive motions to dismiss has received actual notice of the action against it. Actual notice defeats any technical service objection at this stage. A defendant cannot simultaneously deny service and invoke this Court's jurisdiction to seek dismissal on the merits. Defendant's service objection is contradicted by the docket itself. Service was proper. The objection is waived.

8.     Defendants' coordinated filing of substantive Rule 12 Motions confirms their appearance and participation in this case. Having invoked this Court's jurisdiction to seek dismissal on the merits, Defendants cannot simultaneously deny that the action is properly before the Court.

9.     Plaintiff previously filed an application for temporary restraining order in this Court. That application became moot when the Court ordered Plaintiff to file a new amended complaint, superseding the pleading upon which the TRO was based. The application was

6

never adjudicated on the merits. No court has ruled against Plaintiff on the substance of any request for emergency relief. The most recent TRO application is attached as Exhibit I, PACER Doc. 22

10. The emergency has only become more precipitous. Since Plaintiff first sought emergency relief, her commercial insurance has been canceled, a federal investigation into her operating authority has been opened, her business bank accounts have reached zero, her utilities face imminent shutoff, and the financial destruction documented in Exhibits K through Y has compounded with each passing day. The failure to adjudicate emergency relief on the merits has not made the emergency smaller. It has made it larger.

11. Defendants have mischaracterized the procedural history of this action. This case was not dismissed. It was not rendered moot by any ruling on the merits. Following the filing of the original complaint in the Cuyahoga County Court of Common Pleas, Judge John Russo scheduled a hearing. Before that hearing could be held, C.H. Robinson removed the action to this Court. That removal was immediate and strategic. It displaced the scheduled state court hearing, stripped Plaintiff of the emergency relief she had sought, and protracted this litigation. The TRO was never heard on the merits, not because it lacked merit, but because C.H. Robinson removed the case before any court could hear it.

12. Internet Truckstop Payments LLC's characterization of the prior proceedings as a dismissal or a mooting on the merits is factually incorrect and contradicted by the docket. Every day of delay caused by that removal has produced compounding and documented harm. The removal did not resolve this case; it strategically protracted the litigation.

13. Plaintiff notes that Benesch Friedlander Coplan & Aronoff has entered appearances on behalf of both Internet Truckstop Payments LLC and C.H. Robinson Worldwide, Inc.,

7

defendants whose conduct is alleged to be interrelated, and reserves the right to address this representation on a full record.

## II. INTRODUCTION: THE CONDUCTOR AND THE ORCHESTRA

14.    This Court has subject matter jurisdiction pursuant to  28 U.S.C. § 1331 and 18 U.S.C. § 1964(c)  over each Defendant because the conduct alleged was directed at and caused injury to a federally authorized motor carrier domiciled in North Olmsted, Ohio, operating under MC #1710778. Each Defendant conducted business with Plaintiff in Ohio, directed communications and platform conditions to Plaintiff in Ohio, and caused the  financial harm alleged to occur in Ohio. The interstate commerce affected by Defendants' conduct flows through Ohio and the Northern District. Where conduct directed at a forum causes injury felt in that forum, personal jurisdiction is proper. See Southern Machine Co. v.  Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968); Air Prods. & Controls, Inc. v.  Safetech Int'l, Inc., 503 F.3d 544, 550 (6th Cir. 2007).

15.    Carriers and solo truck drivers operate within a system they cannot see, cannot negotiate, and cannot realistically exit while in motion. Their work requires constant travel and continuous dependence on platform-controlled access to freight, routing, and payment while engaged in interstate commerce. Unlike fixed businesses, they cannot readily exit or challenge the system without risking immediate operational and financial disruption. This is the functional equivalent of a company-town environment.

16.    Loss of access, payment interruption, or system exclusion can occur while a carrier is in transit and far from base thus creating the potential for immediate and cascading operational failure. Plaintiff experienced this cascade directly on multiple occasions. It did not happen at a

8

desk. It happened in interstate commerce, far from home, with no meaningful ability to challenge or exit in real time.

17. Interstate trucking is simple in structure. A buyer of goods needs them moved. A truck driver moves them from seller to buyer. That is the transaction. Defendants do not haul freight. They do not buy freight. They bear none of the costs associated with freight and do not spend on fuel, commercial auto insurance, or equipment, federal truck or trailer equipment compliance or inspections. Those costs and burdens belong entirely to the carrier alone. Yet each named Defendant has positioned itself at a point of control over that transaction the onboarding, vetting, tracking, payment, intelligence and extracting revenue from the ecosystem while the carrier who performs the work bears all of its costs.

18. Plaintiff alleges that Defendants' coordinated platform system has transformed independent motor carriers into functionally controlled, platform-dependent operators and are now closer in structure to DoorDash drivers than to independent businesses.

19. In these systems, carrier participants are penalized for declining work, even when the work is economically unreasonable, through reduced scores, fewer future opportunities, and restricted access. Plaintiff alleges that the same structure now governs interstate trucking: carriers must accept loads, maintain continuous tracking, and comply with platform conditions or risk diminished access to freight, delayed payment, or complete exclusion from the market.

20. At the same time, the system imposes a paternalistic dynamic in which brokers, shippers, and platform operators continuously instruct, monitor, and correct carriers, most often without firsthand knowledge of on-the-ground conditions, effectively treating experienced, federally authorized operators as if they lack competence. This is not merely

9

oversight. It is a pattern of professional degradation. Carriers are second-guessed, spoken over, and subjected to directives that disregard their expertise, creating an environment described by many experienced operators as grueling and humiliating.

21. The result is a system where control is exercised upward, but accountability is pushed downward. Carriers are directed in how to perform their work, evaluated through platform-based scoring systems, and penalized for refusal and yet are solely blamed when outcomes fall short, even where those outcomes are shaped by the very system imposing the conditions.

22. This is not an open market. It is a controlled environment in which independent carriers are subordinated to platform authority and are required to comply, are monitored in real time, and penalized for nonconformity but also being denied both the protections of employment or the freedom and autonomy of true independence. That transformation did not come from law or regulation. It came from coordinated private control. And the law does not permit it.

23. The enterprise does not require formal hierarchy. See Boyle v. United States, 556 U.S. 938, 946 (2009) (an association-in-fact enterprise requires only a purpose, relationships among those associated, and longevity sufficient to pursue the enterprise's purpose; its existence is more readily proven by what it does than by abstract analysis of its structure). On a motion to dismiss, the Court must construe the complaint in the light most favorable to Plaintiff and accept all factual allegations as true. See Keys v. Humana, Inc., 684 F.3d 605, 608 (6th Cir.2012). The defendant bears the burden of showing that Plaintiff has failed to state a claim. See DirecTV, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007). The coordinated roles alleged are not parallel conduct but interdependent functions within a shared system. Each Defendant's actions are reinforcing and enabling the others in a continuous operational framework.

10

25.  Motive Technologies is the conductor. The remaining defendants are instruments in the orchestra. Without Motive's Physical Operations Graph, feeding data from over one million vehicles and without it Highway cannot vet, Truckstop cannot route, RMIS cannot onboard, Magellan cannot enforce, and the broker defendants cannot access the carrier intelligence that controls market participation. The score is the same across every instrument: the systematic commercial destruction of independent carriers. This contradiction defines the mechanism of Plaintiff's injury: carriers bearing all costs of independence while Defendants exercise all the benefits of control.

## III. MOTIVE TECHNOLOGIES: THE ANCHOR DEFENDANT

Counsel: Calfee Halter & Griswold

### THE ELD MANDATE DOOR

26. Beginning in December 2017, federally authorized carriers were required by federal law to adopt electronic logging devices. At the time of adoption, ELD systems, including those provided by Motive Technologies, were presented to carriers and truck drivers as carrier facing compliance tools with an app for smartphones.

27.  Carriers were not informed that these systems would evolve to function as continuous data collection and transmit high frequency broadcasting to platforms capable of integration with external systems affecting freight access, payment, and market participation.

28.  On October 11, 2017,  before the federal ELD mandate took effect on December 18, 2017   KeepTruckin, now Motive Technologies, Inc., was already integrated into Truckstop.com's ELD Marketplace. This is documented on Motive's own website. The system was positioned within the compliance layer before carriers were required to adopt it. The mandate created the captive audience and every truck driver. The platform monetized it.

11

29.   Motive entered through the Federal ELD Mandate, a compliance requirement every carrier had to meet. From that mandatory entry point it expanded: Ai cameras, safety monitoring, fleet management, maintenance tracking, spend management, fleet cards, driver scoring. Each additional product increased operational dependence. The longer a carrier stays in the system the more data Motive holds, the more disruptive exit becomes. The system entered through law. It stayed through dependency.

**The Intelligence Operation of One Point Logistics.**

30.   While carriers were being onboarded under the mandate, KeepTruckin/Motive briefly acquired an operating brokerage One Point Logistics (OPL), a federally authorized freight brokerage, in April 2019. OPL was shut down in February 2020. KeepTruckin/Motives CEO stated publicly that the purpose of the acquisition was to capture data and decision-making processes from real-life brokers to train its matching algorithms and machine learning models. Once the tech stack was built, OPL was shuttered to remove the conflict of interest and invite the broker market in. Source: FreightWaves, February 20, 2020.

31.   Following the closure of One Point Logistics, the offshore dispatching ecosystem that emerged from it in the American freight market grew to a scale significant enough that Congress enacted Delilah's Law (March 2026) specifically to prohibit it. The law did not emerge from speculation. It emerged from a documented and visible market condition: offshore-based dispatching operations working at scale with American carriers and brokers, openly, after being seeded by the intelligence extraction that OPL's operation made possible. A Pakistan-based dispatcher publicly posted a video naming TQL, C.H. Robinson, Schneider, and Echo  Global Logistics as his freight sources and stated that no law would remove him from the American freight market. Plaintiff has this video screen recorded with timestamps.

Named defendants in this action are identified by name in that public video. Congress passed a law to stop it. The enterprise continued anyway.

32. The enterprise alleged here is not theoretical, it is operational, functioning through interdependent platform roles that condition access to freight, control payment, and transmit real-time data across systems, such that Plaintiff's injury arose not from isolated decisions but from the coordinated operation of that system. The S-1 -- Motive's Own Disclosures to the SEC.

33. On December 23, 2025, thirteen days after Plaintiff filed her original state court complaint Motive filed a Form S-1 registration statement with the Securities and Exchange Commission. The following disclosures appear in that filing and are quoted or paraphrased from the document itself.

34. On the platform: Motive describes an Integrated Operations Platform powered by a Physical Operations Graph that serves as the foundational data layer and single source of truth for customers' physical operations. The Physical Operations Graph connects and unifies multi-source data across workers, vehicles, equipment, and spend. As of the filing date, more than one million vehicles and assets contribute to this data corpus.

35. On the data collection: The S-1 describes AI dashcam products that capture inward cab footage and behavioral data. The S-1 further describes data sharing with external platforms via APIs, webhooks, and Snowflake data shares.

36. On the revenue: Motive discloses annualized recurring revenue of $501 million as of September 30, 2025, a 28% year-over-year increase. For the nine months ended September 30, 2025, Motive reported $327.3 million in revenue and a net loss of $138.5 million. The S-1 states that approximately 99% of revenue is subscription-based recurring revenue.

Motive is seeking approximately $600 million in its planned NYSE offering.

37. On international operations: The S-1 states that Motive sells its platform in North America and the United Kingdom and has offices in those locations as well as Pakistan, India, and Taiwan. The S-1 further states that a majority of employees are located in the United States and Pakistan. The S-1 discloses that Motive began sales operations in Mexico in 2024 and the United Kingdom in 2025.

38. On the subsidiary structure: Motive's Exhibit 21.1 lists one foreign subsidiary: ABS-Labs Pvt Ltd. in Pakistan. Motive's own operational disclosures and public materials reflect additional international entities and offices in Canada, Taiwan, India, Estonia, Mexico, and the United Kingdom. The discrepancy between the formal subsidiary disclosure and the operational footprint is a matter discovery should address.

39. On litigation risk: Motive's S-1 discloses pending litigation arising from in-cab data capture as a material risk to the company's business. This disclosure was made to the SEC in connection with Motive's planned initial public offering.

40. Motive cannot characterize Plaintiff's allegations as threadbare and speculative while describing the same architecture in a public filing made to the SEC under penalty of law. These allegations are grounded in Defendants' own public disclosures and observed conduct, and at this stage must be accepted as true and viewed in the light most favorable to Plaintiff. The Biometric Privacy Pattern: Industry Litigation.

41. The in-cab surveillance conduct described in Motive's S-1 has generated substantial litigation in the trucking industry under the Illinois Biometric Information Privacy Act, 740 ILCS 14 et seq., which requires written consent before collecting biometric identifiers including facial geometry.

42. In Lewis v. Lytx, Inc., No. 3:22-cv-00046-NJR (S.D. Ill. 2025), a federal court approved a $4.25 million class action settlement brought by approximately 85,000 truck drivers whose facial geometry was captured by AI dashcam technology without written consent. The court found that the system scanned driver face geometry and fed that data into algorithms to identify driver actions, conduct the complaint described as constant AI surveillance.

42. In Eskridge v. HMD Trucking Inc., No. 1:24-cv-12437 (N.D. Ill. 2025), a federal court denied a motion to dismiss a BIPA class action arising from driver-facing cameras, finding that plaintiffs had plausibly alleged violations arising from in-cab facial geometry capture without written consent.

43. Motive's own response to this litigation landscape is documented. Motive introduced a product feature called "Driver Privacy" mode that disables its inward-facing camera after a truck idles for three minutes, while keeping the road-facing camera active. Motive introduced this feature rather than obtaining written consent from the drivers whose biometric data its system captures. This response is documented in public reporting and confirms Motive's awareness of the legal exposure its in-cab surveillance system creates.

**No Federal Operating Authority.**

44. Motive Technologies, Inc. holds no Motor Carrier operating authority, no broker license, and no freight forwarder authority issued by the Federal Motor Carrier Safety Administration. It is not registered to operate in the interstate freight market in any federally licensed capacity. It entered the market as a carrier-facing hours of service compliance tool. It has no MC number.

45. Motive's S-1 describes the company as the foundational data layer for over one million commercial vehicles operating under federal authority. The carriers it monitors are federally

15

licensed and federally regulated. The platform monitoring them is not subject to that regulatory framework. Motive's S-1 separately identifies anti-competition regulations and antitrust compliance as material risks to its business, disclosing this exposure to investors in connection with its planned $600 million NYSE offering.

**The Conductor.**

46. Motive Technologies is the conductor.

47. Picture a record player. The needle drops. The record spins. And once it starts, it does not stop.

48. The truck is the record. The driver is the one turning it. The data is the music.

50. Motive is the needle embedded in the machine, powered by it, reading everything in real time: where the truck goes, how it moves, how it stops, what happens inside the cab. From that single point of contact, the entire system comes alive.

51. The conductor raises its hand. The instruments follow. Highway decides who gets through the door. Truckstop decides when, or if they get paid. Magellan enforces compliance. GenLogs watches, aggregates, and feeds intelligence upstream. Carrier411 keeps score and decides who gets to play again.

52. The system is coordinated. It is continuous. And it is not optional.

53. The record keeps spinning because the driver keeps driving. Mile by mile. Hour by hour Day after day.

54. And the music/the data then travels in all directions. Into every platform. Into broker systems. Into investor reports. Into insurance providers. Into the market itself. Into a pending IPO.

55. Motive calls it its Physical Operations Graph. But the graph only exists because the drivers do. They are the source. They are the signal. They are the reason the system works at all. And yet drivers do not control it. They do not share in it. And they cannot meaningfully refuse it without losing access to the work itself.

56. This is not a free market. This is a system where the driver turns the 18 wheels, the system takes the data, and someone else decides what it is worth.

57. The music is theirs. The artists have not been paid. And the conductor is preparing to take a bow in front of the NYSE.

Rule 9(b) -- Particularity Satisfied.

58. Plaintiff satisfies Rule 9(b) by alleging with particularity the who, what, when, where, and how of the fraudulent scheme. Rule 9(b) requires sufficient detail to give Defendants fair notice of the precise misconduct charged and enable them to prepare a responsive pleading, it does not require facts that are uniquely within Defendants' possession and control. See U.S. ex rel. SNAPP, Inc. v. Ford Motor Co., 532 F.3d 496, 502 (6th Cir. 2008). Additional detail beyond what is necessary to provide that notice is not mandatory. Plaintiff has identified the specific transactions, communications, and mechanisms by which the alleged scheme operated, which is sufficient to place Defendants on notice of the claims against them.


## IV. DEFENDANT-SPECIFIC RESPONSES

59. Motive Technologies, Inc. : Motion to Dismiss Should Be Denied.

17

60. Defendant Motive Technologies moves to dismiss on the grounds that the Amended Complaint is threadbare, constitutes shotgun pleading, and fails to allege conduct of an enterprise or a pattern of racketeering activity.

61. Those arguments are contradicted by Motive's own public disclosures.

62. Plaintiff adopted Motive's system as a carrier-facing compliance tool for hours-of-service requirements beginning in 2017. She did not adopt it as part of any data-sharing network or external data distribution architecture. Plaintiff used Motive's system from approximately 2017 through January 2025. During that time she did not have visibility into how data collected by the system was transmitted beyond its compliance function. Plaintiff discontinued use upon learning of the broader scope of data transmission and integration.

63. Motive's Form S-1, filed December 23, 2025, describes an integrated platform aggregating real-time data from commercial vehicles at scale and confirms transmission of such data through APIs, integrations, and external data-sharing mechanisms. These disclosures correspond directly to Plaintiff's allegations. Motive cannot characterize Plaintiff's allegations as speculative while describing the same architecture in its public filing.

64. Plaintiff alleges an association-in-fact enterprise consisting of interconnected platforms operating through shared data flows. Motive participates in that enterprise by generating and transmitting the data on which those systems rely. At the pleading stage, these allegations are sufficient. See Boyle v. United States, 556 U.S. 938 (2009); Ouwinga v.Benistar 419 Plan Servs., Inc., 694 F.3d 783, 791 (6th Cir. 2012); Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir. 2006); Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393 (6th Cir. 2012). The conduct alleged is not a series of isolated commercial disagreements but a

18

coordinated pattern of deceptive and coercive practices carried out across multiple transactions and actors, giving rise to liability under 18 U.S.C. Section 1962.

65. Plaintiff's injury flowed directly from Defendants' conduct, as the withholding of payment immediately impaired her ability to maintain insurance and continue operations, establishing a direct causal chain sufficient at the pleading stage. Plaintiff alleges direct injury: loss of access to freight, disruption of payment, and inability to continue operating under MC #1710778.

**B. Internet Truckstop Payments LLC -- Motions to Dismiss Should Be Denied**

66. Defendant Internet Truckstop Payments LLC filed two motions to dismiss. Both should be denied. Service was proper. Plaintiff served the registered agent of record as reflected in Secretary of State filings. All affiliated entities, Internet Truckstop Payments LLC, Truckstop, RMIS, and Denim share the same registered agent at the same address. Plaintiff served that agent. The entities were served through their own designated agent of record across multiple entity names. Defendant cannot claim improper service when its affiliated entities share the same registered agent and that agent was served.

67. Defendant's motion attempts to disclaim Denim as a separate unrelated entity. Plaintiff has emails showing that Internet Truckstop Payments migrated her account from Truckstop factoring to Denim by Truckstop without her consent, without a new agreement, and without disclosure. A carrier cannot be involuntarily transferred between two truly independent companies. Defendant cannot disclaim an entity it used to migrate Plaintiff's account. The migration is itself evidence of unified control.

68. Plaintiff alleges specific documented conduct: a UCC-1 lien was filed against Plaintiff's assets without advance disclosure. Six penny deposits were issued in lieu of payment owed

19

for completed loads. Plaintiff lacked access to her own financial records and transaction history. Payment was held hostage to a load board subscription for equipment type Plaintiff did not operate.

69.    The pattern of conduct did not end with the initial filing. Plaintiff hauled three additional loads in February 2026 and experienced the same payment obstruction. Plaintiff was unable to fuel her truck without personal financial assistance and was effectively stranded approximately 1,200 miles from home in Miami, Florida. One load from that period remains unpaid. Plaintiff cannot access her Denim account, the login function does not work, a replacement link provided by Denim also does not work. Plaintiff possesses a video when access was obtained recording for two minutes and documenting the account access obstruction, showing that the "submit" function does not operate as represented. Denim has claimed in a series of spamming emails that Plaintiff failed to upload load documentation when she cannot to press submit to upload. These dark patterns repeat and are not occasional.

70.    December 2025. February 2026. The same conduct. The same obstruction. The same result. That is the pattern. That is the continuity required under 18 U.S.C. Section 1961(5).

71. As a direct consequence of Defendant's payment obstruction, Plaintiff's commercial insurance lapsed. On March 19, 2026, the Federal Motor Carrier Safety Administration opened an investigation under 49 U.S.C. Section 14701(a) and 49 U.S.C. Section 13905 regarding Plaintiff's operating authority, MC #1710778.

72. Plaintiff has now under thirty days to cure as of this filing. Plaintiff cannot cure without payment for completed loads that Internet Truckstop Payments continues to withhold. ITP Payments' role was not incidental; it was this financial control layer through which carrier participation and continued operation were regulated.

20

73. He who comes into equity must come with clean hands.

## C. Highway App, Inc.: Motion to Dismiss Should Be Denied

74. . Defendant Highway App filed a Notice of Appearance and participated in this action before raising any service objection. Under Fed. R. Civ. P. 12(h)(1), any objection to service is waived. See King v. Taylor, 694 F.3d 650 (6th Cir. 2012) (waiver of Rule 12 defenses through litigation conduct). The Amended Complaint was served on Highway's counsel of record under Fed. R. Civ. P. 5. Service was proper. Defendant had actual notice and has not alleged any prejudice.

75. Plaintiff alleges that Highway operates as a carrier onboarding and approval system through which brokers condition access to freight. Carriers must be approved within Highway's system in order to access load opportunities. This approval process functions as a prerequisite to market participation. Highway's own public materials confirm direct integration with Motive Technologies. Denial, restriction, or delay within Highway's system results in loss of access to freight. Plaintiff has been unable to successfully and continuously move freight since approximately November 2025.

## D. C.H. Robinson Worldwide, Inc.: Motion to Dismiss Should Be Denied

76. On December 15, 2025, after Plaintiff filed this action, C.H. Robinson sent Plaintiff an unsolicited email. Plaintiff did not solicit this communication and did not visit C.H. Robinson's website. The act of opening the email, according to its own terms, implied acceptance of the conditions contained within it. This document is Exhibit H.

77. Those conditions describe the following in C.H. Robinson's own words across ten clauses: Carriers must enroll through Highway, a named defendant, not through FMCSA. Continuous ELD or GPS tracking is required and carriers must maintain a 90% compliance rate. Carrier

21

performance is scored on load acceptance, tracking compliance, cancellations, and on-time delivery, with lower scores resulting in restricted freight access. Freight access is algorithmically controlled, with higher-scoring carriers receiving access to more freight. Payment is routed through Triumph factoring and LoadPay banking, with faster payment available only to carriers who remain within the system and accept a 2% quick pay discount.

78. All submissions are the exclusive property of C.H. Robinson, non-confidential, and usable for any purpose without compensation. C.H. Robinson reserves the right to monitor carrier activity at its sole discretion while disclaiming liability for resulting damages. Liability is capped at $200. Disputes must be resolved in Minnesota. The final clause states that no employer-employee relationship is created while simultaneously describing continuous control over carrier behavior, access to work, payment timing, and all data generated by carrier operations. Its 90% capitulation score is the threshold or you're out of work.

79. C.H. Robinson additionally directed Plaintiff in a prior written communication to onboard with Highway App, describing carrier surveillance as industry standard. That communication is a predicate act under 18 U.S.C. Section 1343. By conditioning freight opportunities on adherence to its imposed acceptance and performance thresholds,

80. Defendant exerts economic pressure that falls within the coercion prohibited by 49 C.F.R. Section 390.6. Contractual defenses do not defeat federal statutory claims under RICO or the Sherman Act. C.H. Robinson is a federally authorized freight broker MC# 131029

**E. Total Quality Logistics, LLC: Motion to Dismiss Should Be Denied**

81. Plaintiff performed between approximately forty-five to fifty loads for Defendant. Those loads were completed successfully. Plaintiff filed this action on December 10, 2025. On or about December 30, 2025, Defendant ceased doing business with Plaintiff without warning,

without explanation, and without any stated performance-based justification. The temporal proximity between the filing of this action and Defendant's decision to cease business engagement supports a reasonable inference that the cutoff was not based on performance.

82. The broker-carrier agreement relied upon by Defendant was presented through RMIS a broker-facing platform controlled and provided by invitation only, to which carriers do not have independent access. The agreement was presented in a standardized, non-negotiable, click-through format under time constraints requiring acceptance in under approximately one minute. Failure to accept would have resulted in immediate loss of the load. Plaintiff had no meaningful opportunity to review, negotiate, or retain the agreement at the time of acceptance. She did not have access to a complete copy until Defendant produced it in this litigation. Any purported consent obtained through non-negotiable, time-constrained, and economically coercive conditions does not defeat claims arising under federal statutory law.

83.Defendant offered a quick-pay option in that contract. Plaintiff said yes to the direct quick pay option. Defendant did not provide the promised expedited payment. Plaintiff was forced to use Truckstop-affiliated factoring, incurring additional fees. A party that fails to perform its own obligations cannot rely on favorable provisions of the same agreement to defeat claims at the pleading stage.

84. TQL subsequently cancelled Plaintiff's carrier portal access altogether, preventing Plaintiff from obtaining tax documents for completed work, while simultaneously seeking dismissal of claims arising from that work.

85. Federal statutory RICO and Sherman Act claims cannot be contractually diverted from federal court. See Wong v. PartyGaming Ltd., 589 F.3d 821, 828 (6th Cir. 2009). The

23

Bostwick affidavit introduces matters outside the pleadings. The Court may convert this motion to summary judgment under Rule 56, entitling Plaintiff to discovery the agreement TQL now seeks to enforce.

86. Plaintiff notes for the record that TQL was not named as a defendant in the initial complaint filed in the Cuyahoga County Court of Common Pleas. TQL was added as a defendant following its unilateral decision to cease doing business with Plaintiff without notice, explanation, or stated performance-based justification on December 30, 2025 twenty days after the original filing. The temporal proximity between the filing of this action and Defendant's sudden termination of a longstanding carrier relationship supports a reasonable inference of retaliation. Plaintiff performed between approximately forty-five and fifty for TQL without complaint, claim, or service failure. No carrier is required to accept commercial destruction in silence.

## F. Magellan Transport Logistics, Inc. : Motion to Dismiss Should Be Denied

87. Plaintiff performed two separate loads for Defendant. Both were completed successfully. Each rate confirmation included a MacroPoint provision imposing a $300 deduction in the event that tracking was deemed to have failed. On two separate occasions, on two separate loads, Defendant deducted $300 post-delivery. Tracking for both loads was continuous and recorded. Plaintiff possesses records documenting continuous tracking for both loads. The deductions were imposed despite continuous tracking being maintained.

88. Each wrongful deduction was communicated through interstate electronic systems. Each constitutes a predicate act of wire fraud under 18 U.S.C. Section 1343. Two loads. Two deductions. Two predicate acts. The pattern requirement of 18 U.S.C. Section 1961(5) is

24

satisfied. Plaintiff's direct financial loss of $600 across two transactions contributed to her inability to maintain operations.

## V. PREEMPTIVE RESPONSE : PLAINTIFF'S COMMERCIAL DESTRUCTION WAS CAUSED BY THE DEFENDANTS' CONDUCT, NOT THE PLAINTIFF'S PERFORMANCE.

89. Defendants will argue Plaintiff failed to run a successful trucking business. The argument fails three times.

90. First, the system is the barrier. No carrier can negotiate any term of any broker carrier agreement. Carriers are not afforded any opportunity to write any part of any agreement. It's take it or leave it. Written by the broker for the broker. No carrier can opt out of the surveillance architecture. The market is not competitive because entry requires submission to a closed-loop control structure that Defendants built, own, and operate together. The antitrust injury alleged here is the type the Sherman Act was designed to prevent: exclusion from the market through coordinated platform control, not merely vigorous competition. See Nicsand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007). The relevant market is the access-controlled brokerage and platform-mediated interstate freight market in which Defendants collectively condition participation, restrict access, and control payment flows. Defendants' liability arises not from a failure to confer benefits, but from affirmative conduct that interfered with Plaintiff's ability to participate in interstate commerce.

91. Second, Plaintiff is not alone. In 2022, as these platforms reached full integration, the freight market entered what the industry now calls the Great Freight Recession. Established carriers with hundreds of trucks, some in business for 75 years were displaced alongside new entrants. The same period in which Motive's annualized recurring revenue grew 28% is the

25

period the trucking industry identifies as the Great Freight Recession. The platform that federally licensed carriers were compelled to adopt grew by hundreds of millions in recurring revenue while the carriers generating that revenue lost their businesses.

92. Third, Plaintiff performed. She hauled freight. She delivered loads. She documented continuous tracking. She performed approximately forty-five to fifty loads for TQL alone. She complied with platform requirements. She was commercially destroyed not because she failed to perform but because the financial control layer withheld payment, filed undisclosed liens, and migrated her accounts without consent. Plaintiff has approximately ten years and eight months of experience in the trucking industry, including roles as a driver, dispatcher, operations manager, and safety manager.

93. Carriers were never meant to see the scope of the technology built around the ELD. The fault and failure lies not with the carrier who drove blind. The fault lies with the system that built the blindfold. Carriers are driving blind.

94. At the pleading stage, Plaintiff is required to allege a plausible claim, not to prove it. The factual detail provided here, specific transactions, specific dates, specific dollar amounts, specific communications, specific statutory violations, and specific documented consequences, more than satisfies that standard.

95. At the pleading stage, Plaintiff is not required to prove Defendants' liability, but only to allege a plausible, coherent set of facts showing entitlement to relief. Plaintiff has done so here.

96. This case does not arise from generalized market conditions or isolated contractual disagreements, but from specific, repeated transactions in which Defendants' coordinated platform functions, onboarding, surveillance, access control, and payment processing.

26

Operated together to restrict Plaintiff's ability to participate in interstate commerce.

97. The injury alleged is direct and traceable: identified loads were performed, payment was withheld or obstructed, and as a result Plaintiff was unable to maintain federally required insurance, triggering regulatory action against her operating authority.

98. These are not independent acts by unrelated entities, but interdependent components of a system whose operation depends on shared data flows and conditional access to freight and payment.

99. Under controlling law, including Bell Atlantic Corp. v. Twombly, Ashcroft v. Iqbal, and Boyle v. United States, these allegations more than satisfy the requirement that a complaint state a plausible claim for relief and adequately plead the existence of an enterprise and resulting injury.

## VI. CONCLUSION

100. Plaintiff has alleged specific facts, based on direct participation in the systems operated and utilized by the Defendants, sufficient to state claims that are plausible on their face. The Amended Complaint identifies distinct roles and conduct attributable to each Defendant.

101. Motive Technologies is physically installed in the vehicle and operates as the initial point of contact with the truck, the driver, and the work performed is confirmed by Motive's own SEC filing. Internet Truckstop Payments controls payment processing, financial visibility, and access to funds as documented by the UCC-1 lien, the penny deposits, and the forced account migration. Highway App controls onboarding and access to freight is confirmed by Motive's own integration documentation. C.H. Robinson, TQL, and Magellan operate as brokers within that system as documented by the December 15, 2025 email, the rate confirmations, and the

27

post-filing termination. These roles operate together within a continuous and interconnected system.

102. MC #1710778 is the documented injury. The UCC-1 lien is in the record. The Motive S-1 is public record at SEC EDGAR. The C.H. Robinson December 15, 2025 email is Exhibit H.

103. The six penny deposits from Internet Truckstop Payments LLC are documented. The forced migration from Truckstop to Denim without consent is documented. The Magellan rate confirmations and tracking records are preserved. The Motive-Truckstop integration has been publicly documented since October 2017. The Lewis v. Lytx settlement confirms the legal exposure created by the in-cab surveillance architecture Motive operates.

104. As a direct consequence of the payment obstruction described herein, Plaintiff's commercial insurance was cancelled. On March 19, 2026, the FMCSA opened an investigation under 49 U.S.C. Section 14701(a) and 49 U.S.C. Section 13905 regarding Plaintiff's operating authority. Plaintiff has less than thirty days to cure. Plaintiff cannot cure without payment for completed loads that remain withheld. The commercial destruction of MC #1710778 is complete and documented.

105. Discovery will reveal what Defendants have not yet disclosed.

106. At this stage, the Court must accept these allegations as true and determine only whether they plausibly state a claim for relief. They do.

107. Plaintiff respectfully requests that this Court deny Defendants' Motions to Dismiss in their entirety and allow this action to proceed to discovery.

28

Respectfully submitted,

Sandra Worthing Alves d/b/a All Directions Trucking 25540 Byron Dr

North Olmsted, OH 44070

Email: adt@alldirections247.com

Phone: 440-591-0354

MC #: 1710778

April 6, 2026

## APPENDIX — INDEX OF EXHIBITS

**Exhibit A** All Directions Trucking Operating Authority (FMCSA)

**Exhibit B** Federal Operating Authority: Parties with FMCSA Authority (SAFER/FMCSA):

All Directions Trucking, C.H. Robinson Worldwide, TQL, and Magellan Transport Logistics.

No other defendant in this action holds federal operating authority.

**Exhibit C** Cuyahoga County Court of Common Pleas: Complaint Cover Page, Case No. CV

25-129498, filed December 10, 2025

**Exhibit D** Demand Letter to Internet Truckstop Payments LLC

**Exhibit E** Internet Truckstop: Correspondence and Email Record documenting pattern of conduct, forced account migration from Truckstop to Denim Labs without consent, and new login requirements

**Exhibit F** Motive Technologies, Inc.: Form S-1 Registration Statement, SEC EDGAR, filed December 23, 2025 (selected pages including revenue disclosures, Physical Operations Graph, AI camera initiatives, growth timeline, and risk factors)

**Exhibit G** Highway App, Inc.: Carrier Onboarding Documentation, Five Star Setup Attempt.; Carrier Setup Documentation. All Directions Trucking was "already in use" upon opening of Plaintiff's new authority and with a new domain. It would be months before decommissioning the error, preventing onboarding from the onset. Corresponding emails

**Exhibit H** C.H. Robinson Worldwide, Inc.: Unsolicited email dated December 15, 2025 directing carrier enrollment through Highway App with platform conditions; unsolicited load solicitation dated March 27, 2026; and prior bills of lading establishing business relationship dating back to 2016

**Exhibit I** Renewed Motion for Temporary Restraining Order: PACER Doc. No. 22. Never adjudicated on the merits.

**Exhibit J** UCC Financing Statement: Internet Truckstop Payments LLC, filed with the Ohio Secretary of State, Filing No. OH00290660927, listing collateral including all assets, accounts, chattel paper, and general intangibles, with anti-transfer and tortious interference language

**Exhibit K** First Insurance: Cancellation Correspondence, January 2026, including notices dated January 13, January 21, and January 27, 2026, documenting non-payment, payment rejection, and escalating balance of $3,063.21

**Exhibit L** First Insurance: Final Cancellation Notice and Billing Statement, effective March 27, 2026, outstanding balance $4,652.17, to be reported to personal credit

**Exhibit M** FMCSA / U.S. Department of Transportation: Notice of Investigation, received March 19, 2026, regarding revocation of operating authority MC #1710778 for failure to maintain insurance, pursuant to 49 U.S.C. §§ 13905 and 14701 (30 days to cure)

**Exhibit N** RMIS: Correspondence documenting unauthorized contact with Plaintiff's insurer after written instruction to cease, unauthorized addition as certificate holder, and continued insurance record access despite explicit refusal of certificate request

**Exhibit O** TQL: Unsolicited load offer emails dated January 27, 2026 and February 21, 2026, transmitted after TQL ceased doing business with Plaintiff without explanation. They still call and offer loads they won't give Plaintiff. Still tracking.

**Exhibit P** All Directions Trucking: Written Notice to TQL Legal and Compliance, dated January 5–6, 2026, documenting December 30, 2025 blacklisting 824 miles from home, 40+ successful loads with zero complaints, and request to cease retaliatory conduct, given TQL an opportunity to cure.

**Exhibit Q** Final TQL Load: PO No. 35021572, December 30, 2025; email chain with Charles Freeman (TQL Sales Team Leader, Mobile, Alabama) documenting weather event, rescheduled delivery, clean BOL confirmation, and discovery of blacklisting upon call for subsequent load immediately after delivery. Call is recorded.

31

**Exhibit R** TQL: Blocked Access to 1099 Tax Documents; TQL email dated January 29, 2026 directing Plaintiff to TQL's Carrier Dashboard for tax records; documented login failure and account lockout preventing access to earnings records for work performed. Plaintiff still has not received the 1099 obstructing her tax filings and liabilities.

**Exhibit S** Magellan Transport Logistics: Two Rate Confirmations, two Bills of Lading, MacroPoint tracking records for both loads, and Carrier Agreement; documenting $300 post-delivery deductions on each load despite continuous tracking, total loss of $600

**Exhibit T** TriumphPay Unsolicited Outreach — Evidence of Interconnected Platform Data Sharing. From: Brett Perkins, Carrier Success, TriumphPay (bperkins@tfin.com). To: adt@alldirections247.com. Date: April 2, 2026, four days before this filing, during active federal litigation. Sender demonstrated knowledge that Plaintiff held a Denim/Truckstop account without Plaintiff ever disclosing that information to TriumphPay. Email references other TriumphPay customers experiencing credit limit frustrations with Truckstop and offers to help Plaintiff exit her Truckstop contract. Plaintiff responded: "How do you know I have Denim?" No explanation was provided. TriumphPay is the same Triumph factoring and payment system identified in the C.H. Robinson unsolicited email (Exhibit H) as the required payment route for carriers doing business with C.H. Robinson. This email constitutes real-time documentary evidence of inter-platform data sharing among freight technology defendants and their affiliated payment networks, corroborating Plaintiff's core allegation that carrier account data flows between platform defendants without carrier knowledge or consent. Received April 2, 2026.

**Exhibit U** Insurance Documentation — Commercial and Personal

Republic Vanguard (Commercial Truck Insurance): Balance due to reinstate $4,652.17 by April 16, 2026. Additional premium charge $378.50. Annual premium $13,350.00; taxes and fees $667.50. Policy canceled. Operating authority MC #1710778 at risk of permanent revocation.

TEK Insurance: Annual premium $1,108.00; fees $55.40.

State Farm (Personal Vehicles — GMC Yukon, Ram, Chrysler, Chevy): $246.00 per month. GMC Yukon was involved in an accident and sustained damage. Plaintiff is unable to pay the $500.00 insurance deductible required to initiate the repair process. Plaintiff continues to drive the vehicle in its damaged condition as it is her only means of transportation. Full coverage insurance on all personal vehicles is at risk of lapsing entirely.

As a direct and proximate result of Defendants' payment obstruction and financial control, Plaintiff faces the imminent loss of insurance coverage on all commercial and personal vehicles and equipment, the loss of operating authority MC #1710778, and the forfeiture of equipment currently held at repair facilities in Kansas and Ohio due to inability to pay outstanding balances.

**Exhibit V** Utilities and Communications — Shutoff Notices and Outstanding Balances

Illuminating Company (Electric): $819.59 due. Shutoff notice issued. Payment deadline April 15, 2026.

Enbridge Gas Company: $1,178.37 due. Account past due. Shutoff possible as early as April 6, 2026.

33

Water Bill: $312.20 due April 9, 2026. Notice hand-delivered by landlord.

Cell Phone, WiFi, and iPad (three services): $799.00 to restore. All three services currently shut off as of filing date. These services were used for business operations including load coordination, document transmission, case communications, and carrier platform access.

Total Exhibit V: $3,109.16. Plaintiff is filing this Consolidated Response without a working telephone or internet connection at her residence. These conditions exist as of April 6, 2026.

**Exhibit W** Outstanding Toll Obligations — Pay by Plate, Interstate Operations

Toll invoices are typically received four to six weeks after the route is completed. The outstanding toll obligations reflected herein correspond to loads hauled prior to the payment obstruction documented in this action, for which Plaintiff was never fully compensated. Additional invoices are anticipated as routes continue to process.

Illinois (Chicago): $82.40 | Pennsylvania Turnpike: $403.25 (referred to collections end of March 2026) | Pennsylvania Turnpike: $48.52 (due March 13, 2026) | Illinois (Chicago): $67.40 (due February 7, 2026) | Massachusetts: $15.05 (due February 12, 2026) | North Texas Tollway Authority: $23.52 (due February 8, 2026) | Kansas Turnpike Authority: $51.68 (due March 13, 2026) | Massachusetts: $36.65 (due February 18, 2026) | Oklahoma Turnpike Authority: $105.04 (due January 1, 2026) | Kansas Turnpike Authority: $42.18 (due December 13, 2025) | Massachusetts: $13.45 (due January 6, 2026) | Oklahoma: $54.03 (due December 2, 2025)

Known toll total as of April 6, 2026: $943.17. Additional anticipated: New York Turnpike (approximately 4 crossings, bill not yet received); Pennsylvania Turnpike (approximately 3–4 additional crossings at approximately $250 per crossing); Kentucky permits unpaid; IFTA not filed. Unpaid New York tolls place Plaintiff's personal driver's license at risk of suspension,

34

which would eliminate all remaining employment options as a commercial driver. As of April 6, 2026, Plaintiff has received a collections notice from the law firm of Leinberger, Gogan, Blair and Sampson, retained to collect an unpaid toll of $42.18. Attorney fees will be added to that balance. Every unpaid toll in this exhibit is a potential collections matter. The original toll amounts documented herein do not reflect the attorney fees, collection costs, and penalties that will attach to each as they are referred to counsel. The total exposure from toll collections including attorney fees is expected to significantly exceed the face value of the tolls listed. Plaintiff is not alone in her inability to meet toll obligations. If the platform ecosystem is financially destroying independent carriers at scale, toll authorities, state revenues, and public infrastructure dependent on interstate commerce suffer corresponding downstream harm. Motive Technologies reported $501 million in annualized recurring revenue for the same period in which carriers generating that data could not pay their tolls.

Exhibit X Credit, Financial Debt, and Investor Damages — Grange Alves

Discover Card (account held in the name of Grange Alves): Outstanding balance as of November 23, 2025: $11,097.86. Monthly interest accruing at approximately $254.00. Account is effectively interest-only; principal is not being reduced. All charges on this account were incurred for All Directions Trucking operational expenses including fuel, vehicle rentals, and business-related costs. Payments on this account were made by Plaintiff Sandra Worthing Alves until the financial destruction caused by Defendants' conduct rendered payment impossible. Setoff notice received March 26, 2026. Business Bank Account (ending 0152): Current balance $0.00. Setoff notice received March 26, 2026. Account closure is imminent. These are not personal consumer debts. They are the documented cost of doing the

35

work for which Plaintiff was not fully compensated. The carrier bore the cost. The platform kept the data. The conductor is preparing to take a bow before the NYSE. Grange Alves, Plaintiff's son, has served as the sole financial investor in All Directions Trucking operations throughout the period relevant to this action. He purchased three commercial trucks in direct support of MC #1710778 operations: a first truck located in Knoxville, Tennessee ($7,000.00); a second truck currently stranded at a repair facility in Kansas with an outstanding repair bill of $11,000.00 and estimated value of $15,000.00; and a third truck purchased November 2025 for $21,000.00, title received, transfer pending due to inability to pay sales tax. A GMC Yukon sustained accident damage and Plaintiff continues to drive it unrepaired as her only means of transportation, unable to pay the $500.00 deductible to initiate repairs. Grange Alves has assumed sole responsibility for household expenses including monthly rent of $2,180.00 since October 2025, prioritizing housing above all other obligations. Total documented investment is no less than $63,177.86. The notarized Affidavit of Grange Alves is attached hereto as Exhibit Y.

**Exhibit Y** Affidavit of Grange Alves — Notarized. Investor, son of Plaintiff, documenting three commercial truck purchases totaling $39,000.00, household financial support since October 2025, Discover card operational debt of $11,097.86, and total documented investment of no less than $63,177.86. States under penalty of perjury that all contributions were investments made with a reasonable expectation of return, not gifts, and that this business was intended to be his legacy.

**Exhibit Z** Affidavit of Sandra Worthing Alves — Pro Se Plaintiff, d/b/a All Directions Trucking, MC #1710778. Personal sworn testimony regarding adoption of Motive ELD in good faith, operational history, blacklisting 824 miles from home on December 30, 2025, payment obstruction, FMCSA investigation, and the conditions under which this brief was filed. Submitted as a matter of duty to the carriers and the industry.

**Exhibit AA** Affidavit of Kip Coltrin — Previously executed, signed, and notarized. Submitted in support of Plaintiff's claims.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2026, I served a true and correct copy of the foregoing Plaintiff's Consolidated Response to Defendants' Motions to Dismiss with Exhibits upon the following counsel of record by CM/ECF

Benesch Friedlander Coplan & Aronoff

Suite 4900, 127 Public Square

Cleveland, OH 44114

Counsel for Internet Truckstop Payments LLC and C.H. Robinson Worldwide, Inc.

37

Clare R. Taft | Briana R. Cowman | Eric Larson Zalud

Frantz Ward LLP

Suite 3000, 200 Public Square

Cleveland, OH 44114


Counsel for Total Quality Logistics, LLC

Jonathan M. Scandling

Calfee, Halter & Griswold

1405 East 6th Street

Cleveland, OH 44114


Counsel for Motive Technologies, Inc. Nicholas A. Bonaminio

Perkins Coie LLP

Suite 800, 700 13th Street NW

Washington, DC 20005


Counsel for Highway App, Inc.

Brandon M. White

Gallagher Sharp

7th Floor, 1215 Superior Avenue

Cleveland, OH 44114

Counsel for Magellan Transport Logistics, Inc.

Abigail R. Jones | Markus E. Apelis

Gallagher Sharp - Cleveland

7th Floor

1215 Superior Avenue

Cleveland, OH 44114


Respectfully Submitted,


Sandra Worthing Alves d/b/a All Directions Trucking 25540 Byron Dr

North Olmsted, OH 44070


Email: adt@alldirections247.com

Phone: 440-591-0354

MC #: 1710778


Date: 04/06/2026